# EXHIBIT "B"

⚜ **EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
RICHMOND COUNTY, GEORGIA

**2020RCCV00412**

**JOHN FLYTHE**
**JAN 22, 2021 05:05 PM**

*Hattie Holmes Sullivan*
Hattie Holmes Sullivan, Clerk
Richmond County, Georgia

**IN THE SUPERIOR COURT OF RICHMOND COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| THE HALE FOUNDATION, INC., | |
| Petitioner | |
| v. | CIVIL ACTION FILE NO. |
| AUGUSTA-RICHMOND COUNTY, GEORGIA, MAYOR HARDIE DAVIS, JR., and COMMISSIONERS WILLIAM FENNOY, DENNIS WILLIAMS, MARY DAVIS, SAMMIE SIAS, BOBBY WILLIAMS, BEN HASAN, SEAN FRANTOM, BRANDON GARRETT, MARION WILLIAMS, and JOHN CLARKE Individually and in their Official Capacities as Members of the Augusta Richmond County Commission of Commissioners | **2020-RCCV-00412** |
| Respondents in Certiorari, and Defendants | |

**AMENDED PETITION FOR WRIT OF CERTIORARI,**
**AND COMPLAINT**

COMES NOW, Petitioner, The Hale Foundation, Inc., a Georgia non-profit corporation (hereinafter "Petitioner"), by and through its undersigned counsel, and files this Amended Petition for a Writ of Certiorari and Complaint ("Petition"), showing this Court as follows:

### INTRODUCTION

1.

This action arises from Petitioner's request for a Special Exception to establish a voluntary in-patient medical substance abuse treatment center exclusively for first responders on property located at 3042 Eagle Drive, and by the unlawful denial of same by Respondents in Certiorari, Augusta-Richmond County Commission of Commissioners and its Commissioners (hereinafter, collectively, the "Commission"). In denying Petitioners Special Exception Application, the

Commission ignored the evidence submitted by the Petitioner, and the approval recommendation by the Augusta-Richmond County Planning Commission. Instead, the Commission only considered the discriminatory requests of Petitioner's neighbors who asked that a medical treatment facility **not be placed in their back yard**. Such an arbitrary denial violates Petitioner's constitutionally protected rights, it is a determination beyond the scope of the Commission's discretion, and it is an action in bad faith outside the scope of the law. Moreover, it renders the property useless compared to its historical and intended purpose. For these reasons, Petitioner seeks relief from this Court to reverse the denial and compel the approval of the application.

2.

This action is brought as a petition for writ of certiorari pursuant to O.C.G.A. § 5-4-3, *et seq.*

3.

This Petition was timely filed within thirty (30) days of the Respondents' August 18, 2020 decision denying Petitioner's Special Exception Application (Z-20-38).

4.

The Commission's August 18, 2020 decision denying Petitioner's Special Exception Application (Z-20-38) is a final decision.

5.

Petitioner is aggrieved because of the Commission's final decision.

6.

The subject property consists of +/- 20.65 acres adjacent to Augusta Technical College, and it is identified as Richmond County Tax Parcel 109-0-001-00-0 (the "Property").

7.

Petitioner is the owner of the Property, which is subject to the jurisdiction of this Court by filing this action.

8.

"The sweep of sovereign immunity under the Georgia Constitution is broad." *Lathrop v. Deal*, 301 Ga. 408, 424 (2017) (citing *Olvera v. Univ. System of Ga. Commission of Regents*, 298 Ga. 425, 426 (2016)). "[T]he doctrine of sovereign immunity extends generally to suits against the State, its departments and agencies, and its officers in their official capacities for injunctive and declaratory relief from official acts that are alleged to be unconstitutional." *Lathrop*, 301 Ga. at 409. However, this does "not mean that citizens aggrieved by unlawful conduct of public officers are without recourse. It means only that they must seek relief against such officers in their individual capacities." *Lathrop*, 301 Ga. at 434 (citing *Georgia Dept. of Natural Resources v. Center for a Sustainable Coast*, 294 Ga. 593, 603 (2014) and *Olvera*, 298 Ga. at 428 (2016)). And the doctrine of sovereign immunity is no bar to petitions for writs of mandamus, the writ being a way "in which an aggrieved citizen may pursue claims directly against state departments, agencies and officers in their official capacities from relief from official acts alleged to be unconstitutional or otherwise unlawful, notwithstanding the broad sweep of sovereign immunity". *Lathrop*, 301 Ga. at 434 (citing *SJN Properties v. Fulton County Bd of Assessors*, 296 Ga. 793, 799 (2015)).

9.

The doctrine of official immunity, also known as qualified immunity and set forth in Article I, Section II, Paragraph IX (d) of the Georgia Constitution, "concerns suits and liabilities of public officers for monetary damages and other retrospective relief" but "does not limit the availability of prospective relief" and hence "does not bar suits for declaratory or injunctive relief brought

against county [and city] officers in their individual capacities". *Love v. Fulton County Bd of Tax Assessors,* 2018 Ga. App. Lexis 643 page 24; 2018 WL 6288099 (citing *Lathrop*, 301 Ga. at 444).

10.

Respondent in Certiorari/Defendant, Augusta-Richmond County, Georgia, is a political subdivision of the State of Georgia and is subject to the jurisdiction and venue of this Court.

11.

Respondent in Certiorari/Defendant, Mayor Hardie Davis, Jr., is subject to the jurisdiction and venue of this Court individually and in his official capacity as the Mayor of Augusta-Richmond County.

12.

Respondent in Certiorari/Defendant, William Fennoy, is subject to the jurisdiction and venue of this Court individually and in his official capacity as a Member of the Augusta-Richmond County Commission.

13.

Respondent in Certiorari/Defendant, Dennis Williams, is subject to the jurisdiction and venue of this Court individually and in his official capacity as a Member of the Augusta-Richmond County Commission.

14.

Respondent in Certiorari/Defendant, Mary Davis, is subject to the jurisdiction and venue of this Court individually and in her official capacity as a Member of the Augusta-Richmond County Commission.

15.

Respondent in Certiorari/Defendant, Sammie Sias, is subject to the jurisdiction and venue of this Court individually and in his official capacity as a Member of the Augusta-Richmond County Commission.

16.

Respondent in Certiorari/Defendant, Bobby Williams, is subject to the jurisdiction and venue of this Court individually and in his official capacity as a Member of the Augusta-Richmond County Commission.

17.

Respondent in Certiorari/Defendant, Ben Hasan, is subject to the jurisdiction and venue of this Court individually and in his official capacity as a Member of the Augusta-Richmond County Commission.

18.

Respondent in Certiorari/Defendant, Sean Frantom, is subject to the jurisdiction and venue of this Court individually and in his official capacity as a Member of the Augusta-Richmond County Commission.

19.

Respondent in Certiorari/Defendant, Brandon Garrett, is subject to the jurisdiction and venue of this Court individually and in his official capacity as a Member of the Augusta-Richmond County Commission.

20.

Respondent in Certiorari/Defendant, Marion Williams, is subject to the jurisdiction and venue of this Court individually and in his official capacity as a Member of the Augusta-Richmond County Commission.

21.

Respondent in Certiorari/Defendant, John Clarke, is subject to the jurisdiction and venue of this Court individually and in his official capacity as a Member of the Augusta-Richmond County Commission.

22.

This Court has jurisdiction over this Petition and the claims asserted herein.

## FACTUAL BACKGROUND

23.

The Property was used as an abbey (convent) for over 40 years by the Order of St. Helena. Despite the clear intention and historical use as a multi-family dwelling, the Property was rezoned by the Commission as Single-Family Residential, R-1 subject to a special exception for the existing use by the Order of St. Helena. The Commission thus improperly zoned the Property while it was owned by the Order of St. Helena. Respondent Augusta-Richmond County Commission subsequently approved another special exception to allow a group of monks to use the property as a monastery in 2017, though they could not consummate the purchase of the Property from the nuns. The property is designed as a multiple-family dwelling with dorms. As presently zoned, without a special exception, the Property does not have any reasonable economic use, and the Commission has systematically eliminated any value in the Property by virtue of its zoning classification and actions as set forth herein.

24.

The Property is located in an area of Richmond County that is mixed use. To the north-east is the Green Meadows neighborhood. To the east is the Green Meadows Golf Course. To the north-west is Augusta Technical College. To the south is the Bobby Jones Expressway. Petitioner

would wall off the Property from the Green Meadows neighborhood, and create an entry way exclusively from the north-west through the Augusta Technical College road as shown below.



*The First Application*

25.

Petitioner initially applied for a special exception on June 29, 2018 under Section 26-1 of the Comprehensive Zoning Ordinance of Augusta, Georgia.   It completed the entire process and met all requirements of the Richmond County Planning Department, the Richmond County Planning Commission, and the Respondent, but it did not receive a special exception to use the Property.  The Planning Commission at that time recommended the denial of the Special Exception Application because the Petitioner did not yet have a right of access through Augusta Technical College.  On April 30, 2019, the Commission voted 5-4 to approve the motion to allow the Special Exception.   However, six votes are required to approve the special exception, and Commissioners

Hasan abstained from voting. A separate motion was made to "uphold" the recommendation of the Planning Commission, but that vote failed with 6 commissioners voting not to uphold it and 4 voting to do so.  The result was "no action" by the Commission since six votes are required to affirmatively approve the special exception.  The attorney for the Commission announced that the matter was "disposed" of and any further pursuit of the special exception would require a new application by the Petitioner.  Following such a "no action" vote, the Petitioner's application was not scheduled to be reheard, and its only recourse was to appeal or start over with a new special exception application process.  As true and accurate copy of the documents pertaining to the First Application are attached to the original Petition as Exhibit "A."

### *The Second Application*

#### 26.

The Petitioner properly filed a Second Application for Special Exception with the Augusta-Richmond County Planning Department on or about November 27, 2019, and it submitted all documentation required by the Planning Department.  A true and correct copy of the Petitioner's Special Exception Application is attached to the original Petition as Exhibit "B" (the "Special Exception Application").

#### 27.

This time, the Petitioner's Special Exception Application was presented to and approved by the 10-person Planning Commission on or about August 3, 2020, with the following stipulations:

1. The Special Exception for this property is for an alcohol, drug and post-traumatic stress disorder treatment facility for first responders only. If the clientele or treatment program changes, the applicant/owner must apply for a new Special Exception.

2.  Final approval of this project is contingent on obtaining an easement, in writing, from the State of Georgia to provide driveway access to the property from Augusta Tech Drive. All egress and ingress to this property is to be through this driveway.

3.  A privacy fence consisting of solid wood board six feet in height shall be installed along the east boundary line of the property at Augusta Tech Drive to head south +/- 1,772 feet to Eagle Drive, continue across Eagle Drive and follow the southern property boundary along 3038 Eagle Drive, 3040 Eagle Drive and 2900 Green Meadows Drive. Access from Eagle Drive is for emergencies only. A 50-foot vegetative buffer shall be installed along the fence line except where emergency access is provided.

4.  Any expansion, additions or alterations to the property must comply with all development standards and regulations set forth by the City of Augusta, and must receive site plan approval prior to any changes.

A true and accurate copy of the Planning Commission's Approval is attached to the original Petition as Exhibit "C."

28.

At the August 3, 2020 public hearing before the Planning Commission, residents of the Green Meadows neighborhood attended to voice opposition to the Petitioner's Special Exception Application.  Their objections focused almost entirely on the discriminatory opposition to the medical condition of the proposed residents of the Property and wholly unfounded concerns about a potential increase in crime and decrease in property value.

29.

The Petitioner's Application for Rezoning was on the public notice and agenda before the Augusta-Richmond County Commission on August 18, 2020.  Again, the same neighbors appeared

to object to the Special Exception Application, and they made similar presentations focused on the medical condition of the proposed residents of the Property and wholly unfounded concerns about a potential increase in crime.  Many sent letters, but all focused on the medical condition of the patients, such as the following:

- Barbara Pirtle: "I have to go out and spend money that I do not have by purchasing security cameras and other protective devices." (R.34)

- Bernice Bogan: "I pray that they are or will get the treatment, but not in my neighborhood" …  "we do not want substance abuse and PTSD facility in our neighborhood" … "This is a concern for the safety of the students, faculty, staff, and the residents of Green Meadows." (R.35)

- George Hatcher:  "what will happen to our property values when the neighborhood sits adjacent to a drug rehab center?" (R.36)

- Malody Valentine-Holliman: "Placing a medical substance abuse center in our neighborhood violates the peace of mind that the residents have come to expect living in this neighborhood." … "The presence of a medical substance abuse center will cause them to live in anxiety and fear for the remainder of their precious lives." (R.37)

- Cheryl Eldridge:  "Regardless of the fact that the patients may be first responders, they are addicts who have an ongoing, incurable illness, and they are plagued with all of the challenges and pitfalls that encompass being addicts." (R.40)

- Wanda F. Watson:  "Nearly all residents of the Green Meadows neighborhood is completely opposed to this treatment facility, that will … potentially lower the property value of the neighborhood." (R.44)

30.

An initial vote was held on the motion of Brandon Garrett to confirm the approval of the special exception by the Augusta Planning Commission.  Voting in favor of the special exception were commissioners Brandon Garrett, Mary Davis, Sean Frantom, John Clarke and Marion Williams. Commissioner Bill Fennoy abstained and prevented Mayor Hardie Davis from potentially breaking a 5-5 tie. The vote was 5-4-1 in favor of confirmation of the approval, but six votes are required to carry the vote.  A subsequent motion to deny Petitioner's application also

failed along the same lines with Commissioner Fennoy again abstaining.   A copy of the Commission's action is attached to the original Petition as Exhibit "D".

31.

The Commission's decision not to confirm the approval of the Petitioner's Special Exception Applications creates a taking of valuable property rights.

32.

The Commission lacked discretion to deny the Special Exception Application because the Special Exception Application satisfied the standards for approval.  There was no valid reason to deny the special exception as there is no non-discriminatory, legal or material difference between the prior uses and special exceptions granted by the Commission for this Property, and the present proposed use by the Petitioner.  Moreover, there is no material difference between the proposed use of the Property and the uses of adjoining properties, including a golf course and a technical college.

33.

The Commission vote amounted to a denial of the Special Exception Application without the authority of law.  The Commission has twice voted in the same manner, which effectively denies the Petitioner the use of its Property.

34.

Petitioner preserved its Constitutional objections and provided notice to the Planning Commission prior to the August 18, 2020 public hearing.   A true and correct copy of the Constitutional objections are attached to the original Petition as Exhibit "E" and incorporated by reference.

35.

Petitioner has at all times acted in good faith.

36.

The Petitioner has exhausted any and all administrative remedies.

37.

The Petitioner timely filed this appeal.

38.

As a result of the actions by the Defendants, Petitioner has been, and is being, damaged irreparably and does not have an adequate remedy at law.

39.

As a result of the actions by the Defendants, Petitioner has been forced to engage the services of the undersigned attorney to represent its interests.

40.

Petitioner has a clear legal right to the approval of the Special Exception Application.

41.

The Commission's denial of the Petitioner's Special Exception Application is arbitrary, capricious, discriminatory, an abuse of discretion, and not supported by any evidence.

## COUNT I
## CERTIORARI

42.

Petitioner realleges and incorporates by reference the foregoing paragraphs of this Petition as if fully set forth herein.

43.

There are no unpaid costs in the proceeding below.

44.

Petitioner presented a statement regarding payment of costs to the Clerk of Commission and has filed the signed statement simultaneously with this action.

45.

In accordance with O.C.G.A. § 5-4-5, Petitioner has filed the Certiorari Bond simultaneously with this action.

46.

The Commission's decision to deny the Application includes, but is not limited to, the following legal errors: (a) the Commission's decision was arbitrary, capricious, an abuse of discretion, and not supported by any evidence; (b) the Commission's denial decision results in the taking of private property without payment of just compensation in violation of the federal and state constitutions; and (c) the Commission's denial decision resulted from discrimination against the intended users of the property who are first responders that suffer from medical conditions associated with post-traumatic stress disorder, alcoholism, and drug addiction.

47.

The Commission's decision to deny the Application is contrary to law, unsupported by the record evidence, and an abuse of discretion entitling Petitioner to a writ of certiorari and a reversal of the Commission's decision.

## COUNT II
## MANDAMUS

48.

Petitioner hereby realleges and incorporates by reference the foregoing paragraphs of this Petition as if fully set forth herein.

49.

Petitioner has a clear legal right to special exception, which zoning use is consistent with other prior use of the Property and with the use of other parcels in the immediate vicinity of the Petitioner's Property.

50.

The Commission's denial of the Petitioner's Special Exception Application is a gross abuse of discretion.

51.

A defect of legal justice would ensue if a writ of mandamus is not issued.

52.

Petitioner requests this Court to order the Defendants to process and approve the Special Exception Application.

## COUNT III
## UNCONSTITUTIONAL TAKING

53.

Petitioner hereby realleges and incorporates by reference the foregoing paragraphs of this Petition as if fully set forth herein.

54.

There is live controversy that exists as to whether the Petitioner should be granted the special exception to use the Property as recommended by the Richmond County Planning Commission.

55.

Petitioner is in a position of uncertainty and insecurity as a result of the denial of its Special Exception Application.

56.

Petitioner has no adequate remedy at law should it not be afforded the full rights and privileges granted to them by Augusta-Richmond County's Comprehensive Zoning Ordinance and other applicable laws.

57.

Petitioner is in need of judicial guidance regarding the Commission's denial of its Special Exception Application to enable it to avoid the impairment of its property rights and privileges.

58.

The Commission's denial of the Petitioner's Special Exception Application deprives Petitioner of constitutionally guaranteed property rights without just and adequate compensation and constitutes a violation of the rights and privileges secured by Article I, Section III, Paragraph I of the 1983 Constitution of the State of Georgia.

59.

The Commission had no objective factual basis to deny the Special Exception Application, and as such, has destroyed Petitioner's property rights without first paying fair, adequate, and just compensation for such rights, in violation of Article I, Section I, Paragraph I and Article I, Section III, Paragraph I of the Constitution of the State of Georgia of 1983, and the Just Compensation Clause of the Fifth Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.

60.

The Commission's denial of Petitioner's Special Exception Application is arbitrary, capricious, without any objective basis, and discriminates between Petitioner and other similarly situated property owners in violation of Petitioner's right to equal protection under Article I, Section I, Paragraph II of the 1983 Constitution of the State of Georgia and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.

61.

The denial of Petitioner's Special Exception Application results in no gain to the public in general, fails to promote the public health, safety, morals, and welfare, constitutes a substantial destruction of Petitioner's property values, and is confiscatory, and void.

62.

The Constitution and laws of the State of Georgia provide and require that just and adequate compensation be paid prior to any taking or interference with the property rights of the Petitioner.

63.

Petitioner is entitled to a declaratory judgment from this Court finding the Commission's denial of the Special Exception Application to be an unconstitutional taking requiring full and adequate compensation to be awarded in favor of Petitioner in an amount to be determined at trial.

## COUNT IV
## ARBITRARY AND CAPRICIOUS DENIAL OF
## PETITIONER'S SPECIAL EXCEPTION APPLICATION

64.

Petitioner hereby realleges and incorporates by reference the foregoing paragraphs of this Petition as if fully set forth herein.

65.

There is live controversy that exists as to whether the Petitioner should be granted the special exception to use the Property as recommended by the Richmond County Planning Commission.

66.

Petitioner is in a position of uncertainty and insecurity as a result of the denial of its Special Exception Application.

67.

Petitioner is in need of judicial guidance regarding the Commission's denial of its Special Exception Application to enable it to avoid the impairment of its properly rights and privileges.

68.

The Commission's decision to deny the Special Exception Application is arbitrary, capricious, unconstitutional, illegal, null and void, and constituting a taking of Petitioner's Property without payment of just and adequate compensation in violation of the Just Compensation Clause of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States, and Article I, Section I, Paragraph I, and Article I, Section III, Paragraph I of the Constitution of the State of Georgia of 1983, by denying Petitioner an economically viable use of its Property, while not substantially advancing legitimate state interests.

69.

The Commission's decision to deny Petitioner's Special Exception Application was arbitrary, capricious, without rational basis, and based on improper motives, thereby constituting a gross abuse of discretion.

70.

The Commission's failure to adhere to its own Comprehensive Zoning Ordinance which required Commission members to apply specific standards to determine approval of Special Exception Applications denied Petitioner of the due process of law and a fair and impartial hearing, as guaranteed by the 1983 Constitutional of the State of Georgia and Fifth and Fourteenth Amendments of the Constitution of the United States and resulted in a decision that was arbitrary, capricious, unreasonable, null and void.

71.

The Commission's failure to adhere to its own Comprehensive Zoning Ordinance renders its decision on the Petitioner's Special Exception Application null and void.

72.

For these reasons, Petitioner is entitled to an order from this Court reversing the decision

of the Commission and requiring the Commission to approve the Special Exception Application as requested by the Petitioner.

## COUNT V
## FEDERAL DISCRIMINATION CLAIMS

73.

Petitioner hereby realleges and incorporates by reference the foregoing paragraphs of this Petition as if fully set forth herein.

74.

Petitioner brings this count under the Fair Housing Act, 42 U.S.C. § 3601 ("FHA"), the Americans with Disabilities Act, 42 U.S.C. § 12102 ("ADA"), the Rehabilitation Act, 29 U.S.C. § 791, the Fifth and Fourteenth Amendments to the United States Constitution.

75.

With respect to the Property at issue here, the Hale Foundation seeks to create a clinic for voluntary admission by first responders seeking drug and alcohol treatment. It would be a residential treatment facility that only accepts voluntary participants who are not presently consuming drugs or alcohol and are not ordered to be at the facility by any Court.

76.

Drug and alcohol abuse is a nationwide public health epidemic. Drug overdose deaths surpass deaths from gun homicides and traffic accidents combined. This public health epidemic has been widely acknowledged across the country, and hardly a day passes that does not see new reports of communities that have been devastated by the health consequences of drug and alcohol abuse.

77.

The Comprehensive Addiction and Recovery Act of 2016 recognized the abuse of heroin and prescription opioid painkillers as having "a devastating effect on public health and safety in

communities across the United States." Comprehensive Addiction and Recovery Act of 2016, S. 524, 114th Cong., § 2.

78.

More recently, in 2017 the United States President's Commission on Combating Drug Addiction and the Opioid Crisis issued a report in which it warned:

> According to the Centers for Disease Control (CDC), the most recent data estimates that 142 Americans die every day from a drug overdose. Our citizens are dying. We must act boldly to stop it. The Opioid epidemic we are facing is unparalleled. The average American would likely be shocked to know that drug overdoses now kill more people than gun homicides and car crashes combined. In fact, between 1999 and 2015, more than 560,000 people in this country died due to drug overdoses – this is a death toll larger than the entire population of Atlanta.

(Available at:  https://www.whitehouse.gov/sites/whitehouse.gov/files/images/Final_Report_Draft_11-15-2017.pdf   (last visited October 5, 2020)). The Commission urged the President to declare a national emergency.

79.

In addition, the Commission found that one of the largest obstacles to stemming the epidemic was a lack of treatment facilities. As it now stands, the Commission noted, "only 10 percent of the nearly 21 million citizens with a substance abuse disorder receive any type of specialty treatment according to the most recent National Survey on Drug Use and Health."

80.

Overdose is now the leading cause of death in Americans under the age of 50.  From 2010 to 2017, the total number of opioid-related overdose deaths in Georgia increased by 245 percent.

81.

In October 2017, the President declared the opioid crisis a national public health emergency, and in Georgia, almost two-thirds of drug overdose deaths were attributed to opioids—1,043 total.

82.

Despite the fact that substance abuse and addiction are on the rise, there are an insufficient number of residential treatment beds available to potential patients.  This is in part due to the long and continuing history of discrimination against people with substance use disorders, including discriminatory zoning laws and decisions that operate as a barrier to providers seeking to open or expand substance use disorder treatment programs.

83.

Augusta has experienced the devastating effects of the country's opioid crisis. In 2018, Augusta filed a lawsuit against the manufacturers and wholesale distributors of prescription opioids.  Augusta alleged that the manufacturers aggressively pushed highly addictive, dangerous opioids, falsely representing to doctors that patients would only rarely succumb to drug addiction. It asserted that pharmaceutical companies aggressively advertised to and persuaded doctors to prescribe highly addictive, dangerous opioids, which turned patients into drug addicts for their own corporate profit. It also asserted that distributors and manufacturers intentionally and/or unlawfully breached their legal duties under federal and state law to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates.  A true and accurate copy of the Complaint is attached hereto as Exhibit "F."

84.

In that Complaint, Augusta asserted that from 2009 to 2014, Georgia had the highest percentage change in the rate of opioid-related inpatient stays of any state, at 99.8 percent. Georgia also had the third highest cumulative percent increase (85.2 percent) in the rate of opioid-related emergency department visits. (See Ex. F ¶ 63).

85.

According to the Defendant Augusta, the opioid epidemic has been particularly devastating in this County with opioid-related overdoses increasing from just 3 in 2013 to 34 in 2016.  In 2017, at least 41 deaths were caused by drugs, with opioids accounting for 24 of those deaths.  (Compl., Ex. F ¶ 66).

86.

According to the Defendant, in this County the opioid prescribing rates, as reported by the CDC, are consistently above the national averages – which are themselves too high – and in some years there were more opioid prescriptions dispensed than persons in Augusta.

    a.  In 2016, compared to the national average of 66.5 opioid prescriptions dispensed per 100 persons, the County rate was 86.8.

    b.  Compared to the national average of 70.6 opioid prescriptions per 100 persons in 2015, the Augusta rate was 92.9.

    c.  In 2014, compared to the national average of 75.6 prescriptions per 100 persons, the Augusta rate was 102.

    d.  Compared to the national average of 78.1 prescriptions per 100 persons in 2013, the Augusta rate was107.5.

    e.  In 2012, compared to the national average of 81.3 prescriptions per 100 persons, the Augusta rate was 110.4.

    f.  Compared to the national average of 80.9 prescriptions per 100 persons in 2011, the Augusta rate was 107.8.

    g.  Augusta rates of opioid prescriptions per 100 persons in prior years also exceeded the national average and the number of persons in Augusta: 107.4 in 2010, 104.8 prescriptions per 100 people in 2009, and 100.4 in 2008.

87.

Augusta asserted that the opioid epidemic has placed increased budgetary constraints upon the public health and medical care expenditures of the State and Petitioner's Community.   It asserted that opioid addiction is one of the primary reasons citizens of Augusta seek substance abuse treatment. (Compl., Ex. F ¶ 69).

88.

Augusta claims that opioid abuse, addiction, morbidity, and mortality are hazards to public health and safety in Augusta, and they constitute temporary and continuing public nuisances, which remain unabated. (Compl., Ex. F ¶ 70).

89.

Because of a shortage of beds in dedicated drug treatment facilities, many patients end up in hospital emergency rooms for detoxification. This in turn causes unnecessary expense to the patient and to the community, an unnecessary strain on first responders, who are commonly required to transport patients 60-90 miles to find a bed at a facility capable of medically managed detoxification, and on hospitals, which must find space and medical staff to treat these patients.

90.

Detoxification in a hospital setting is often less effective than care at many residential treatment facilities, which are, unlike hospitals, able to offer a continuum of care that extends well beyond a typical hospital stay.

91.

A skyrocketing number of people suffering from addiction in Augusta and elsewhere need treatment and are unable to get it, particularly in a residential facility.

92.

Defendant's denial of Petitioner's application perpetuates this growing problem and irreparably harms those persons in desperate need of treatment.  It also stands in stark contrast to

the complaint it has filed against opioid manufacturers and distributers, wherein it complains and alleges that drug addiction is a "continuing public nuisance, which remains unabated."  Petitioner seeks to assist in abating that nuisance.

93.

This problem is particularly felt by first responders who are at a higher risk of developing behavioral health conditions due to repeated exposure to high-stress, life-threatening situations coupled with long hours and an insular culture.  *See* Police and Addiction: Officers are nearly three times as likely to suffer from addiction as others, available at https://www.psychologytoday.com/us/blog/sure-recovery/201803/police-and-addiction (last visited 10-6-2020) ("Between 7% and 19% of police officers have symptoms of post-traumatic stress disorder, as compared to 3.5% in the general population.").

94.

It is estimated that first responders develop behavioral health conditions including, but not limited to, depression and posttraumatic stress disorder at a rate that is 50% higher than the general population.  *See* SAMHSA, Disaster Technical Assistance Center Supplemental Research Bulletin: First Responders: Behavioral Health Concerns, Emergency Response, and Trauma May 2018  (available at https://www.samhsa.gov/sites/default/files/dtac/supplementalresearchbulletin-firstresponders-may2018.pdf, last visited 10/6/20).

95.

PTSD and depression rates among firefighters and police officers have been found to be as much as five times higher than the rates within the civilian population, which causes first responders to commit suicide at a considerably higher rate than the general public. Study: Police Officers and Firefighters Are More Likely to Die by Suicide than in Line of Duty, available at

https://rudermanfoundation.org/white_papers/police-officers-and-firefighters-are-more-likely-to-die-by-suicide-than-in-line-of-duty/ (last visited 10-6-20).

96.

One survey shows that first responders are ten times more likely to contemplate suicide and attempt suicide than the general public.  Abbot, C., Barber, E., Burke, B., Harvey, J., Newland, C., Rose, M., & Young, A. (2015). What's killing our medics? Ambulance Service Manager Program.       Conifer,       CO:       Reviving       Responders.       Retrieved       from http://www.revivingresponders.com/originalpaper (last visited  10/6/20).

97.

Petitioner seeks to provide medical assistance to first responders by opening a treatment facility on the Property.

98.

The Property is an approximately 20-acre site with buildings and dormitories designed to serve as residences for up to 30 people.  The Property was originally not subject to zoning law, and it was used by a convent by the Order of St. Helena Convent for over 40 years until they moved from the Property to North Augusta in approximately 2014.  After sitting for many years on the market, the property was sold in October of 2017 to the Hale Foundation.

99.

It already contains the dormitories, meeting rooms, and commercial kitchen facilities to support the mission of the Hale Foundation.   Since the nuns vacated the Property, the only proposed uses for it have been (a) a monastery, (b) a rehabilitation center for troubled youth, and

(c) the Hale Foundation's proposed rehabilitation center.  The Property is not suited for single family use, and its present zoning designation without special exception renders it valueless.

100.

On July 29, 2015, Westcare Georgia, Inc., filed an application for special exception for the Property to operate a residential vocational and educational facility to provide therapy for behavioral and substance abuse treatment.  Westcare selected the Property as an ideal location to move its Keysville, Georgia operation because the Property is secluded, wooded, set up for dormitory living, and ideally situated for such a use.  The neighbors of the Green Meadows subdivision opposed the use by Westcare, and so it subsequently withdrew its application.  A true and accurate copy of the documents pertaining to its application are attached hereto as Exhibit "G."

101.

On May 31, 2017, the Monks of Mt. Tabor filed an application for special exception to permit the Property to be used as a monastery.   It proposed to use the facility as living quarters for monks, and to welcome the public for retreats and worship on the Property.  The Defendant approved the application for special exception, but the Monks ultimately could not consummate their purchase of the Property.   A true and accurate copy of the documents pertaining to its application are attached hereto as Exhibit "H."

102.

In response to the increasing need for safe, effective residential treatment facilities for those seeking to recover from drug and alcohol addiction, Hale Foundation acquired the Property with the plan to develop a residential alcohol and substance abuse treatment facility on the Property. The facility would be called "Valor Station" and would serve as a licensed residential rehabilitation center for first responders suffering from addiction.

103.

The existing facilities and setting are ideally suited for use as a rehabilitation center.

104.

The existing facilities include numerous meeting rooms, worship rooms, a dining hall, a commercial-grade kitchen, and dormitory. The facilities collectively occupy only a small portion of the 20-acre property, which otherwise consists of undeveloped forested space.

105.

The facility is located in the center of the property and is very private. It is set back from the roadway, and it will be separated from the Green Meadows subdivision by a solid wall, with vegetative buffering and no access from the Green Meadows roadways. The property is surrounded by acres of forest preserve on the West, South and East.

106.

The facilities are shielded from view by any of the adjoining roads.

107.

Because of its isolated location, the design has and would minimize any impact the facility otherwise might have on the surrounding community.

*The Augusta Zoning Ordinance and Application Procedures*

108.

Augusta, Georgia has adopted a Comprehensive Zoning Ordinance (the "Ordinance"), which was filed by Respondent.

109.

Pursuant to the Comprehensive Zoning Ordinance, the Property is presently zoned as R-1 (One-Family Residential) Zone, even though it was not constructed, intended to be used, or actually ever used as a single-family residence.

110.

The Ordinance enumerates certain uses which an applicant may propose to the County Commission for classification as a "special exception."

111.

Ordinance Section 26-1 provides that Special Exceptions, including drug and alcohol treatment facilities, may be permitted in any Zone where such uses are deemed desirable to the public convenience or welfare and are in harmony with the various elements or objectives of the Master Plan/Planning Document in effect. (R.179)

112.

Pursuant to the Ordinance Section 35-10:  When a proposed zoning decision relates to or will allow the location or relocation of a halfway house, drug rehabilitation center, or other facility for treatment of drug dependency, a public hearing shall be held on the proposed action. Such public hearing shall be held at least six (6) months and not more than nine (9) months prior to the date of final action on the zoning decision. The hearing required by this subsection shall be in addition to any hearing required under subsection (a) of this Code section. (R.239)

113.

The Ordinance specifically treats medical substance abuse treatment facilities differently based upon their protected status, and it does not mention or acknowledge that Augusta is obligated to comply with the requirements of the FHA or ADA.

114.

In the ordinary course, an application a "special exception" is first considered by Augusta's Planning Department.  If a public hearing is required, it is held by the Planning Department, following by the waiting period required in the Ordinance.  The application is then heard by the

County's Planning Commission, which makes a recommendation for approval or denial to the Augusta Commission.

115.

All documents pertaining to the Hale Foundation's Application for Special Exception are attached to the original Petition as Exhibits B through D.

116.

At the public hearings on Petitioners Special Exception Application, the Green Meadows neighborhood played a video for the Commissioners to view in which they provided statements such as the following:

- "I would feel very unsafe to know that there were people in the neighborhood that we are not used to having in the neighborhood."

- "We have that sense of peace here … If a different entity was to come into our neighborhood, it is not going to provide that safety and that serenity and all of that anymore."

- "When we heard that this half-way house was coming up here, something jolted us."

- "We could wake up in the middle of the night and find them sitting on our porch ... We could wake up any morning and maybe find them swimming in our swimming pool."

- "My worst nightmare is knowing that a drug rehab center is coming in my neighborhood."

- "It's safe over here.  We don't want that over here."

- "I don't like the idea of a drug rehab center being in our neighborhood."

- "The peace safety and serenity that I feel now is going to diminish."

- "Don't let these people move in here."

- "We don't need a half-way house here in our neighborhood."

- "We all want to have a peace of mind, safety, serenity in our own neighborhood."

A true and accurate copy of the video is filed herewith as Exhibit "I."

117.

At the August 3, 2020 public hearing before the Planning Commission, residents of the Green Meadows neighborhood attended to voice opposition to the Petitioner's Special Exception Application.  Their objections focused entirely on the discriminatory opposition to the medical condition of the proposed residents of the Property and the wholly unfounded concerns about a potential increase in crime and decrease in property values.

118.

The Petitioner's Application for Rezoning was on the public notice and agenda before the Augusta Commission on August 18, 2020.  Again, the same neighbors appeared to object to the Special Exception Application, and they made similar presentations focused on the medical condition of the proposed residents of the Property and wholly unfounded concerns about a potential increase in crime.  Many sent letters, but all focused on the medical condition of the patients, such as the following:

- Barbara Pirtle: "I have to go out and spend money that I do not have by purchasing security cameras and other protective devices." (R. 34)

- Bernice Bogan: "I pray that they are or will get the treatment, but not in my neighborhood" … "we do not want substance abuse and PTSD facility in our neighborhood" … "This is a concern for the safety of the students, faculty, staff, and the residents of Green Meadows." (R. 35)

- George Hatcher:  "what will happen to our property values when the neighborhood sits adjacent to a drug rehab center?" (R. 36)

- Malody Valentine-Holliman: "Placing a medical substance abuse center in our neighborhood violates the peace of mind that the residents have come to expect living in this neighborhood." … "The presence of a medical substance abuse center will cause them to live in anxiety and fear for the remainder of their precious lives." (R.37)

- Cheryl Eldridge: "Regardless of the fact that the patients may be firs responders, they are addicts who have an ongoing, incurable illness, and they are plagued with all of the challenges and pitfalls that encompass being addicts." (R.40)

- Wanda F. Watson:  "Nearly all residents of the Green Meadows neighborhood is completely opposed to this treatment facility, that will … potentially lower the property value of the neighborhood." (R.44)

119.

Residents who vocally opposed the application did so simply because the facility sought to treat individuals seeking to recover from drug and alcohol addiction.  There were no other grounds to object to the treatment facility.

120.

Although the manifest weight of the evidence overwhelmingly supported the approval of Petitioner's special exception application, irrational fear and discrimination against disabled individuals seeking to recover from drug and alcohol addiction dominated the hearings before both the Planning Commission and the Augusta Commission.

121.

For example, the primary concern of residents was for safety, security, and property values, although there is no evidence that the proposed use by the Hale Foundation will cause any diminishment of safety, security, and property values.  They refer to the Hale Foundation as a "contrary business."

122.

One neighbor testified at the August 28, 2020 hearing that, "We will not have our safety, our security, we will be nervous because we do not know what is going on back there.  They may put in precautions … but you never know what is going to happen."  He further stated, "We do not want our grandchildren to feel that they cannot play in the road because there is someone coming down the street from the treatment center."

123.

Another resident referenced a fear of finding a person on her porch in the middle of the night or in her pool in the morning.  These are irrational, unfounded and discriminatory fears that cannot serve as a basis for excluding a voluntary residential treatment facility from opening.

124.

No resident provided any logical or evidence-based reasoning for the disapproval of the special exception application, other than the discriminatory grounds that they do not want a drug and alcohol treatment facility in their back yard.  This is no different under the law than objecting to the Hale Foundation's use based upon the color or race of its proposed patients.

125.

There was absolutely no objection to the number of residents, the activities to be conducted on the property, the noise, the smell, the increased traffic, or to any other objective, non-discriminatory criteria that could serve as a basis to deny the Special Exception Application.

126.

The commissioners who voted against the Hale Foundation similarly did not provide any logical or evidentiary grounds to deny the application.  Instead, they simply indicated that they would cast their votes according to the wishes of the residents of Green Meadows (even if they had not non-discriminatory objections), which wished were clearly based entirely on discriminatory grounds.

127.

Commissioner Ben Hasan went so far as to declare that the Commissioners would stand with the wishes of the neighborhood "regardless of whether it was a good project or an excellent project."  (R.254)

128.

He indicated that he would support a neighborhood's objection simply because it does not want an activity in its neighborhood (even if the reasoning is based on discriminatory grounds).

129.

Commissioner William Fennoy similarly explained that he would cast his vote based solely upon the wishes of the neighborhood.  Since there was no non-discriminatory grounds put forward by the neighborhood to oppose the Special Exception Application, this means his vote was based purely on discriminatory objections to a protected class of patients who would utilize the Hale Foundation's services.  (R. 256)

130.

However, as Commissioner Marion Williams explained, the Hale Foundation does not have a history of a single safety concern arising from its existing facilities in Augusta, Georgia. Hence, the fear and concerns asserted by the residents of Green Meadows arise simply from unsupported, discriminatory views of the Hale Foundation and its patients. (R.255)

131.

Commissioner Brandon Garrett explained that the Hale House has met every condition put to it by the County, but the goal post keeps getting moved by Augusta.  This is because of Augusta's desire to keep the Hale Foundation out of the Property, even though there is no remaining non-discriminatory reason to do so. (R.253)

132.

Augusta's actions of moving the goal post over the past three years are acts of discrimination for which Petitioner seeks a remedy in this court.

133.

The Fair Housing Act ("FHA," and sometimes referred to as the "Fair Housing Amendments Act," or "FHAA"), 42 U.S.C. § 3601 et seq., guarantees fair housing to handicapped individuals.

134.

Under the FHA, the term "handicap" means, with respect to a person, a "physical or mental impairment which substantially limits one or more of such person's major life activities, a record of such impairment, or being regarded as having such an impairment." 42 U.S.C. § 3602(h).

135.

The term "physical or mental impairment" includes "alcoholism" and "drug addiction (other than addiction caused by current, illegal use of a controlled substance)." 24 C.F.R. § 100.201.

136.

Hale Foundation's patients are qualified individuals with disabilities within the meaning of 42 U.S.C. § 12101.

137.

Under the FHA, it is unlawful to discriminate against or otherwise make unavailable or deny a dwelling to any buyer or renter because of a handicap of that buyer, renter, or person residing in or intending to reside in that dwelling after it is sold, rented, or made available. 42 U.S.C. § 3604(f)(1).

138.

The proposed residential buildings within the rehabilitation center qualify as dwellings under the FHA.

139.

Defendant has violated, and is continuing to violate, the FHA by, among other things:

a. Allowing official and community prejudice against Hale Foundation's disabled patients to dictate the outcome of the zoning hearings;

b. Discriminating against Petitioner and the disabled patients that Hale Foundation is committed to serve;

c. Denying the requested special exception because of the disabled status of the residents that the proposed facility would house and treat; and

d. Refusing to engage in a reasonable accommodation analysis in connection with their denial of Petitioner's special exception application.

140.

Defendant's arbitrary and discriminatory policies in respect to, and interpretation of, the Augusta Zoning Ordinance have also had a disparate impact on those suffering from addiction, including Hale Foundation's disabled patients, in several ways that are unlawful under the FHA. These include, among others:

a. By allowing special exceptions for this Property for multi-family uses, but not allowing residential facilities for the treatment of substance abuse and addiction on the same Property, Defendant's interpretation and enforcement of its Zoning Ordinance has a disparate impact on those suffering from the disability of addiction; and

b. By utilizing its Zoning Ordinance to impose, and interpreting its Zoning Ordinance to require, onerous conditions on facilities for the treatment of addiction that are not imposed upon other permitted special exceptions, such as the convent that operated on this Property for 40 years, or the monastery that proposed to operate on the Property, Defendant's interpretation and enforcement of its Zoning Ordinance has a disparate impact on those suffering from the disability of addiction.

141.

In addition, Defendant violated the FHA's reasonable accommodation requirement. The FHA prohibits "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). Despite Petitioner's repeated requests for a reasonable accommodation throughout the zoning hearings, Defendant failed to provide reasonable accommodations for Hale Foundation's disabled patients.

142.

Defendant has failed to make reasonable accommodations to Petitioner and Hale

Foundation's patients in several ways by, among other things:

    a.  Imposing onerous requirements and other conditions on the facility's operation that are not required of other, similar special exceptions;

    b.  Failing to permit the facility to operate in the identical manner as the conventit would replace solely because of the disabled status of the patients the facility would house and treat;

    c.  Denying Petitioner's special exception application in part on the stated but unsupported ground that, due to the public stigma associated with those suffering from addiction, the proposed facility would result in a reduction in property value for a nearby residents, without considering Petitioner's contrary evidence, or evaluating whether any risk of such a decline could be reduced or eliminated by conditions placed on Petitioner or by other measures, or whether the overall benefits to the health and welfare of the community provided by the facility outweighed any such risk; and

    d.  Voting to deny Petitioner's application even after Hale Foundation agreed to all of Augusta's recommended conditions for the approval of the special exception, all of which were recommended by the Planning Commission to address Defendant's concerns regarding the proposed facility.

143.

Similarly, the Americans with Disabilities Act ("ADA") provides that no qualified

individual with a disability shall, by reason of such disability, be excluded from participation in or

be denied the benefits of any service, program, or activity of a public entity, or be subjected to

discrimination by any such entity. The ADA also makes it unlawful for a public entity, in

determining the site or location of a facility, to make selections that have the purpose or effect of

excluding individuals with disabilities. 42 U.S.C. § 12132; 28 C.F.R. § 35.130.

144.

Hale Foundation's patients are qualified persons under the ADA with disabilities that

substantially impair one or more major life activities.

35

145.

The first criteria for admission to the treatment facility for patients will be that the patient has been diagnosed as suffering from drug or alcohol addiction and has agreed to participate in substance abuse treatment. As part of this requirement, Hale Foundation's medical personnel must determine that the patient is suffering from drug or alcohol addiction to such a degree that he or she is unable to care for him- or herself.

146.

While being treated at the facility, Hale Foundation's patients will not be illegally using controlled substances. As such, Hale Foundation's patients are "qualified persons with disabilities" within the meaning of the ADA. 42 U.S.C. § 12102(2); 28 C.F.R. § 35.104.

147.

Defendant are qualifying public entities within the meaning of the ADA. 42 U.S.C. § 12131(1)(A).

148.

Section 12132 of the ADA constitutes a general prohibition against discrimination on the basis of disability by public entities.

149.

Defendant has violated, and are continuing to violate, the ADA by, among other things:

a. Allowing official and community prejudice against Hale Foundation's disabled patients to dictate the outcome of the zoning hearings;

b. Discriminating against Petitioner and the disabled patients that Hale Foundation is committed to serve;

c. Denying the requested special exception because of the disabled status of the residents that the proposed facility would house and treat;

d. Imposing, or seeking to impose, discriminatory conditions upon Petitioner solely because of the disabled status of the residents that the proposed facility would house and treat; and

    e.  Refusing to engage in a reasonable accommodation analysis in connection with their denial of Petitioner's special exception application.

150.

Defendant's arbitrary and discriminatory policies in respect to, and interpretation of, the Augusta Zoning Ordinance have also had a disparate impact on those suffering from addiction, including Hale Foundation's disabled patients, in several ways that are unlawful under the ADA. These include, among others:

    a.  By allowing other similar facilities to operate on the Property and in the R-1 Zoning District, but not allowing residential facilities for the treatment of substance abuse and addiction in those same districts, Defendant's interpretation and enforcement of its Zoning Ordinance has a disparate impact on those suffering from the disability of addiction; and

    b.  By utilizing its Zoning Ordinance to impose, and interpreting its Zoning Ordinance to require, onerous conditions on facilities for the treatment of addiction that are not imposed upon other permitted special exceptions, such as the convent that operated on this site for 40 years, Defendant's interpretation and enforcement of its Zoning Ordinance has a disparate impact on those suffering from the disability of addiction.

151.

In addition, Defendant violated the ADA's reasonable accommodation requirement. The ADA provides: "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). Despite Petitioner's repeated requests for a reasonable accommodation throughout the zoning hearings, Defendant failed to provide reasonable accommodation for Hale Foundation's disabled patients. Moreover, Defendant cannot demonstrate that accommodating Petitioner and Hale Foundation's patients would fundamentally alter the nature of the Augusta Zoning Ordinance.

152.

37

Defendant has failed to make reasonable accommodations to Petitioner and Hale Foundation's patients in several ways by, among other things:

    a.  Imposing onerous security requirements and other conditions on the facility's operation that are not required of other, similar special exceptions;

    b.  Failing to permit the facility to operate in the identical manner as the boarding school it would replace solely because of the disabled status of the patients the facility would house and treat;

    c.  Denying Petitioner's special exception application in part on the stated but unsupported ground that, due to the public stigma associated with those suffering from addiction, the proposed facility would result in a reduction in property value for a nearby residential homeowners, without considering Petitioner's contrary evidence, or evaluating whether any risk of such a decline could be reduced or eliminated by conditions placed on Petitioner or by other measures, or whether the overall benefits to the health and welfare of the community provided by the facility outweighed any such risk; and

    d.  Voting to deny Petitioner's application even after Hale Foundation agreed to all of Augusta's recommended conditions for the approval of the special exception, all of which were supposedly recommended by the Planning Commission to address Defendant's concerns regarding the proposed facility.

153.

Finally, the Rehabilitation Act, 29 U.S.C. § 791, et seq., provides that no qualified individual with a disability shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

154.

Augusta receives federal financial assistance, including through federal grant programs such as the Community Development Block Grant program, which is funded by the United States Department of Housing and Urban Development.

155.

Section 508 of the Rehabilitation Act defines "program or activity" as "all of the operations" of specific entities, including "a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(1)(A).

156.

Defendant are qualifying public entities within the meaning of the Rehabilitation Act.

157.

Zoning decisions by a municipality are normal functions of a governmental entity and thus are covered by the Rehabilitation Act.

158.

Hale Foundation's patients are qualified persons under the Rehabilitation Act with disabilities that substantially impair one or more major life activities. See 29 U.S.C. §705(9)(B); 42 U.S.C. § 12102.

159.

The first criteria for admission to the treatment facility for patients will be that the patient has been diagnosed as suffering from drug or alcohol addiction and has agreed to participate in substance abuse treatment. As part of this requirement, Hale Foundation's medical personnel must determine that the patient is suffering from drug or alcohol addiction to such a degree that he or she is unable to care for him- or herself.

160.

While being treated at the facility, Hale Foundation's patients will not be illegally using controlled substances. As such, Hale Foundation's patients are "qualified persons with disabilities" within the meaning of the Rehabilitation Act. 29 U.S.C. § 705(9)(B); 42 U.S.C. § 12102(2); 28 C.F.R. § 35.104.

161.

Section 508 of the Rehabilitation Act constitutes a general prohibition against discrimination on the basis of disability by public entities.

162.

Defendant has violated, and is continuing to violate, the Rehabilitation Act by, among other things:

a. Allowing official and community prejudice against Hale Foundation's disabled patients to dictate the outcome of the zoning hearings;

b. Discriminating against Petitioner and the disabled patients that Hale Foundation is committed to serve;

c. Denying the requested special exception because of the disabled status of the residents that the proposed facility would house and treat; and

d. Imposing, or seeking to impose, discriminatory conditions upon Petitioner solely because of the disabled status of the residents that the proposed facility would house and treat; and

e. Refusing to engage in a reasonable accommodation analysis in connection with their denial of Petitioner's special exception application.

163.

Defendant's arbitrary and discriminatory policies in respect to, and interpretation of, the Augusta Zoning Ordinance have also had a disparate impact on those suffering from addiction, including Hale Foundation's disabled patients, in several ways that are unlawful under the Rehabilitation Act. These include, among others:

a. By allowing other similar facilities to operate on the Property and in the R-1 Zoning District, but not allowing residential facilities for the treatment of substance abuse and addiction in those same districts, Defendant's interpretation and enforcement of its Zoning Ordinance has a disparate impact on those suffering from the disability of addiction; and

b. By utilizing its Zoning Ordinance to impose, and interpreting its Zoning Ordinance to require, onerous conditions on facilities for the treatment of addiction that are not imposed upon other permitted special exceptions, such as the convent that operated on this site for 40 years, Defendant's interpretation and enforcement of its Zoning Ordinance has a disparate impact on those suffering from the disability of addiction.

164.

In addition, Defendant violated the Rehabilitation Act's reasonable accommodation requirement. The Rehabilitation Act prohibits a government entity from refusing to modify an existing program or to make reasonable accommodations to the disabled where to do so would render the program unreasonable or discriminatory. Despite Petitioner's repeated requests for a reasonable accommodation throughout the zoning hearings, Defendant failed to provide or make any efforts toward a reasonable accommodation for the Hale Foundation's disabled patients.

165.

Defendant has failed to make reasonable accommodations to Petitioner and Hale Foundation's patients in several ways by, among other things:

   a. Imposing onerous security requirements and other conditions on the facility's operation that are not required of other, similar special exceptions;

   b. Failing to permit the facility to operate in the identical manner as the boarding school it would replace solely because of the disabled status of the patients the facility would house and treat;

   c. Denying Petitioner's special exception application in part on the stated but unsupported ground that, due to the public stigma associated with those suffering from addiction, the proposed facility would result in a reduction in property value for a nearby residential homeowners, without considering Petitioner's contrary evidence, or evaluating whether any risk of such a decline could be reduced or eliminated by conditions placed on Petitioner, or by other measures, or whether the overall benefits to the health and welfare of the community provided by the facility outweighed any such risk; and

   d. Voting to deny Petitioner's application even after Hale Foundation agreed to all of Augusta's recommended conditions for the approval of the special exception, all of which were recommended by the Planning Commission to address Defendant's concerns regarding the proposed facility.

166.

Petitioner and Hale Foundation's patients have suffered, and continue to suffer, substantial damages and other harm as a result of Defendant's unlawful conduct.

41

## COUNT VI
## ATTORNEY'S FEES AND OTHER COSTS AND EXPENSES OF LITIGATION

167.

Petitioner hereby realleges and incorporates by reference the foregoing paragraphs of this Petition as if fully set forth herein.

168.

The denial of the Application was in bad faith, wanton and malicious, without justification or good cause, stubbornly litigious, and has caused Petitioner to incur attorney's fees and other costs and expenses of litigation.

169.

Pursuant to O.C.G.A. § 13-6-11, Petitioner is entitled to recover reasonable attorney's fees and other costs and expenses of litigation in bringing this action.

170.

Petitioner is also entitled to attorney fees under the ADA, FHA, and Rehabilitation Act.

WHEREFORE, Petitioner prays for the following relief:

A.     That the Court cause a Summons to issue and allow service to issue against Respondents/Defendants;

B.     That a writ of certiorari be directed to the Respondents and that the Respondents be directed to certify and send up the complete record of proceedings pertaining to the August 18, 2020 Commission hearing;

C.     That this Court reverse the Commission's denial of Petitioner's Special Exception Application and order the Commission to grant the special exception as requested by the Petitioner;

D.     That this Court declare that Petitioner's Special Exception Application satisfies the standards for approval as described in the Augusta-Richmond County's Comprehensive Zoning Ordinance;

E.      That this Court declare that the Commission's actions in denying the Special Exception Application were arbitrary, capricious, unreasonable, and discriminatory, and as a result, denied Petitioner due process of law, as guaranteed under the Constitution of the State of Georgia;

F.      That this Court declare that the Commission's denial of the Special Exception Application is an unconstitutional taking of Petitioner's property rights in violation of Article I, Section I, Paragraph I and Article I, Section III, Paragraph I of the Constitution of the State of Georgia, and the Just Compensation Clause of the Fifth Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution of the United States;

G.      That this Court declare that the Commission's denial of the Special Exception Application is arbitrary, capricious, discriminatory, null and void as it bears no substantial relationship to the public health, safety, morals or general welfare;

H.      That this Court declare that the Commission's denial of the Special Exception Application discriminates between Petitioner and other similarly situated property owners in violation of Petitioner's right to equal protection under Article I, Section I, Paragraph II of the Constitution of the State of Georgia and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States;

I.      That this Court declare that the actions of the Commission in denying the Special Exception Application have resulted in a denial of substantive and procedural due process of law as guaranteed by the Constitutions of the State of Georgia and the United States;

J.      That this Court declare that the Commission's failure to comply with its own Comprehensive Zoning Ordinance which required the Commission to apply specific standards for approval of Special Exception Applications denied Petitioner of the due process of law and a fair and impartial hearing, as guaranteed by the 1983 Constitutional of the State of Georgia and Fifth

and Fourteenth Amendments of the Constitution and resulted in a decision that was arbitrary, capricious, unreasonable, and void;

K.     That this Court declare that the Commission's failure to adhere to its own Comprehensive Zoning Ordinance renders its decision on the Petitioner's Special Exception Application null and void;

L.     That the Court enjoin the Commission and compel the issuance of the requested Special Exception for the Property.

M.     That the Court declare Defendant's improper denials of Plaintiff's application for a special exception constituted violations of the FHA, ADA, and the Rehabilitation Act, and that Hale Foundation and its patients are entitled to reasonable accommodations to facilitate the operation of the rehabilitation center as proposed in Plaintiff's application;

N.     That the Court enter preliminary and permanent injunctive relief permitting Hale Foundation's operation of the rehabilitation center, as proposed in Plaintiff's application, and enjoining Defendant from obstructing or interfering with Hale Foundation's operation thereof;

O.     That this Court enter judgment in favor of Petitioner and award the Petitioner Compensatory damages in an amount to be shown at trial;

P.     That this Court enter judgment in favor of Petitioner and award Petitioner reasonable attorney's fees and costs and expenses of litigation pursuant to O.C.G.A. § 13-6-11, and pursuant to the FHA, ADA, and the Rehabilitation Act; and

Q.     That this Court conduct a trial by jury on all claims so triable.

R.     For such other and further relief as this Court deems just, proper, and appropriate under the facts and evidence presented to it.

Respectfully submitted this 22nd day of January, 2021.

/s/ Christopher A. Cosper

**CHRISTOPHER A. COSPER**
Georgia Bar No. 142020
HULL BARRETT, P.C.
801 Broad Street, Suite 700
Augusta, Georgia 30901
(t) 706/722-4481
(f) 706/722-9779
(e) ccosper@hullbarrett.com


**JAMES B. TROTTER**
Georgia Bar No. 203193
TROTTER JONES, LLP
3527 Walton Way
Augusta, Georgia 30909
(t) 706/737-3138
(f) 706/738-3973
(e) jim@trotterjones.com

*Attorneys for Petitioner*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### AUGUSTA DIVISION

| | |
|---|---|
| AUGUSTA, GEORGIA,<br><br>                    Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; McKESSON CORPORATION; PURDUE PHARMA L.P.; PURDUE PHARMA, INC.; THE PURDUE FREDERICK COMPANY, INC.; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; NORAMCO, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC f/k/a ACTAVIS PLS; WATSON PHARMACEUTICALS, INC. n/k/a ACTAVIS, INC.; WATSON LABORATORIES, INC.; ACTAVIS LLC; ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.; MALLINCKRODT PLC and MALLINCKRODT LLC.<br><br>                    Defendants. | **CASE NO.:**<br><br><br><br><br>**COMPLAINT**<br><br>Complaint for Public Nuisance, Violations of Racketeer Influenced and Corrupt Organizations Act (RICO) 18 U.S.C. § 1961 *et seq.*, Violations of 18 U.S.C. § 1962 *et seq.*, Violations of Georgia RICO Act, Ga. Code Ann. § 16-14-1 *et seq.*, Negligence and Negligent Misrepresentation, Negligence Per Se; Fraud and Fraudulent Misrepresentation.<br><br><br>**JURY TRIAL DEMANDED AND ENDORSED HEREON** |

## <u>TABLE OF CONTENTS</u>

I. INTRODUCTION ..................................................................................................1

II. PARTIES ...........................................................................................................2

    A. Plaintiff.......................................................................................... 2

    B. Defendants...................................................................................4

1. Manufacturer Defendants. .................................................................4

2. Distributor Defendants. ....................................................................9

III. JURISDICTION & VENUE .............................................................................11

IV. FACTUAL BACKGROUND ...........................................................................13

    A. THE OPIOID EPIDEMIC. ............................................................ 13

1. The National Opioid Epidemic. .......................................................13

2. Georgia's Opioid Epidemic. ............................................................17

3. The Opioid Epidemic in Plaintiff's Community. .................................20

    B. THE MANUFACTURER DEFENDANTS' FALSE, DECEPTIVE AND UNFAIR MARKETING OF OPIOIDS. ....................................................... 22

1. Each Manufacturer Defendant Used Multiple Avenues to Disseminate Their False and Deceptive Statements About Opioids...................................24

        i.    Direct Marketing........................................................ 25

        ii.    Indirect Marketing...................................................... 27

2. The Manufacturer Defendants' Marketing Scheme Misrepresented the Risks and Benefits of Opioids. .........................................................................39

        i.    The Manufacturer Defendants embarked upon a campaign of false, deceptive and unfair assurances grossly understating and misstating the dangerous addiction risks of the opioid drugs. ...................................... 39

        ii.    The Manufacturer Defendants embarked upon a campaign of false, deceptive and unfair assurances grossly overstating the benefits of the opioid drugs.......................................................................... 49

3. The Manufacturer Defendants Targeted Susceptible Prescribers and Vulnerable Patient Populations. ....................................................................................56

4. The Manufacturer Defendants Made Materially Deceptive Statements and Concealed Material Facts ....................................................................................57

5. The Manufacturer Defendants Fraudulently Concealed Their Misconduct ....................63

    C. THE DISTRIBUTOR DEFENDANTS' UNLAWFUL DISTRIBUTION OF OPIOIDS ....................................................................................65

1. Wholesale Drug Distributors Have a Duty Under State and Federal Law to Guard Against and Report Unlawful Diversion and to Report and Prevent Suspicious Orders. 66

2. The Distributor Defendants Breached Their Duties ..............................................75

3. The Distributor Defendants Have Sought to Avoid and Have Misrepresented Their Compliance with Their Legal Duties. ....................................................................78

    D. THE MANUFACTURER DEFENDANTS' UNLAWFUL FAILURE TO PREVENT DIVERSION AND MONITOR, REPORT AND PREVENT SUSPICIOUS ORDERS. 86

    E. DEFENDANTS' UNLAWFUL CONDUCT AND BREACHES OF LEGAL DUTIES CAUSED THE HARM ALLEGED HEREIN AND SUBSTANTIAL DAMAGES. ...... 92

    F. STATUTES OF LIMITATIONS ARE TOLLED BECAUSE DEFENDANTS' CONDUCT HAS NOT CEASED AND THEY FRAUDULENTLY CONCEALED THEIR UNLAWFUL CONDUCT. ....................................................................95

1. Continuing Conduct ....................................................................................95

2. Fraudulent Concealment ..............................................................................95

V. LEGAL CAUSES OF ACTION ....................................................................99

COUNT I PUBLIC NUISANCE ......................................................................99

 COUNT II RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C. 1961, *et seq.* ....................................................................................108

    A. THE OPIOID DIVERSION ENTERPRISE ....................................................112

    B. CONDUCT OF THE OPIOID DIVERSION ENTERPRISE ....................................126

    C. PATTERN OF RACKETEERING ACTIVITY. ....................................................131

1. The RICO Defendants Engaged in Mail and Wire Fraud. ....................................131

2. The RICO Defendants Manufactured, Sold and/or Dealt in Controlled Substances, and Their Crimes Are Punishable as Felonies. ...................................139

    D. DAMAGES ........................................................................................ 144

 COUNT III RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C. 1962(d), *et seq.* ...............................................................................145

    A.    THE OPIOID DIVERSION ENTERPRISE. ........................................ 146

    B.    CONDUCT OF THE OPIOID DIVERSION ENTERPRISE. .......................... 146

    C.    PATTERN OF RACKETEERING ACTIVITY. ................................ 146

    D.    DAMAGES. ...................................................................................... 146

COUNT IV GEORGIA RICO (RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS) ACT, Ga. Code Ann. § 16-14-1 *et seq.* ...............................147

COUNT V NEGLIGENCE AND NEGLIGENT MISREPRESENTATION ......................149

COUNT VI NEGLIGENCE PER SE ........................................................................154

COUNT VII FRAUD AND FRAUDULENT MISREPRESENTATION ...........................159

PUNITIVE DAMAGES ...........................................................................................161

000004

Plaintiff, AUGUSTA, GEORGIA,[1] brings this Complaint against Defendants Purdue Pharma L.P.; Purdue Pharma, Inc.; The Purdue Frederick Company, Inc.; Teva Pharmaceutical Industries, LTD.; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.; Janssen Pharmaceutica Inc. n/k/a Janssen Pharmaceuticals, Inc.; Noramco, Inc.; Endo Health Solutions, Inc.; Endo Pharmaceuticals, Inc.; Allergan PLC f/k/a Actavis PLS; Watson Pharmaceuticals, Inc. n/k/a Actavis, Inc.; Watson Laboratories, Inc.; Actavis, LLC; Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; Mallinckrodt plc; Mallinckrodt LLC; McKesson Corporation; Cardinal Health, Inc.; and AmerisourceBergen Drug Corporation (collectively "Defendants") and alleges as follows:

## I.    INTRODUCTION

1.     Plaintiff brings this civil action to eliminate the hazard to public health and safety caused by the opioid epidemic, to abate the nuisance caused thereby and to recoup monies spent because of Defendants' false, deceptive and unfair marketing and/or unlawful diversion of prescription opioids.[2] Such economic damages were foreseeable to Defendants and were sustained because of Defendants' intentional and/or unlawful actions and omissions.

2.     Opioid analgesics are widely diverted and improperly used, and the widespread abuse of opioids has resulted in a national epidemic of opioid overdose deaths and addictions.[3]

---

[1] "Augusta, Georgia" is the official name of the consolidated government of the City of Augusta and Richmond County, Georgia. Georgia Laws, 1997, Page 4024, changed the name of the Augusta-Richmond County to "Augusta Georgia." Charter and Code of Ordinances of the Code of Augusta-Richmond County, available at http://www.augustaga.gov/DocumentCenter/View/747.

[2] As used herein, the term "opioid" refers to the entire family of opiate drugs including natural, synthetic and semi-synthetic opiates.

[3] *See* Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain—Misconceptions and Mitigation Strategies*, 374 N. Eng. J. Med. 1253 (2016).

Exhibit F

000005

3.  The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[4]

4.  Plaintiff brings this suit against the manufacturers of prescription opioids. The manufacturers aggressively pushed highly addictive, dangerous opioids, falsely representing to doctors that patients would only rarely succumb to drug addiction. These pharmaceutical companies aggressively advertised to and persuaded doctors to prescribe highly addictive, dangerous opioids, which turned patients into drug addicts for their own corporate profit. Such actions were intentional and/or unlawful.

5.  Plaintiff also brings this suit against the wholesale distributors of these highly addictive drugs. The distributors and manufacturers intentionally and/or unlawfully breached their legal duties under federal and state law to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates.

## II.   PARTIES

**A. Plaintiff.**

6.  Plaintiff AUGUSTA, GEORGIA ("Augusta" or "Plaintiff") is the consolidated government of Richmond County, Georgia and the City of Augusta, Georgia. Charter and Laws of Local Application, Augusta-Richmond County Code § 1-27 ("The Commission shall constitute a county as well as a municipality for the purpose of the application of the general laws and Constitution of this state. . . . Said county-wide government shall be a new political entity, a body politic and corporate, and a political subdivision of the state"); *see also* Ga. L. 1996, p. 3607, (HB 662, effective July 1, 1997), available at

---

[4] See Robert M. Califf *et al.*, *A Proactive Response to Prescription Opioid Abuse*, 374 N. Eng. J. Med. 1480 (2016).

Exhibit F

000006

http://www.legis.ga.gov/Legislation/Archives/19971998/leg/fulltext/hb662.htm. It is a body corporate with the power to sue or be sued in any court. Ga. Code Ann. § 36-1-3.

7.     Plaintiff is responsible for the public health, safety and welfare of its citizens.

8.     Plaintiff has declared, *inter alia*, that opioid abuse, addiction, morbidity and mortality have created a serious public health and safety crisis and are a public nuisance and that the diversion of legally produced controlled substances into the illicit market causes or contributes to this public nuisance.

9.     The distribution and diversion of opioids into Georgia (the "State"), and into the County and its surrounding areas (collectively, "Plaintiff's Community"), created the foreseeable opioid crisis and opioid public nuisance for which Plaintiff here seeks relief.

10.     Plaintiff directly and foreseeably sustained all economic damages alleged herein. Defendants' conduct has exacted a financial burden for which the Plaintiff seeks relief. Categories of past and continuing sustained damages include, *inter alia*: (1) costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs for providing treatment, counseling and rehabilitation services; (3) costs for providing treatment of infants born with opioid-related medical conditions; (4) costs associated with law enforcement and public safety relating to the opioid epidemic; and (5) costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation. The Plaintiff has suffered and continues to suffer these damages directly.

11.     Plaintiff also seeks the means to abate the epidemic Defendants' wrongful and/or unlawful conduct has created.

Exhibit F                                                                 000007

12. Plaintiff has standing to bring an action for the opioid epidemic nuisance created by Defendants. Ga. Code Ann. § 36-1-3.

13. Plaintiff has standing to recover damages incurred as a result of Defendants' actions and omissions. Plaintiff has standing to bring all claims pled herein, including, *inter alia*, to bring claims under the federal RICO statute, pursuant to 18 U.S.C. § 1961(3) ("persons" include entities which can hold legal title to property) and 18 U.S.C. § 1964 ("persons" have standing). Defendants.

**B. Defendants.**

    **1. Manufacturer Defendants.**

14. The Manufacturer Defendants are defined below. At all relevant times, the Manufacturer Defendants have packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted and purported to warn or purported to inform prescribers and users regarding the benefits and risks associated with the use of the prescription opioid drugs. The Manufacturer Defendants, at all times, have manufactured and sold prescription opioids without fulfilling their legal duty to prevent diversion and report suspicious orders.

15. PURDUE PHARMA L.P. is a limited partnership organized under the laws of Delaware. PURDUE PHARMA, INC. is a New York corporation with its principal place of business in Stamford, Connecticut and THE PURDUE FREDERICK COMPANY is a Delaware corporation with its principal place of business in Stamford, Connecticut (collectively, "Purdue").

16. Purdue manufactures, promotes, sells and distributes opioids such as OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER and Targiniq ER in the United States. OxyContin is Purdue's best-selling opioid. Since 2009, Purdue's annual nationwide sales of

OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold from its 2006 sales of $800 million. OxyContin constitutes roughly 30% of the entire market for analgesic drugs (painkillers).

17.    CEPHALON, INC. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. TEVA PHARMACEUTICAL INDUSTRIES, LTD. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel. In 2011, Teva Ltd. acquired Cephalon, Inc. TEVA PHARMACEUTICALS USA, INC. ("Teva USA") is a Delaware corporation and is a wholly owned subsidiary of Teva Ltd. in Pennsylvania. Teva USA acquired Cephalon in October 2011.

18.    Cephalon, Inc. manufactures, promotes, sells and distributes opioids, such as Actiq and Fentora, in the United States. The FDA has approved Actiq only for the "management of breakthrough cancer pain in patients 16 years and older with malignancies who are already receiving and who are tolerant to around-the-clock opioid therapy for the underlying persistent cancer pain."[5] The FDA has approved Fentora only for the "management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."[6] In 2008, Cephalon pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs and agreed to pay $425 million.[7]

---

[5]  *Highlights of Prescribing Information, ACTIQ® (fentanyl citrate) oral transmucosal lozenge, CII* (2009), https://www.accessdata.fda.gov/drugsatfda_docs/label/2009/020747s030lbl.pdf.

[6]  *Highlights of Prescribing Information, FENTORA® (fentanyl citrate) buccal tablet, CII* (2011), https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/021947s015lbl.pdf.

[7]  Press Release, U.S. Dep't of Justice, *Biopharmaceutical Company, Cephalon, to Pay $425 Million & Enter Plea to Resolve Allegations of Off-Label Marketing* (Sept. 29, 2008), https://www.justice.gov/archive/opa/pr/2008/September/08-civ-860.html.

19.     Teva Ltd., Teva USA and Cephalon, Inc. work together closely to market and sell Cephalon products in the United States. Teva Ltd. conducts all sales and marketing activities for Cephalon in the United States through Teva USA and has done so since its October 2011 acquisition of Cephalon. Teva Ltd. and Teva USA hold out Actiq and Fentora as Teva products to the public. Teva USA sells all former Cephalon-branded products through its "specialty medicines" division. The FDA-approved prescribing information and medication guide, which is distributed with Cephalon opioids, discloses that Teva USA submitted the guide and directs physicians to contact Teva USA to report adverse events.

20.     All of Cephalon's promotional websites, including those for Actiq and Fentora, display Teva Ltd.'s logo.[8] Teva Ltd.'s financial reports list Cephalon's and Teva USA's sales as its own, and its year-end report for 2012 – the year immediately following the Cephalon acquisition – attributed a 22% increase in its specialty medicine sales to "the inclusion of a full year of Cephalon's specialty sales," including, *inter alia*, sales of Fentora®.[9] Through interrelated operations like these, Teva Ltd. operates in the United States through its subsidiaries, Cephalon and Teva USA. The United States is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015, and, were it not for the existence of Teva USA and Cephalon, Inc., Teva Ltd. would conduct those companies' business in the United States itself. Upon information and belief, Teva Ltd. directs the business practices of Cephalon and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder. Teva Pharmaceutical Industries, Ltd.; Teva Pharmaceuticals USA, Inc.; and Cephalon, Inc. are referred to as "Cephalon."

---

[8] *E.g.*, ACTIQ, http://www.actiq.com/ (displaying logo at bottom-left) (last visited Aug. 21, 2017).

[9] Teva Ltd., Annual Report (Form 20-F) 62 (Feb. 12, 2013),
http://annualreports.com/HostedData/AnnualReportArchive/t/NASDAQ_TEVA_2012.pdf.

21.    JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey and is a wholly owned subsidiary of JOHNSON & JOHNSON (J&J), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. NORAMCO, INC. ("Noramco") is a Delaware company headquartered in Wilmington, Delaware and was a wholly owned subsidiary of J&J until July 2016. ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. JANSSEN PHARMACEUTICA, INC., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock and corresponds with the FDA regarding Janssen's products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs and Janssen's profits inure to J&J's benefit. Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., Noramco and J&J are referred to as "Janssen."

22.    Janssen manufactures, promotes, sells and distributes drugs in the United States, including the opioid Duragesic (fentanyl). Before 2009, Duragesic accounted for at least $1 billion in annual sales. Until January 2015, Janssen developed, marketed and sold the opioids Nucynta (tapentadol) and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.

23.    ENDO HEALTH SOLUTIONS, INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. ENDO PHARMACEUTICALS, INC. is a wholly owned subsidiary of Endo Health Solutions, Inc. and is a Delaware corporation with its principal

place of business in Malvern, Pennsylvania. Endo Health Solutions, Inc. and Endo Pharmaceuticals, Inc. are referred to as "Endo."

24. Endo develops, markets and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet and Zydone, in the United States. Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012. Opana ER yielded $1.15 billion in revenue from 2010 and 2013 and accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids, such as oxycodone, oxymorphone, hydromorphone and hydrocodone products, in the United States, by itself and through its subsidiary, QUALITEST PHARMACEUTICALS, INC.

25. ALLERGAN PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. ACTAVIS PLC acquired Allergan PLC in March 2015, and the combined company changed its name to Allergan PLC in January 2013. Before that, WATSON PHARMACEUTICALS, INC. acquired ACTAVIS, INC. in October 2012, and the combined company changed its name to Actavis, Inc. as of January 2013 and then Actavis PLC in October 2013. WATSON LABORATORIES, INC. is a Nevada corporation with its principal place of business in Corona, California and is a wholly-owned subsidiary of Allergan PLC (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.). ACTAVIS PHARMA, INC. (f/k/a Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey and was formerly known as WATSON PHARMA, INC. ACTAVIS LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Allergan PLC owns each of these defendants and uses them to market and sell its drugs in the United States. Upon information and belief, Allergan PLC exercises control over these marketing and sales efforts and profits from the sale of Allergan/Actavis products ultimately inure to its benefit.

Allergan PLC; Actavis PLC; Actavis, Inc.; Actavis LLC; Actavis Pharma, Inc.; Watson Pharmaceuticals, Inc.; Watson Pharma, Inc. and Watson Laboratories, Inc. are referred to as "Actavis."

26.     Actavis manufactures, promotes, sells and distributes opioids, including the branded drugs Kadian and Norco, a generic version of Kadian and generic versions of Duragesic and Opana, in the United States. Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008 and began marketing Kadian in 2009.

27.     MALLINCKRODT, PLC is an Irish public limited company headquartered in Staines-upon-Thames, United Kingdom, with its United States headquarters in St. Louis, Missouri. MALLINCKRODT, LLC is a limited liability company organized and existing under the laws of the State of Delaware. Mallinckrodt, LLC is a wholly owned subsidiary of Mallinckrodt, plc. Mallinckrodt, plc and Mallinckrodt, LLC are referred to as "Mallinckrodt."

28.     Mallinckrodt manufactures, markets and sells drugs in the United States including generic oxycodone, of which it is one of the largest manufacturers. In July 2017, Mallinckrodt agreed to pay $35 million to settle allegations brought by the Department of Justice that it failed to detect and notify the DEA of suspicious orders of controlled substances.[10]

### 2.  Distributor Defendants.

29.     The Distributor Defendants are defined below. At all relevant times, the Distributor Defendants have distributed, supplied, sold and placed into the stream of commerce the prescription opioids, without fulfilling the fundamental duty of wholesale drug distributors to detect and warn of diversion of dangerous drugs for non-medical purposes. The Distributor

---

[10] Press Release, U.S. Dep't of Justice, *Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations,* July 11, 2017, https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders, last visited October 26, 2017.

Defendants universally failed to comply with federal and/or state law. The Distributor Defendants are engaged in "wholesale distribution," as defined under state and federal law. Plaintiff alleges the unlawful conduct by the Distributor Defendants is responsible for the volume of prescription opioids plaguing Plaintiff's Community.

30.     McKESSON CORPORATION ("McKesson") at all relevant times operated as a licensed pharmacy wholesaler in Georgia. McKesson is a Delaware corporation. McKesson has its principal place of business located in San Francisco, California. McKesson operates distribution centers in Georgia, including in Duluth, Georgia.

31.     CARDINAL HEALTH, INC. ("Cardinal") at all relevant times operated as a licensed pharmacy wholesaler in Georgia. Cardinal's principal office located in Dublin, Ohio. Cardinal operates distribution centers in Georgia.

32.     AMERISOURCEBERGEN DRUG CORPORATION ("AmerisourceBergen") at all relevant times operated as a licensed pharmacy wholesaler in Georgia. AmerisourceBergen's principal place of business is located in Chesterbrook, Pennsylvania. AmerisourceBergen operates distribution centers in Georgia, including in Buford, Georgia.

33.     The data that reveals and/or confirms the identity of each wrongful opioid distributor is hidden from public view in the DEA's confidential ARCOS database. *See Madel v. USDOJ*, 784 F.3d 448 (8th Cir. 2015). Neither the DEA[11] nor the wholesale distributors[12] will

---

[11] *See* Declaration of Katherine L. Myrick, Chief, Freedom of Information (FOI)/Privacy Act Unit ("SARF"), FOI, Records Management Section ("SAR"), Drug Enforcement Administration (DEA), United States Department of Justice (DOJ), *Madel v. USDOJ*, Case 0:13-cv-02832-PAM-FLN, (Document 23) (filed 02/06/14) (noting that ARCOS data is "kept confidential by the DEA").

[12] *See* Declaration of Tina Lantz, Cardinal Health VP of Sales Operation, *Madel v. USDOJ*, Case 0:13-cv-02832-PAM-FLN, (Document 93) (filed 11/02/16) ("Cardinal Health does not customarily release any of the information identified by the DEA notice letter to the public, nor is the information publicly available. Cardinal Health relies on DEA to protect its confidential business information reported to the Agency.").

voluntarily disclose the data necessary to identify with specificity the transactions that will form the evidentiary basis for the claims asserted herein.

34.   Consequently, Plaintiff has named the three (3) wholesale distributors (*i.e.*, AmerisourceBergen Drug Corporation, Cardinal Health, Inc. and McKesson Corporation) that dominate 85% of the market share for the distribution of prescription opioids. These "Big 3" are Fortune 500 corporations listed on the New York Stock Exchange whose principal business is the nationwide wholesale distribution of prescription drugs. *See Fed. Trade Comm'n v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 37 (D.D.C. 1998) (describing Cardinal Health, Inc., McKesson Corporation and AmerisourceBergen Drug Corporation predecessors). The DEA has investigated and/or fined each for the failure to report suspicious orders. Plaintiff has reason to believe each has engaged in unlawful conduct that resulted in the diversion of prescription opioids into Plaintiff's Community, and that discovery will likely reveal others who likewise engaged in unlawful conduct. Plaintiff names each of the "Big 3" herein as defendants and places the industry on notice that the Plaintiff is acting to abate the public nuisance plaguing the community. Plaintiff will request expedited discovery pursuant to Rule 26(d) of the Federal Rules of Civil Procedure to secure the data necessary to reveal and/or confirm the identities of the wholesale distributors, including data from the ARCOS database.

### III.   JURISDICTION & VENUE

35.   This Court has subject matter jurisdiction under 28 U.S.C. § 1331 based upon the federal claims asserted under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiff's federal claims that they form part of the same case or controversy.

Case 1:21-cv-00018-JRH-BKE Document 1-2 Filed 02/03/21 Page 62 of 301

36.     This Court also has jurisdiction over this action in accordance with 28 U.S.C. § 1332(a) because the Plaintiff is a "citizen" of this State, the named Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

37.     This Court has personal jurisdiction over Defendants because they conduct business in the State, they purposefully direct or directed their actions toward the State, some or all consented to be sued in the State by registering an agent for service of process, they consensually submitted to the jurisdiction of the State when obtaining a manufacturer or distributor license and they have the requisite minimum contacts with the State necessary to constitutionally permit the Court to exercise jurisdiction.

38.     This Court also has personal jurisdiction over all of the Defendants under 18 U.S.C. § 1965(b). This Court may exercise nationwide jurisdiction over the named Defendants where the "ends of justice" require national service and Plaintiff demonstrates national contacts. Here, the interests of justice require that Plaintiff be allowed to bring all members of the nationwide RICO enterprise before the court in a single trial. *See, e.g.*, *Iron Workers Local Union No. 17 Insurance Fund v. Philip Morris Inc.*, 23 F. Supp. 2d 796 (1998) (citing *LaSalle National Bank v. Arroyo Office Plaza, Ltd.*, 1988 WL 23824, *3 (N.D. Ill. Mar 10, 1988); *Butcher's Union Local No. 498 v. SDC Invest., Inc.*, 788 F.2d 535, 539 (9th Cir. 1986).

39.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 18 U.S.C. §1965 because a substantial part of the events or omissions giving rise to the claims stated herein occurred in this District and each Defendant transacted affairs and conducted activity that gave rise to the claims for relief in this District. 28 U.S.C. § 1391(b); 18 U.S.C. §1965(a).

# IV.    FACTUAL BACKGROUND

## A.  THE OPIOID EPIDEMIC.

### 1. The National Opioid Epidemic.

40.    Increasing abuse and diversion of prescription drugs, including opioid medications, have characterized the past two decades in the United States.[13]

41.    Prescription opioids have become widely prescribed. By 2010, enough prescription opioids were sold to medicate every adult in the United States with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[14]

42.    By 2011, the U.S. Department of Health and Human Resources, Centers for Disease Control and Prevention declared prescription painkiller overdoses to be at epidemic levels. The news release noted:

  a.  The death toll from overdoses of prescription painkillers has more than tripled in the past decade.

  b.  More than 40 people die every day from overdoses involving narcotic pain relievers like hydrocodone (Vicodin), methadone, oxycodone (OxyContin), and oxymorphone (Opana).

  c.  Overdoses involving prescription painkillers are at epidemic levels and now kill more Americans than heroin and cocaine combined.

  d.  The increased use of prescription painkillers for nonmedical reasons, along with growing sales, has contributed to a large number of overdoses and deaths. In 2010, 1 in every 20 people in the United States age 12 and older—a total of 12 million people—reported using prescription painkillers non-medically according to the National Survey on Drug Use and Health. Based on the data from the Drug Enforcement Administration, sales of these drugs to pharmacies and health care providers have increased by more than 300 percent since 1999.

---

[13] *See* Richard C. Dart *et al*, *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 N. Eng. J. Med. 241 (2015).

[14] Katherine M. Keyes, *et al.*, *Understanding the Rural-Urban Differences in Nonmedical Prescription Opioid Use and Abuse in the United States*, 104 Am. J. Pub. Health e52 (2014).

    e.   Prescription drug abuse is a silent epidemic that is stealing thousands of lives and tearing apart communities and families across America.

    f.   Almost 5,500 people start to misuse prescription painkillers every day.[15]

43.    The number of annual opioid prescriptions written in the United States is now roughly equal to the number of adults in the population.[16]

44.    Many Americans are now addicted to prescription opioids, and the number of deaths due to prescription opioid overdose is unacceptable. In 2016, drug overdoses killed roughly 64,000 people in the United States, an increase of more than 22 percent over the 52,404 drug deaths recorded the previous year.[17]

45.    Moreover, the CDC has identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. People who are addicted to prescription opioid painkillers are forty times more likely to be addicted to heroin.[18]

46.    Heroin is pharmacologically similar to prescription opioids. The majority of current heroin users report having used prescription opioids non-medically before they initiated heroin use. Available data indicates that the nonmedical use of prescription opioids is a strong risk factor for heroin use.[19]

---

[15] *See* Press Release, Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., *Prescription Painkiller Overdoses at Epidemic Levels* (Nov. 1, 2011), https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html.

[16] *See* Robert M. Califf *et al.*, *A Proactive Response to Prescription Opioid Abuse*, 374 N. Eng. J. Med. 1480 (2016).

[17] *See* Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., *Provisional Counts of Drug Overdose Deaths*, (August 8, 2016), https://www.cdc.gov/nchs/data/health_policy/monthly-drug-overdose-death-estimates.pdf.

[18] *See* Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., *Today's Heroin Epidemic*, https://www.cdc.gov/vitalsigns/heroin/index.html  (last updated July 7, 2015).

[19] *See* Wilson M. Compton, *Relationship Between Nonmedical Prescription-Opioid Use and Heroin*, 374 N. Eng. J. Med. 154 (2016).

47.     The CDC reports that drug overdose deaths involving heroin continued to climb sharply, with heroin overdoses more than tripling in 4 years. This increase mirrors large increases in heroin use across the country and has been shown to be closely tied to opioid pain reliever misuse and dependence. Past misuse of prescription opioids is the strongest risk factor for heroin initiation and use, specifically among persons who report past-year dependence or abuse. The increased availability of heroin combined with its relatively low price (compared with diverted prescription opioids) and high purity appear to be major drivers of the upward trend in heroin use and overdose.[20]

48.     The societal costs of prescription drug abuse are "huge."[21]

49.     Across the nation, local governments are struggling with a pernicious, ever-expanding epidemic of opioid addiction and abuse. Every day, more than 90 Americans lose their lives after overdosing on opioids.[22]

50.     The National Institute on Drug Abuse identifies misuse and addiction to opioids as "a serious national crisis that affects public health as well as social and economic welfare."[23] The economic burden of prescription opioid misuse alone is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment and criminal justice expenditures.[24]

---

[20] *See* Rose A. Rudd *et al.*, *Increases in Drug and Opioid Overdose Deaths—United States, 2000–2014*, 64 Morbidity & Mortality Wkly. Rep. 1378 (2016).

[21] *See* Amicus Curiae Brief of Healthcare Distribution Management Association in Support of Appellant Cardinal Health, Inc., *Cardinal Health, Inc. v. United States Dept. Justice*, No. 12-5061 (D.C. Cir. May 9, 2012), 2012 WL 1637016, at *10 [hereinafter, "Brief of HDMA"].

[22] Opioid Crisis, NIH, National Institute on Drug Abuse (available at https://www.drugabuse.gov/drugs-abuse/opioids/opioid-crisis, last visited Sept. 19, 2017) ("Opioid Crisis, NIH") (citing at note 1 Rudd RA, Seth P, David F, Scholl L, Increases in Drug and Opioid-Involved Overdose Deaths — United States, 2010–2015, *MMWR MORB MORTAL WKLY REP.* 2016;65, doi:10.15585/mmwr.mm655051e1).

[23] Opioid Crisis, NIH.

[24] *Id.* (citing at note 2 Florence CS, Zhou C, Luo F, Xu L, The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States, 2013, *MED CARE* 2016;54(10):901-906, doi:10.1097/MLR.0000000000000625).

51.    The U.S. opioid epidemic is continuing, and drug overdose deaths nearly tripled during 1999–2014. Among 47,055 drug overdose deaths that occurred in 2014 in the United States, 28,647 (60.9%) involved an opioid.[25]

52.    The rate of death from opioid overdose has quadrupled during the past 15 years in the United States. Nonfatal opioid overdoses that require medical care in a hospital or emergency department have increased by a factor of six in the past 15 years.[26]

53.    Every day brings a new revelation regarding the depth of the opioid plague: just to name one example, the New York Times reported in September 2017 that the epidemic, which now claims 60,000 lives a year, is now killing babies and toddlers because ubiquitous, deadly opioids are "everywhere" and mistaken for candy.[27]

54.    In 2016, the President of the United States declared an opioid and heroin epidemic.[28]

55.    The epidemic of prescription pain medication and heroin deaths is devastating families and communities across the country.[29]  Meanwhile, the manufacturers and distributors of prescription opioids extract billions of dollars of revenue from the addicted American public while public entities experience tens of millions of dollars of injury caused by the reasonably foreseeable consequences of the prescription opioid addiction epidemic.

---

[25] *See* Rose A. Rudd *et al.*, *Increases in Drug and Opioid-Involved Overdose Deaths—United States, 2010–2015*, 65 Morbidity & Mortality Wkly. Rep. 1445 (2016).

[26] *See* Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain—Misconceptions and Mitigation Strategies*, 374 N. Eng. J. Med. 1253 (2016).

[27]  Julie Turkewitz, *'The Pills are Everywhere': How the Opioid Crisis Claims Its Youngest Victims*, N.Y. Times, Sept. 20, 2017 ("'It's a cancer,' said [grandmother of dead one-year old], of the nation's opioid problem, 'with tendrils that are going everywhere.'").

[28] *See* Proclamation No. 9499, 81 Fed. Reg. 65,173 (Sept. 16, 2016) (proclaiming "Prescription Opioid and Heroin Epidemic Awareness Week").

[29] *See* Presidential Memorandum – Addressing Prescription Drug Abuse and Heroin Use, 2015 Daily Comp. Pres. Doc. 743 (Oct. 21, 2015), https://www.gpo.gov/fdsys/pkg/DCPD-201500743/pdf/DCPD-201500743.pdf.

56.     The prescription opioid manufacturers and distributors, including the Defendants, have continued their wrongful, intentional and unlawful conduct, despite their knowledge that such conduct is causing and/or continuing to cause the national, state and local opioid epidemic.

### 2.  Georgia's Opioid Epidemic.

57.     The national opioid crisis has especially ravaged Georgia.

58.     The opioid scourge has visited devastating harm upon this State. At the 2017 University of Georgia College of Public Health's "State of the Public's Health" conference, experts explained that the deepening opioid epidemic is hitting Georgia harder than most states, and that from 2009 to 2014, Georgia's rate of increase in the number of opioid-related patient encounters led the nation.[30]

59.     Georgia is among the top 11 states in terms of the most prescription opioid overdose deaths.[31] Almost as many Georgians die of drug overdoses as in car accidents.[32] Georgia suffered 1,394 overdose deaths in 2016,[33] 1,302 deaths in 2015,[34] and 1,206 deaths in 2014.[35]

60.     Of the over 1,300 drug overdose deaths in 2015, 900 of them – or 68 percent – were due to opioid overdoses, including heroin.[36] Overdose deaths tripled in Georgia from 1999

---

[30] *Experts: Opioid crisis is hitting Georgia,* The Augusta Chronicle (Oct. 21, 2017), available at http://chronicle.augusta.com/news/2017-10-21/experts-opioid-crisis-hitting-georgia.

[31] Substance Abuse Research Alliance (SARA), Georgia Prevention Project, *Prescription Opioids and Heroin Epidemic in Georgia – a White Paper*, 2017, at 2, available at http://www.senate.ga.gov/sro/Documents/StudyCommRpts/OpioidsAppendix.pdf (last visited January 29, 2018).

[32] *Id*. at 5.

[33] CDC, Drug Overdose Death Data, available at https://www.cdc.gov/drugoverdose/data/statedeaths.html ("2016 Deaths" tab) (last visited January 19, 2018).

[34] *Id*. at "2015 Deaths" tab, (last visited January 19, 2018).

[35] *Id*. at "2014 Deaths" tab, (last visited January 19, 2018).

[36] Substance Abuse Research Alliance (SARA), *supra* note 31, at 5.

to 2013. Prescription opioid overdose deaths grew tenfold between 1999 and 2014 to 549 deaths, or a rate of 5.5 deaths per 100,000 people.[37]





61.    According to the Centers for Disease Control and Prevention ("CDC"), Georgia was among the States to experience a statistically significant (10.2 percent) increase in drug overdose death rates in 2014 as compared to 2013:[38]

---

[37] *Id*.

[38]  *See* Substance Abuse Research Alliance (SARA), *supra* note 31, at 14.



62.    Hospitalizations due to opioid abuse in Georgia have soared from about 302,000 in 2002 to around 520,000 in 2012.[39] During this time, the cost of this inpatient care related to opioid use more than doubled in Georgia, reaching $15 billion in 2012.[40]

63.    Froom 2009 to 2014, Georgia had the highest percent change in the rate of opioid-related inpatient stays of any state, at 99.8 percent.[41] Georgia also had the third highest cumulative percent increase (85.2 percent) in the rate of opioid-related emergency department visits.[42]

---

[39] *Id*. at 7.

[40] *Id*.

[41] Audrey J. Weiss, Ann Elixhauser, Marguerite L. Barrett, Claudia A. Steiner, Molly K. Bailey and Lauren O'Malley, *Opioid-Related Inpatient Stays and Emergency Department visits by State, 2009-2014*, December 2016, Revised January 2017, Healthcare Cost and Utilization Project (HCUP), available at https://www.hcup-us.ahrq.gov/reports/statbriefs/sb219-Opioid-Hospital-Stays-ED-Visits-by-State.jsp (last visited Jan. 29, 2018).

[42] *Id*.

64.    Georgia is also seeing an increase in cases of newborns with Neonatal Abstinence Syndrome ("NAS"), a collection of symptoms babies experience in withdrawing from opioid medications taken by the mother.[43] NAS is closely associated with opioid use.

65.    Opioid addiction is part of the reason the number of children in Georgia state custody has almost doubled in the last three years.[44]

### 3.    The Opioid Epidemic in Plaintiff's Community.

66.    The opioid epidemic is particularly devastating in Plaintiff's Community. In Richmond County, opioid-related overdoses increased from just 3 in 2013 to 34 in 2016.[45] Of those deaths, just one was attributable to opioid pain relievers only in 2013 while 22 were caused by opioids only in 2016.[46] In 2017, at least 41 deaths were caused by drugs, with opioids accounting for 24 of those deaths.[47]

67.    The CDC has tracked prescription rates per county in the United States, identifying the geographic "hotspots" for rates of opioid prescriptions.[48] The CDC has calculated the geographic distribution at county levels of opioid prescriptions dispensed per 100 persons,[49] revealing that Richmond County has been a consistent hotspot over at least the past decade.

68.    Unfortunately, in Richmond County, Georgia, the opioid prescribing rates, as reported by the CDC, are consistently above the national averages – which are themselves too

---

[43] Substance Abuse Research Alliance (SARA), *supra* note 31, at 30.

[44] WRDW, *News 12 Investigates: Children of Opioids*, Oct. 9, 2017, available at http://www.wrdw.com/content/news/Children-of-Opioids-450115313.html (last visited January 29, 2018).

[45] Online Analytical Statistical Information System, Drug Overdoses/Opioids Web Query Tool Accessing the Georgia Department of Public Health's Data Warehouse, Georgia Department of Public Health, available at https://oasis.state.ga.us/oasis/webquery/qryDrugOverdose.aspx (last visited January 25, 2018).

[46] *Id*.

[47] WRDW, *UPDATE: Augusta city leaders vote to take on lawsuit against opioid manufacturers and distributors*, Jan. 5, 2018, available at http://www.wrdw.com/content/news/Opioid-epidemic-spikes-in-Augusta-lawsuit-proposed--468191943.html (last visited January 29, 2018).

[48] U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited Dec. 11, 2017).

[49] *Id.*

high – and in some years there were more opioid prescriptions dispensed than persons in the County. In 2016, compared to the national average of 66.5 opioid prescriptions dispensed per 100 persons,[50] the County rate was 86.8 opioid prescriptions per 100 persons.[51] Compared to the national average of 70.6 opioid prescriptions per 100 persons in 2015,[52] the County rate was 92.9.[53] In 2014, compared to the national average of 75.6 prescriptions per 100 persons,[54] the County rate was 102.0[55] – more opioid prescriptions than persons in Richmond County, Georgia. Compared to the national average of 78.1 prescriptions per 100 persons in 2013,[56] the County rate also exceeded the number of people: 107.5 opioid prescriptions per 100 persons.[57] In 2012, compared to the national average of 81.3 prescriptions per 100 persons,[58] the County rate also exceeded the population at a whopping 110.4 prescriptions per 100 persons.[59] Compared to the national average of 80.9 prescriptions per 100 persons in 2011,[60] the Richmond County rate was

[50] U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited Dec. 11, 2017).

[51] Centers for Disease Control and Prevention, U.S. County Prescribing Rates 2016, (reporting for "Richmond, GA,") available at https://www.cdc.gov/drugoverdose/maps/rxcounty2016.html (last visited January 29, 2018).

[52] U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited Dec. 11, 2017).

[53] Centers for Disease Control and Prevention, U.S. County Prescribing Rates 2015, (reporting for "Richmond, GA,") available at https://www.cdc.gov/drugoverdose/maps/rxcounty2015.html (last visited January 29, 2018).

[54] U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited Dec. 11, 2017).

[55] Centers for Disease Control and Prevention, U.S. County Prescribing Rates 2014, (reporting for "Richmond, GA,") available at https://www.cdc.gov/drugoverdose/maps/rxcounty2014.html (last visited January 29, 2018).

[56] U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited Dec. 11, 2017).

[57] Centers for Disease Control and Prevention, U.S. County Prescribing Rates 2013, (reporting for "Richmond, GA,") available at https://www.cdc.gov/drugoverdose/maps/rxcounty2013.html (last visited January 29, 2018).

[58] U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited Dec. 11, 2017).

[59] Centers for Disease Control and Prevention, U.S. County Prescribing Rates 2012, (reporting for "Richmond, GA,") available at https://www.cdc.gov/drugoverdose/maps/rxcounty2012.html (last visited January 29, 2018).

[60] U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited Dec. 11, 2017).

107.8.[61] County rates of opioid prescriptions per 100 persons in prior years also exceeded the national average and the number of persons in the County: 107.4 in 2010,[62] 104.8 prescriptions per 100 people in 2009,[63] and 100.4 in 2008.[64]

69.    The opioid epidemic has placed increased budgetary constraints upon inter alia the public health and medical care expenditures of the State and Plaintiff's Community. Opioid addiction is one of the primary reasons citizens of the State and Plaintiff's Community seek substance abuse treatment.

70.    Opioid abuse, addiction, morbidity, and mortality are hazards to public health and safety in the State and in Plaintiff's Community, and constitute a temporary and continuing public nuisance, which remains unabated.

## B.  THE MANUFACTURER DEFENDANTS' FALSE, DECEPTIVE AND UNFAIR MARKETING OF OPIOIDS.

71.    The opioid epidemic did not happen by accident.

72.    Before the 1990s, generally accepted standards of medical practice dictated that patients should only use opioids short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time, the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

---

[61] Centers for Disease Control and Prevention, U.S. County Prescribing Rates 2011, (reporting for "Richmond, GA,") available at https://www.cdc.gov/drugoverdose/maps/rxcounty2011.html (last visited January 29, 2018).

[62] Centers for Disease Control and Prevention, U.S. County Prescribing Rates 2010, (reporting for "Richmond, GA,") available at https://www.cdc.gov/drugoverdose/maps/rxcounty2010.html (last visited January 29, 2018).

[63] Centers for Disease Control and Prevention, U.S. County Prescribing Rates 2009, (reporting for "Richmond, GA,") available at https://www.cdc.gov/drugoverdose/maps/rxcounty2009.html (last visited January 29, 2018).

[64] Centers for Disease Control and Prevention, U.S. County Prescribing Rates 2013, (reporting for "Richmond, GA,") available at https://www.cdc.gov/drugoverdose/maps/rxcounty2008.html (last visited January 29, 2018).

73.     Each Manufacturer Defendant has conducted and has continued to conduct a marketing scheme designed to persuade doctors and patients that opioids can and should be used for chronic pain, resulting in opioid treatment for a far broader group of patients who are much more likely to become addicted and suffer other adverse effects from the long-term use of opioids. In connection with this scheme, each Manufacturer Defendant spent and continues to spend millions of dollars on promotional activities and materials that falsely deny or trivialize the risks of opioids while overstating the benefits of using them for chronic pain.

74.     The Manufacturer Defendants have made false and misleading claims, contrary to the language on their drugs' labels, regarding the risks of using their drugs that: (1) downplayed the serious risk of addiction; (2) created and promoted the concept of "pseudoaddiction" when signs of actual addiction began appearing and advocated that doctors should treat the signs of addiction with more opioids; (3) exaggerated the effectiveness of screening tools to prevent addiction; (4) claimed that it is easy to manage opioid dependence and withdrawal; (5) denied the risks of higher opioid dosages; and (6) exaggerated the effectiveness of "abuse-deterrent" opioid formulations to prevent abuse and addiction. The Manufacturer Defendants also have falsely touted the benefits of long-term opioid use, including the supposed ability of opioids to improve function and quality of life, even though there was no scientifically reliable evidence to support the Manufacturer Defendants' claims.

75.     The Manufacturer Defendants have disseminated these common messages to reverse the popular and medical understanding of opioids and risks of opioid use. They disseminated these messages directly, through their sales representatives, in speaker groups led by physicians the Manufacturer Defendants recruited for their support of their marketing messages, through unbranded marketing and through industry-funded front groups.

76.     The Manufacturer Defendants' efforts have been wildly successful. Opioids are now the most prescribed class of drugs. Globally, opioid sales generated $11 billion in revenue for drug companies in 2010 alone; sales in the United States have exceeded $8 billion in revenue annually since 2009.[65] In an open letter to the nation's physicians in August 2016, the then-U.S. Surgeon General expressly connected this "urgent health crisis" to "heavy marketing of opioids to doctors . . . [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain."[66] This epidemic has resulted in a flood of prescription opioids available for illicit use or sale (the supply) and a population of patients physically and psychologically dependent on them (the demand). When those patients can no longer afford or obtain opioids from licensed dispensaries, they often turn to the street to buy prescription opioids or even non-prescription opioids, like heroin.

77.     The Manufacturer Defendants intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

### 1. Each Manufacturer Defendant Used Multiple Avenues to Disseminate Their False and Deceptive Statements About Opioids.

78.     The Manufacturer Defendants spread their false and deceptive statements by marketing their branded opioids directly to doctors and patients in and around the State, including in Plaintiff's Community. Defendants also deployed seemingly unbiased and independent third parties whom they controlled to spread their false and deceptive statements

---

[65] *See* Katherine Eban, *Oxycontin: Purdue Pharma's Painful Medicine*, Fortune, Nov. 9, 2011, http://fortune.com/2011/11/09/oxycontin-purdue-pharmas-painful-medicine/; David Crow, *Drugmakers Hooked on $10bn Opioid Habit*, Fin. Times, Aug. 10, 2016, https://www.ft.com/content/f6e989a8-5dac-11e6-bb77-a121aa8abd95.

[66] Letter from Vivek H. Murthy, U.S. Surgeon General (Aug. 2016), http://turnthetiderx.org/.

Exhibit F
000028

about the risks and benefits of opioids for the treatment of chronic pain throughout the State and Plaintiff's Community.

79.     The Manufacturer Defendants employed the same marketing plans and strategies and deployed the same messages in and around the State, including in Plaintiff's Community, as they did nationwide. Across the pharmaceutical industry, corporate headquarters fund and oversee "core message" on a national basis. This comprehensive approach ensures that the Manufacturer Defendants accurately and consistently deliver their messages across marketing channels – including detailing visits, speaker events and advertising – and in each sales territory. The Manufacturer Defendants consider this high level of coordination and uniformity crucial to successfully marketing their drugs.

80.     The Manufacturer Defendants ensure marketing consistency nationwide through national and regional sales representative training; national training of local medical liaisons, the company employees who respond to physician inquiries; centralized speaker training; single sets of visual aids, speaker slide decks and sales training materials; and nationally coordinated advertising. The Manufacturer Defendants required their sales representatives and physician speakers to stick to prescribed talking points, sales messages and slide decks, and supervisors rode along with them periodically to check on both their performance and compliance.

> **i.     Direct Marketing.**

81.     The Manufacturer Defendants' direct marketing of opioids generally proceeded on two tracks. First, each Manufacturer Defendant conducted and continues to conduct advertising campaigns touting the purported benefits of their branded drugs. For example, upon information and belief, the Manufacturer Defendants spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they spent in 2001.

82.     Many of the Manufacturer Defendants' branded ads deceptively portrayed the benefits of opioids for chronic pain. For example, Endo distributed and made available on its website opana.com a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like construction worker, chef and teacher, misleadingly implying that the drug would provide long-term pain-relief and functional improvement. Upon information and belief, Purdue also ran a series of ads called "Pain vignettes" for OxyContin in 2012 in medical journals. These ads featured chronic pain patients and recommended OxyContin for each. One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively.

83.     Second, each Manufacturer Defendant promoted the use of opioids for chronic pain through "detailers" – sales representatives who visited individual doctors and medical staff in their offices – and small-group speaker programs. The Manufacturer Defendants have not corrected this misinformation. Instead, each Defendant devoted massive resources to direct sales contacts with doctors. Upon information and belief, in 2014 alone, the Manufacturer Defendants spent in excess of $168 million on detailing branded opioids to doctors, more than twice what they spent on detailing in 2000.

84.     The Manufacturer Defendants' detailing to doctors is effective. Numerous studies indicate that marketing impacts prescribing habits, with face-to-face detailing having the greatest influence. Even without such studies, the Manufacturer Defendants purchase, manipulate and analyze some of the most sophisticated data available in any industry, data available from IMS Health Holdings, Inc., to precisely track the rates of initial prescribing and renewal by individual doctors, which in turn allows them to target, tailor and monitor the impact of their core messages. Thus, the Manufacturer Defendants know their detailing to doctors is effective.

Exhibit F

85. The Manufacturer Defendants' detailers have been reprimanded for their deceptive promotions. In March 2010, for example, the FDA found that Actavis had been distributing promotional materials that "minimize[] the risks associated with Kadian and misleadingly suggest[] that Kadian is safer than has been demonstrated." Those materials in particular "fail to reveal warnings regarding potentially fatal abuse of opioids, use by individuals other than the patient for whom the drug was prescribed."[67]

### ii. Indirect Marketing.

86. The Manufacturer Defendants indirectly marketed their opioids using unbranded advertising, paid speakers and "key opinion leaders" ("KOLs"), and industry-funded organizations posing as neutral and credible professional societies and patient advocacy groups (referred to hereinafter as "Front Groups").

87. The Manufacturer Defendants deceptively marketed opioids in the State and Plaintiff's Community through unbranded advertising – *e.g*., advertising that promotes opioid use generally but does not name a specific opioid. Independent third parties ostensibly created and disseminated this advertising. However, by funding, directing, reviewing, editing and distributing this unbranded advertising, the Manufacturer Defendants controlled the deceptive messages these third parties disseminated and acted in concert with them to falsely and misleadingly promote opioids for the treatment of chronic pain. Much as the Manufacturer Defendants controlled the distribution of their "core messages" via their own detailers and speaker programs, they similarly controlled the distribution of these messages in scientific publications, treatment guidelines, Continuing Medical Education ("CME") programs, medical

---

[67] Letter from Thomas Abrams, Dir., Div. of Drug Mktg., Advert., & Commc'ns, U.S. Food & Drug Admin., to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), http://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf.

conferences and seminars. To this end, the Manufacturer Defendants used third-party public relations firms to help control those messages when they originated from third-parties.

88.    The Manufacturer Defendants marketed through third-party, unbranded advertising to avoid regulatory scrutiny because that advertising is not submitted to and typically is not reviewed by the FDA. The Manufacturer Defendants also used third-party, unbranded advertising to give the false appearance that the deceptive messages came from an independent and objective source. Like the tobacco companies, the Manufacturer Defendants used third parties that they funded, directed and controlled to carry out and conceal their scheme to deceive doctors and patients about the risks and benefits of long term opioid use for chronic pain.

89.    The Manufacturer Defendants also identified doctors to serve, for payment, on their speakers' bureaus and to attend programs with speakers and meals paid for by Defendants. These speaker programs provided: (1) an incentive for doctors to prescribe a particular opioid (so they might be selected to promote the drug); (2) recognition and compensation for the doctors selected as speakers; and (3) an opportunity to promote the drug through the speaker to his or her peers. These speakers give the false impression that they are providing unbiased and medically accurate presentations when they are, in fact, presenting a script prepared by Defendants. On information and belief, these presentations conveyed misleading information, omitted material information and failed to correct Defendants' prior misrepresentations about the risks and benefits of opioids.

90.    Borrowing a page from Big Tobacco's playbook, the Manufacturer Defendants worked through third parties they controlled by: (a) funding, assisting, encouraging and directing doctors who served as KOLs, and (b) funding, assisting, directing and encouraging seemingly neutral and credible Front Groups. The Manufacturer Defendants then worked together with

those KOLs and Front Groups to taint the sources that doctors and patients relied on for ostensibly "neutral" guidance, such as treatment guidelines, CME programs, medical conferences, seminars and scientific articles. Thus, working individually and collectively and through these Front Groups and KOLs, the Manufacturer Defendants persuaded doctors and patients that what they have long known – that opioids are addictive drugs, unsafe in most circumstances for long-term use – was untrue and that the compassionate treatment of pain required opioids.

91.    In 2007, multiple States sued Purdue for engaging in unfair and deceptive practices in its marketing, promotion and sale of OxyContin. Certain states settled their claims in a series of Consent Judgments that prohibited Purdue from making misrepresentations in the promotion and marketing of OxyContin in the future. By using indirect marketing strategies, however, Purdue intentionally circumvented these restrictions. Such actions included contributing to the creation of misleading publications and prescribing guidelines, which lack reliable scientific basis and promote prescribing practices that have worsened the opioid crisis.

92.    Pro-opioid doctors are one of the most important avenues that the Manufacturer Defendants use to spread their false and deceptive statements about the risks and benefits of long-term opioid use. The Manufacturer Defendants know that doctors rely heavily and less critically on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for chronic opioid therapy. For example, the State of New York found in its settlement with Purdue that the Purdue website "In the Face of Pain" failed to disclose that Purdue paid doctors who provided testimonials on the site and concluded that Purdue's failure to disclose these financial connections potentially misled consumers regarding the objectivity of the testimonials.

93.     Defendants utilized many KOLs, including many of the same ones.

94.     Dr. Russell Portenoy, former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, is one example of a KOL whom the Manufacturer Defendants identified and promoted to further their marketing campaign. Dr. Portenoy received research support, consulting fees and honoraria from Cephalon, Endo, Janssen and Purdue (among others) and was a paid consultant to Cephalon and Purdue. Dr. Portenoy was instrumental in opening the door for the regular use of opioids to treat chronic pain. He served on the American Pain Society ("APS") / American Academy of Pain Medicine ("AAPM") Guidelines Committees, which endorsed the use of opioids to treat chronic pain, first in 1996 and again in 2009. He was also a member of the board of the American Pain Foundation ("APF"), an advocacy organization almost entirely funded by the Manufacturer Defendants.

95.     Dr. Portenoy also made frequent media appearances promoting opioids and spreading misrepresentations, such as his claim that "the likelihood that the treatment of pain using an opioid drug which is prescribed by a doctor will lead to addiction is extremely low." He appeared on Good Morning America in 2010 to discuss the use of opioids long-term to treat chronic pain. On this widely-watched program, broadcast across the country, Dr. Portenoy claimed: "Addiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted."[68]

96.     Dr. Portenoy later admitted that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true." These lectures falsely claimed that fewer than 1% of

---

[68] Good Morning America (ABC television broadcast Aug. 30, 2010).

patients would become addicted to opioids. According to Dr. Portenoy, because the primary goal was to "destigmatize" opioids, he and other doctors promoting them overstated their benefits and glossed over their risks. Dr. Portenoy also conceded that "[d]ata about the effectiveness of opioids does not exist."[69] Portenoy candidly stated: "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? Well, . . . I guess I did."[70]

97.     Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah. Dr. Webster was President of American Academy of Pain Medicine ("AAPM") in 2013. He is a Senior Editor of Pain Medicine, the same journal that published Endo special advertising supplements touting Opana ER. Dr. Webster was the author of numerous CMEs sponsored by Cephalon, Endo and Purdue. At the same time, Dr. Webster was receiving significant funding from the Manufacturer Defendants (including nearly $2 million from Cephalon).

98.     During a portion of his time as a KOL, Dr. Webster was under investigation for overprescribing by the U.S. Department of Justice's Drug Enforcement Agency, which raided his clinic in 2010. Although the DEA closed the investigation without charges in 2014, more than 20 of Dr. Webster's former patients at the Lifetree Clinic have died of opioid overdoses.

99.     Ironically, Dr. Webster created and promoted the Opioid Risk Tool, a five question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors confidence to

---

[69] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, Wall St. J., Dec. 17, 2012, https://www.wsj.com/articles/SB10001424127887324478304578173342657044604.

[70] *Id.*

prescribe opioids long-term, and, for this reason, references to screening appear in various industry-supported guidelines. Versions of Dr. Webster's Opioid Risk Tool appear on or are linked to websites run by Endo, Janssen and Purdue. Unaware of the flawed science and industry bias underlying this tool, certain states and public entities have incorporated the Opioid Risk Tool into their own guidelines, indicating, also, their reliance on the Manufacturer Defendants and those under their influence and control.

100.  In 2011, Dr. Webster presented via webinar a program sponsored by Purdue entitled "Managing Patient's Opioid Use: Balancing the Need and the Risk." Dr. Webster recommended use of risk screening tools, urine testing and patient agreements as a way to prevent "overuse of prescriptions" and "overdose deaths." This webinar was available to and was intended to reach doctors in the State and doctors treating members of Plaintiff's Community.[71]

101.  Dr. Webster also was a leading proponent of the concept of "pseudoaddiction," the notion that doctors should see addictive behaviors not as warnings, but as indications of undertreated pain. In Dr. Webster's description, the only way to differentiate the two was to increase a patient's dose of opioids. As he and co-author Beth Dove wrote in their 2007 book *Avoiding Opioid Abuse While Managing Pain*—a book that is still available online—when faced with signs of aberrant behavior, increasing the dose "in most cases . . . should be the clinician's first response."[72] Upon information and belief, Endo distributed this book to doctors. Years later,

---

[71] *See* Emerging Solutions in Pain, *Managing Patient's Opioid Use: Balancing the Need and the Risk*, http://www.emergingsolutionsinpain.com/ce-education/opioid-management?option=com_continued&view=frontmatter&Itemid=303&course=209 (last visited Aug. 22, 2017).

[72] Lynn Webster & Beth Dove, *Avoiding Opioid Abuse While Managing Pain* (2007).

Dr. Webster reversed himself, acknowledging that "[pseudoaddiction] obviously became too much of an excuse to give patients more medication."[73]

102.  The Manufacturer Defendants also entered into arrangements with seemingly unbiased and independent patient and professional organizations to promote opioids for the treatment of chronic pain. Under the direction and control of the Manufacturer Defendants, these "Front Groups" generated treatment guidelines, unbranded materials and programs that favored chronic opioid therapy. They also assisted the Manufacturer Defendants by responding to negative articles, advocating against regulatory changes that would limit opioid prescribing in accordance with the scientific evidence and conducting outreach to vulnerable patient populations targeted by the Manufacturer Defendants.

103.  These Front Groups depended on the Manufacturer Defendants for funding and, in some cases, for survival. The Manufacturer Defendants also exercised control over programs and materials created by these groups by collaborating on, editing and approving their content and by funding their dissemination. In doing so, the Manufacturer Defendants made sure that the Front Groups would generate only the messages that the Manufacturer Defendants wanted to distribute. Despite this, the Front Groups held themselves out as independent and serving the needs of their members – whether patients suffering from pain or doctors treating those patients.

104.  Defendants Cephalon, Endo, Janssen and Purdue, in particular, utilized many Front Groups, including many of the same ones. Several of the most prominent are described below, but there are many others, including the American Pain Society ("APS"), American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), American Chronic Pain

---

[73] John Fauber, *Painkiller Boom Fueled by Networking*, Milwaukee Wisc. J. Sentinel, Feb. 18, 2012, http://archive.jsonline.com/watchdog/watchdogreports/painkiller-boom-fueled-by-networking-dp3p2rn-139609053.html.

Association ("ACPA"), the Center for Practical Bioethics ("CPB"), the U.S. Pain Foundation ("USPF") and Pain & Policy Studies Group ("PPSG").[74]

105. The most prominent of the Manufacturer Defendants' Front Groups was the American Pain Foundation ("APF"), which, upon information and belief, received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012, primarily from Endo and Purdue. APF issued education guides for patients, reporters and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. APF also launched a campaign to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes – including death – among returning soldiers. APF also engaged in a significant multimedia campaign – through radio, television and the internet – to educate patients about their "right" to pain treatment, namely opioids. All of the programs and materials were available nationally and were intended to reach citizens of the State and Plaintiff's Community.

106. In 2009 and 2010, more than 80% of APF's operating budget came from pharmaceutical industry sources. Including industry grants for specific projects, APF received about $2.3 million from industry sources out of total income of about $2.85 million in 2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of a total income of about $3.5 million. By 2011, upon information and belief, APF was entirely dependent on incoming grants from defendants Purdue, Cephalon, Endo and others to avoid using its line of credit.

---

[74] *See generally, e.g.*, Letter from Sen. Ron Wyden, U.S. Senate Comm. on Fin., to Sec. Thomas E. Price, U.S. Dep't of Health and Human Servs., (May 5, 2015), https://www.finance.senate.gov/imo/media/doc/050517%20Senator%20Wyden%20to%20Secretary%20Price%20re%20FDA%20Opioid%20Prescriber%20Working%20Group.pdf.

107. APF held itself out as an independent patient advocacy organization. It often engaged in grassroots lobbying against various legislative initiatives that might limit opioid prescriptions and thus the profitability of its sponsors. Upon information and belief, the Manufacturer Defendants often called upon it to provide "patient representatives" for the promotional activities, including for Purdue's Partners Against Pain and Janssen's Let's Talk Pain. APF functioned largely as an advocate for the interests of the Manufacturer Defendants, not patients. Indeed, upon information and belief, as early as 2001, Purdue told APF that the basis of a grant was Purdue's desire to "strategically align its investments in nonprofit organizations that share [its] business interests."

108. Upon information and belief, on several occasions, representatives of the Manufacturer Defendants, often at informal meetings at conferences, suggested activities and publications for APF to pursue. APF then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

109. The U.S. Senate Finance Committee began looking into APF in May 2012 to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. The investigation caused considerable damage to APF's credibility as an objective and neutral third party, and the Manufacturer Defendants stopped funding it. Within days of being targeted by the Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately."[75]

---

[75] Charles Ornstein & Tracy Weber, *Senate Panel Investigates Drug Companies' Ties to Pain Groups*, Wash. Post, May 8, 2012, https://www.washingtonpost.com/national/health-science/senate-panel-investigates-drug-companies-ties-to-pain-groups/2012/05/08/gIQA2X4qBU_story.html.

110.  Another front group for the Manufacturer Defendants was the American Academy of Pain Medicine ("AAPM"). With the assistance, prompting, involvement and funding of the Manufacturer Defendants, the AAPM issued purported treatment guidelines and sponsored and hosted medical education programs essential to the Manufacturer Defendants' deceptive marketing of chronic opioid therapy.

111.  AAPM received substantial funding from opioid manufacturers. For example, AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate. The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event – its annual meeting held in Palm Springs, California or other resort locations. AAPM describes the annual event as an "exclusive venue" for offering education programs to doctors. Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings. Defendants Endo, Purdue and Cephalon were members of the council and presented deceptive programs to doctors who attended this annual event.

112.  Upon information and belief, Endo internally views AAPM as "industry friendly," with Endo advisors and speakers among its active members. Endo attended AAPM conferences, funded its CMEs and distributed its publications. The conferences sponsored by AAPM heavily emphasized sessions on opioids – 37 out of roughly 40 at one conference alone. AAPM's presidents have included top industry-supported KOLs Perry Fine and Lynn Webster. The AAPM even elected Dr. Webster president while he was under a DEA investigation.

113.  The Manufacturer Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

114. In 1996, AAPM and APS jointly issued a consensus statement, "The Use of Opioids for the Treatment of Chronic Pain," which endorsed opioids to treat chronic pain and claimed that the risk of a patient's addiction to opioids was low. Dr. Haddox, who co-authored the AAPM/APS statement, was a paid speaker for Purdue at the time. Dr. Portenoy was the sole consultant. The consensus statement remained on AAPM's website until 2011, and, upon information and belief, the AAPM only removed it from the website after a doctor complained.[76]

115. AAPM and APS issued their own treatment guidelines in 2009 ("AAPM/APS Guidelines") and continued to recommend the use of opioids to treat chronic pain.[77] Doctors, especially the general practitioners and family doctors targeted by the Manufacturer Defendants, have relied upon treatment guidelines. Treatment guidelines not only directly inform doctors' prescribing practices, but are cited throughout the scientific literature and referenced by third-party payors in determining whether they should cover treatments for specific indications. Pharmaceutical sales representatives employed by Endo, Actavis and Purdue discussed treatment guidelines with doctors during individual sales visits.

116. At least 14 of the 21 panel members who drafted the AAPM/APS Guidelines, including KOLs Dr. Portenoy and Dr. Perry Fine of the University of Utah, received support from Janssen, Cephalon, Endo and Purdue. The 2009 Guidelines promote opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories.[78] One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and

---

[76] *The Use of Opioids for the Treatment of Chronic Pain: A Consensus Statement From the American Academy of Pain Medicine and the American Pain Society*, 13 Clinical J. Pain 6 (1997).

[77] Roger Chou *et al.*, *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Non-Cancer Pain*, 10 J. Pain 113 (2009).

[78] *Id.*

founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the 2009 Guidelines were influenced by contributions that drug companies, including Manufacturer Defendants, made to the sponsoring organizations and committee members. These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids; the Guidelines have been cited hundreds of times in academic literature, were disseminated in the State and/or Plaintiff's Community during the relevant time period, are still available online and were reprinted in the Journal of Pain. The Manufacturer Defendants widely referenced and promoted the 2009 Guidelines without disclosing the lack of evidence to support them or the Manufacturer Defendants' financial support to members of the panel.

117. The Manufacturer Defendants worked together through Front Groups to spread their deceptive messages about the risks and benefits of long-term opioid therapy. For example, Defendants combined their efforts through the Pain Care Forum ("PCF"), which began in 2004 as an APF project. PCF comprises representatives from opioid manufacturers (including Cephalon, Endo, Janssen and Purdue) and various Front Groups, almost all of which received substantial funding from the Manufacturer Defendants. Among other projects, PCF worked to ensure that an FDA-mandated education project on opioids was not unacceptably negative and did not require mandatory participation by prescribers, which the Manufacturer Defendants determined would reduce prescribing.

### 2. The Manufacturer Defendants' Marketing Scheme Misrepresented the Risks and Benefits of Opioids.

#### i. The Manufacturer Defendants embarked upon a campaign of false, deceptive and unfair assurances grossly understating and misstating the dangerous addiction risks of the opioid drugs.

118.  To falsely assure physicians and patients that opioids are safe, the Manufacturer Defendants deceptively trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that the FDA and CDC have conclusively debunked. These misrepresentations – described below – reinforced each other and created the dangerously misleading impression that: (1) starting patients on opioids was low risk because most patients would not become addicted and because doctors could identify and manage those at greatest risk for addiction; (2) patients who displayed signs of addiction probably were not addicted, and, in any event, doctors could easily wean them from the drugs; (3) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (4) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive. The Manufacturer Defendants have not only failed to correct these misrepresentations; they continue to make them today.

119.  Opioid manufacturers, including Defendants Endo Pharmaceuticals, Inc. and Purdue Pharma L.P., have entered into settlement agreements with public entities that prohibit them from making many of the misrepresentations identified in this Complaint. Yet even afterward, each Manufacturer Defendant continued to misrepresent the risks and benefits of long-term opioid use in the State and Plaintiff's Community and each continues to fail to correct its past misrepresentations.

120.  Some illustrative examples of the Manufacturer Defendants' false, deceptive and unfair claims about the purportedly low risk of addiction include:

a.  Actavis's predecessor caused a patient education brochure, *Managing Chronic Back Pain*, to be distributed beginning in 2003 that admitted that opioid addiction is possible, but falsely claimed that it is "less likely if you have never had an addiction problem." Based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, it appears that Actavis continued to use this brochure in 2009 and beyond.

b.  Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which suggested that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining duplicative opioid prescriptions from multiple sources, or theft. This publication is still available online.[79]

c.  Endo sponsored a website, "PainKnowledge," which, upon information and belief, claimed in 2009 that "[p]eople who take opioids as prescribed usually do not become addicted." Upon information and belief, another Endo website, PainAction.com, stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them." Endo also distributed an "Informed Consent" document on PainAction.com that misleadingly suggested that only people who "have problems with substance abuse and addiction" are likely to become addicted to opioid medications.

d.  Upon information and belief, Endo distributed a pamphlet with the Endo logo entitled *Living with Someone with Chronic Pain*, which stated that: "Most health care providers who treat people with pain agree that most people do not develop an addiction problem."

e.  Janssen reviewed, edited, approved and distributed a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which described as "myth" the claim that opioids are addictive and asserted as fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain."

f.  Janssen currently runs a website, Prescriberesponsibly.com (last updated July 2, 2015), which claims that concerns about opioid addiction are "overestimated."

g.  Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claims that less than 1% of children prescribed opioids will

---

[79] Am. Pain Found., *Treatment Options: A Guide for People Living in Pain* (2007) [hereinafter APF, *Treatment Options*], https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf.

become addicted and that pain is undertreated due to "[m]isconceptions about opioid addiction."[80]

h. Consistent with the Manufacturer Defendants' published marketing materials, upon information and belief, detailers for Purdue, Endo, Janssen and Cephalon in the State and Plaintiff's Community minimized or omitted any discussion with doctors of the risk of addiction, misrepresented the potential for abuse of opioids with purportedly abuse-deterrent formulations and routinely did not correct the misrepresentations noted above.

i. Seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, the Manufacturer Defendants' Front Groups APF and NPF argued in an *amicus* brief to the United States Fourth Circuit Court of Appeals that "patients rarely become addicted to prescribed opioids," citing research by their KOL, Dr. Portenoy.[81]

121. These claims are contrary to longstanding scientific evidence. A 2016 opioid-prescription guideline issued by the CDC (the "2016 CDC Guideline") explains that there is "[e]xtensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction], [and] overdose . . .)."[82] The 2016 CDC Guideline further explains that "[o]pioid pain medication use presents serious risks, including overdose and opioid use disorder" and that "continuing opioid therapy for 3 months substantially increases risk for opioid use disorder."[83]

122. The FDA further exposed the falsity of Defendants' claims about the low risk of addiction when it announced changes to the labels for extended-release and long-acting

---

[80] Am. Pain Found., *A Policymaker's Guide to Understanding Pain and Its Management* 6 (2011) [hereinafter APF, *Policymaker's Guide*], http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf.

[81] Brief of the American Pain Foundation, the National Pain Foundation, and the National Foundation for the Treatment of Pain in Support of Appellant and Reversal of the Conviction, *United States v. Hurowitz*, No. 05-4474 (4th Cir. Sept. 8, 2005) [hereinafter Brief of APF] at 9.

[82] Deborah Dowell *et al.*, *CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016*, Morbidity & Mortality Wkly. Rep., Mar. 18, 2016, at 15 [hereinafter 2016 CDC Guideline], https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

[83] *Id.* at 2, 25.

("ER/LA") opioids in 2013 and for immediate release ("IR") opioids in 2016. In its announcements, the FDA found that "most opioid drugs have 'high potential for abuse'" and that opioids "are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death." According to the FDA, because of the "known serious risks" associated with long-term opioid use, including "risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed.[84]

123. The State of New York, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder."[85] Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the State of New York found that Endo had no evidence for that statement. Consistent with this, Endo agreed not to "make statements that . . . opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York. Endo remains free, however, to make those statements in this State.

---

[84] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Andrew Koldny, M.D., President, Physicians for Responsible Opioid Prescribing (Sept. 10, 2013), https://www.regulations.gov/contentStreamer?documentId=FDA-2012-P-0818-0793&attachmentNumber=1&contentType=pdf.; Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Peter R. Mathers & Jennifer A. Davidson, Kleinfeld, Kaplan and Becker, LLP (Mar. 22, 2016), https://www.regulations.gov/contentStreamer?documentId=FDA-2014-P-0205-0006&attachmentNumber=1&contentType=pdf.

[85] Assurance of Discontinuance, *In re Endo Health Solutions Inc. and Endo Pharm. Inc. (*Assurance No. 15-228), at 16, https://ag.ny.gov/pdfs/Endo_AOD_030116-Fully_Executed.pdf.

124.  In addition to mischaracterizing the highly addictive nature of the drugs they were pushing, the Manufacturer Defendants also fostered a fundamental misunderstanding of the signs of addiction. Specifically, the Manufacturer Defendants misrepresented to doctors and patients that warning signs and/or symptoms of addiction were, instead, signs of undertreated pain (*i.e.*, pseudoaddiction) – and instructed doctors to increase the opioid prescription dose for patients who were already in danger.

125. To this end, one of Purdue's employees, Dr. David Haddox, invented a phenomenon called "pseudoaddiction." KOL Dr. Portenoy popularized the term. Examples of the false, misleading, deceptive and unfair statements regarding pseudoaddiction include:

    a.  Cephalon and Purdue sponsored *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids and hoarding are all signs of pseudoaddiction, rather than true addiction.[86]  The 2012 edition, which remains available for sale online, continues to teach that pseudoaddiction is real.[87]

    b.  Janssen sponsored, funded and edited the Let's Talk Pain website, which in 2009 stated: "pseudoaddiction . . . refers to patient behaviors that may occur when pain is under-treated . . . . Pseudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management."

    c.  Endo sponsored a National Initiative on Pain Control ("NIPC") CME program in 2009 entitled "Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia," which, upon information and belief, promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain. Endo appears to have substantially controlled NIPC by funding NIPC projects; developing, specifying and reviewing content; and distributing NIPC materials.

    d.  Purdue published a pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*, which, upon information and belief, described pseudoaddiction as a concept that "emerged in the literature" to describe the inaccurate interpretation of [drug-

---

[86] Scott M. Fishman, M.D., *Responsible Opioid Prescribing: A Physician's Guide* (2007) at 62.

[87] *See* Scott M. Fishman, M.D., *Responsible Opioid Prescribing: A Physician's Guide* (2d ed. 2012).

000047

seeking behaviors] in patients who have pain that has not been effectively treated."

e. Upon information and belief, Purdue sponsored a CME program titled "Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse." In a roleplay, a chronic pain patient with a history of drug abuse tells his doctor that he is taking twice as many hydrocodone pills as directed. The narrator notes that because of pseudoaddiction, the doctor should not assume the patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine or "overindulges in unapproved escalating doses." The doctor treats this patient by prescribing a high-dose, long-acting opioid.

126. In the 2016 CDC Guideline, the CDC rejects the validity of the pseudoaddiction fallacy invented by a Purdue employee as a reason to push more opioid drugs onto already-addicted patients.

127. In addition to misstating the addiction risk and inventing the pseudoaddiction falsehood, a third category of false, deceptive and unfair practice is the Manufacturer Defendants' false instructions that addiction risk screening tools, patient contracts, urine drug screens and similar strategies allow them to reliably identify and safely prescribe opioids to patients predisposed to addiction. These misrepresentations were especially insidious because the Manufacturer Defendants aimed them at general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. The Manufacturer Defendants' misrepresentations made these doctors feel more comfortable prescribing opioids to their patients, and patients more comfortable starting on opioid therapy for chronic pain. Illustrative examples include:

a. Endo paid for a 2007 supplement in the *Journal of Family Practice* written by a doctor who became a member of Endo's speakers bureau in 2010. The supplement, entitled *Pain Management Dilemmas in Primary Care: Use of Opioids*, emphasized the effectiveness of screening tools, claiming that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts.

b. Purdue, upon information and belief, sponsored a 2011 webinar, *Managing Patient's Opioid Use: Balancing the Need and Risk*, which claimed that screening tools, urine tests and patient agreements prevent "overuse of prescriptions" and "overdose deaths."

c. As recently as 2015, upon information and belief, Purdue has represented in scientific conferences that "bad apple" patients – and not opioids – are the source of the addiction crisis and that once those "bad apples" are identified, doctors can safely prescribe opioids without causing addiction.

128. The 2016 CDC Guideline confirms the falsity of these claims. The Guideline explains that there are no studies assessing the effectiveness of risk mitigation strategies "for improving outcomes related to overdose, addiction, abuse or misuse."[88]

129. A fourth category of deceptive messaging regarding dangerous opioids is the Manufacturer Defendants' false assurances regarding the alleged ease of eliminating opioid dependence. The Manufacturer Defendants falsely claimed that doctors can easily address opioid dependence by tapering and that opioid withdrawal is not a problem, but they failed to disclose the increased difficulty of stopping opioids after long-term use. In truth, the 2016 CDC Guideline explains that the symptoms of opioid withdrawal include abdominal pain, vomiting, diarrhea, sweating, tremor, tachycardia, drug cravings, anxiety, insomnia, spontaneous abortion and premature labor in pregnant women.[89]

130. The Manufacturer Defendants nonetheless downplayed the severity of opioid detoxification. For example, upon information and belief, a CME sponsored by Endo, entitled *Persistent Pain in the Older Adult*, claimed that withdrawal symptoms can be avoided by tapering a patient's opioid dose by 10%-20% for 10 days. And Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that

---

[88] *Id.* at 11.

[89] *Id.* at 26.

"[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation" without mentioning any hardships that might occur.[90]

131. A fifth category of false, deceptive and unfair statements the Manufacturer Defendants made to sell more drugs is that patients could increase opioid dosages indefinitely without added risk. The ability to escalate dosages was critical to Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief. The Manufacturer Defendants' deceptive claims include:

a. Upon information and belief, Actavis's predecessor created a patient brochure for Kadian in 2007 that stated, "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction." Based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, Actavis appears to have continued to use these materials in 2009 and beyond.

b. Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed. The guide stated that opioids have "no ceiling dose" and insinuated that they are therefore the most appropriate treatment for severe pain.[91] This publication is still available online.

c. Endo sponsored a website, "PainKnowledge," which, upon information and belief, claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain."

d. Endo distributed a pamphlet edited by a KOL entitled *Understanding Your Pain: Taking Oral Opioid Analgesics* (2004 Endo Pharmaceuticals PM-0120). In Q&A format, it asked "If I take the opioid now, will it work later when I really need it?" The response is, "The dose can be increased. . . . You won't 'run out' of pain relief."[92]

---

[90] APF, *Policymaker's Guide*, at 32.

[91] APF, *Treatment Options*, at 12.

[92] Margo McCaffery & Chris Pasero, Endo Pharm., *Understanding Your Pain: Taking Oral Opioid Analgesics* (Russell K Portenoy, M.D., ed., 2004).

e.  Janssen sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which its sales force distributed. This guide listed dosage limitations as "disadvantages" of other pain medicines, but omitted any discussion of risks of increased opioid dosages.

f.  Upon information and belief, Purdue's In the Face of Pain website promoted the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will.

g.  Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that dosage escalations are "sometimes necessary" and that "the need for higher doses of medication is not necessarily indicative of addiction," but inaccurately downplayed the risks from high opioid dosages.[93]

h.  In 2007, Purdue sponsored a CME entitled "Overview of Management Options" that was available for CME credit and available until at least 2012. The CME was edited by a KOL and taught that NSAIDs and other drugs, but not opioids, are unsafe at high dosages.

i.  Purdue presented a 2015 paper at the College on the Problems of Drug Dependence, "the oldest and largest organization in the US dedicated to advancing a scientific approach to substance use and addictive disorders," challenging the correlation between opioid dosage and overdose.[94]

j.  Seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, the Manufacturer Defendants' Front Groups APF and NPF argued in an *amicus* brief to the United States Fourth Circuit Court of Appeals that "there is no 'ceiling dose'" for opioids.[95]

132.  Once again, the 2016 CDC Guideline reveals that the Manufacturer Defendants' representations regarding opioids were lacking in scientific evidence. The 2016 CDC Guideline clarifies that the "[b]enefits of high-dose opioids for chronic pain are not established," while the "risks for serious harms related to opioid therapy increase at higher opioid dosage."[96] More

---

[93] APF, *Policymaker's Guide*, *supra*, at 32.

[94] The College on Problems of Drug Dependence, *About the College*, http://cpdd.org (last visited Aug. 21, 2017).

[95] Brief of APF, *supra*, at 9.

[96] 2016 CDC Guideline, *supra*, at 22–23.

specifically, the CDC explains that "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages."[97]  The CDC also states that there is an increased risk "for opioid use disorder, respiratory depression, and death at higher dosages."[98] That is why the CDC advises doctors to "avoid increasing dosage" to above 90 morphine milligram equivalents per day.[99]

133.  Defendants' deceptive marketing of the so-called abuse-deterrent properties of some of their opioids has created false impressions that these opioids can cure addiction and abuse.

134.  The Manufacturer Defendants made misleading claims about the ability of their so-called abuse-deterrent opioid formulations to deter abuse. For example, Endo's advertisements for the 2012 reformulation of Opana ER claimed Endo had designed it to be crush-resistant, in a way that suggested it was more difficult to abuse. This claim was false. The FDA warned in a 2013 letter that Opana ER Extended-Release Tablets' "extended-release features can be compromised, causing the medication to 'dose dump,' when subject to . . . forms of manipulation such as cutting, grinding, or chewing, followed by swallowing."[100] Also troubling, Opana ER can be prepared for snorting using commonly available methods and "readily prepared for injection."[101] The letter discussed "the troubling possibility that a higher (and rising) percentage of [Opana ER Extended-Release Tablet] abuse is occurring via injection."[102] Endo's own studies,

---

[97] *Id.* at 23–24.

[98] *Id.* at 21.

[99] *Id.* at 16.

[100] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Robert Barto, Vice President, Reg. Affairs, Endo Pharm. Inc. (May 10, 2013), at 5.

[101] *Id*. at 6.

[102] *Id*. at 6 n.21.

which it failed to disclose, showed that Opana ER could still be ground and chewed. In June 2017, the FDA requested that Endo remove Opana ER from the market.

> ### ii. The Manufacturer Defendants embarked upon a campaign of false, deceptive and unfair assurances grossly overstating the benefits of the opioid drugs.

135.  To convince doctors and patients that they should use opioids to treat chronic pain, the Manufacturer Defendants also had to persuade them that there was a significant upside to long-term opioid use. But as the CDC Guideline makes clear, "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized trials ≤ 6 weeks in duration)" and that other treatments were more or equally beneficial and less harmful than long-term opioid use.[103] The FDA, too, has recognized the lack of evidence to support long-term opioid use. Despite this, Defendants falsely and misleadingly touted the benefits of long-term opioid use and falsely and misleadingly suggested that these benefits were supported by scientific evidence.

136.  Some illustrative examples of the Manufacturer Defendants' false claims are:

a.  Upon information and belief, Actavis distributed an advertisement claiming that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health" and help patients enjoy their lives.

b.  Endo distributed advertisements that claimed the use of Opana ER for chronic pain would allow patients to perform demanding tasks like construction work or work as a chef and portrayed seemingly healthy, unimpaired subjects.

c.  Janssen sponsored and edited a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which states as "a fact" that "opioids may make it easier for people to live normally." The guide lists expected

---

[103] *Id.* at 15.

functional improvements from opioid use, including sleeping through the night, returning to work, recreation, sex, walking and climbing stairs.

d. Janssen promoted Ultracet for everyday chronic pain and distributed posters for display in doctors' offices of presumed patients in active professions. The caption read: "Pain doesn't fit into their schedules."

e. Upon information and belief, Purdue ran a series of advertisements for OxyContin in 2012 in medical journals entitled "Pain vignettes," which were case studies featuring patients with pain conditions persisting over several months and recommending OxyContin for them. The ads implied that OxyContin improves patients' function.

f. *Responsible Opioid Prescribing* (2007), which Cephalon, Endo and Purdue sponsored and distributed, taught that relief of pain by opioids, by itself, improved patients' function.

g. Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which counseled patients that opioids "give [patients] a quality of life we deserve."[104] This publication is still available online.

h. Endo's NIPC website "PainKnowledge" claimed in 2009, upon information and belief, that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." Elsewhere, the website touted improved quality of life (as well as "improved function") as benefits of opioid therapy. The grant request that Endo approved for this project specifically indicated NIPC's intent to make misleading claims about function, and Endo closely tracked visits to the site.

i. Endo was the sole sponsor, through NIPC, of a series of CMEs entitled "Persistent Pain in the Older Patient."[105] Upon information and belief, a CME disseminated via webcast claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning."

j. Janssen sponsored and funded a multimedia patient education campaign called "Let's Talk Pain." One feature of the campaign was to complain that patients were under-treated. In 2009, upon information and belief, a Janssen-sponsored

---

[104] APF, *Treatment Options*.

[105] *E.g.*, NIPC, *Persistent Pain and the Older Patient* (2007), https://www.painedu.org/Downloads/NIPC/Activities/B173_Providence_RI_%20Invite.pdf.

website, part of the "Let's Talk Pain" campaign, featured an interview edited by Janssen claiming that opioids allowed a patient to "continue to function."

k.  Purdue sponsored the development and distribution of APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "[m]ultiple clinical studies" have shown that opioids are effective in improving "[d]aily function," "[p]sychological health" and "[o]verall health-related quality of life for chronic pain."[106] The Policymaker's Guide was originally published in 2011.

l.  Purdue's, Cephalon's, Endo's and Janssen's sales representatives have conveyed and continue to convey the message that opioids will improve patient function.

137.  As the FDA and other agencies have made clear for years, these claims have no support in the scientific literature.

138.  In 2010, the FDA warned Actavis, in response to its advertising of Kadian described above, that "we are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug [Kadian] has in alleviating pain, taken together with any drug-related side effects patients may experience . . . results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."[107] And in 2008, upon information and belief, the FDA sent a warning letter to an opioid manufacturer, making it clear "that [the claim that] patients who are treated with the drug experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."

139.  The Manufacturer Defendants also falsely and misleadingly emphasized or exaggerated the risks of competing medications like NSAIDs, so that doctors and patients would look to opioids first for the treatment of chronic pain. Once again, these misrepresentations by

---

[106] APF, *Policymaker's Guide*, *supra*, at 29.

[107] Letter from Thomas Abrams to Doug Boothe, *supra*, at 2.

the Manufacturer Defendants contravene pronouncements by and guidance from the FDA and CDC based on the scientific evidence. Indeed, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids in 2016 to state that opioids should only be used as a last resort "in patients for which alternative treatment options" like non-opioid drugs "are inadequate." And the 2016 CDC Guideline states that NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain.[108] Purdue misleadingly promoted OxyContin as being unique among opioids in providing 12 continuous hours of pain relief with one dose. In fact, OxyContin does not last for 12 hours – a fact that Purdue has known at all times relevant to this action. Upon information and belief, Purdue's own research shows that OxyContin wears off in under six hours in one quarter of patients and in under 10 hours in more than half. This is because OxyContin tablets release approximately 40% of their active medicine immediately, after which release tapers. This triggers a powerful initial response, but provides little or no pain relief at the end of the dosing period, when the tablet releases less medicine. This phenomenon is known as "end of dose" failure, and the FDA found in 2008 that a "substantial proportion" of chronic pain patients taking OxyContin experience it. This not only renders Purdue's promise of 12 hours of relief false and deceptive, it also makes OxyContin more dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly increasing the amount of drug they are taking and spurring growing dependence.

140.  Purdue's competitors were aware of this problem. For example, upon information and belief, Endo ran advertisements for Opana ER referring to "real" 12-hour dosing. Nevertheless, Purdue falsely promoted OxyContin as if it were effective for a full 12 hours.

---

[108] 2016 CDC Guideline, *supra*, at 12.

Upon information and belief, Purdue's sales representatives continue to tell doctors that OxyContin lasts a full 12 hours.

141. Front Groups supported by Purdue likewise echoed these representations. For example, in an amicus brief submitted to the Supreme Court of Ohio by the American Pain Foundation, the National Foundation for the Treatment of Pain and the Ohio Pain Initiative in support of Purdue, those amici represented:

> OxyContin is particularly useful for sustained long-term pain because it comes in higher, compact pills with a slow release coating. OxyContin pills can work for 12 hours. This makes it easier for patients to comply with dosing requirements without experiencing a roller-coaster of pain relief followed quickly by pain renewal that can occur with shorter acting medications. It also helps the patient sleep through the night, which is often impossible with short-acting medications. For many of those serviced by Pain Care Amici, OxyContin has been a miracle medication.[109]

142. Cephalon deceptively marketed its opioids Actiq and Fentora for chronic pain, even though the FDA has expressly limited their use to the treatment of cancer pain in opioid-tolerant individuals. Both Actiq and Fentora are extremely powerful fentanyl-based IR opioids. Neither is approved for nor has been shown to be safe or effective for chronic pain. Indeed, the FDA expressly prohibited Cephalon from marketing Actiq for anything but cancer pain and refused to approve Fentora for the treatment of chronic pain because of the potential harm, including the high risk of "serious and life-threatening adverse events" and abuse – which are greatest in non-cancer patients. The FDA also issued a Public Health Advisory in 2007, emphasizing that Fentora should only be used for cancer patients who are opioid-tolerant and should not be used

---

[109] Reply Brief of Amicus Curiae of the American Pain Foundation, The National Foundation for the Treatment of Pain and the Ohio Pain Initiative Supporting Appellants, *Howland v. Purdue Pharma L.P.*, No. 2003-1538 (Ohio Apr. 13, 2004), 2004 WL 1637768, at *4 (footnote omitted).

for any other conditions, such as migraines, post-operative pain or pain due to injury.[110] Specifically, the FDA advised that Fentora "is only approved for breakthrough cancer pain in patients who are *opioid-tolerant*, meaning those patients who take a regular, daily, around-the-clock narcotic pain medication."[111]

143.   Despite this, Cephalon conducted and continues to conduct a well-funded campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was not approved and is not appropriate or safe. As part of this campaign, Cephalon used CMEs, speaker programs, KOLs, journal supplements and detailing by its sales representatives to give doctors the false impression that Actiq and Fentora are safe and effective for treating non-cancer pain. For example:

a.   Cephalon paid to have a CME it sponsored, *Opioid-Based Management of Persistent and Breakthrough Pain*, published in a supplement of Pain Medicine News in 2009. The CME instructed doctors that "[c]linically, broad classification of pain syndromes as either cancer- or non-cancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain.

b.   Upon information and belief, Cephalon's sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq and Fentora for the treatment of non-cancer pain.

c.   In December 2011, Cephalon widely disseminated a journal supplement entitled "Special Report: An Integrated Risk Evaluation and Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)" to Anesthesiology News, Clinical Oncology News and Pain Medicine News – three publications that are sent to thousands of anesthesiologists and other medical professionals. The Special Report openly promotes Fentora for "multiple causes of pain" – and not just cancer pain.

---

[110] *See* U.S. Food & Drug Admin., *Public Health Advisory: Important Information for the Safe Use of Fentora (fentanyl buccal tablets)* (Sept. 26, 2007), https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm051273.htm.

[111] *Id.*

144.  Cephalon's deceptive marketing gave doctors and patients the false impression that Actiq and Fentora were not only safe and effective for treating chronic pain, but were also approved by the FDA for such uses.

145.  Purdue also unlawfully and unfairly failed to report or address illicit and unlawful prescribing of its drugs, despite knowing about it for years. Purdue's sales representatives have maintained a database since 2002 of doctors suspected of inappropriately prescribing its drugs. Rather than report these doctors to state medical boards or law enforcement authorities (as Purdue is legally obligated to do) or cease marketing to them, Purdue used the list to demonstrate the high rate of diversion of OxyContin – the same OxyContin that Purdue had promoted as less addictive – in order to persuade the FDA to bar the manufacture and sale of generic copies of the drug because the drug was too likely to be abused. In an interview with the Los Angeles Times, Purdue's senior compliance officer acknowledged that in five years of investigating suspicious pharmacies, Purdue failed to take action – even where Purdue employees personally witnessed the diversion of its drugs. The same was true of prescribers; despite its knowledge of illegal prescribing, Purdue did not report that a Los Angeles clinic prescribed more than 1.1 million OxyContin tablets and that Purdue's district manager described it internally as "an organized drug ring" until years after law enforcement shut it down. In doing so, Purdue protected its own profits at the expense of public health and safety.[112]

146.  Like Purdue, Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing. In its settlement agreement with Endo, the State of New York found that Endo failed to require sales representatives to report signs of abuse, diversion and inappropriate prescribing; paid bonuses to sales representatives for detailing

---

[112] Harriet Ryan *et al.*, *More Than 1 Million Oxycontin Pills Ended Up in the Hands of Criminals and Addicts. What the Drugmaker Knew*, L.A. Times, July 10, 2016, http://www.latimes.com/projects/la-me-oxycontin-part2/.

prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.

**3. The Manufacturer Defendants Targeted Susceptible Prescribers and Vulnerable Patient Populations.**

147. As a part of their deceptive marketing scheme, the Manufacturer Defendants identified and targeted susceptible prescribers and vulnerable patient populations in the U.S., including this State and Plaintiff's Community. For example, the Manufacturer Defendants focused their deceptive marketing on primary care doctors, who were more likely to treat chronic pain patients and prescribe them drugs, but were less likely to be educated about treating pain and the risks and benefits of opioids and therefore more likely to accept the Manufacturer Defendants' misrepresentations.

148. The Manufacturer Defendants also targeted vulnerable patient populations like the elderly and veterans, who tend to suffer from chronic pain. The Manufacturer Defendants targeted these vulnerable patients, even though the risks of long-term opioid use were significantly greater for them. For example, the 2016 CDC Guideline observes that existing evidence confirms that elderly patients taking opioids suffer from elevated fall and fracture risks, reduced renal function and medication clearance and a smaller window between safe and unsafe dosages.[113] The 2016 CDC Guideline concludes that there must be "additional caution and increased monitoring" to minimize the risks of opioid use in elderly patients. *Id*. at 27. The same is true for veterans, who are more likely to use anti-anxiety drugs (benzodiazepines) for post-traumatic stress disorder, which interact dangerously with opioids.

---

[113] 2016 CDC Guideline, *supra*, at 13.

**4. The Manufacturer Defendants Made Materially Deceptive Statements and Concealed Material Facts.**

149. As alleged herein, the Manufacturer Defendants made and/or disseminated deceptive statements regarding material facts and further concealed material facts in the course of manufacturing, marketing and selling prescription opioids. The Manufacturer Defendants' actions were intentional and/or unlawful. Such statements include, but are not limited to, those set out below and alleged throughout this Complaint.

150. Defendant Purdue made and/or disseminated deceptive statements and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

    a. Creating, sponsoring and assisting in the distribution of patient education materials distributed to consumers that contained deceptive statements;

    b. Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

    c. Disseminating misleading statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through Purdue's own unbranded publications and on internet sites Purdue operated that were marketed to and accessible by consumers;

    d. Distributing brochures to doctors, patients and law enforcement officials that included deceptive statements concerning the indicators of possible opioid abuse;

    e. Sponsoring, directly distributing and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

    f. Endorsing, directly distributing and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g. Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

h. Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

i. Assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction;

j. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k. Developing and disseminating scientific studies that misleadingly concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

l. Assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

m. Creating, endorsing and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

n. Targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

o. Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

p. Exclusively disseminating misleading statements in education materials to hospital doctors and staff, while purportedly educating them on new pain standards;

q. Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing; and

r.  Withholding from law enforcement the names of prescribers Purdue believed to be facilitating the diversion of its opioids, while simultaneously marketing opioids to these doctors by disseminating patient and prescriber education materials, advertisements and CMEs they knew would reach these same prescribers.

151.  Defendant Endo made and/or disseminated deceptive statements and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a.  Creating, sponsoring and assisting in the distribution of patient education materials that contained deceptive statements;

b.  Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

c.  Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long term use for high risk patients;

d.  Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal or intravenous abuse;

e.  Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through Endo's own unbranded publications and on internet sites Endo sponsored or operated;

f.  Endorsing, directly distributing and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g.  Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

h.  Providing needed financial support to pro-opioid pain organizations – including over $5 million to the organization responsible for many of the most egregious misrepresentations – that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

i. Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

j. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k. Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

l. Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

m. Creating, endorsing and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

n. Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing.

152. Defendant Janssen made and/or disseminated deceptive statements and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a. Creating, sponsoring and assisting in the distribution of patient education materials that contained deceptive statements;

b. Directly disseminating deceptive statements through internet sites, over which Janssen exercised final editorial control and approval, stating that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

c. Disseminating deceptive statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through internet sites, over which Janssen exercised final editorial control and approval;

d. Promoting opioids for the treatment of conditions for which Janssen knew, due to the scientific studies it conducted, that opioids were not efficacious and concealing this information;

e. Sponsoring, directly distributing and assisting in the dissemination of patient education publications over which Janssen exercised final editorial control and approval, which presented an unbalanced treatment of the long-term and dose dependent risks of opioids versus NSAIDs;

f. Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

g. Providing necessary financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

h. Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

i. Targeting the elderly by sponsoring, directly distributing and assisting in the dissemination of patient education publications targeting this population that contained deceptive statements about the risks of addiction and the adverse effects of opioids and made false statements that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and improve quality of life, while concealing contrary data;

j. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k. Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

l. Creating, endorsing and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

000065

m. Targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain; and

n. Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing.

153. Defendant Cephalon made and/or disseminated untrue, false and deceptive statements and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a. Creating, sponsoring and assisting in the distribution of patient education materials that contained deceptive statements;

b. Sponsoring and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

c. Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain and breakthrough chronic non-cancer pain;

d. Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain in conjunction with Cephalon's potent rapid-onset opioids;

e. Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

f. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

g. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of Cephalon's rapid-onset opioids;

h. Directing its marketing of Cephalon's rapid-onset opioids to a wide range of doctors, including general practitioners, neurologists, sports medicine specialists and workers' compensation programs, serving chronic pain patients;

i. Making deceptive statements concerning the use of Cephalon's opioids to treat chronic non-cancer pain to prescribers through in-person detailing and speakers' bureau events, when such uses are unapproved and unsafe; and

j. Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing and speakers' bureau events.

154. Defendant Actavis made and/or disseminated deceptive statements and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a. Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing;

b. Creating and disseminating advertisements that contained deceptive statements that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life;

c. Creating and disseminating advertisements that concealed the risk of addiction in the long-term treatment of chronic, non-cancer pain; and

d. Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life while concealing contrary data.

**5. The Manufacturer Defendants Fraudulently Concealed Their Misconduct.**

155. The Manufacturer Defendants, both individually and collectively, made, promoted and profited from their misrepresentations about the risks and benefits of opioids for chronic pain, even though they knew that their misrepresentations were false and deceptive. The history of opioids, as well as research and clinical experience, establish that opioids are highly addictive and are responsible for a long list of very serious adverse outcomes. The FDA warned Defendants of this, and Defendants had access to scientific studies, detailed prescription data and reports of adverse events, including reports of addiction, hospitalization and death – all of which clearly described the harm from long-term opioid use and that patients were suffering from addiction, overdose and death in alarming numbers. More recently, the FDA and CDC have issued pronouncements, based on medical evidence, that conclusively expose the falsity of

Defendants' misrepresentations, and Endo and Purdue have recently entered agreements in New York prohibiting them from making some of the same misrepresentations described in this Complaint.

156. At all times relevant to this Complaint, the Manufacturer Defendants took steps to avoid detection of and to fraudulently conceal their deceptive marketing and unlawful, unfair and fraudulent conduct. For example, the Manufacturer Defendants disguised their role in the deceptive marketing of chronic opioid therapy by funding and working through third parties like Front Groups and KOLs. The Manufacturer Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of the Manufacturer Defendants' false and deceptive statements about the risks and benefits of long-term opioid use for chronic pain. Defendants also never disclosed their role in shaping, editing and approving the content of information and materials disseminated by these third parties. The Manufacturer Defendants exerted considerable influence on these promotional and "educational" materials in emails, correspondence and meetings with KOLs, Front Groups and public relations companies that were not, and have not yet become, public. For example, PainKnowledge.org, which the NIPC runs, did not disclose Endo's involvement. Other Manufacturer Defendants, such as Purdue and Janssen, ran similar websites that masked their own role.

157. Finally, the Manufacturer Defendants manipulated their promotional materials and the scientific literature to make it appear that these documents were accurate, truthful and supported by objective evidence when they were not. The Manufacturer Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The Manufacturer Defendants invented "pseudoaddiction" and promoted it to an

unsuspecting medical community. The Manufacturer Defendants provided the medical community with false and misleading information about ineffectual strategies to avoid or control opioid addiction. The Manufacturer Defendants recommended to the medical community that dosages be increased, without disclosing the risks. The Manufacturer Defendants spent millions of dollars over a period of years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks and promoting sales. The lack of support for the Manufacturer Defendants' deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions, nor could the Plaintiff or Plaintiff's Community have detected it. Thus, the Manufacturer Defendants successfully concealed from the medical community, patients and health care payors facts sufficient to arouse suspicion of the claims that the Plaintiff now asserts. Plaintiff did not know of the existence or scope of the Manufacturer Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

## C. THE DISTRIBUTOR DEFENDANTS' UNLAWFUL DISTRIBUTION OF OPIOIDS.

158. The Distributor Defendants owe a duty under both federal law and Georgia law to monitor, detect, investigate, refuse to fill, and report suspicious orders of prescription opioids originating from Plaintiff's Community, as well as those orders which the Distributor Defendants knew or should have known were likely to be diverted into Plaintiff's Community.

159. The foreseeable harm from a breach of these duties is the diversion of prescription opioids for nonmedical purposes.

160. Each Distributor Defendant repeatedly and purposefully breached its duties under state and federal law. Such breaches are direct and proximate causes of the widespread diversion of prescription opioids for nonmedical purposes into Plaintiff's Community.

161.  The unlawful diversion of prescription opioids is a direct and proximate cause and/or substantial contributing factor to the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality in the State and in Plaintiff's Community. This diversion and the epidemic are direct causes of harms for which Plaintiff seeks to recover here.

162.  The opioid epidemic in the State, including, *inter alia,* in Plaintiff's Community, remains an immediate **hazard to public health and safety**.

163.  The opioid epidemic in Plaintiff's Community is a temporary and continuous **public nuisance** and remains unabated.

164.  The Distributor Defendants intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

      **1. Wholesale Drug Distributors Have a Duty Under State and Federal Law to Guard Against and Report Unlawful Diversion and to Report and Prevent Suspicious Orders.**

165.   Opioids are a controlled substance, and Georgia law categorizes them as having a "high potential for abuse." *See* Ga. Code Ann. § 16-13-24(b)(2)(A). These "Schedule II" drugs are controlled substances with a "high potential for abuse." 21 U.S.C.A. §§ 812(b), 812(2)(A)-(C). *See also* Ga. Code Ann. § 16-13-26.

166.  Georgia law required each Defendant to first be registered with the Georgia State Board of Pharmacy. Ga. Code Ann. §§ 16-13-35 (Georgia Controlled Substances Act) and § 26-4-115(a) (Georgia Pharmacy Practice Act); and Ga. Comp. R. & Regs. 480-7-.03(1).

167.  The Georgia Controlled Substances Act requires "[e]very person who manufactures, distributes, or dispenses any controlled substances within this state or who proposes to engage in the manufacture, distribution, or dispensing of any controlled substance

within this state must obtain annually a registration issued by the State Board of Pharmacy in accordance with its rules." Ga. Code Ann. § 16-13-35(a).

168.  Similarly, the Georgia Pharmacy Practice Act requires all "persons, firms or corporations, whether located in this state or in any other states, engaged in the business of selling or distributing drugs at wholesale in this state, in the business of supplying drugs to manufacturers, compounders, and processors in the state, or in the business of a reverse drug distributor shall biennially register with the [Board of Pharmacy] as a drug wholesaler, distributor, reverse drug distributor, or supplier." Ga. Code Ann. § 26-4-115(a).

169.  The State Board of Pharmacy is required to register manufacturers and distributors "unless it determines that the issuance of that registration would be inconsistent with the public interest." Ga. Code Ann. § 16-13-36(a). Factors to be considered in determining the public interest include, *inter alia*, "[m]aintenance of effective controls against diversion of controlled substances into other than legitimate medical, scientific, or industrial channels" and "[p]ast experience in the manufacture or distribution of controlled substances and the existence in the applicant's establishment of effective controls against illegal diversion." Ga. Code Ann. § 16-13-36(a)(1) and (4).

170.  Georgia Board of Pharmacy Regulations require manufacturers and distributors of controlled substances to "maintain records of unusual orders of controlled substances received by the registrant and shall inform the Office of the Director of the Georgia Drugs and Narcotics Agency (GDNA) of unusual orders when discovered by the registrant." Ga. Comp. R. & Regs. 480-20-.02(1). *See also* Ga. Code Ann. § 16-13-39 ("Persons registered to manufacture, distribute, or dispense controlled substances under this article shall keep a complete and accurate record of all controlled substances . . . and shall maintain such records and inventories in

conformance with the record-keeping and inventory requirements of federal law and with any additional rules issued by the State Board of Pharmacy"); Ga. Code Ann. § 16-13-42(a)(3) ("It is unlawful for any person: . . . To refuse or fail to make, keep, or furnish any record, notification, order form, statement, invoice, or information required under this article"); and Ga. Code Ann. § 16-13-37(a)(1) (registration to manufacture or distribute a controlled substance may be suspended or revoked if the registrant has "furnished false or fraudulent material information in any application filed under [the Georgia Uniform Controlled Substances Act]").

171.  Furthermore, Georgia law incorporates federal requirements set out under the Controlled Substance Act and related controlled substance laws and regulations. *See* Ga. Comp. R. & Regs. 480-7-.03(10)(b) ("Wholesale drug distributors . . . shall comply with all applicable State, Local, and DEA regulations."); Ga. Code Ann. § 16-13-36(d) ("[c]ompliance by manufacturers and distributors with the provisions of federal law respecting registration . . . entitles them to be registered under [Article 16 of the Georgia Controlled Substances Act].") and Ga. Code Ann. § 16-13-39 ("Persons registered to manufacture, distribute, or dispense controlled substances under [Article 16 of the Georgia Controlled Substances Act] shall keep a complete and accurate record of all controlled substances . . . and shall maintain such records and inventories in conformance with the record-keeping and inventory requirements of federal law and with any additional rules issued by the State Board of Pharmacy").

172.  The federal Controlled Substance Act further required each Distributor Defendant to register with the DEA. *See* 21 U.S.C. § 823(b), (e) and 28 C.F.R. § 0.100. Each Distributor Defendant is a "registrant" as a wholesale distributor in the chain of distribution of Schedule II controlled substances with a duty to comply with all security requirements imposed under that statutory scheme. Georgia law adopts and incorporates those requirements, as set out above. *See,*

*e.g.*, Ga. Comp. R. & Regs. 480-7-.03(10) ("Wholesale drug distributors shall operate in compliance with applicable Federal, State, and local laws and regulations."); Ga. Code Ann. § 26-4-115(a) (registration may be suspended or revoked, among other punishments, "if the registrant fails to comply with any law of this state [or] the United States"); Ga. Code Ann. § 26-4-115(b)(2) (registered wholesalers and distributors shall "[a]utomatically submit reports of any excessive purchases of controlled substances by licensed persons or firms located within this state using the federal Drug Enforcement Administration guidelines to define excessive purchases as set forth under the provisions of 21 C.F.R. Section 1301"); Ga. Code Ann. § 16-13-37(a)(3) (registration can be suspended or revoked if the registrant has had its "federal registration to manufacture, distribute, or dispense controlled substances suspended or revoked").

173.    Each Distributor Defendant has an affirmative duty under federal and Georgia law to act as a gatekeeper guarding against the diversion of the highly addictive, dangerous opioid drugs. Federal law requires that Distributors of Schedule II drugs, including opioids, must maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. § 823(b)(1). Georgia law adopts and incorporates those requirements, as set out above. *See also* Ga. Code Ann. § 16-13-37(a)(5) (registration can be suspended or revoked by the State Board of Pharmacy upon a finding that the registrant has "failed to maintain sufficient controls against diversion of controlled substances into other than legitimate medical, scientific, or industrial channels.").

174.    Federal regulations and Georgia law impose a non-delegable duty upon wholesale drug distributors to "design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant [distributor] shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious

orders include orders of unusual size, orders deviating substantially from a normal pattern, and

orders of unusual frequency." 21 C.F.R. § 1301.74(b). *See also* Ga. Comp. R. & Regs. 480-20-

.02(1) ("Each registrant shall maintain records of unusual orders of controlled substances

received by the registrant and shall inform the Office of the Director of the Georgia Drugs and

Narcotics Agency (GDNA) of unusual orders when discovered by the registrant. For purposes of

this section, an unusual order shall include orders of greatly increased quantity, orders deviating

substantially from a normal pattern, and orders of highly abnormal frequency.").

175.   "Suspicious orders" include orders of an unusual size, orders of unusual frequency

or orders deviating substantially from a normal pattern. *See* 21 CFR § 1301.74(b). These criteria

are disjunctive and are not all inclusive. For example, if an order deviates substantially from a

normal pattern, the size of the order does not matter and the distributor should report the order as

suspicious. Likewise, a wholesale distributor need not wait for a normal pattern to develop over

time before determining whether a particular order is suspicious. The size of an order alone,

regardless of whether it deviates from a normal pattern, is enough to trigger the wholesale

distributor's responsibility to report the order as suspicious. The determination of whether an

order is suspicious depends not only on the ordering patterns of the particular customer, but also

on the patterns of the entirety of the wholesale distributor's customer base and the patterns

throughout the relevant segment of the wholesale distributor industry.

176.   In addition to reporting all suspicious orders, distributors must also stop shipment

on any order which is flagged as suspicious and only ship orders that were flagged as potentially

suspicious if, after conducting due diligence, the distributor can determine that the order is not

likely to be diverted into illegal channels. *See Southwood Pharm., Inc.*, 72 Fed. Reg. 36,487,

36,501 (Drug Enf't Admin. July 3, 2007); *Masters Pharmaceutical, Inc. v. Drug Enforcement*

*Administration*, No. 15-11355 (D.C. Cir. June 30, 2017). Regardless, distributors must report all flagged orders. *Id.*

177. The law regulates these prescription drugs for the purpose of providing a "closed" system **intended to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market**, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.[114]

178. Different entities supervise the discrete links in the chain that separate a consumer from a controlled substance. Statutes and regulations define each participant's role and responsibilities.[115]

179. As the DEA advised the Distributor Defendants in a letter to them dated September 27, 2006, wholesale distributors are "one of the key components of the distribution chain. If the closed system is to function properly … distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. This responsibility is critical, as … the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people."[116]

---

[114] *See* 1970 U.S.C.C.A.N. 4566, 4571-72.

[115] Brief for Healthcare Distribution Management Association and National Association of Chain Drug Stores as Amici Curiae in Support of Neither Party, *Masters Pharm., Inc. v. U.S. Drug Enf't Admin.* (No. 15-1335) (D.C. Cir. Apr. 4, 2016), 2016 WL 1321983, at *22 [hereinafter Brief for HDMA and NACDS]. The Healthcare Distribution Management Association (HDMA or HMA)—now known as the Healthcare Distribution Alliance (HDA)—is a national, not-for-profit trade association that represents the nation's primary, full-service healthcare distributors whose membership includes, among others: AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation. *See generally* HDA, *About*, https://www.healthcaredistribution.org/about (last visited Aug. 21, 2017). The National Association of Chain Drug Stores (NACDS) is a national, not-for-profit trade association that represents traditional drug stores and supermarkets and mass merchants with pharmacies whose membership includes, among others: Walgreen Company, CVS Health, Rite Aid Corporation and Walmart. *See generally* NACDS, *Mission*, https://www.nacds.org/ about/mission/ (last visited Aug. 21, 2017).

[116] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Sept. 27, 2006) [hereinafter Rannazzisi Letter] ("This letter is being sent to every commercial entity in the United States registered with the Drug Enforcement Agency (DEA) to distribute controlled substances. The purpose of this letter is to reiterate the responsibilities of controlled substance

180.  The Distributor Defendants have admitted that they are responsible for reporting suspicious orders.[117]

181.  The DEA sent a letter to each of the Distributor Defendants on September 27, 2006, warning that it would use its authority to revoke and suspend registrations when appropriate. The letter expressly states that a distributor, ***in addition*** to reporting suspicious orders, has a "statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels."[118] The letter also instructs that "distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes."[119] The DEA warns that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."[120]

182.  The DEA sent a second letter to each of the Distributor Defendants on December 27, 2007.[121] This letter reminds the Defendants of their statutory and regulatory duties to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances."[122]  The letter further explains:

> The regulation also requires that the registrant inform the local DEA Division Office of suspicious orders <u>when discovered</u> by the registrant. Filing a

---

distributors in view of the prescription drug abuse problem our nation currently faces."), *filed in Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-51.

[117] *See* Brief for HDMA and NACDS, *supra*, 2016 WL 1321983, at *4 ("[R]egulations . . . in place for more than 40 years require distributors to report suspicious orders of controlled substances to DEA based on information readily available to them (e.g., a pharmacy's placement of unusually frequent or large orders).").

[118]  Rannazzisi Letter, *supra*, at 2.

[119]  *Id.* at 1.

[120] *Id.* at 2.

[121] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Dec. 27, 2007), filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-8.

[122]  *Id.*

monthly report of completed transactions (*e.g.*, "excessive purchase report" or "high unity purchases") does not meet the regulatory requirement to report suspicious orders. Registrants are reminded that their responsibility does not end merely with the filing of a suspicious order report. Registrants must conduct an independent analysis of suspicious orders prior to completing a sale to determine whether the controlled substances are likely to be diverted from legitimate channels. Reporting an order as suspicious will not absolve the registrant of responsibility if the registrant knew, or should have known, that the controlled substances were being diverted.

The regulation specifically states that suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of an unusual frequency. These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a registrant need not wait for a "normal pattern" to develop over time before determining whether a particular order is suspicious. The size of an order alone, whether or not it deviates from a normal pattern, is enough to trigger the registrant's responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer, but also on the patterns of the registrant's customer base and the patterns throughout the segment of the regulated industry.

Registrants that rely on rigid formulas to define whether an order is suspicious may be failing to detect suspicious orders. For example, a system that identifies orders as suspicious only if the total amount of a controlled substance ordered during one month exceeds the amount ordered the previous month by a certain percentage or more is insufficient. This system fails to identify orders placed by a pharmacy if the pharmacy placed unusually large orders from the beginning of its relationship with the distributor. Also, this system would not identify orders as suspicious if the order were solely for one highly abused controlled substance if the orders never grew substantially. Nevertheless, ordering one highly abused controlled substance and little or nothing else deviates from the normal pattern of what pharmacies generally order.

When reporting an order as suspicious, registrants must be clear in their communication with DEA that the registrant is actually characterizing an order as suspicious. Daily, weekly, or monthly reports submitted by registrant indicating "excessive purchases" do not comply with the requirement to report suspicious orders, even if the registrant calls such reports "suspicious order reports."

Lastly, registrants that routinely report suspicious orders, yet fill these orders without first determining that order is not being diverted into other than legitimate medical, scientific, and industrial channels, may be failing to maintain effective controls against diversion. Failure to maintain effective controls against diversion is inconsistent with the public interest as that term is used in 21 USC

823 and 824, and may result in the revocation of the registrant's DEA Certificate of Registration.[123]

Finally, the DEA letter references the Revocation of Registration issued in *Southwood Pharmaceuticals, Inc.*, 72 Fed. Reg. 36,487-01 (July 3, 2007), which discusses the obligation to report suspicious orders and "some criteria to use when determining whether an order is suspicious."[124]

183. The Distributor Defendants admit that they "have not only statutory and regulatory responsibilities to detect and prevent diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."[125]

184. The Distributor Defendants knew they were required to monitor, detect and halt suspicious orders. Industry compliance guidelines established by the Healthcare Distribution Management Association, the trade association of pharmaceutical distributors, explain that distributors are "[a]t the center of a sophisticated supply chain" and therefore "are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers." The guidelines set forth recommended steps in the "due diligence" process and note in particular: If an order meets or exceeds a distributor's threshold, as defined in the distributor's monitoring system, or the distributor otherwise characterizes it as an order of interest, the distributor should not ship to the customer, in fulfillment of that order, any units of the specific drug code product as to which the order met or

---

[123] *Id*.

[124] *Id*.

[125] *See* Brief of HDMA, *supra*, 2012 WL 1637016, at *2.

exceeded a threshold or as to which the order was otherwise characterized as an order of interest.[126]

185. Each of the Distributor Defendants sold prescription opioids, including hydrocodone and/or oxycodone, to retailers in Plaintiff's Community and/or to retailers from which Defendants knew prescription opioids were likely to be diverted to Plaintiff's Community.

186. Each Distributor Defendant owes a duty to monitor and detect suspicious orders of prescription opioids.

187. Each Distributor Defendant owes a duty under federal and state law to investigate and refuse suspicious orders of prescription opioids.

188. Each Distributor Defendant owes a duty under federal and state law to report suspicious orders of prescription opioids.

189. Each Distributor Defendant owes a duty under federal and state law to prevent the diversion of prescription opioids into illicit markets in the State and Plaintiff's Community.

190. The foreseeable harm resulting from a breach of these duties is the diversion of prescription opioids for nonmedical purposes and subsequent plague of opioid addiction.

191. The foreseeable harm resulting from the diversion of prescription opioids for nonmedical purposes is abuse, addiction, morbidity and mortality in Plaintiff's Community and the damages caused thereby.

### 2. The Distributor Defendants Breached Their Duties.

192. Because distributors handle such large volumes of controlled substances and are the first major line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, it is incumbent on distributors to maintain effective

---

[126] Healthcare Distribution Management Association (HDMA) *Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances*, filed in *Cardinal Health, Inc. v. Holder*, No. 12-5061 (D.C. Cir. Mar. 7, 2012), Doc. No. 1362415 (App'x B).

controls to prevent diversion of controlled substances. Should a distributor deviate from these checks and balances, the closed system collapses.[127]

193.   The sheer volume of prescription opioids distributed to pharmacies in the Plaintiff's Community and/or to pharmacies from which the Distributor Defendants knew the opioids were likely to be diverted into Plaintiff's Community is excessive for the medical need of the community and facially suspicious. Some red flags are so obvious that no one who engages in the legitimate distribution of controlled substances can reasonably claim ignorance of them.[128]

194.   The Distributor Defendants failed to report "suspicious orders" originating from Plaintiff's Community or that the Distributor Defendants knew were likely to be diverted to Plaintiff's Community to the federal and state authorities, including the DEA and/or the state Board of Pharmacy.

195.   The Distributor Defendants unlawfully filled suspicious orders of unusual size, orders deviating substantially from a normal pattern and/or orders of unusual frequency in Plaintiff's Community and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted to Plaintiff's Community.

196.   The Distributor Defendants breached their duty to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates originating from Plaintiff's Community and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted to Plaintiff's Community.

---

[127]  *See* Rannazzisi Decl. ¶ 10, filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-2.

[128]  *Masters Pharmaceuticals, Inc.*, 80 Fed. Reg. 55,418-01, 55,482 (Sept. 15, 2015) (citing *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*, 77 Fed. Reg. 62,316, 62,322 (2012)).

197. The Distributor Defendants breached their duty to maintain effective controls against diversion of prescription opiates into other than legitimate medical, scientific and industrial channels.

198. The Distributor Defendants breached their duty to "design and operate a system to disclose to the registrant suspicious orders of controlled substances" and failed to inform the authorities including the DEA of suspicious orders when discovered, in violation of their duties under federal and state law.

199. The Distributor Defendants breached their duty to exercise due diligence to avoid filling suspicious orders that might be diverted into channels other than legitimate medical, scientific and industrial channels.[129]

200. The federal and state laws at issue here are public safety laws.

201. The Distributor Defendants' violations of public safety statutes constitute prima facie evidence of negligence under State law.

202. The Distributor Defendants supplied prescription opioids to obviously suspicious physicians and pharmacies, enabled the illegal diversion of opioids, aided criminal activity and disseminated massive quantities of prescription opioids into the black market.

203. The unlawful conduct by the Distributor Defendants is purposeful and intentional. The Distributor Defendants refuse to abide by the duties imposed by federal and state law, which require Distributor Defendants to legally acquire and maintain a license to distribute prescription opiates.

---

[129] *See Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 206 (D.D.C. 2012).

204. The Distributor Defendants acted with actual malice in breaching their duties, i.e., they have acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

205. The Distributor Defendants' repeated shipments of suspicious orders over an extended period of time, in violation of public safety statutes and without reporting the suspicious orders to the relevant authorities demonstrate wanton, willful or reckless conduct or criminal indifference to civil obligations affecting the rights of others and justifies an award of punitive damages.

### 3. The Distributor Defendants Have Sought to Avoid and Have Misrepresented Their Compliance with Their Legal Duties.

206. The Distributor Defendants have repeatedly misrepresented their compliance with their legal duties under state and federal law and have wrongfully and repeatedly disavowed those duties in an effort to mislead regulators and the public regarding the Distributor Defendants' compliance with their legal duties.

207. The Distributor Defendants have refused to recognize any duty beyond reporting suspicious orders. In Masters Pharmaceuticals, the HDMA, a trade association the Distributor Defendants run, and the NACDS submitted amicus briefs regarding the legal duty of wholesale distributors. Inaccurately denying the legal duties that the wholesale drug industry has been tragically recalcitrant in performing, they argued as follows:

    a. The Associations complained that the "DEA has required distributors not only to report suspicious orders, but to *investigate* orders (e.g., by interrogating pharmacies and physicians) and take action to *halt* suspicious orders before they are filled."[130]

    b. The Associations argued that, "DEA now appears to have changed its position to require that distributors not only *report* suspicious orders, but *investigate* and *halt*

---

[130] Brief for HDMA and NACDS, *supra*, 2016 WL 1321983, at *4–5.

suspicious orders. Such a change in agency position must be accompanied by an acknowledgment of the change and a reasoned explanation for it. In other words, an agency must display awareness that it *is* changing position and show that there are good reasons for the new policy. This is especially important here, because imposing intrusive obligation on distributors threatens to disrupt patient access to needed prescription medications."[131]

c.  The Associations alleged (inaccurately) that nothing "requires distributors to investigate the legitimacy of orders, or to halt shipment of any orders deemed to be suspicious."[132]

d.  The Association complained that the purported "practical infeasibility of requiring distributors to investigate and halt suspicious orders (as well as report them) underscores the importance of ensuring that DEA has complied with the APA before attempting to impose such duties."[133]

e.  The Associations alleged (inaccurately) that "DEA's regulations [] sensibly impose[] a duty on distributors simply to *report* suspicious orders, but left it to DEA and its agents to investigate and halt suspicious orders."[134]

f.  Also inaccurately, the Associations argued that, "[i]mposing a duty on distributors – which lack the patient information and the necessary medical expertise – to investigate and halt orders may force distributors to take a shot-in-the-dark approach to complying with DEA's demands."[135]

208.  The positions taken by the trade groups is emblematic of the position taken by the Distributor Defendants in a futile attempt to deny their legal obligations to prevent diversion of the dangerous drugs.[136]

209.  The Court of Appeals for the District of Columbia recently issued its opinion affirming that a wholesale drug distributor does, in fact, have duties beyond reporting. *Masters*

---

[131] *Id.* at *8 (citations and quotation marks omitted).

[132] *Id.* at *14.

[133] *Id.* at *22.

[134] *Id.* at *24–25.

[135] *Id.* at 26.

[136] *See* Brief of HDMA, *supra*, 2012 WL 1637016, at *3 (arguing the wholesale distributor industry "does not know the rules of the road because" they claim (inaccurately) that the "DEA has not adequately explained them").

*Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206 (D.C. Cir. 2017). The D.C. Circuit Court upheld the revocation of Master Pharmaceutical's license and determined that DEA regulations require that, in addition to reporting suspicious orders, distributors must "decline to ship the order, or conduct some 'due diligence' and—if it is able to determine that the order is not likely to be diverted into illegal channels—ship the order." *Id.* at 212. Masters Pharmaceutical was in violation of legal requirements because it failed to conduct necessary investigations and filled suspicious orders. *Id.* at 218–19, 226. A distributor's investigation must dispel all the red flags giving rise to suspicious circumstance prior to shipping a suspicious order. *Id.* at 226. The Circuit Court also rejected the argument made by the HDMA and NACDS (quoted above) that, allegedly, the DEA had created or imposed new duties. *Id.* at 220.

210.   Wholesale Distributor McKesson recently has been forced to specifically admit to breaches of its duties to monitor, report and prevent suspicious orders. Pursuant to an Administrative Memorandum of Agreement ("2017 Agreement") between McKesson and the DEA in January 2017, McKesson admitted that, at various times during the period from January 1, 2009 through the effective date of the Agreement (January 17, 2017), it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters."[137]  Further, the 2017 Agreement specifically finds that McKesson "distributed controlled substances to pharmacies even though those McKesson Distribution Centers should have known that the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their

---

[137] *See* Administrative Memorandum of Agreement between the U.S. Dep't of Justice, the Drug Enf't Admin., and the McKesson Corp. (Jan. 17, 2017), https://www.justice.gov/opa/press-release/file/928476/download.

professional practice, as required by 21 C.F.R § 1306.04(a)."[138] McKesson admitted that, during

this time period, it "failed to maintain effective controls against diversion of particular controlled

substances into other than legitimate medical, scientific and industrial channels by sales to

certain of its customers in violation of the CSA and the CSA's implementing regulations, 21

C.F.R. Part 1300 *et seq*., at the McKesson Distribution Centers," including the McKesson

Distribution Center located in "Washington Courthouse, Ohio."[139]   Due to these violations,

McKesson agreed that its authority to distribute controlled substances from the Washington

Courthouse, Ohio facility (among other facilities) would be partially suspended.[140]

211.   The 2017 Agreement followed a 2008 Settlement Agreement in which McKesson

also admitted failure to report suspicious orders of controlled substances to the DEA.[141]   In the

2008 Settlement Agreement, McKesson "recognized that it had a duty to monitor its sales of all

controlled substances and report suspicious orders to DEA," but had failed to do so.[142]   The 2017

Agreement documents that McKesson continued to breach its admitted duties by "fail[ing] to

properly monitor its sales of controlled substances and/or report suspicious orders to DEA, in

accordance with McKesson's obligations."[143]   As a result of these violations, McKesson was

fined and required to pay to the United States $150,000,000.[144]

---

[138] *Id.* at 4.

[139] *Id.*

[140] *Id.* at 6.

[141] *Id.* at 4.

[142] *Id.*

[143] *Id.*; *see also* Settlement Agreement and Release between the U.S. and McKesson Corp., at 5 (Jan. 17, 2017) [hereinafter 2017 Settlement Agreement and Release] ("McKesson acknowledges that, at various times during the Covered Time Period [2009-2017], it did not identify or report to DEA certain orders placed by certain pharmacies, which should have been detected by McKesson as suspicious, in a manner fully consistent with the requirements set forth in the 2008 MOA."), https://www.justice.gov/opa/press-release/file/928471/download.

[144] *See* 2017 Settlement Agreement and Release, *supra*, at 6.

212.  Even though McKesson had been sanctioned in 2008 for failure to comply with its legal obligations regarding controlling diversion and reporting suspicious orders, and even though McKesson had specifically agreed in 2008 that it would no longer violate those obligations, McKesson continued to violate the laws in contrast to its written agreement not to do so.

213.  Because of the Distributor Defendants' refusal to abide by their legal obligations, the DEA has repeatedly taken administrative action to attempt to force compliance. For example, in May 2014, the United States Department of Justice, Office of the Inspector General, Evaluation and Inspections Divisions reported that the DEA issued final decisions in 178 registrant actions between 2008 and 2012.[145] The Office of Administrative Law Judges issued a recommended decision in a total of 117 registrant actions before the DEA issued its final decision, including 76 actions involving orders to show cause and 41 actions involving immediate suspension orders.[146] These actions include the following:

   a. On April 24, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the AmerisourceBergen Orlando, Florida distribution center ("Orlando Facility") alleging failure to maintain effective controls against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its DEA registration;

   b. On November 28, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Auburn, Washington Distribution Center ("Auburn Facility") for failure to maintain effective controls against diversion of hydrocodone;

   c. On December 5, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution

---

[145] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.

[146] *Id.*

Center ("Lakeland Facility") for failure to maintain effective controls against diversion of hydrocodone;

d.  On December 7, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Swedesboro, New Jersey Distribution Center ("Swedesboro Facility") for failure to maintain effective controls against diversion of hydrocodone;

e.  On January 30, 2008, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Stafford, Texas Distribution Center ("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone;

f.  On May 2, 2008, McKesson Corporation entered into an *Administrative Memorandum of Agreement* ("2008 MOA") with the DEA, which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program;"

g.  On September 30, 2008, Cardinal Health entered into a *Settlement and Release Agreement and Administrative Memorandum of Agreement* with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia ("McDonough Facility"); Valencia, California ("Valencia Facility"); and Denver, Colorado ("Denver Facility");

h.  On February 2, 2012, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Lakeland Facility for failure to maintain effective controls against diversion of oxycodone;

i.  On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against the Lakeland Facility; and

j.  On January 5, 2017, McKesson Corporation entered into an *Administrative Memorandum Agreement* with the DEA wherein it agreed to pay a $150 million civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora, Colorado; Aurora, Illinois; Delran, New Jersey; LaCrosse, Wisconsin; Lakeland, Florida; Landover,

Maryland; La Vista, Nebraska; Livonia, Michigan; Livonia, Michigan; Methuan, Massachusetts; Santa Fe Springs, California; Washington Courthouse, Ohio; and West Sacramento, California.

214. Rather than abide by their non-delegable duties under public safety laws, the Distributor Defendants, individually and collectively through trade groups in the industry, pressured the U.S. Department of Justice to "halt" prosecutions and lobbied Congress to strip the DEA of its ability to immediately suspend distributor registrations. The result was a "sharp drop in enforcement actions" and the passage of the "Ensuring Patient Access and Effective Drug Enforcement Act," which, ironically, raised the burden for the DEA to revoke a distributor's license from "imminent harm" to "immediate harm" and provided the industry the right to "cure" any violations of law before the DEA can issue a suspension order.[147]

215. In addition to taking actions to limit regulatory prosecutions and suspensions, the Distributor Defendants undertook to fraudulently convince the public that they were complying with their legal obligations, including those imposed by licensing regulations. Through such statements, the Distributor Defendants attempted to assure the public they were working to curb the opioid epidemic.

216. For example, a Cardinal Health executive claimed that it uses "advanced analytics" to monitor its supply chain and represented that it was being "as effective and efficient as

---

[147] *See* Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post, Mar. 6, 2017, https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html; Eric Eyre, *DEA Agent: "We Had No Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail, Feb. 18, 2017, http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills-.

possible in constantly monitoring, identifying, and eliminating any outside criminal activity."[148] Given the sales volumes and the company's history of violations, this executive was either not telling the truth or, if Cardinal Health had such a system, it ignored the results.

217. Similarly, Defendant McKesson publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders" and claimed it is "deeply passionate about curbing the opioid epidemic in our country."[149] Again, given McKesson's historical conduct, this statement is either false, or the company ignored outputs of the monitoring program.

218. By misleading the public about the effectiveness of their controlled substance monitoring programs, the Distributor Defendants successfully concealed the facts sufficient to arouse suspicion of the claims that the Plaintiff now asserts. The Plaintiff did not know of the existence or scope of Distributor Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

219. Meanwhile, the opioid epidemic rages unabated in the Nation, the State and Plaintiff's Community.

220. The epidemic still rages because the fines and suspensions imposed by the DEA do not change the conduct of the industry. The distributors, including the Distributor Defendants, pay fines as a cost of doing business in an industry that generates billions of dollars in annual revenue. They hold multiple DEA registration numbers, and when the DEA suspends one facility, they simply ship from another facility.

---

[148] Lenny Bernstein, *et al.*, *How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: "No One Was Doing Their Job,"* Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html.

[149] Scott Higham, *et al.*, *Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried to Curb Opioid Abuse*, Wash. Post, Dec. 22, 2016, https://www.washingtonpost.com/investigations/key-officials-switch-sides-from-dea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-949c5893595e_story.html.

221.   Plaintiff's racketeering allegations below allege in greater detail the wrongful actions and omissions of the Distributor Defendants, which have caused the diversion of opioids and have been a substantial contributing factor to and/or proximate cause of the opioid crisis.

222.   The Distributor Defendants have abandoned their duties imposed under federal and state law, taken advantage of a lack of DEA law enforcement and abused the privilege of distributing controlled substances in the State and Plaintiff's Community.

## D.  THE MANUFACTURER DEFENDANTS' UNLAWFUL FAILURE TO PREVENT DIVERSION AND MONITOR, REPORT AND PREVENT SUSPICIOUS ORDERS.

223.   The same legal duties to prevent diversion and to monitor, report and prevent suspicious orders of prescription opioids that were incumbent upon the Distributor Defendants were also legally required of the Manufacturer Defendants under federal and Georgia law.

224.   Under Georgia and federal law, the Manufacturer Defendants were required to comply with substantially the same licensing and permitting requirements as the Distributor Defendants and the same rules regarding prevention of diversion and reporting suspicious orders, as set out above. See, e.g., Ga. Comp. R. & Regs. 480-7-.02; Ga. Comp. R. & Regs. 480-20-.02(1); Ga. Code Ann. § 16-13-35; Ga. Code Ann. § 16-13-36; Ga. Code Ann. § 16-13-37(a); Ga. Code Ann. § 16-13-39.

225.   Like the Distributor Defendants, the Manufacturer Defendants were required to register with the DEA to manufacture schedule II controlled substances like prescription opioids. See 21 U.S.C. § 823(a). A requirement of such registration is the:

> maintenance of effective controls against diversion of particular controlled substances and any controlled substance in schedule I or II compounded therefrom into other than legitimate medical, scientific, research, or industrial channels, by limiting the importation and bulk manufacture of such controlled substances to a number of establishments which can produce an adequate and uninterrupted supply of these substances under adequately competitive conditions for legitimate medical, scientific, research, and industrial purposes...

21 U.S.C. § 823(a)(1).

226.  Additionally, as "registrants" under Section 823, the Manufacturer Defendants were also required to monitor, report and prevent suspicious orders of controlled substances:

> The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

21 C.F.R. § 1301.74. *See also* 21 C.F.R. § 1301.02 ("Any term used in this part shall have the definition set forth in section 102 of the Act (21 U.S.C. 802) or part 1300 of this chapter."); 21 C.F.R. § 1300.01 ("Registrant means any person who is registered pursuant to either section 303 or section 1008 of the Act (21 U.S.C. 823 or 958).") Like the Distributor Defendants, the Manufacturer Defendants breached these duties.

227.  The Manufacturer Defendants had access to and possession of the information necessary to monitor, report and prevent suspicious orders and to prevent diversion. The Manufacturer Defendants engaged in the practice of paying "chargebacks" to opioid distributors. A chargeback is a payment made by a manufacturer to a distributor after the distributor sells the manufacturer's product at a price below a specified rate. After a distributor sells a manufacturer's product to a pharmacy, for example, the distributor requests a chargeback from the manufacturer and, in exchange for the payment, the distributor identifies to the manufacturer the product, volume and the pharmacy to which it sold the product. Thus, the Manufacturer Defendants knew – just as the Distributor Defendants knew – the volume, frequency and pattern of opioid orders being placed and filled. The Manufacturer Defendants built receipt of this information into the payment structure for the opioids provided to the opioid distributors.

Case 1:21-cv-00018-JRH-BKE Document 1-2 Filed 02/03/21 Page 138 of 301

228.   Federal statutes and regulations are clear: just like opioid distributors, the law requires opioid manufacturers to "design and operate a system to disclose . . . suspicious orders of controlled substances" and to maintain "effective controls against diversion." 21 C.F.R. § 1301.74; 21 U.S.C. § 823(a)(1). Georgia law also requires manufacturers to maintain sufficient controls against diversion. *See., e.g.,* Ga. Code Ann. § 16-13-36(a)(1); Ga. Code Ann. § 16-13-37(a)(5); Ga. Comp. R. & Regs. 480-7-.03(7)(b) (minimum requirements for storage and handling of prescription drugs and for establishment and maintenance of prescription drug distribution records includes protections against diversion).

229.   The Department of Justice recently has confirmed the suspicious order obligations clearly imposed by federal law upon opioid manufacturers, fining Mallinckrodt $35 million for failure to report suspicious orders of controlled substances, including opioids, and for violating recordkeeping requirements.[150]

230.   In the press release accompanying the settlement, the Department of Justice stated: Mallinckrodt "did not meet its obligations to detect and notify DEA of suspicious orders of controlled substances such as oxycodone, the abuse of which is part of the current opioid epidemic. These suspicious order monitoring requirements exist to prevent excessive sales of controlled substances, like oxycodone . . .  Mallinckrodt's actions and omissions formed a link in the chain of supply that resulted in millions of oxycodone pills being sold on the street. . . . Manufacturers and distributors have a crucial responsibility to ensure that controlled substances do not get into the wrong hands[.]"[151]

---

[150] *See* Press Release, U.S. Dep't of Justice, *Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations* (July 11, 2017), https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders.

[151] *Id.*

231. The settlement resolved, *inter alia,* government's allegations that "Mallinckrodt failed to design and implement an effective system to detect and report 'suspicious orders' for controlled substances – orders that are unusual in their frequency, size, or other patterns . . . [and] Mallinckrodt supplied distributors, and the distributors then supplied various U.S. pharmacies and pain clinics, an increasingly excessive quantity of oxycodone pills without notifying DEA of these suspicious orders."[152]

232. The Memorandum of Agreement Mallinckrodt entered into ("2017 Mallinckrodt MOA") avers "[a]s a registrant under the CSA, Mallinckrodt had a responsibility to maintain effective controls against diversion, including a requirement that it review and monitor these sales and report suspicious orders to DEA."[153]

233. The 2017 Mallinckrodt MOA further details the DEA's allegations regarding Mallinckrodt's failures to fulfill its legal duties as an opioid manufacturer:

> With respect to its distribution of oxycodone and hydrocodone products, Mallinckrodt's alleged failure to distribute these controlled substances in a manner authorized by its registration and Mallinckrodt's alleged failure to operate an effective suspicious order monitoring system and to report suspicious orders to the DEA when discovered as required by and in violation of 21 C.F.R. § 1301.74(b). The above includes, but is not limited to Mallinckrodt's alleged failure to:
>
>   i.   conduct adequate due diligence of its customers;
>
>   ii.  detect and report to the DEA orders of unusual size and frequency;
>
>   iii. detect and report to the DEA orders deviating substantially from normal patterns including, but not limited to, those identified in letters from the DEA Deputy Assistant Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007:

---

[152] *Id.*

[153] Administrative Memorandum of Agreement between the United States Department of Justice, the Drug Enforcement Agency, and Mallinckrodt, plc. and its subsidiary Mallinckrodt, LLC (July 10, 2017), https://www.justice.gov/usao-edmi/press-release/file/986026/download. ("2017 Mallinckrodt MOA").

1. orders that resulted in a disproportionate amount of a substance which is most often abused going to a particular geographic region where there was known diversion,

2. orders that purchased a disproportionate amount of a substance which is most often abused compared to other products, and

3. orders from downstream customers to distributors who were purchasing from multiple different distributors, of which Mallinckrodt was aware;

iv. use "chargeback" information from its distributors to evaluate suspicious orders. Chargebacks include downstream purchasing information tied to certain discounts, providing Mallinckrodt with data on buying patterns for Mallinckrodt products; and

v. take sufficient action to prevent recurrence of diversion by downstream customers after receiving concrete information of diversion of Mallinckrodt product by those downstream customers.[154]

234. Mallinckrodt agreed that its "system to monitor and detect suspicious orders did not meet the standards outlined in letters from the DEA Deputy Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007." Mallinckrodt further agreed that it "recognizes the importance of the prevention of diversion of the controlled substances they manufacture" and would "design and operate a system that meets the requirements of 21 CFR 1301.74(b) . . . [such that it would] utilize all available transaction information to identify suspicious orders of any Mallinckrodt product. Further, Mallinckrodt agrees to notify DEA of any diversion and/or suspicious circumstances involving any Mallinckrodt controlled substances that Mallinckrodt discovers."[155]

---

[154] 2017 Mallinckrodt MOA at p. 2-3.

[155] *Id.* at 3-4.

235.   Mallinckrodt acknowledged that "[a]s part of their business model Mallinckrodt collects transaction information, referred to as chargeback data, from their direct customers (distributors). The transaction information contains data relating to the direct customer sales of controlled substances to 'downstream' registrants." Mallinckrodt agreed that, from this data, it would "report to the DEA when Mallinckrodt concludes that the chargeback data or other information indicates that a downstream registrant poses a risk of diversion."[156]

236.   The same duties federal law imposed on Mallinckrodt were imposed upon all Manufacturer Defendants.

237.   The same business practices Mallinckrodt utilized regarding "charge backs" and receipt and review of data from opioid distributors as to orders of opioids were utilized industry-wide among opioid manufacturers and distributors, including, upon information and belief, the other Manufacturer Defendants.

238.   Through, inter alia, the chargeback data, the Manufacturer Defendants could monitor suspicious orders of opioids.

239.   The Manufacturer Defendants failed to monitor, report and halt suspicious orders of opioids as required by federal law.

240.   The Manufacturer Defendants' failures to monitor, report and halt suspicious orders of opioids were intentional and unlawful.

241.   The Manufacturer Defendants have misrepresented their compliance with federal law.

242.   The Manufacturer Defendants enabled the supply of prescription opioids to obviously suspicious physicians and pharmacies, enabled the illegal diversion of opioids, aided

---

[156] *Id.* at p.5.

criminal activity and disseminated massive quantities of prescription opioids into the black market.

243.  Plaintiff's racketeering allegations below allege in greater detail the wrongful actions and omissions of the Manufacturer Defendants, which have caused the diversion of opioids and have been a substantial contributing factor to and/or proximate cause of the opioid crisis.

244.  The Manufacturer Defendants' actions and omissions in failing to effectively prevent diversion and failing to monitor, report and prevent suspicious orders have enabled the unlawful diversion of opioids into Plaintiff's Community.

**E.  DEFENDANTS' UNLAWFUL CONDUCT AND BREACHES OF LEGAL DUTIES CAUSED THE HARM ALLEGED HEREIN AND SUBSTANTIAL DAMAGES.**

245.  As the Manufacturer Defendants' efforts to expand the market for opioids have increased, so have the rates of prescription and sale of their products — and the rates of opioid-related substance abuse, hospitalization and death among the people of the State and the Plaintiff's Community. The Distributor Defendants have continued to unlawfully ship these massive quantities of opioids into communities like the Plaintiff's Community, fueling the epidemic.

246.  There is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes."[157]

247.  Opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions.[158]

---

[157] *See* Dart, *et al.*, *supra*.

[158] *See* Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain—Misconceptions and Mitigation Strategies*,  374 N. Eng. J. Med. 1253 (2016).

248.   The epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[159]

249.   The increased abuse of prescription painkillers, along with growing sales, has contributed to a large number of overdoses and deaths.[160]

250.   As shown above, the opioid epidemic has escalated in Plaintiff's Community with devastating effects: substantial opiate-related substance abuse, hospitalization and death that mirrors Defendants' increased distribution of opiates.

251.   Because of the well-established relationship between the use of prescription opiates and the use of non-prescription opioids, like heroin, the massive distribution of opioids to Plaintiff's Community and areas from which such opioids are being diverted into Plaintiff's Community has resulted in the Defendant-caused opioid epidemic including heroin addiction, abuse and death.

252.   Prescription opioid abuse, addiction, morbidity and mortality are hazards to public health and safety in the State and in Plaintiff's Community.

253.   Heroin abuse, addiction, morbidity and mortality are hazards to public health and safety in the State and in Plaintiff's Community.

254.   Defendants repeatedly and purposefully breached their duties under state and federal law, and such breaches are direct and proximate causes of and/or substantial factors leading to the widespread diversion of prescription opioids for nonmedical purposes into the Plaintiff's Community.

255.   The unlawful diversion of prescription opioids is a direct and proximate cause of and/or substantial factor leading to the opioid epidemic, prescription opioid abuse, addiction,

---

[159] *See* Califf *et al.*, *supra* .
[160] *See* Press Release, Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., *supra*.

morbidity and mortality in the State and Plaintiff's Community. This diversion and the epidemic are direct causes of foreseeable harms the Plaintiff and Plaintiff's Community have incurred.

256.  Defendants' intentional and/or unlawful conduct resulted in direct and foreseeable, past and continuing economic damages for which Plaintiff seeks relief, as alleged herein. Plaintiff also seeks the means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct.

257.  Plaintiff seeks economic damages from the Defendants as reimbursement for the costs associated with past efforts to eliminate the hazards to public health and safety.

258.  Plaintiff seeks economic damages from the Defendants to pay for the cost to permanently eliminate the hazards to public health and safety and abate the temporary public nuisance.

259.  To eliminate the hazard to public health and safety and abate the public nuisance, a "multifaceted, collaborative public health and law enforcement approach is urgently needed."[161]

260.  A comprehensive response to this crisis must focus on preventing new cases of opioid addiction, identifying opioid-addicted individuals early and ensuring access to effective opioid addiction treatment while safely meeting the needs of patients experiencing pain.[162]

261. These community-based problems require community-based solutions that "budgetary constraints at the state and Federal levels" have limited.[163]

---

[161]  *See* Rudd *et al.*, *supra*, at 1145.

[162]  *See* Johns Hopkins Bloomberg School of Public Health, *The Prescription Opioid Epidemic: An Evidence-Based Approach* (G. Caleb Alexander *et al*. eds., 2015), http://www.jhsph.edu/research/centers-and-institutes/center-for-drug-safety-and-effectiveness/research/prescription-opioids/JHSPH_OPIOID_EPIDEMIC_REPORT.pdf.

[163]  *See* Office of Nat'l Drug Control Policy, Exec. Office of the President, *Epidemic: Responding to America's Prescription Drug Abuse Crisis* (2011), **Error! Hyperlink reference not valid.**https://www.ncjrs.gov/pdffiles1/ondcp/rx_abuse_plan.pdf.

262. Having profited enormously through the aggressive sale, misleading promotion and irresponsible distribution of opiates, Defendants should be required to take responsibility for the financial burdens their conduct has inflicted upon the Plaintiff and Plaintiff's Community.

## F. STATUTES OF LIMITATIONS ARE TOLLED BECAUSE DEFENDANTS' CONDUCT HAS NOT CEASED AND THEY FRAUDULENTLY CONCEALED THEIR UNLAWFUL CONDUCT.

### 1. Continuing Conduct.

263. Defendants' continued tortious and unlawful conduct has not ceased.

264. Plaintiff contends it continues to suffer harm from Defendants' unlawful actions.

265. Defendant's persistent wrongful conduct is continuous in nature and causes a repeated or continuous injury. The damages have not occurred all at once, but have continued to occur and increase as time progresses. The tort is not completed nor have all the damages been incurred until the wrongdoing ceases. Defendants' wrongdoing and unlawful activity have not ceased. The public nuisance continues and remains unabated.

## 2. Fraudulent Concealment.

266. Defendants cannot rely upon a statute of limitations defense because they undertook efforts to purposefully conceal their unlawful conduct and fraudulently assure the public, including the State, the Plaintiff and Plaintiff's Community, that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered manufacturer or distributor status in the State and continuing to generate profits.

267. Defendants committed actual fraud as alleged herein and also actively concealed information which deterred and prevented Plaintiff, in the exercise of ordinary diligence, from discovering Defendants' wrongful conduct. Ga. Code. Ann. § 9-3-96.

268.  Defendants' knowing and fraudulent concealment of the facts alleged herein tolls the limitations periods of Plaintiff's claims. As alleged herein, Defendants knew of the wrongful acts set forth above, had material information pertinent to their discovery, and concealed them from the Plaintiff and Plaintiff's Community. The Plaintiff did not know, or could not have known through the exercise of reasonable diligence, of its causes of action, as a result of Defendants' conduct.

269.  The purposes of the statutes of limitations periods are satisfied because Defendants cannot claim prejudice due to a late filing where the Plaintiff filed suit promptly upon discovering the facts essential to its claims, described herein, which Defendants knowingly concealed.

270.  In light of their statements to the media, in legal filings and in settlements, it is clear that Defendants had actual or constructive knowledge that their conduct was deceptive, in that they consciously concealed the schemes set forth herein.

271.  Defendants continually and secretly engaged in their scheme to avoid compliance with their legal obligations. Only Defendants and their agents knew or could have known about Defendants' unlawful actions because Defendants made deliberate efforts to conceal their conduct. As a result of the above, the Plaintiff was unable to obtain vital information bearing on its claims absent any fault or lack of diligence on its part.

272.  Notwithstanding the allegations set forth above, the Defendants affirmatively assured the public, including the State, the Plaintiff and Plaintiff's Community, that they are working to curb the opioid epidemic.

273. For example, a Cardinal Health executive claimed that it uses "advanced analytics" to monitor its supply chain and assured the public it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."[164]

274. Similarly, McKesson publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders," and claimed it is "deeply passionate about curbing the opioid epidemic in our country."[165]

275. Moreover, in furtherance of their effort to affirmatively conceal their conduct and avoid detection, the Distributor Defendants, through their trade associations, HDMA and NACDS, filed an *amicus* brief in *Masters Pharmaceuticals*, which made the following statements:[166]

> a. "HDMA and NACDS members not only have statutory and regulatory responsibilities to guard against diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."
>
> b. "DEA regulations that have been in place for more than 40 years require distributors to *report* suspicious orders of controlled substances to DEA based on information readily available to them (e.g., a pharmacy's placement of unusually frequent or large orders)."
>
> c. "Distributors take seriously their duty to report suspicious orders, utilizing both computer algorithms and human review to detect suspicious orders based on the generalized information that *is* available to them in the ordering process."
>
> d. "A particular order or series of orders can raise red flags because of its unusual size, frequency, or departure from typical patterns with a given pharmacy."
>
> e. "Distributors also monitor for and report abnormal behavior by pharmacies placing orders, such as refusing to provide business contact information or insisting on paying in cash."

---

[164] Bernstein *et al.*, *supra*.

[165] Higham *et al.*, *supra*.

[166] Brief for HDMA and NACDS, *supra*, 2016 WL 1321983, at *3-4, *25.

Through the above statements made on their behalf by their trade associations and other similar statements assuring their continued compliance with their legal obligations, the Distributor Defendants not only acknowledged that they understood their obligations under the law, but they further affirmed that their conduct was in compliance with those obligations.

276. The Distributor Defendants have also concealed and prevented discovery of information, including data from the ARCOS database, that will confirm their identities and the extent of their wrongful and illegal activities.

277. The Manufacturer Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The Manufacturer Defendants invented "pseudoaddiction" and promoted it to an unsuspecting medical community. The Manufacturer Defendants provided the medical community with false and misleading information about ineffectual strategies to avoid or control opioid addiction. The Manufacturer Defendants recommended to the medical community that dosages be increased, without disclosing the risks. The Manufacturer Defendants spent millions of dollars over a period of years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks and promoting sales. The Manufacturer Defendants' campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing in the State and in Plaintiff's Community deceived the medical community, consumers, the State and Plaintiff's Community.

278. Defendants intended that their actions and omissions would be relied upon, including by Plaintiff and Plaintiff's Community. Plaintiff and Plaintiff's Community did not know and did not have the means to know the truth, due to Defendants' actions and omissions.

000102

279. The Plaintiff and Plaintiff's Community reasonably relied on Defendants' affirmative statements regarding their purported compliance with their obligations under the law and consent orders.

## V.  LEGAL CAUSES OF ACTION

### COUNT I
### PUBLIC NUISANCE
### (Against All Defendants)

280.  Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

281.  Each Defendant is liable for public nuisance because its conduct at issue has caused an unreasonable and substantial interference with a right common to the general public, which is the proximate cause of and/or a substantial factor leading to Plaintiff's injury. See Restatement Second, Torts § 821B. See City of Coll. Park v. 2600 Camp Creek, LLC, 666 S.E.2d 607, 608 (Ga. Ct. App. 2008) (citing Restatement Second, Torts § 821B).

282.  Under Georgia Law, a nuisance is also "anything that causes hurt, inconvenience, or damage to another and the fact that the act done may otherwise be lawful shall not keep it from being a nuisance." Ga. Code Ann. § 41-1-1. A public nuisance "is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals." Ga. Code Ann. § 41-1-2.

283.  Defendants have created a public nuisance under Georgia law.

284.  Plaintiff has standing to bring claims for nuisance due to the opioid epidemic affecting and causing harm in Plaintiff's Community.

285.  By causing dangerously addictive drugs to flood the community and be diverted for illicit purposes, in contravention of federal and State law, each Defendant has injuriously affected rights common to the general public, specifically including the rights of the people of

the Plaintiff's Community to public health, public safety, public peace, public comfort and public convenience. The public nuisance caused by the diversion of dangerous drugs has caused substantial annoyance, inconvenience and injury to the public.

286.  By selling dangerously addictive opioid drugs diverted from a legitimate medical, scientific or industrial purpose, Defendants have committed a course of conduct that injuriously affects the safety, health and morals of the people of the Plaintiff's Community.

287.  By failing to maintain a closed system that guards against diversion of dangerously addictive drugs for illicit purposes, Defendants injuriously affected public rights, including the right to public health, public safety, public peace and public comfort of the people of the Plaintiff's Community.

288.  Plaintiff alleges that Defendants' wrongful and illegal actions have created a public nuisance. Each Defendant is liable for public nuisance because its conduct at issue has caused an unreasonable interference with a right common to the general public.

289.  The Defendants have intentionally and/or unlawfully created an absolute nuisance.

290.  The residents of Plaintiff's Community have a common right to be free from conduct that creates an unreasonable jeopardy to the public health, welfare and safety and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

291.  Defendants intentionally, unlawfully and recklessly manufacture, market, distribute and sell prescription opioids that Defendants know or reasonably should know will be diverted, causing widespread distribution of prescription opioids in and/or to Plaintiff's Community, resulting in addiction and abuse; an elevated level of crime, death and injuries to the  residents of

Plaintiff's Community; a higher level of fear, discomfort and inconvenience to the residents of Plaintiff's Community; and direct costs to Plaintiff's Community.

292.  Defendants have unlawfully and/or intentionally caused and permitted dangerous drugs under their control to be diverted such as to injure the Plaintiff's Community and its residents.

293.  Defendants have unlawfully and/or intentionally distributed opioids or caused opioids to be distributed without maintaining effective controls against diversion. Such conduct is illegal. Defendants' failures to maintain effective controls against diversion include Defendants' failure to effectively monitor for suspicious orders, report suspicious orders and/or stop shipment of suspicious orders.

294.  Defendants have caused a significant and unreasonable interference with the public health, safety, welfare, peace, comfort, convenience and ability to be free from disturbance and reasonable apprehension of danger to person or property.

295.  Defendants' conduct in illegally distributing and selling prescription opioids or causing such opioids to be distributed and sold where Defendants know or reasonably should know such opioids will be diverted, possessed and/or used illegally in Plaintiff's Community is of a continuing nature.

296.  Defendants' actions have been of a continuing nature and have produced a significant effect upon the public's rights, including the public's right to health and safety.

297.  A violation of any rule or law controlling the distribution of a drug of abuse in Plaintiff's Community and the State is a public nuisance.

298.  Statute and regulation proscribe Defendants' distribution of opioids while failing to maintain effective controls against diversion.

000105

299.  Defendants' ongoing conduct produces an ongoing nuisance, as the prescription opioids that they allow and/or cause to be illegally distributed and possessed in Plaintiff's Community will be diverted, leading to abuse, addiction, crime, and public health costs.

300.  Because of the continued use and addiction caused by these illegally distributed opioids, the public will continue to fear for its health, safety and welfare and will be subjected to conduct that creates a disturbance and reasonable apprehension of danger to person and property.

301.  Defendants know, or reasonably should know, that their conduct will have an ongoing detrimental effect upon the public health, safety and welfare and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

302.  Defendants know, or reasonably should know, that their conduct causes an unreasonable invasion of the public right to health, safety and welfare and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

303.  Defendants are aware, and at a bare minimum certainly should be aware, of the unreasonable interference that their conduct has caused in Plaintiff's Community. Defendants are in the business of manufacturing, marketing, selling and distributing prescription drugs, including opioids, which Defendants specifically know to be dangerous under federal law. See e.g., 21 U.S.C. § 812 (b)(2).

304.  Defendants' conduct in marketing, distributing and selling prescription opioids which the Defendants know, or reasonably should know, likely will be diverted for non-legitimate, non-medical use creates a strong likelihood that these illegal distributions of opioids will cause death and injuries to residents in Plaintiff's Community and otherwise significantly and unreasonably interfere with public health, safety and welfare and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

305. It is, or should be, reasonably foreseeable to Defendants that their conduct will cause deaths and injuries to residents in Plaintiff's Community and will otherwise significantly and unreasonably interfere with public health, safety and welfare and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

306. The prevalence and availability of diverted prescription opioids in the hands of irresponsible persons and persons with criminal purposes in Plaintiff's Community not only causes deaths and injuries, but also creates a palpable climate of fear among residents in Plaintiff's Community where opioid diversion, abuse and addiction are prevalent and where diverted opioids tend to be used frequently.

307. Defendants' conduct makes it easier for persons to divert prescription opioids, constituting a dangerous threat to the public.

308. Defendants' actions were, at the least, a substantial factor in opioids becoming widely available and widely used for non-medical purposes. Because of Defendants' special positions within the closed system of opioid distribution, but for Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse and addiction that now exists would have been averted.

309. The presence of diverted prescription opioids in Plaintiff's Community and the consequence of prescription opioids having been diverted in Plaintiff's Community proximately results in and/or substantially contributes to the creation of significant costs to the Plaintiff and to Plaintiff's Community in order to enforce the law, equip its police force and treat the victims of opioid abuse and addiction.

310. Stemming the flow of illegally distributed prescription opioids and abating the nuisance caused by the illegal flow of opioids will help to alleviate this problem, save lives, prevent injuries and make Plaintiff's Community a safer place to live.

311. Defendants' conduct is a direct and proximate cause of and/or a substantial contributing factor to opioid addiction and abuse in Plaintiff's Community and costs borne by Plaintiff's Community and the Plaintiff, as well as a significant and unreasonable interference with public health, safety and welfare and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

312. Defendants' conduct constitutes a public nuisance and, if unabated, will continue to threaten the health, safety and welfare of the residents of Plaintiff's Community, creating an atmosphere of fear and addiction that tears at the residents' sense of well-being and security. Plaintiff has a clearly ascertainable right to abate conduct that perpetuates this nuisance.

313. Defendants created an absolute nuisance. Defendants' actions created and expanded the abuse of opioids, which are dangerously addictive, and the ensuing associated plague of prescription opioid and heroin addiction. Defendants knew the dangers to public health and safety that diversion of opioids would create in Plaintiff's Community; however, Defendants intentionally and/or unlawfully failed to maintain effective controls against diversion through proper monitoring, reporting and refusal to fill suspicious orders of opioids. Defendants intentionally and/or unlawfully distributed opioids or caused opioids to be distributed without reporting or refusing to fill suspicious orders or taking other measures to maintain effective controls against diversion. Defendants intentionally and/or unlawfully continued to ship and failed to halt suspicious orders of opioids or caused such orders to be shipped. Defendants

Case 1:21-cv-00018-JRH-BKE   Document 1-2   Filed 02/03/21   Page 155 of 301

intentionally and/or unlawfully marketed opioids in manners they knew to be false and misleading. Such actions were inherently dangerous.

314.  Defendants knew prescription opioids have a high likelihood of being diverted. It was foreseeable to Defendants that where Defendants distributed prescription opioids or caused such opioids to be distributed without maintaining effective controls against diversion, including monitoring, reporting and refusing shipment of suspicious orders, that the opioids would be diverted and create an opioid abuse nuisance in Plaintiff's Community.

315.  Defendants' actions also created a qualified nuisance. Defendants acted recklessly, negligently and/or carelessly, in breach of their duties to maintain effective controls against diversion, thereby creating an unreasonable risk of harm.

316.  Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

317.  The damages available to the Plaintiff include, inter alia, recoupment of governmental costs, flowing from an ongoing and persistent public nuisance that the government seeks to abate. Defendants' conduct is ongoing and persistent, and the Plaintiff seeks all damages flowing from Defendants' conduct. Plaintiff further seeks to abate the nuisance and harm created by Defendants' conduct.

318.  As a direct result of Defendants' conduct, the Plaintiff and Plaintiff's Community have suffered actual injury and damages including, but not limited to, significant expenses for police, emergency, health, prosecution, corrections and other services. The Plaintiff here seeks recovery for its own harm.

000109

319.   The Plaintiff and Plaintiff's Community have sustained specific and special injuries because their damages include, inter alia, health services, law enforcement expenditures, and costs related to opioid addiction treatment and overdose prevention.

320.   The Plaintiff further seeks to abate the nuisance created by the Defendants' unreasonable, unlawful, intentional, ongoing, continuing and persistent actions and omissions and interference with a right common to the public.

321.   Plaintiff seeks all legal and equitable relief as allowed by law, including, inter alia, abatement, compensatory damages and punitive damages from the Defendants for the creation of a public nuisance, attorneys' fees and costs, and pre- and post-judgment interest.

322.   Defendants' intentional and unlawful actions and omissions, as well as their unreasonable interference with a right common to the public are of a continuing nature.

323.   Defendants are aware, and at a bare minimum certainly should be aware, of the unreasonable interference that their conduct has caused in the Plaintiff's Community. Defendants are in the business of manufacturing or distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous because, inter alia, federal and state law define these drugs as substances posing a high potential for abuse and severe addiction. Defendants created an absolute nuisance. Defendants' actions created and expanded the abuse of opioids, drugs specifically codified as constituting severely harmful substances.

324.   The public nuisance created by Defendants' actions is substantial and unreasonable – it has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefit. The staggering rates of opioid and heroin use resulting from the Defendants' abdication of their gate-keeping and diversion prevention duties and the

Manufacturer Defendants' fraudulent marketing activities have caused harm to the entire community that includes, but is not limited to, the following:

    a. The high rates of use have led and continue to lead to unnecessary opioid abuse, addiction, overdose, injuries and deaths.

    b. Even children have fallen victim to the opioid epidemic. Easy access to prescription opioids made opioids a recreational drug of choice among teenagers. Even infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts.

    c. Even those residents of Plaintiff's Community who have never taken opioids have suffered from the public nuisance arising from Defendants' abdication of their gate-keeper duties and fraudulent promotions. Many residents have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids and the loss of companionship, wages or other support from family members who have used, abused, become addicted to, overdosed on or been killed by opioids.

    d. The opioid epidemic has increased health care costs.

    e. Employers have lost the value of productive and healthy employees.

    f. Defendants' conduct created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse and injury.

    g. Defendants' dereliction of duties and/or fraudulent misinformation campaign pushing dangerous drugs resulted in a diverted supply of narcotics to sell and the ensuing demand of addicts to buy them. More prescription opioids sold by Defendants led to more addiction, with many addicts turning from prescription opioids to heroin. People addicted to opioids frequently require increasing levels of opioids, and many turned to heroin as a foreseeable result.

    h. The diversion of opioids into the secondary, criminal market and the increased number of individuals who abuse or are addicted to opioids increased the demands on health care services and law enforcement.

    i. The significant and unreasonable interference with the public rights caused by Defendants' conduct taxed the human, medical, public health, law enforcement and financial resources of the Plaintiff's Community.

      j.   Defendants' interference with the comfortable enjoyment of life in the Plaintiff's Community is unreasonable because there is little social utility to opioid diversion and abuse, and any potential value is outweighed by the gravity of the harm Defendants' actions inflicted.

325.   The Plaintiff and Plaintiff's Community have sustained specific and special injuries because their damages include, inter alia, health services and law enforcement expenditures, as described in this Complaint.

326.  Plaintiff seeks economic losses (direct, incidental or consequential pecuniary losses) resulting from Defendants' fraudulent activity and fraudulent misrepresentations.

327.  Plaintiff seeks all legal and equitable relief as allowed by law, other than such damages disavowed herein, including, inter alia, injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, all damages allowed by law to be paid by the Defendants, attorneys' fees and costs, and pre- and post-judgment interest.

## COUNT II
### RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### 18 U.S.C. 1961, *et seq.*
### (Against All Defendants)

328.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

329.  Plaintiff brings this Count against the following Defendants, as defined above: Purdue, Cephalon, Janssen, Endo, Mallinckrodt, Actavis, McKesson, Cardinal and AmerisourceBergen (collectively, for purposes of this Count, the "RICO Defendants").

330.  The RICO Defendants conducted and continue to conduct their business through legitimate and illegitimate means in the form of an association-in-fact enterprise and/or a legal entity enterprise. At all relevant times, the RICO Defendants were "persons" under 18 U.S.C. §

1961(3) because they are entities capable of holding, and do hold, "a legal or beneficial interest in property."

331.  Section 1962(c) of Racketeer-Influenced and Corrupt Organizations Act ("RICO") makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c); United States v. Turkette, 452 U.S. 576, 580 (1981).

332.  The term "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); Turkette, 452 U.S. at 580; Boyle v. U.S., 556 U.S. 938, 944 (2009). The definition of "enterprise" in Section 1961(4) includes legitimate and illegitimate enterprises within its scope. Specifically, the section "describes two separate categories of associations that come within the purview of an 'enterprise' – the first encompassing organizations such as corporations, partnerships, and other 'legal entities,' and the second covering 'any union or group of individuals associated in fact although not a legal entity.'" Turkette, 452 U.S. at 577. The second category is not a more generalized description of the first. Id.

333.  For over a decade, the RICO Defendants aggressively sought to bolster their revenue, increase profit and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold. However, the RICO Defendants are not permitted to engage in a limitless expansion of their market through the unlawful sales of regulated painkillers. As "registrants," the RICO Defendants operated and continue to operate

within the "closed system" created under the Controlled Substances Act, 21 U.S.C. § 821, et seq. (the "CSA"). The CSA restricts the RICO Defendants' ability to manufacture or distribute Schedule II substances like opioids by requiring them to: (1) register to manufacture or distribute opioids; (2) maintain effective controls against diversion of the controlled substances that they manufacturer or distribute; (3) design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales and report them to the DEA; and (4) make sales within a limited quota set by the DEA for the overall production of Schedule II substances like opioids.

334. Congress specifically intended the closed system created by the CSA, including the establishment of quotas, to reduce or eliminate the diversion of Schedule II substances like opioids from "legitimate channels of trade" to the illicit market by controlling "the quantities of the basic ingredients needed for the manufacture of [controlled substances]."[167]

335. Finding it impossible to legally achieve their ever-increasing sales ambitions, members of the Opioid Diversion Enterprise (as defined below) systematically and fraudulently violated their statutory duty to maintain effective controls against diversion of their drugs, to design and operate a system to identify suspicious orders of their drugs, to halt unlawful sales of suspicious orders and to notify the DEA of suspicious orders.[168] As discussed in detail below, through the RICO Defendants' scheme, members of the Opioid Diversion Enterprise repeatedly engaged in unlawful sales of painkillers, which, in turn, artificially and illegally increased the annual production quotas for opioids allowed by the DEA.[169] In doing so, the RICO Defendants

---

[167] 1970 U.S.C.C.A.N. 4566 at 5490; *see also* Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).

[168] 21 U.S.C. § 823(a)(1), (b)(1); 21 C.F.R. § 1301.74(b)-(c).

[169] 21 C.F.R. § 1303.11(b); 21 C.F.R. § 1303.23.

allowed hundreds of millions of pills to enter the illicit market, which allowed them to generate obscene profits.

336.   An association-in-fact enterprise between the Manufacturer Defendants and the Distributor Defendants hatched Defendants' illegal scheme, and each of them executed it in perfect harmony. In particular, each of the RICO Defendants were associated with and conducted or participated in the affairs of the RICO enterprise (defined below and referred to collectively as the "Opioid Diversion Enterprise"), the purpose of which was to engage in the unlawful sales of opioids, while deceiving the public and federal and state regulators into believing that the RICO Defendants were faithfully fulfilling their statutory obligations. The RICO Defendants' scheme allowed them to make billions in unlawful sales of opioids and, in turn, increase and/or maintain high production quotas with the purpose of ensuring unlawfully increasing revenues, profits and market share. As a direct result of the RICO Defendants' fraudulent scheme, course of conduct and pattern of racketeering activity, they were able to extract billions of dollars of revenue from the addicted American public, while entities like the Plaintiff experienced tens of millions of dollars of injury caused by the reasonably foreseeable consequences of the prescription opioid addiction epidemic. As explained in detail below, the RICO Defendants' misconduct violated Section 1962(c), and 18 U.S.C. § 1964(c) entitles Plaintiff to treble damages for its injuries.

337.   Alternatively, the RICO Defendants were members of a legal entity enterprise within the meaning of 18 U.S.C. § 1961(4), through which the RICO Defendants conducted their pattern of racketeering activity in this jurisdiction and throughout the United States. Specifically, the Healthcare Distribution Alliance (the "HDA")[170] is a distinct legal entity that satisfies the definition of a RICO enterprise. The HDA is a non-profit corporation formed under the laws of

---

[170] Health Distribution Alliance, Health, Health Distribution Alliance, (last visited on September 15, 2017), https://www.healthcaredistribution.org/about/hda-history.

the District of Columbia and doing business in Virginia. As a non-profit corporation, HDA qualifies as an "enterprise" within the definition set out in 18 U.S.C. § 1961(4) because it is a corporation and a legal entity.

338. On information and belief, each of the RICO Defendants is a member, participant and/or sponsor of the HDA and utilized the HDA to conduct the Opioid Diversion Enterprise and to engage in the pattern of racketeering activity that gives rise to the Count.

339. Each of the RICO Defendants is a legal entity separate and distinct from the HDA. Additionally, the HDA serves the interests of distributors and manufacturers beyond the RICO Defendants. Therefore, the HDA exists separately from the Opioid Diversion Enterprise, and each of the RICO Defendants exists separately from the HDA. Therefore, the HDA may serve as a RICO enterprise.

340. The legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs were each used by the RICO Defendants to conduct the Opioid Diversion Enterprise by engaging in a pattern of racketeering activity. Therefore, the legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs are pleaded in the alternative and are collectively referred to as the "Opioid Diversion Enterprise."

**A. THE OPIOID DIVERSION ENTERPRISE**

341. Recognizing that there is a need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety, the United States Congress enacted the Controlled Substances Act in 1970.[171] The CSA and its implementing regulations created a closed system of distribution for all controlled substances and listed chemicals.[172]

---

[171] Joseph T. Rannazzisi Decl. ¶ 4, *Cardinal Health, Inc. v. Eric Holder, Jr., Attorney General*, D.D.C. Case No. 12-cv-185 (Document 14-2 February 10, 2012).

[172] *See* H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566.

Congress specifically designed the closed chain of distribution to prevent the diversion of legally produced controlled substances into the illicit market.[173] As reflected in comments from United States Senators during deliberation on the CSA, the "[CSA] is designed to crack down hard on the narcotics pusher and the illegal diverters of pep pills and goof balls."[174] Congress was concerned with the diversion of drugs out of legitimate channels of distribution when it enacted the CSA and acted to halt the "widespread diversion of [controlled substances] out of legitimate channels into the illegal market."[175] Moreover, Congress specifically designed the closed system to ensure that there are multiple ways of identifying and preventing diversion through active participation by registrants within the drug delivery chain.[176] All registrants – manufacturers and distributors alike – must adhere to the specific security, recordkeeping, monitoring and reporting requirements that are designed to identify or prevent diversion.[177] When registrants at any level fail to fulfill their obligations, the necessary checks and balances collapse.[178]  The result is the scourge of addiction that has occurred.

342.  In 2006 and 2007, the DEA issued multiple letters to the Distributor Defendants reminding them of their obligation to maintain effective controls against diversion of particular controlled substances, design and operate a system to disclose suspicious orders, and inform the

---

[173] *Gonzalez v. Raich*, 545 U.S. 1, 12-14 (2005); 21 U.S.C. § 801(20; 21 U.S.C. §§ 821-824, 827, 880; H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566, 4572 (Sept. 10, 1970).

[174] *See* H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566; 116 Cong. Rec. 977-78 (Comments of Sen. Dodd, Jan 23, 1970).

[175] See Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).

[176] See Statement of Joseph T. Rannazzisi before the Caucus on International Narcotics Control United States Senate, July 18, 2012 (available at https://www.justice.gov/sites/default/files/testimonies/witnesses/attachments/07/18/12/07-18-12-dea-rannazzisi.pdf).

[177] *Id.*

[178] Joseph T. Rannazzisi Decl. ¶ 10, *Cardinal Health, Inc. v. Eric Holder, Jr., Attorney General*, D.D.C. Case No. 12-cv-185 (Document 14-2 February 10, 2012).

DEA of any suspicious orders.[179] The DEA also published suggested questions that a distributor should ask prior to shipping controlled substances, in order to "know their customers."[180]

343.   Central to the closed system created by the CSA was the directive that the DEA determine quotas of each basic class of Schedule I and II controlled substances each year. The quota system was intended to reduce or eliminate diversion from "legitimate channels of trade" by controlling the "quantities of the basic ingredients needed for the manufacture of [controlled substances] and requiring order forms for all transfers of these drugs."[181] When evaluating production quotas, the DEA was instructed to consider the following information:

a.   Information provided by the Department of Health and Human Services;

b.   Total net disposal of the basic class by all manufacturers;

c.   Trends in the national rate of disposal of the basic class;

d.   An applicant's production cycle and current inventory position;

e.   Total actual or estimated inventories of the class and of all substances manufactured from the class and trends in inventory accumulation; and

f.   Other factors such as: changes in the currently accepted medical use of substances manufactured for a basic class; the economic and physical availability of raw materials; yield and sustainability issues; potential disruptions to production; and unforeseen emergencies.[182]

---

[179] Joseph T. Rannazzisi, In Reference to Registration # RC0183080 (September 27, 2006); Joseph T. Rannazzisi, In Reference to Registration # RC0183080 (December 27, 2007).

[180] Suggested Questions a Distributor should ask prior to shipping controlled substances, Drug Enforcement Administration (available at https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf).

[181] 1970 U.S.C.C.A.N. 4566 at 5490; see also Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).

[182] See Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).

344.   It is unlawful for a registrant to manufacture a controlled substance in Schedule II, like prescription opioids, that is (1) not expressly authorized by its registration and by a quota assigned to it by DEA or (2) in excess of a quota assigned to it by the DEA.[183]

345.   At all relevant times, the RICO Defendants operated as an association-in-fact enterprise formed for the purpose of unlawfully increasing sales, revenues and profits by disregarding their statutory duty to identify, investigate, halt and report suspicious orders of opioids and diversion of their drugs into the illicit market in order to unlawfully increase the quotas set by the DEA and allow them to collectively benefit from the unlawful formation of a greater pool of prescription opioids from which to profit. The RICO Defendants conducted their pattern of racketeering activity in this jurisdiction and throughout the United States through this enterprise.

346.   The opioid epidemic has its origins in the mid-1990s when, between 1997 and 2007, per capita purchase of methadone, hydrocodone and oxycodone increased 13-fold, 4-fold and 9-fold, respectively. By 2010, enough prescription opioids were sold in the United States to medicate every adult in the country with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[184] On information and belief, the Opioid Diversion Enterprise has been ongoing for at least the last decade.[185]

347.   The Opioid Diversion Enterprise was and is a shockingly successful endeavor. The Opioid Diversion Enterprise has been conducting business uninterrupted since its genesis.

---

[183] *Id.* (citing 21 U.S.C. 842(b)).

[184] Keyes KM, Cerdá M, Brady JE, Havens JR, Galea S. Understanding the rural-urban differences in nonmedical prescription opioid use and abuse in the United States. Am J Public Health. 2014;104(2):e52-9.

[185] Matthew Perrone, Pro-Painkiller echo chamber shaped policy amid drug epidemic, The Center for Public Integrity (September 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic.

However, it was not until recently that United States and State regulators finally began to unravel the extent of the enterprise and the toll that it exacted on the American public.

348. At all relevant times, the Opioid Diversion Enterprise: (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the RICO Defendants; (d) was characterized by interpersonal relationships among the RICO Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. *Turkette*, 452 U.S. at 580; *Boyle*, 556 U.S. at 944 (2009). Each member of the Opioid Diversion Enterprise participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the astounding growth of profits supplied by fraudulently inflating opioid sales generated as a result of the Opioid Diversion Enterprise's disregard for their duty to prevent diversion of their drugs into the illicit market and requests that the DEA increase production quotas, all so that the RICO Defendants would have a larger pool of prescription opioids from which to profit.

349. The Opioid Diversion Enterprise also engaged in efforts to lobby against the DEA's authority to hold the RICO Defendants liable for disregarding their duty to prevent diversion. Members of the Pain Care Forum (described in greater detail below) and the Healthcare Distribution Alliance lobbied for the passage of legislation to weaken the DEA's enforcement authority. The Ensuring Patient Access and Effective Drug Enforcement Act significantly reduced the DEA's ability to issue orders to show cause and to suspend and/or revoke registrations[186] The HDA and other members of the Pain Care Forum contributed

---

[186] *See* <u>HDMA is now the Healthcare Distribution Alliance</u>, Pharmaceutical Commerce, (June 13, 2016, updated July 6, 2016), http://pharmaceuticalcommerce.com/business-and-finance/hdma-now-healthcare-distribution-

substantial amounts of money to political campaigns for federal candidates, state candidates, political action committees and political parties. Plaintiff is informed and believes that the Pain Care Forum and its members and the HDA devoted millions dollars to its lobbying efforts in this jurisdiction between 2011 and 2016.

350.  The Opioid Diversion Enterprise functioned by selling prescription opioids. While there are some legitimate uses and/or needs for prescription opioids, the RICO Defendants, through their illegal enterprise, engaged in a pattern of racketeering activity that involves a fraudulent scheme to increase revenue by violating State and Federal laws requiring the maintenance of effective controls against diversion of prescription opioids and the identification, investigation and reporting of suspicious orders of prescription opioids destined for the illicit drug market. The goal of Defendants' scheme was to increase profits from opioid sales. However, Defendants' profits were limited by the production quotas set by the DEA, so the Defendants refused to identify, investigate and/or report suspicious orders of their prescription opioids being diverted into the illicit drug market. The end result of this strategy was to increase and maintain artificially high production quotas of opioids so that there was a larger pool of opioids for Defendants to manufacture and distribute for public consumption.

351.  The Opioid Diversion Enterprise engaged in, and its activities affected, interstate and foreign commerce because the enterprise involved commercial activities across state lines, such as manufacture, sale, distribution and shipment of prescription opioids throughout the

---

alliance/; Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post, Mar. 6, 2017, https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html; Eric Eyre, *DEA Agent: "We Had no Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail, Feb. 18, 2017, http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills-.

country and this jurisdiction and the corresponding payment and/or receipt of money from the sale of the same.

352.  Within the Opioid Diversion Enterprise, there were interpersonal relationships and common communication by which the RICO Defendants shared information on a regular basis. These interpersonal relationships also formed the organization of the Opioid Diversion Enterprise. The Opioid Diversion Enterprise used their interpersonal relationships and communication network for the purpose of conducting the enterprise through a pattern of racketeering activity.

353.  Each of the RICO Defendants had a systematic link to each other through joint participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities. The RICO Defendants participated in the operation and management of the Opioid Diversion Enterprise by directing its affairs, as described herein. While the RICO Defendants participated in and are members of the enterprise, they each have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements and financial statements.

354.  The RICO Defendants exerted substantial control over the Opioid Diversion Enterprise by their membership in the Pain Care Forum and the HDA and through their contractual relationships.

355.  The Pain Care Forum ("PCF") is a coalition of drug makers, trade groups and dozens of non-profit organizations supported by industry funding. The PCF recently became a national news story when reporters discovered that lobbyists for members of the PCF quietly

shaped federal and state policies regarding the use of prescription opioids for more than a decade.

356.  The Center for Public Integrity and The Associated Press obtained "internal documents shed[ding] new light on how drug makers and their allies shaped the national response to the ongoing wave of prescription opioid abuse."[187] Specifically, PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.[188]

357.  Not surprisingly, each of the RICO Defendants who stood to profit from lobbying in favor of prescription opioid use is a member of and/or participant in the PCF.[189] In 2012, membership and participating organizations included the HDA (of which all RICO Defendants are members), Endo, Purdue, Johnson & Johnson (the parent company for Janssen Pharmaceuticals), Actavis (*i.e.*, Allergan) and Teva (the parent company of Cephalon).[190] Each of the Manufacturer Defendants worked together through the PCF to advance the interests of the enterprise. However, the Manufacturer Defendants were not alone. The Distributor Defendants actively participated and continue to participate in the PCF, at a minimum, through their trade organization, the HDA.[191] Upon information and belief, the Distributor Defendants participated directly in the PCF as well.

---

[187] Matthew Perrone, Pro-Painkiller echo chamber shaped policy amid drug epidemic, The Center for Public Integrity (September 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic (emphasis added).

[188] *Id*.

[189] PAIN CARE FORUM 2012 Meetings Schedule, (last updated December 2011), https://assets.documentcloud.org/documents/3108982/PAIN-CARE-FORUM-Meetings-Schedule-amp.pdf.

[190] *Id*. Upon information and belief, Mallinckrodt became an active member of the PCF sometime after 2012.

[191] *Id*. The Executive Committee of the HDA (formerly the HDMA) currently includes the Chief Executive Officer, Pharmaceutical Segment for Cardinal Health, Inc., the Group President, Pharmaceutical Distribution and Strategic Global Source for AmerisourceBergen Corporation, and the President, U.S. Pharmaceutical for McKesson

358. The 2012 Meeting Schedule for the Pain Care Forum is particularly revealing on the subject of the Defendants' interpersonal relationships. The meeting schedule indicates that meetings were held in the D.C. office of Powers Pyles Sutter & Verville on a monthly basis, unless otherwise noted. Local members were "encouraged to attend in person" at the monthly meetings. Additionally, the meeting schedule indicates that the quarterly and year-end meetings included a "Guest Speaker."

359. The 2012 Pain Care Forum Meeting Schedule demonstrates that each of the Defendants participated in meetings on a monthly basis, either directly or through their trade organization, in a coalition of drug makers and their allies, sole purpose of which was to shape the national response to the ongoing prescription opioid epidemic, including the concerted lobbying efforts that the PCF undertook on behalf of its members.

360. Second, the HDA – or Healthcare Distribution Alliance – led to the formation of interpersonal relationships and an organization between the RICO Defendants. Although the entire HDA membership directory is private, the HDA website confirms that each of the Distributor Defendants and the Manufacturer Defendants named in the Complaint, including Actavis (*i.e.*, Allergan), Endo, Purdue, Mallinckrodt and Cephalon, were members of the HDA.[192] Additionally, the HDA and each of the Distributor Defendants eagerly sought the active membership and participation of the Manufacturer Defendants by advocating that one of the benefits of membership included the ability to develop direct relationships between Manufacturers and Distributors at high executive levels.

---

Corporation. Executive Committee, Healthcare Distribution Alliance (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/executive-committee.

[192] Manufacturer Membership, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/membership/manufacturer.

361. In fact, the HDA touted the benefits of membership to the Manufacturer Defendants, advocating that membership included the ability to, among other things, "network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference," "networking with HDA wholesale distributor members," "opportunities to host and sponsor HDA Board of Directors events," "participate on HDA committees, task forces and working groups with peers and trading partners" and "make connections."[193] Clearly, the HDA and the Distributor Defendants believed that membership in the HDA was an opportunity to create interpersonal and ongoing organizational relationships between the Manufacturers and Defendants.

362. The application for manufacturer membership in the HDA further indicates the level of connection that existed between the RICO Defendants.[194] A "senior company executive" must sign the manufacturer membership application, and it requests that the manufacturer applicant identify a key contact and any additional contacts from within its company. The HDA application also requests that the manufacturer identify its current distribution information and its most recent year-end net sales through any HDA distributors, including, but not limited to, Defendants AmerisourceBergen, Cardinal Health and McKesson.[195]

363. After becoming members, the Distributors and Manufacturers were eligible to participate on councils, committees, task forces and working groups, including:

---

[193] Manufacturer Membership Benefits, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/~/media/pdfs/membership/manufacturer-membership-benefits.ashx?la=en.

[194] Manufacturer Membership Application, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/~/media/pdfs/membership/manufacturer-membership-application.ashx?la=en.

[195] Id.

a.  Industry Relations Council: "This council, composed of distributor and manufacturer members, provides leadership on pharmaceutical distribution and supply chain issues."[196]

b.  Business Technology Committee: "This committee provides guidance to HDA and its members through the development of collaborative e-commerce business solutions. The committee's major areas of focus within pharmaceutical distribution include information systems, operational integration and the impact of e-commerce." Participation in this committee includes distributors and manufacturer members.[197]

c.  Health, Beauty and Wellness Committee: "This committee conducts research, as well as creates and exchanges industry knowledge to help shape the future of the distribution for health, beauty and wellness/consumer products in the healthcare supply chain." Participation in this committee includes distributor and manufacturer members.[198]

d.  Logistics Operation Committee: "This committee initiates projects designed to help members enhance the productivity, efficiency and customer satisfaction within the healthcare supply chain. Its major areas of focus include process automation, information systems, operational integration, resource management and quality improvement." Participation in this committee includes distributors and manufacturer members.[199]

e.  Manufacturer Government Affairs Advisory Committee: "This committee provides a forum for briefing HDA's manufacturer members on federal and state legislative and regulatory activity affecting the pharmaceutical distribution channel. Topics discussed include such issues as prescription drug traceability, distributor licensing, FDA and DEA regulation of distribution, importation and Medicaid/Medicare reimbursement." Participation in this committee includes manufacturer members. [200]

---

[196] Councils and Committees, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/councils-and-committees.

[197] Id.

[198] Id.

[199] Id.

[200] Id.

f. Bar Code Task Force: Participation includes Distributor, Manufacturer and Service Provider Members.[201]

g. eCommerce Task Force: Participation includes Distributor, Manufacturer and Service Provider Members.[202]

h. ASN Working Group: Participation includes Distributor, Manufacturer and Service Provider Members.[203]

i. Contracts and Chargebacks Working Group: "This working group explores how the contract administration process can be streamlined through process improvements or technical efficiencies. It also creates and exchanges industry knowledge of interest to contract and chargeback professionals." Participation includes Distributor and Manufacturer Members.[204]

364. The councils, committees, task forces and working groups provided the Manufacturer and Distributor Defendants with the opportunity to work closely together in shaping their common goals and forming the enterprise's organization.

365. The HDA also offers a multitude of conferences, including annual business and leadership conferences. The HDA and the Distributor Defendants advertise these conferences to the Manufacturer Defendants as an opportunity to "bring together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing industry issues."[205] The conferences also gave the Manufacturer and Distributor Defendants "unmatched opportunities to network with [their] peers and trading partners at all levels of the healthcare distribution industry."[206] The HDA and its conferences were significant opportunities

---

[201] *Id.*

[202] *Id.*

[203] *Id.*

[204] *Id.*

[205] Business and Leadership Conference – Information for Manufacturers, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/events/2015-business-and-leadership-conference/blc-for-manufacturers.

[206] *Id.*

for the Manufacturer and Distributor Defendants to interact at a high level of leadership. It is clear that the Manufacturer Defendants embraced this opportunity by attending and sponsoring these events.[207]

366. Third, the RICO Defendants maintained their interpersonal relationships by working together, exchanging information and driving the unlawful sales of their opioids through their contractual relationships, including chargebacks and vault security programs.

367. The Manufacturer Defendants engaged in an industry-wide practice of paying rebates and/or chargebacks to the Distributor Defendants for sales of prescription opioids.[208] As reported in the Washington Post, identified by Senator McCaskill and acknowledged by the HDA, there is an industry-wide practice whereby the Manufacturers paid the Distributors rebates and/or chargebacks on their prescription opioid sales.[209] On information and belief, these contracts were negotiated at the highest levels, demonstrating ongoing relationships between the Manufacturer and Distributor Defendants. In return for the rebates and chargebacks, the Distributor Defendants provided the Manufacturer Defendants with detailed information regarding their prescription opioid sales, including purchase orders, acknowledgements, ship notices, and invoices.[210] The Manufacturer Defendants used this information to gather high-level

---

[207] 2015 Distribution Management Conference and Expo, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/events/2015-distribution-management-conference.

[208] Lenny Bernstein & Scott Higham, The government's struggle to hold opioid manufacturers accountable, The Washington Post, (April 2, 2017), https://www.washingtonpost.com/graphics/investigations/dea-mallinckrodt/?utm_term=.b24cc81cc356; see also, Letter from Sen. Claire McCaskill, (July 27, 2017), https://www.mccaskill.senate.gov/imo/media/image/july-opioid-investigation-letter-manufacturers.png; Letter from Sen. Claire McCaskill, (July 27, 2017), https://www.mccaskill.senate.gov/imo/media/image/july-opioid-investigation-letter-manufacturers.png; Letters From Sen. Claire McCaskill, (March 28, 2017), https://www.mccaskill.senate.gov/opioid-investigation; Purdue Managed Markets, Purdue Pharma, (accessed on September 14, 2017), http://www.purduepharma.com/payers/managed-markets/.

[209] Id.

[210] Webinars, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/resources/webinar-leveraging-edi.

data regarding overall distribution and direct the Distributor Defendants on how to most effectively sell the prescription opioids.

368. The contractual relationships among the RICO Defendants also include vault security programs. The RICO Defendants are required to maintain certain security protocols and storage facilities for the manufacture and distribution of their opiates. Plaintiff is informed and believes that Manufacturers negotiated agreements whereby the Manufacturers installed security vaults for Distributors in exchange for agreements to maintain minimum sales performance thresholds. Plaintiff is informed and believes that these agreements were used by the RICO Defendants as a tool to violate their reporting and diversion duties in order to reach the required sales requirements.

369. Taken together, the interaction and length of the relationships between and among the Manufacturer and Distributor Defendants reflects a deep level of interaction and cooperation between two groups in a tightly knit industry. The Manufacturer and Distributor Defendants were not two separate groups operating in isolation or two groups forced to work together in a closed system. The RICO Defendants operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids. The HDA and the Pain Care Forum are but two examples of the overlapping relationships, and concerted joint efforts to accomplish common goals and demonstrates that the leaders of each of the RICO Defendants were in communication and cooperation.

370. According to articles published by the Center for Public Integrity and The Associated Press, the Pain Care Forum – the members of which include the Manufacturers and the Distributors' trade association – has been lobbying on behalf of the Manufacturers and

Distributors for "more than a decade."[211] Additionally, from 2006 to 2016, the Distributors and Manufacturers worked together through the Pain Care Forum to spend over $740 million lobbying in the nation's capital and in all 50 statehouses on issues including opioid-related measures.[212] Similarly, the HDA has continued its work on behalf of Distributors and Manufacturers, without interruption, since at least 2000, if not longer.[213]

371.  As described above, the RICO Defendants began working together as early as 2006 through the Pain Care Forum and/or the HDA to promote the common purpose of their enterprise. Plaintiff is informed and believes that the RICO Defendants worked together as an ongoing and continuous organization throughout the existence of their enterprise.

## B. CONDUCT OF THE OPIOID DIVERSION ENTERPRISE

372.  During the time period alleged in this Complaint, the RICO Defendants exerted control over, conducted and/or participated in the Opioid Diversion Enterprise by fraudulently failing to comply with their Federal and State obligations to identify, investigate and report suspicious orders of opioids in order to prevent diversion of those highly addictive substances into the illicit market and to halt such unlawful sales so as to increase production quotas and generate unlawful profits, as follows:

373.  Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligations to maintain effective controls against diversion of their prescription opioids.

---

[211] Matthew Perrone, Pro-Painkiller echo chamber shaped policy amid drug epidemic, The Center for Public Integrity (accessed September 19, 2017), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic.

[212] Id.

[213] HDA History, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/hda-history.

000130

374. Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligations to design and operate a system to disclose to the registrant suspicious orders of their prescription opioids.

375. Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligation to notify the DEA of any suspicious orders or diversion of their prescription opioids.

376. Defendants paid nearly $800 million dollars to influence local, state and federal governments through joint lobbying efforts as part of the Pain Care Forum. The RICO Defendants were all members of their Pain Care Forum either directly or indirectly through the HDA. The lobbying efforts of the Pain Care Forum and its members included efforts to pass legislation making it more difficult for the DEA to suspend and/or revoke the Manufacturers' and Distributors' registrations for failure to report suspicious orders of opioids.

377. The RICO Defendants exercised control and influence over the distribution industry by participating and maintaining membership in the HDA.

378. The RICO Defendants applied political and other pressure on the DOJ and DEA to halt prosecutions for failure to report suspicious orders of prescription opioids and lobbied Congress to strip the DEA of its ability to immediately suspend registrations pending investigation by passing the "Ensuring Patient Access and Effective Drug Enforcement Act."[214]

---

[214] *See* <u>HDMA is now the Healthcare Distribution Alliance</u>, Pharmaceutical Commerce, (June 13, 2016, updated July 6, 2016), http://pharmaceuticalcommerce.com/business-and-finance/hdma-now-healthcare-distribution-alliance/; Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post, Mar. 6, 2017, https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html; Eric Eyre, *DEA Agent: "We Had no Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail, Feb. 18, 2017, http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills-.

379. The RICO Defendants engaged in an industry-wide practice of paying rebates and chargebacks to incentivize unlawful opioid prescription sales. Upon information and belief, the Manufacturer Defendants used the chargeback program to acquire detailed, high-level data regarding sales of the opioids they manufactured. Additionally, upon information and belief, the Manufacturer Defendants used this high-level information to direct the Distributor Defendants' sales efforts to regions where prescription opioids were selling in larger volumes.

380. The Manufacturer Defendants lobbied the DEA to increase Aggregate Production Quotas year after year by submitting net disposal information that the Manufacturer Defendants knew included sales that were suspicious and involved the diversion of opioids the RICO Defendants had not properly investigated or reported.

381. The Distributor Defendants developed "know your customer" questionnaires and files. This information, compiled pursuant to comments from the DEA in 2006 and 2007, was intended to help the RICO Defendants identify suspicious orders or customers who were likely to divert prescription opioids.[215] On information and belief, the "know your customer" questionnaires informed the RICO Defendants of the number of pills that the pharmacies sold, how many non-controlled substances they sold compared to controlled substances, whether the pharmacy buys from other distributors, and the types of medical providers in the area, including pain clinics, general practitioners, hospice facilities, cancer treatment facilities, among others, and these questionnaires put the recipients on notice of suspicious orders.

---

[215] Suggested Questions a Distributor should ask prior to shipping controlled substances, Drug Enforcement Administration (available at https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf); Richard Widup, Jr., Kathleen H. Dooley, Esq. Pharmaceutical Production Diversion: Beyond the PDMA, Purdue Pharma and McQuite Woods LLC, (available at https://www.mcguirewoods.com/news-resources/publications/lifesciences/product_diversion_beyond_pdma.pdf).

382. The RICO Defendants refused to identify, investigate and report suspicious orders to the DEA when they became aware of the same despite their actual knowledge of drug diversion rings. The RICO Defendants refused to identify suspicious orders and diverted drugs despite the DEA issuing final decisions against the Distributor Defendants in 178 registrant actions between 2008 and 2012[216] and 117 recommended decisions in registrant actions from The Office of Administrative Law Judges. These numbers include 76 actions involving orders to show cause and 41 actions involving immediate suspension orders -- all for failure to report suspicious orders.[217]

383. Defendants' scheme had a decision-making structure driven by the Manufacturer Defendants and corroborated by the Distributor Defendants. The Manufacturer Defendants worked together to control the State and Federal Government's response to the manufacture and distribution of prescription opioids by increasing production quotas through a systematic refusal to maintain effective controls against diversion and identify suspicious orders and report them to the DEA.

384. The RICO Defendants worked together to control the flow of information and influence state and federal governments and political candidates to pass legislation that was pro-opioid. The Manufacturer and Distributor Defendants did this through their participation in the PCF and HDA.

385. The RICO Defendants also worked together to ensure that the Aggregate Production Quotas, Individual Quotas and Procurement Quotas allowed by the DEA stayed high and ensured that suspicious orders were not reported to the DEA. By not reporting suspicious

---

[216] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.

[217] *Id.*

orders or diversion of prescription opioids, the RICO Defendants ensured that the DEA had no basis for refusing to increase or decrease the production quotas for prescription opioids due to diversion of suspicious orders. The RICO Defendants influenced the DEA production quotas in the following ways:

    a.   The Distributor Defendants assisted the enterprise and the Manufacturer Defendants in their lobbying efforts through the PCF;

    b.   The Distributor Defendants invited the participation, oversight and control of the Manufacturer Defendants by including them in the HDA, including on the councils, committees, task forces and working groups;

    c.   The Distributor Defendants provided sales information to the Manufacturer Defendants regarding their prescription opioids, including reports of all opioid prescriptions filled by the Distributor Defendants;

    d.   The Manufacturer Defendants used a chargeback program to ensure delivery of the Distributor Defendants' sales information;

    e.   The Manufacturer Defendants obtained sales information from QuintilesIMS (formerly IMS Health) that gave them a "stream of data showing how individual doctors across the nation were prescribing opioids."[218]

    f.   The Distributor Defendants accepted rebates and chargebacks for orders of prescription opioids;

    g.   The Manufacturer Defendants used the Distributor Defendants' sales information and the data from QuintilesIMS to instruct the Distributor Defendants to focus their distribution efforts to specific areas where the purchase of prescription opioids was most frequent;

    h.   The RICO Defendants identified suspicious orders of prescription opioids and then continued filling those unlawful orders, without reporting them, knowing that they were suspicious and/or being diverted into the illicit drug market;

    i.   The RICO Defendants refused to report suspicious orders of prescription opioids despite repeated investigation and punishment of the Distributor Defendants by the DEA for failure to report suspicious orders; and

---

[218] Harriet Ryan, *et al*., <u>More than 1 million OxyContin pills ended up in the hands of criminals and addicts. What the drugmaker knew</u>, Los Angeles Times, (July 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-part2/.

j.  The RICO Defendants withheld information regarding suspicious orders and illicit diversion from the DEA because it would have revealed that the "medical need" for and the net disposal of their drugs did not justify the production quotas set by the DEA.

386.  The scheme the RICO Defendants devised and implemented amounted to a common course of conduct characterized by a refusal to maintain effective controls against diversion, and all designed and operated to ensure the continued unlawful sale of controlled substances.

### C. PATTERN OF RACKETEERING ACTIVITY.

387.  The RICO Defendants conducted and participated in the conduct of the Opioid Diversion Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(B), including mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343 and 18 U.S.C. § 1961(D)) by the felonious manufacture, importation, receiving, concealment, buying, selling or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substance Act), punishable under any law of the United States.

**1.  The RICO Defendants Engaged in Mail and Wire Fraud.**

388.  The RICO Defendants carried out, or attempted to carry out, a scheme to defraud federal and state regulators and the American public by knowingly conducting or participating in the conduct of the Opioid Diversion Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

389.  The RICO Defendants committed, conspired to commit and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (*i.e.,* violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the RICO Defendants committed, or aided and abetted in the commission of, were related to each

other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels and employees of the Opioid Diversion Enterprise. The RICO Defendants participated in the scheme to defraud by using mail, telephone and the internet to transmit mailings and wires in interstate or foreign commerce.

390.   The RICO Defendants used, directed the use of and/or caused to be used thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions regarding their compliance with their mandatory reporting requirements and the actions necessary to carry out their unlawful goal of selling prescription opioids without reporting suspicious orders or the diversion of opioids into the illicit market.

391.   In devising and executing the illegal scheme, the RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud by means of materially false or fraudulent pretenses, representations, promises or omissions of material facts. For the purpose of executing the illegal scheme, the RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

392.   The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

   a.   Mail Fraud: The RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market and sell the prescription opioids by means of false pretenses, misrepresentations, promises and omissions.

   b.   Wire Fraud: The RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by

wire for the purpose of executing the unlawful scheme to design, manufacture, market and sell the prescription opioids by means of false pretenses, misrepresentations, promises and omissions.

393.   The RICO Defendants' use of the mail and wires includes, but is not limited to, Manufacturers, Distributors or third parties that were foreseeably caused to conduct the transmission, delivery or shipment of the following as a result of the RICO Defendants' illegal scheme, including but not limited to:

a.   The prescription opioids themselves;

b.   Documents and communications that facilitated the manufacture, purchase and unlawful sale of prescription opioids;

c.   Defendants' DEA registrations;

d.   Documents and communications that supported and/or facilitated Defendants' DEA registrations;

e.   Documents and communications that supported and/or facilitated the Defendants' request for higher aggregate production quotas, individual production quotas and procurement quotas;

f.   Defendants' records and reports that 21 U.S.C. § 827 required Defendants to submit to the DEA;

g.   Documents and communications related to the Defendant's mandatory DEA reports pursuant to 21 U.S.C. § 823 and 21 C.F.R. § 1301.74;

h.   Documents intended to facilitate the manufacture and distribution of Defendants' prescription opioids, including bills of lading, invoices, shipping records, reports and correspondence;

i.   Documents for processing and receiving payment for prescription opioids;

j.   Payments from the Distributors to the Manufacturers;

k.   Rebates and chargebacks from the Manufacturers to the Distributors;

l.   Payments to Defendants' lobbyists through the PCF;

m.  Payments to Defendants' trade organizations, like the HDA, for memberships and/or sponsorships;

n.  Deposits of proceeds from Defendants' manufacture and distribution of prescription opioids; and

o.  Other documents and things, including electronic communications.

394.  On information and belief, the RICO Defendants (and/or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) shipments of prescription opioids and related documents by mail or by private carrier affecting interstate commerce, including the following:

a.  Purdue manufactures multiple forms of prescription opioids, including, but not limited to: OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER and Targiniq ER. Purdue manufactured and shipped these prescription opioids to the Distributor Defendants in this jurisdiction.

b.  The Distributor Defendants shipped Purdue's prescription opioids throughout this jurisdiction.

c.  Cephalon manufactures multiple forms of prescription opioids, including, but not limited to: Actiq and Fentora. Cephalon manufactured and shipped these prescription opioids to the Distributor Defendants in this jurisdiction.

d.  The Distributor Defendants shipped Teva's prescription opioids throughout this jurisdiction.

e.  Janssen manufactures a prescription opioid known as Duragesic. Janssen manufactured and shipped its prescription opioids to the Distributor Defendants in this jurisdiction.

f.  The Distributor Defendants shipped Janssen's prescription opioids throughout this jurisdiction.

g.  Endo manufactures multiple forms of prescription opioids, including, but not limited to: Opana/Opana ER, Percodan, Percocet and Zydone. Endo manufactured and shipped its prescription opioids to the Distributor Defendants in the State.

h.  The Distributor Defendants shipped Janssen's prescription opioids throughout this jurisdiction.

     i.   Actavis manufactures multiple forms of prescription opioids, including, but not limited to: Kadian and Norco, as well as generic versions of the drugs known as Kadian, Duragesic and Opana. Actavis manufactured and shipped its prescription opioids to the Distributor Defendants in this jurisdiction.

     j.   The Distributor Defendants shipped Actavis' prescription opioids throughout this jurisdiction.

     k.   Mallinckrodt manufactures multiple forms of prescription opioids, including, but not limited to: Exalgo and Roxicodone.

     l.   The Distributor Defendants shipped Mallinckrodt's prescription opioids throughout this jurisdiction.

395.　The RICO Defendants also used the internet and other electronic facilities to carry out their scheme and conceal the ongoing fraudulent activities. Specifically, the RICO Defendants made misrepresentations about their compliance with Federal and State laws requiring them to identify, investigate and report suspicious orders of prescription opioids and/or diversion of the same into the illicit market.

396.　At the same time, the RICO Defendants misrepresented the superior safety features of their order monitoring programs, ability to detect suspicious orders, commitment to preventing diversion of prescription opioids and their compliance with all state and federal regulations regarding the identification and reporting of suspicious orders of prescription opioids.

397.　Upon information and belief, the RICO Defendants utilized the internet and other electronic resources to exchange communications, to exchange information regarding prescription opioid sales and to transmit payments and rebates / chargebacks.

398.　The RICO Defendants also communicated by U.S. Mail, by interstate facsimile and by interstate electronic mail with each other and various other affiliates, regional offices, regulators, distributors and other third-party entities in furtherance of the scheme.

399.  The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and the public that Defendants were complying with their state and federal obligations to identify and report suspicious orders of prescription opioids, all while Defendants were knowingly allowing millions of doses of prescription opioids to divert into the illicit drug market. The RICO Defendants intended their scheme and common course of conduct to increase or maintain high production quotas for their prescription opioids from which they could profit.

400.  Defendants have deliberately hid many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities, and these cannot be alleged without access to Defendants' books and records. However, Plaintiff has described the types of and, in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

401.  The RICO Defendants did not undertake the practices described herein in isolation, but as part of a common scheme. These actions violate 18 U.S.C. § 1962(c). Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, may have contributed to and/or participated in the scheme with the RICO Defendants in these offenses and have performed acts in furtherance of the scheme to increase revenues, increase market share and /or minimize the losses for the RICO Defendants.

402.  The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

403.  The RICO Defendants hid from the general public and suppressed and/or ignored warnings from third parties, whistleblowers and governmental entities the reality of the

suspicious orders that the RICO Defendants were filling on a daily basis -- leading to the diversion of tens of millions of doses of prescription opioids into the illicit market.

404. The RICO Defendants, with knowledge and intent, agreed to the overall objective of their fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in manufacturing and distributing prescription opioids.

405. Indeed, for the Defendants' fraudulent scheme to work, each of the Defendants had to agree to implement similar tactics regarding marketing prescription opioids and refusing to report suspicious orders.

406. As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenue from the sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims and methods of commission. The predicate acts were related and not isolated events.

407. The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants, while Plaintiff was left with substantial injury to its business through the damage that the prescription opioid epidemic caused. The RICO Defendants committed or caused to be committed the predicate acts through their participation in the Opioid Diversion Enterprise and in furtherance of its fraudulent scheme.

408. The pattern of racketeering activity alleged herein and the Opioid Diversion Enterprise are separate and distinct from each other. Likewise, Defendants are distinct from the enterprise.

409.  The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

410.  RICO Defendants have hidden many of the precise dates of the criminal actions at issue here, and these cannot be alleged without access to Defendants' books and records. Indeed, an essential part of the successful operation of the Opioids Addiction and Opioid Diversion Enterprise alleged herein depended upon secrecy.

411.  Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers in this jurisdiction and the Plaintiff. Defendants calculated and intentionally crafted the Opioid Diversion Enterprise and their scheme to increase and maintain their increased profits, without regard to the effect such behavior would have on consumers in this jurisdiction, its citizens or the Plaintiff. In designing and implementing the scheme, at all times Defendants were cognizant of the fact that those in the manufacturing and distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and reliable information regarding Defendants' products and their manufacture and distribution of those products. The Defendants were also aware that Plaintiff and the citizens of this jurisdiction rely on the Defendants to maintain a closed system and to protect against the non-medical diversion and use of their dangerously addictive opioid drugs.

412.  By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

413.  It was foreseeable to Defendants that refusing to report and halt suspicious orders, as required by the CSA and Code of Federal Regulations, would harm Plaintiff by allowing the flow of prescription opioids from appropriate medical channels into the illicit drug market.

414.  The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

## 2.  The RICO Defendants Manufactured, Sold and/or Dealt in Controlled Substances, and Their Crimes Are Punishable as Felonies.

415.  The RICO Defendants conducted and participated in the conduct of the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(D) by the felonious manufacture, importation, receiving, concealment, buying, selling or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substance Act), punishable under any law of the United States.

416.  The RICO Defendants committed crimes that are punishable as felonies under the laws of the United States. Specifically, 21 U.S.C. § 483(a)(4) makes it unlawful for any person to knowingly or intentionally furnish false or fraudulent information in, or omit any material information from, any application, report, record or other document required to be made, kept or filed under this subchapter. A violation of section 483(a)(4) is punishable by up to four years in jail, making it a felony. 21 U.S.C. § 483(d)(1).

417.  Each of the RICO Defendants qualifies as a registrant under the CSA. Their status as registrants under the CSA requires that they maintain effective controls against diversion of controlled substances in schedule I or II, design and operate a system to disclose to the registrant suspicious orders of controlled substances, and inform the DEA of suspicious orders when discovered by the registrant. 21 U.S.C. § 823; 21 C.F.R. § 1301.74(b).

418. The CSA and the Code of Federal Regulations required the RICO Defendants to make reports to the DEA of any suspicious orders identified through the design and operation of their system to disclose suspicious orders.

419. The RICO Defendants knowingly and intentionally furnished false or fraudulent information in their reports to the DEA about suspicious orders and/or omitted material information from reports, records and other documents they were required to file with the DEA, including the Manufacturer Defendants' applications for production quotas. Specifically, the RICO Defendants were aware of suspicious orders of prescription opioids and the diversion of their prescription opioids into the illicit market and failed to report this information to the DEA in their mandatory reports and their applications for production quotas.

420. For example, the DEA and DOJ began investigating McKesson in 2013 regarding its monitoring and reporting of suspicious controlled substances orders. On April 23, 2015, McKesson filed a Form 8-K announcing a settlement with the DEA and DOJ wherein it admitted to violating the CSA and agreed to pay $150 million and have some of its DEA registrations suspended on a staggered basis. The settlement was finalized on January 17, 2017.[219]

421. Purdue's experience in Los Angeles is another striking example of Defendants' willful violation of the CSA and Code of Federal Regulations as they relate to reporting suspicious orders of prescription opioids. In 2016, the Los Angeles Times reported that Purdue was aware of a pill mill operating out of Los Angeles, yet failed to alert the DEA.[220] The LA Times uncovered that Purdue began tracking a surge in prescriptions in Los Angeles, including

---

[219] McKesson, McKesson Finalizes Settlement with U.S. Department of Justice and U.S. Drug Enforcement Administration to Resolve Past Claims, About McKesson / Newsroom / Press Releases, (January 17, 2017), http://www.mckesson.com/about-mckesson/newsroom/press-releases/2017/mckesson-finalizes-settlement-with-doj-and-dea-to-resolve-past-claims/.

[220] Harriet Ryan, et al., More than 1 million OxyContin pills ended up in the hands of criminals and addicts. What the drugmaker knew, Los Angeles Times, (July 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-part2/.

one prescriber in particular. A Purdue sales manager spoke with company officials in 2009 about the prescriber, asking "Shouldn't the DEA be contacted about this?" and adding that she felt "very certain this is an organized drug ring."[221] Despite knowledge of the staggering amount of pills being issued in Los Angeles, and internal discussion of the problem, "Purdue did not shut off the supply of highly addictive OxyContin and did not tell authorities what it knew about Lake Medical until several years later when the clinic was out of business and its leaders indicted. By that time, 1.1 million pills had spilled into the hands of Armenian mobsters, the Crips gang and other criminals."[222]

422.  Finally, Mallinckrodt was recently the subject of a DEA and Senate investigation for its opioid practices. Specifically, in 2011, the DEA targeted Mallinckrodt, arguing that it ignored its responsibility to report suspicious orders as <u>500 million</u> of its pills ended up in Florida between 2008 and 2012.[223] After six years of DEA investigation, Mallinckrodt agreed to a settlement involving a $35 million fine. Federal prosecutors summarized the case by saying that Mallinckrodt's response was that everyone knew what was going on in Florida, but they had no duty to report it.[224]

423.  Upon information and belief, the foregoing examples reflect the RICO Defendants' pattern and practice of willfully and intentionally omitting information from their mandatory reports to the DEA as required by 21 C.F.R. § 1301.74. The sheer volume of enforcement actions

---

[221] *Id*.

[222] *Id*.

[223] Lenny Bernstein & Scott Higham, <u>The government's struggle to hold opioid manufacturers accountable</u>, The Washington Post, (April 2, 2017), https://www.washingtonpost.com/graphics/investigations/dea-mallinckrodt/?utm_term=.b24cc81cc356. This number accounted for 66% of all oxycodone sold in the state of Florida during that time.

[224] *Id.*

available in the public record against the Distributor Defendants supports this conclusion.[225] For

example:

    a.  On April 24, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the AmerisourceBergen Orlando, Florida distribution center ("Orlando Facility") alleging failure to maintain effective controls against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its DEA registration;

    b.  On November 28, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Auburn, Washington Distribution Center ("Auburn Facility") for failure to maintain effective controls against diversion of hydrocodone;

    c.  On December 5, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of hydrocodone;

    d.  On December 7, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Swedesboro, New Jersey Distribution Center ("Swedesboro Facility") for failure to maintain effective controls against diversion of hydrocodone;

    e.  On January 30, 2008, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Stafford, Texas Distribution Center ("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone;

    f.  On May 2, 2008, McKesson Corporation entered into an *Administrative Memorandum of Agreement* ("2008 MOA") with the DEA, which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program;"

    g.  On September 30, 2008, Cardinal Health entered into a *Settlement and Release Agreement and Administrative Memorandum of Agreement* with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford

---

[225] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.

Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia ("McDonough Facility"); Valencia, California ("Valencia Facility"); and Denver, Colorado ("Denver Facility");

h.  On February 2, 2012, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of oxycodone;

i.  On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center; and

j.  On January 5, 2017, McKesson Corporation entered into an *Administrative Memorandum Agreement* with the DEA wherein it agreed to pay a $150,000,000 civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in in Aurora, Colorado; Aurora, Illinois; Delran, New Jersey; LaCrosse, Wisconsin; Lakeland, Florida; Landover, Maryland; La Vista, Nebraska; Livonia, Michigan; Livonia, Michigan; Methuan, Massachusetts; Santa Fe Springs, California; Washington Courthouse, Ohio; and West Sacramento, California.

424.  These actions against the Distributor Defendants confirm that the Distributor Defendants knew they had a duty to maintain effective controls against diversion, design and operate a system to disclose suspicious orders, and to report suspicious orders to the DEA. These actions also demonstrate, on information and belief, that the Manufacturer Defendants were aware of the enforcement against their Distributors and the diversion of the prescription opioids and a corresponding duty to report suspicious orders.

425.  The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

426. Many of the precise dates of Defendants' criminal actions at issue herein were hidden and cannot be alleged without access to Defendants' books and records. Indeed, an essential part of the successful operation of the Opioid Diversion Enterprise depended upon the secrecy of the participants in that enterprise.

427. Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission and had similar results affecting similar victims, including consumers in this jurisdiction and the Plaintiff. Defendants calculated and intentionally crafted the diversion scheme to increase and maintain profits from unlawful sales of opioids, without regard to the effect such behavior would have on this jurisdiction, its citizens or the Plaintiff. The Defendants were aware that Plaintiff and the citizens of this jurisdiction rely on the Defendants to maintain a closed system of manufacturing and distribution to protect against the non-medical diversion and use of their dangerously addictive opioid drugs.

428. By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

429. It was foreseeable to Defendants that refusing to report and halt suspicious orders, as required by the CSA and Code of Federal Regulations, would harm Plaintiff by allowing the flow of prescription opioids from appropriate medical channels into the illicit drug market.

430. The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

## D. DAMAGES

431. The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiff injury in its business and property because Plaintiff

paid for costs associated with the opioid epidemic, as described above in allegations expressly incorporated herein by reference.

432.  Defendants' racketeering activities proximately caused Plaintiff's injuries and those of her citizens. But for the RICO Defendants' conduct, Plaintiff would not have paid the health services and law enforcement services and expenditures required as a result of the plague of drug-addicted residents.

433.  The RICO Defendants' racketeering activities directly caused Plaintiff's injuries and those of her citizens.

434.  Plaintiff was most directly harmed and there is no other Plaintiff better suited to seek a remedy for the economic harms at issue here.

435.  Plaintiff seeks all legal and equitable relief as allowed by law, including, inter alia, actual damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorneys' fees and all costs and expenses of suit, and pre- and post-judgment interest.

### COUNT III
### RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### 18 U.S.C. 1962(d), *et seq.*
### (Against All Defendants)

436.   Plaintiff hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

437.  Plaintiff brings this claim on its own behalf against all RICO Defendants. At all relevant times, the RICO Defendants were associated with the Opioid Diversion Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, they agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). Under

Section 1962(d), it is unlawful for "any person to conspire to violate" Section 1962(d), among other provisions. 18 U.S.C. § 1962(d).

438. Defendants conspired to violate Section 1962(c), as alleged more fully above, by conducting the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity, as incorporated by reference below.

## A. THE OPIOID DIVERSION ENTERPRISE.

439. For efficiency and avoiding repetition, for purposes of this claim, Plaintiff incorporates by reference the paragraphs set out above concerning the "Opioid Diversion Enterprise."

## B. CONDUCT OF THE OPIOID DIVERSION ENTERPRISE.

440. For efficiency and avoiding repetition, for purposes of this claim, Plaintiff incorporates by reference the paragraphs set out above concerning the "Conduct of the Opioid Diversion Enterprise."

## C. PATTERN OF RACKETEERING ACTIVITY.

441. For efficiency and avoiding repetition, for purposes of this claim, Plaintiff incorporates by reference the paragraphs set out above concerning the "Pattern of Racketeering Activity."

## D. DAMAGES.

442. The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiff injury in its business and property because Plaintiff paid for costs associated with the opioid epidemic, as described above in allegations expressly incorporated herein by reference.

443. The RICO Defendants' racketeering activities proximately caused Plaintiff's injuries and those of her citizens. But for the RICO Defendants' conduct, Plaintiff would not

have paid the health services and law enforcement services and expenditures required as a result of the plague of drug-addicted residents.

444. The RICO Defendants' racketeering activities directly caused Plaintiff's injuries and those of her citizens.

445. Plaintiff was most directly harmed and there is no other Plaintiff better suited to seek a remedy for the economic harms at issue here.

446. Plaintiff seeks all legal and equitable relief as allowed by law, including, inter alia, actual damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorneys' fees and all costs and expenses of suit and pre- and post-judgment interest.

## COUNT IV
## GEORGIA RICO (RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS) ACT, Ga. Code Ann. § 16-14-1 *et seq.* (Against All Defendants)

447. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

448. Plaintiff has standing to bring this action as an "aggrieved person." Ga. Code Ann. § 16-14-6(b); see also Ga. Code Ann. § 16-1-3(12).

449. The Georgia RICO Act states that "[i]t shall be unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." Ga. Code Ann. § 16-14-4(a).

450. "'Racketeering activity' means to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit any crime which is chargeable by indictment under the laws of this state involving:" inter alia, "The 'Georgia Controlled Substances Act' in violation of Article 2 of Chapter 13 of this title[.]" Ga. Code Ann. § 16-14-3(5)(A)(xxxiv).

451. "'Racketeering activity' shall also mean any act . . . involving . . . dealing in narcotic or dangerous drugs, ..." Ga. Code Ann. § 16-14-3(5)(B).

452. "'Racketeering activity' shall also mean any conduct defined as 'racketeering activity' under 18 U.S.C. Section 1961 (1), ..." Ga. Code Ann. § 16-14-3(5)(C).

453. The RICO Defendants violated the Georgia RICO Act by conspiring to, attempting and actually engaging in violations of the Georgia Controlled Substances Act, illegally dealing in narcotic or dangerous drugs, and violating 18 U.S.C. Section 1961(1), as described above in allegations expressly incorporated herein by reference.

454. Defendants violated the Georgia RICO Act by conducting the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity, as described above in allegations expressly incorporated herein by reference, in violation of Section 16-14-4(a). Ga. Code Ann. § 16-14-4(a).

455. The RICO Defendants' Opioid Diversion Enterprise existed as an "enterprise" as defined in the Georgia RICO Act. Ga. Code Ann. § 16-14-3(3).

456. As described above and as fully incorporated herein, the violations set forth herein constitute "racketeering activity" within the meaning of section 16-14-3(5) with at least two such acts of racketeering activity having occurred within the past four years.

457. The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiff injury in its business and property because Plaintiff paid for costs associated with the opioid epidemic, as described above in allegations expressly incorporated herein by reference.

458. Plaintiff's injuries, and those of the citizens of Plaintiff's Community, were proximately caused by the RICO Defendants' racketeering activities. But for the RICO

Defendants' conduct, Plaintiff would not have paid the health services and law enforcement services and expenditures required as a result of the plague of drug-addicted residents.

459.  Plaintiff's injuries and those of her citizens were directly caused by the RICO Defendants' racketeering activities.

460.  Plaintiff was most directly harmed and there is no other Plaintiff better suited to seek a remedy for the economic harms at issue here.

461.  Plaintiff seeks all legal and equitable relief as allowed by law, including inter alia actual damages, treble damages, punitive damages, equitable relief, attorney's fees and all costs and expenses of investigation and suit and pre- and post-judgment interest. Ga. Code Ann. § 16-14-6(b) & (c).

**COUNT V**
**NEGLIGENCE AND NEGLIGENT MISREPRESENTATION**
**(Against All Defendants)**

462.  Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

463.  Plaintiff seeks economic damages that were the foreseeable result of Defendants' intentional and/or unlawful actions and omissions.

464.  Under State law, to establish actionable negligence, one must show: the existence of a duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm, a breach of that duty, and injury resulting proximately therefrom and/or that was substantially caused thereby. All such essential elements exist here.

465.  Georgia recognizes the "general duty ones owes to all the world not to subject them to an unreasonable risk of harm." Bradley Ctr., Inc. v. Wessner, 250 Ga. 199, 201, 296 S.E.2d 693, 695 (1982) (citing Restatement, Torts, 2d § 282). Each Defendant owed a duty to the Plaintiff and to the public health and safety in the Plaintiff's Community.

466.   In Georgia, the imposition of a duty cannot be separated from foreseeability, such that "there must be evidence that the act (or omission to act) alleged to be negligent created a foreseeable unreasonable risk of harm." Love v. Morehouse Coll., Inc., 287 Ga. App. 743, 745, 652 S.E.2d 624, 626 (2007) (citations and quotations omitted) (emphasis in original). For a party to be liable for negligence, "it is not necessary that he should have been able to anticipate the particular consequences which ensued. It is sufficient if, in ordinary prudence, he might have foreseen that some injury would result from his act or omission, and that consequences of a generally injurious nature might result." Freeman v. Wal–Mart Stores, Inc., 281 Ga.App. 132, 136, 635 S.E.2d 399, 402 (2006) (cit. om.).

467.   Each Defendant owed a duty to the Plaintiff and to the public health and safety in the Plaintiff's Community because the injury was foreseeable and, in fact, foreseen by the Defendants. If a course of action creates a foreseeable risk of injury, the individual engaged in that course of action has a duty to protect others from such injury. Each Defendant owed a duty to the Plaintiff and to the public in the Plaintiff's Community, because the injury was foreseeable and, in fact, foreseen by the Defendants.

468.   Each Defendant had an obligation to exercise reasonable care in manufacturing, marketing, selling and distributing highly dangerous opioid drugs to the State and Plaintiff's Community.

469.   Each Defendant had an obligation to exercise due care in manufacturing, marketing, selling and distributing highly dangerous opioid drugs in the State and Plaintiff's Community.

470.   Reasonably prudent manufacturers and distributors of prescription opioids would have anticipated that the scourge of opioid addiction would wreak havoc on communities and

impose significant costs upon the governmental entities associated with those communities. The closed system of opioid distribution whereby wholesale distributors are the gatekeepers between manufacturers and pharmacies, and wherein all links in the chain have a duty to prevent diversion, exists for the purpose of controlling dangerous substances such as opioids and preventing diversion and abuse.

471.    Reasonably prudent manufacturers of pharmaceutical products would know that aggressively pushing highly addictive opioids for chronic pain would result in the severe harm of addiction, foreseeably causing patients to seek increasing levels of opioids, frequently turning to the illegal drug market as a result of a drug addiction that was foreseeable to the Manufacturer Defendants.

472.    Moreover, law enforcement repeatedly warned Defendants of the unlawfulness and consequences of their actions and omissions.

473.    The escalating amounts of addictive drugs flowing through Defendants' businesses, and the sheer volume of these prescription opioids, further alerted Defendants that addiction was fueling increased consumption and that legitimate medical purposes were not being served.

474. As described above in allegations expressly incorporated herein, Distributor Defendants breached their duties to exercise due care in the business of wholesale distribution of dangerous opioids, which are Schedule II Controlled Substances, by failing to monitor for, failing to report, and filling highly suspicious orders time and again. Because the very purpose of these duties was to prevent the resulting harm – diversion of highly addictive drugs for non-medical purposes – the causal connection between Defendants' breach of duties and the ensuing harm was entirely foreseeable.

475. Under Georgia law, the elements for negligent misrepresentation include: 1) the negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance. Futch v. Lowndes County, 297 Ga.App. 308, 312, 676 S.E.2d 892 (2009); Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc., 267 Ga. 424, 479 S.E.2d 727, 729 (1997).

476. As described elsewhere in the Complaint in allegations expressly incorporated herein, Defendants supplied information to Plaintiff and Plaintiff's Community.

477. As described elsewhere in the Complaint in allegations expressly incorporated herein, Distributor Defendants misrepresented their compliance with their duties under the law and concealed their noncompliance and shipments of suspicious orders of opioids to Plaintiff's Community and destinations from which they knew opioids were likely to be diverted into Plaintiff's Community, in addition to other misrepresentations alleged and incorporated herein.

478. As described elsewhere in the Complaint in allegations expressly incorporated herein, Manufacturer Defendants breached their duties to exercise due care in the business of pharmaceutical manufacturers of dangerous opioids, which are Schedule II Controlled Substances, by misrepresenting the nature of the drugs and aggressively promoting them for chronic pain for which they knew the drug were not safe or suitable.

479. The Manufacturer Defendants misrepresented and concealed the addictive nature of prescription opioids and their lack of suitability for chronic pain, in addition to other misrepresentations alleged and incorporated herein.

480. All Defendants breached their duties to prevent diversion and report and halt suspicious orders, and all Defendants misrepresented their compliance with their legal duties.

481.  Defendants' breaches were intentional and/or unlawful, and Defendants' conduct was willful, wanton, malicious, reckless, oppressive and/or fraudulent.

482.  Plaintiff justifiably relied on Defendants' representations and/or concealments, both directly and indirectly. This reliance proximately caused Plaintiff's injuries.

483.  The causal connection between Defendants' breaches of duties and misrepresentations and the ensuing harm was entirely foreseeable.

484.  As described above in allegations expressly incorporated herein, Defendants' breaches of duty and misrepresentations caused, bear a causal connection with and/or proximately resulted in the damages sought herein.

485.  Defendants were selling dangerous drugs statutorily categorized as posing a high potential for abuse and severe dependence. Defendants knowingly traded in drugs that presented a high degree of danger if prescribed incorrectly or diverted to other than medical, scientific or industrial channels. However, Defendants breached their duties to monitor for, report and halt suspicious orders; breached their duties to prevent diversion; and, further, misrepresented what their duties were and their compliance with their legal duties.

486.  The Defendants failed to disclose the material facts that, inter alia, they were not in compliance with laws and regulations requiring that they maintain a system to prevent diversion, protect against addiction and severe harm, and specifically monitor, investigate, report, and refuse suspicious orders. But for these material factual omissions, Defendants would not have been able to sell opioids.

487.  As alleged herein, each Manufacturer Defendant wrongfully represented that the opioid prescription medications they manufactured, marketed and sold had characteristics, uses or benefits that they do not have. The Manufacturer Defendants also wrongfully misrepresented

that the opioids were safe and effective when the Manufacturer Defendants knew, or should have

known, such representations were untrue, false and misleading.

488. Because of the dangerously addictive nature of these drugs, which the

Manufacturer Defendants concealed and misrepresented, they lacked medical value and in fact

caused addiction and overdose deaths.

489. The Manufacturer Defendants made deceptive representations about the use of

opioids to treat chronic non-cancer pain. Each Manufacturer Defendant also omitted or

concealed material facts and failed to correct prior misrepresentations and omissions about the

risks and benefits of opioids. Each Defendant's omissions rendered even their seemingly truthful

statements about opioids deceptive.

490. Defendants' unlawful and/or intentional actions create a rebuttable presumption of

negligence and negligent misrepresentation under State law.

491. Plaintiff seeks economic losses (direct, incidental or consequential pecuniary

losses) resulting from Defendants' actions and omissions.

492. Plaintiff seeks all legal and equitable relief as allowed by law, other than such

damages disavowed herein, including, inter alia, injunctive relief, restitution, disgorgement of

profits, compensatory and punitive damages, and all damages allowed by law to be paid by the

Defendants, attorneys' fees and costs, and pre- and post-judgment interest.

**COUNT VI**
**NEGLIGENCE PER SE**
**(Against All Defendants)**

493. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully

set forth herein, and further alleges as follows.

494. "Georgia law allows the adoption of a statute as a standard of conduct so that its

violation becomes negligence per se." Brown v. Belinfante, 252 Ga. App. 856, 861, 557 S.E.2d

399, 403 (2001) (cit. om.). "Where a statute provides a general rule of conduct, although only amounting to a requirement to exercise ordinary care, the violation thereof is negligence as a matter of law, or negligence per se," Holbrook v. Exec. Conference Ctr., Inc., 219 Ga. App. 104, 107, 464 S.E.2d 398, 401 (1995) (cit. om.).

495.   Violations of statutes and regulations support a cause of action for negligence per se where the plaintiff is within the class of persons the statute was designed to protect, and the harm sustained is the type sought to be prevented. Goldstein, Garber & Salama, LLC v. J.B., 300 Ga. 840, 845, 797 S.E.2d 87, 92 (Ga. 2017) (cit. om.).

496.   Georgia's minimum requirements for controlled substance manufacture and wholesale drug distribution is that they must comply with "all applicable Federal, State, and local laws and regulations" and "all applicable State, Local and DEA regulations." Ga. Comp. R. & Regs. 480-7-.03(10).

497.   Each Defendant was required under Georgia law be licensed by the Georgia State Board of Pharmacy. See Ga. Code Ann. §§ 16-13-35; 26-4-115(a) and Ga. Comp. R. & Regs. 480-7-.03(1). To receive and maintain these licenses, each of the Defendants assumed a duty to comply with "all applicable Federal, State, and local laws and regulations" and "all applicable State, Local and DEA regulations." Ga. Comp. R. & Regs. 480-7-.03(10).

498.   The State Board of Pharmacy makes a determination of what is in the public interest when it decides whether to register manufacturers and distributors under the Georgia Controlled Substances Act. Ga. Code Ann. § 16-13-36(a).

499.   The Georgia Board of Pharmacy may suspend or revoke a registration to manufacture or distribute a controlled substance if the registrant has "furnished false or fraudulent material information in any application" to receive or renew a registration. Ga. Code

Ann. § 16-13-37(a)(1). See also Ga. Code Ann. § 16-13-36(a)(5) (furnishing false or fraudulent material in any application is factor considered in Board's determination to grant registration); Ga. Comp. R. & Regs. 480-7-.03(4) (minimum qualifications for "determining eligibility for licensure" to manufacture or distribute prescription drugs includes whether applicant has furnished "false or fraudulent material in any application made in connection with drug manufacturing or distribution").

500.   Federal and Georgia laws and regulations require Defendants to act as gatekeepers guarding against the diversion of the highly addictive, dangerous opioid drugs. See, e.g., Ga. Code Ann. § 16-13-37(a)(5); Ga. Code Ann. § 16-13-36(a)(1) and (4).

501.   The federal mandates incorporated into Georgia law require that Defendants must maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. §§ 823(a)(1), (b)(1).   These federal regulations impose a non-delegable duty upon both manufacturers and distributors to "design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant [distributor or manufacturer] shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b).

502.   In addition to reporting all suspicious orders, distributors must also stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels. See Southwood Pharm., Inc., 72 Fed. Reg.

36,487, 36,501 (Drug Enf't Admin. July 3, 2007); Masters Pharm., Inc. v. Drug Enf't Admin., 861 F.3d 206 (D.C. Cir. 2017).  Regardless, all flagged orders must be reported.  Id.

503.  Defendants violated section 16-13-42 of the Georgia Controlled Substances Act, which provides that, "It is unlawful for any person: (2) Who is a registrant to manufacture a controlled substance not authorized by his registration or to distribute or dispense a controlled substance not authorized by his registration to another registrant or other authorized person[.]" Ga. Code Ann. § 16-13-42(a)(2).

504.  Defendants violated section 16-13-30 of the Georgia Controlled Substances Act, which provides that, except as authorized by law, "[I]t is unlawful for any person to manufacture, deliver, distribute, dispense, administer, sell, or possess with intent to sell, any controlled substance." Ga. Code Ann. § 16-13-30(b).

505.  Defendants also violated section 16-13-33 of the Georgia Controlled Substances Act by attempting and conspiring to violate that Georgia Controlled Substances Act.

506.  Defendants also violated section 26-4-115 of the Georgia Pharmacy Practice Act by failing to submit reports of excessive purchases of controlled substances. Ga. Code Ann. § 26-4-115(b)(2).

507.  Defendants do not qualify for the "authorized by law" exceptions to the Georgia Controlled Substances Act violations because Defendants did not comply with the mandatory terms of the registrations issued to them by the Georgia State Board of Pharmacy or with federal requirements incorporated by reference, as further detailed in this Complaint.

508.  Plaintiff is within the class intended to be protected by the public safety statutes and regulations concerning controlled substances.

509. Defendants' violations of these public safety laws are prima facie evidence of negligence per se. Each Defendant had a duty under inter alia these laws to maintain effective controls against diversion of prescription opioids and to guard against, prevent, and report suspicious orders of opioids. Defendants' violations of the law constitute negligence per se. Defendants breached mandatory, non-delegable legal duties and did not act reasonably under the circumstances.

510. As described above in allegations expressly incorporated herein, Defendants breached their duties to maintain effective controls against diversion of dangerously addictive opioids, including violating public safety statutes and regulations requiring that as wholesale drug distributors, Defendants could only distribute these dangerous drugs under a closed system – a system Defendants were responsible for guarding.

511. As described above in allegations expressly incorporated herein, Defendants' breach of statutory and regulatory duties caused, bears a causal connection with, is and was a substantial factor contributing to, and/or proximately resulted in, harm and damages to Plaintiff.

512. The injuries and damages sustained are those which the Georgia statutes and regulations were designed to prevent.

513. Defendants' violations of the Georgia statutes and public safety regulations cited herein were and are substantial factors in the injuries and damages sustained.

514. It was foreseeable that Defendants' breaches of statutory and regulatory duties described herein would result in the damages sustained.

515. Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' negligence per se.  Plaintiff does not seek damages for physical, personal injury or any physical damage to property caused by Defendants' actions.

000162

516. Plaintiff seeks all legal and equitable relief as allowed by law, except as expressly disavowed herein, including inter alia injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorneys' fees and costs, and pre- and post-judgment interest.

**COUNT VII**
**FRAUD AND FRAUDULENT MISREPRESENTATION**
**(Against All Defendants)**

517. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

518. In Georgia, the tort of fraud has five elements: (1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages. See, e.g., Home Depot U.S.A., Inc. v. Wabash Nat. Corp., 314 Ga. App. 360, 367, 724 S.E.2d 53, 60 (2012); Fortson v. Freeman, 313 Ga. App. 326, 328, 721 S.E.2d 607, 609 (2011). See also Ga. Code Ann., § 51-6-2 ("Willful misrepresentation of a material fact, made to induce another to act, upon which such person acts to his injury, will give him a right of action.").

519. Defendants violated their general duty not to actively deceive, have made knowingly false statements and have omitted and/or concealed information that made statements Defendants did make knowingly false. Defendants acted intentionally and/or unlawfully.

520. As alleged herein, Defendants made false statements as to their compliance with state and federal law regarding their duties to prevent diversion and their duties to monitor, report and halt suspicious orders and/or concealed their noncompliance with these requirements.

521. As alleged herein, the Manufacturer Defendants engaged in false representations and concealments of material fact regarding the use of opioids to treat chronic, non-cancer pain.

522.  As alleged herein, Defendants knowingly and/or intentionally made representations that were false. Defendants had a duty to disclose material facts and concealed them. These false representations and concealed facts were material to the conduct and actions at issue. Defendants made these false representations and concealed facts with knowledge of the falsity of their representations, and did so with the intent of misleading Plaintiff, Plaintiff's Community, the public and persons on whom Plaintiff relied.

523.  These false representations and concealments were reasonably calculated to deceive Plaintiff, Plaintiff's Community and the physicians who prescribed opioids for persons in Plaintiff's Community; were made with the intent to deceive; and did in fact deceive these persons, Plaintiff and Plaintiff's Community.

524.  Plaintiff, Plaintiff's Community and the physicians who prescribed opioids reasonably relied on these false representations and concealments of material fact.

525.  Plaintiff justifiably relied on Defendants' representations and/or concealments, both directly and indirectly. This reliance proximately caused Plaintiff's injuries.

526.  Defendants' fraudulent conduct was a direct and proximate cause of the injuries Plaintiff alleges herein.

527.  Plaintiff seeks economic losses (direct, incidental or consequential pecuniary losses) resulting from Defendants' fraudulent activity, including fraudulent misrepresentations and fraudulent concealment.

528.  Plaintiff seeks all legal and equitable relief as allowed by law, except as expressly disavowed herein, including, inter alia, injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorneys' fees and costs, and pre- and post-judgment interest.

## PUNITIVE DAMAGES

529.  Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

530.  By engaging in the above-described intentional and/or unlawful acts or practices, Defendants acted with actual malice, wantonly and oppressively. Defendants acted with conscious disregard for the rights of others and/or in a reckless, wanton, willful or grossly negligent manner. Defendants acted with a prolonged reckless indifference to the adverse consequences of their actions and/or omissions. Defendants acted with a conscious disregard for the rights and safety of others in a manner that had a great probability of causing substantial harm. Defendants acted toward the Plaintiff with fraud, oppression and/or malice and/or were grossly negligent in failing to perform the duties and obligations imposed upon them under applicable federal and state statutes and common law.

531. Defendants were selling and/or manufacturing dangerous drugs statutorily categorized as posing a high potential for abuse and severe dependence. Thus, Defendants knowingly traded in drugs that presented a high degree of danger if prescribed incorrectly or diverted to other than legitimate medical, scientific or industrial channels. Because of the severe level of danger posed by, and indeed visited upon the State and Plaintiff's Community by, these dangerous drugs, Defendants owed a high duty of care to ensure that these drugs were only used for proper medical purposes. Defendants chose profit over prudence and the safety of the community, and an award of punitive damages is appropriate as punishment and a deterrence. Punitive damages should be awarded pursuant to the common law and all statutory grounds for recovery, including but not limited to section 51-12-5.1 of the Georgia Code.

000165

532.  By engaging in the above-described wrongful conduct, Defendants also engaged in willful misconduct and gross negligence and exhibited an entire want of care that would raise the presumption of a conscious indifference to consequences.

## **RELIEF**

**WHEREFORE,** the Plaintiff respectfully prays that this Court grant the following relief:

1. Enter a Judgment in favor of the Plaintiff in a final order against each of the Defendants;

2. Enjoin the Defendants and their employees, officers, directors, agents, successors, assignees, merged or acquired predecessors, parent or controlling entities, subsidiaries and all other persons acting in concert or participation with them from engaging in unfair or deceptive practices in violation of law and ordering temporary, preliminary or permanent injunction;

3. Order that Defendants compensate the Plaintiff for past and future costs to abate the ongoing public nuisance caused by the opioid epidemic;

4. Order Defendants to fund an "abatement fund" for the purposes of abating the opioid nuisance;

5. Award actual damages, treble damages, injunctive and equitable relief, forfeiture as deemed proper by the Court, and attorneys' fees and all costs and expenses of suit pursuant to Plaintiff's racketeering claims;

6. Award the Plaintiff the damages caused by the opioid epidemic, including (A) costs for providing medical care, additional therapeutic and prescription drug purchase, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (B) costs for providing treatment, counseling, and rehabilitation services; (C) costs for providing treatment of infants born with opioid-related medical conditions; (D) costs for providing care for children whose parents suffer from opioid-related disability or incapacitation; and (E) costs associated with law enforcement and public safety relating to the opioid epidemic;

7. Enter a judgment against the Defendants requiring Defendants to pay punitive damages;

8. Grant the Plaintiff:

a. The costs of investigation, reasonable attorneys' fees, and all other costs and expenses;

b. Pre-judgment and post-judgment interest; and

c. All other relief as provided by law and/or as the Court deems appropriate and just.

Dated: February 12, 2018

RESPECTFULLY SUBMITTED:

/s/ Edward J. Tarver
Edward J. Tarver
**ENOCH TARVER**
3540 Wheeler Road, Suite 312
Augusta, GA 30909
Tel.: 706-738-4141
etarver@enochtarver.com

William Boling
Mason Reid
**WILLIAM BOLING, P.C.**
675 Drewry Street, Suite 8
Atlanta, GA 30306
Tel.: 678-974-7707
bill@bolingandcompany.com

James A. Vaughn
**VAUGHN, WRIGHT AND BOYER, LLP**
236 Vaughn Road
Forsyth, GA 31029
Tel.: 478-994-3830
jamesavaughn@att.net

Benjamin Vaughn
**DILLON & VAUGHN, P.C.**
20 West Main Street
Forsyth, GA 31029
Tel.: 478-994-8535
ben@dillonandvaughn.com

J. Burton LeBlanc, IV
**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Tel.: 214-521-3605
Fax: 214-520-1181
bleblanc@baronbudd.com

Paul T. Farrell, Jr.
**GREENE, KETCHUM, FARRELL,**
  **BAILEY & TWEEL, LLP**
419 - 11th Street (25701)/ P.O. Box 2389
Huntington, West Virginia 25724-2389
Tel.: 800-479-0053 or 304-525-9115
Fax: 304-529-3284
paul@greeneketchum.com

Peter J. Mougey
Archie C. Lamb, Jr.
Page A. Poerschke
Laura S. Dunning
**LEVIN, PAPANTONIO, THOMAS, MITCHELL,**
  **RAFFERTY & PROCTOR, P.A.**
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
Tel.: 850-435-7068
Fax: 850-436-6068
pmougey@levinlaw.com

Anthony J. Majestro
**POWELL & MAJESTRO, PLLC**
405 Capitol Street, Suite P-1200
Charleston, WV 25301
Tel.: 304-346-2889
Fax: 304-346-2895
amajestro@powellmajestro.com

James C. Peterson
**HILL, PETERSON, CARPER,**
  **BEE & DEITZLER, PLLC**
NorthGate Business Park
500 Tracy Way
Charleston, WV  25311
Tel.: 304-345-5667
Fax: 304-345-1519
jcpeterson@hpcbd.com

Michael J. Fuller, Jr.
**MCHUGH FULLER LAW GROUP, PLLC**
97 Elias Whiddon Rd.
Hattiesburg, MS  39402
Tel.: 601-261-2220
Fax: 601-261-2481
mike@mchughfuller.com

JS 44 (Rev. 06/17)

Case 1:21-cv-00018-JRH-BKE Document 1-2 Filed 02/03/21 Page 215 of 301
Case 1:18-op-45268-DAP Doc #: 1-4 Filed: 02/23/18 Page: 1 of 1

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

AUGUSTA, GEORGIA

**(b)** County of Residence of First Listed Plaintiff    RICHMOND
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attached list.

## DEFENDANTS

AMERISOURCEBERGEN DRUG CORPORATION, et al.

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☒ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C.A. § 1961 et al.

Brief description of cause: Public Nuisance; Racketeer Influenced and Corrupt Organizations Act (RICO) violations; Georgia RICO Act, GA Code Ann. § 16-14-1 *et seq.*; Negligence and Negligent Misrepresentation; Negligence Per Se; Fraud; Fraudulent Misrepresentation

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE   Hon. Dan A. Polster    DOCKET NUMBER   MDL 2804, N.D. Ohio

DATE
02/12/2018

SIGNATURE OF ATTORNEY OF RECORD
/s/ Edward J. Tarver

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP   Exhibit F    JUDGE    MAG. JUDGE 000169

## Attachment to CIVIL COVER SHEET

## AUGUSTA, GEORGIA v.
## AMERISOURCEBERGEN DRUG CORPORATION, et al.

**I. PLAINTIFF**
**(c) Attorneys (Firm Name, Address, and Telephone Number)**

Edward J. Tarver
**ENOCH TARVER**
3540 Wheeler Road, Suite 312
Augusta, GA 30909
Tel.: 706-738-4141
etarver@enochtarver.com

William Boling
Mason Reid
**WILLIAM BOLING, P.C.**
675 Drewry Street, Suite 8
Atlanta, GA 30306
Tel.: 678-974-7707
bill@bolingandcompany.com

James A. Vaughn
**VAUGHN, WRIGHT AND BOYER, LLP**
236 Vaughn Road
Forsyth, GA 31029
Tel.: 478-994-3830
jamesavaughn@att.net

Benjamin Vaughn
**DILLON & VAUGHN, P.C.**
20 West Main Street
Forsyth, GA 31029
Tel.: 478-994-8535
ben@dillonandvaughn.com

J. Burton LeBlanc, IV
**BARON & BUDD, P.C.**
2600 CitiPlace, Ste. 400
Baton Rouge, LA 70808
Tel.: 225-927-5441
Fax: 225-927-5449
bleblanc@baronbudd.com

Paul T. Farrell, Jr.
**GREENE, KETCHUM, FARRELL,**
    **BAILEY & TWEEL, LLP**
419 - 11th Street (25701)/ P.O. Box 2389
Huntington, West Virginia 25724-2389
Tel.: 800-479-0053 or 304-525-9115
Fax: 304-529-3284
paul@greeneketchum.com

Peter J. Mougey
Archie C. Lamb, Jr.
**LEVIN, PAPANTONIO, THOMAS, MITCHELL,**
    **RAFFERTY & PROCTOR, P.A.**
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
Tel.: 850-435-7068
Fax: 850-436-6068
pmougey@levinlaw.com

Anthony J. Majestro
**POWELL & MAJESTRO, PLLC**
405 Capitol Street, Suite P-1200
Charleston, WV 25301
Tel.: 304-346-2889
Fax: 304-346-2895
amajestro@powellmajestro.com

1

Michael J. Fuller, Jr.
Amy Quezon
**MCHUGH FULLER LAW GROUP, PLLC**
97 Elias Whiddon Rd.
Hattiesburg, MS  39402
Tel.: 601-261-2220
Fax: 601-261-2481
mike@mchughfuller.com
amy@mchughfuller.com

James C. Peterson
**HILL, PETERSON, CARPER,
   BEE & DEITZLER, PLLC**
NorthGate Business Park
500 Tracy Way
Charleston, WV  25311
Tel.: 304-345-5667
Fax: 304-345-1519
jcpeterson@hpcbd.com

2

Exhibit F

000171

*Public Hearing → See 35-10* (handwritten annotation)

## Augusta GEORGIA

### Parking or Land Subdivision Regulation
### Variance Application

*Rezoning Application* (handwritten)

**Application Date:** July 23, 2015

| | |
|---|---|
| **Name:** WestCare Georgia, Inc. | **Name:** Order of Saint Helena |
| **Address:** 827 Pryor Street | **Address:** 3042 Eagle Drive |
| **City:** Atlanta | **City:** Augusta |
| **State:** GA   **Zip:** 30315 | **State:** GA   **Zip:** 30906-3326 |
| **Phone:** 702-385-2090 x 10104 | **Phone:** 706-738-5903 (representative) |

**Contact Person:** Michael O. Lavin   **Phone:** 702-385-2090 x 10104

**Contact's e-mail:** mlavin@westcare.com

I hereby request a Variance for: Special Exception for parcel 1090001000 zoned R-1A to allow for transitional living.

*(diagonal handwritten text across form:)* Public Hearing 9/9/15 — Withdraw from further action 9/21/15

**Applicant is the:** ☐ Owner   ☐ Petitioner   ☐ Contractor   ☒ Purchaser   ☐ Other

**Property Address:** 3042 Eagle Drive, Augusta, GA 30906-3326

**Present zoning** R-1A        **Requested Zoning** N/A

**Map/ Parcel #:** 1090001000

**Proposed Development:** Transitional housing.

I certify that I am the legal owner of the property for which this application is being made and that I have identified all individuals and business entities having an ownership interest in the real property in question on the space below.

**Owner's Signature:** *The Order of St Helena By Lois M. Miller as it President*   **Date:** 7/28/15

**Petitioner's Signature:** _____   **Date:** 7/28/15

Subscribed and affirmed before me in the county of _Richmond_, State of Georgia,

this _29_ day of _July_, 20_15_.

_____
(Notary's official signature)

Notary Public, Richmond Cty, Georgia
My Commission expires JAN. 16, 2017

*(Notary seal: LOUIS PHILLIP CHRISTMAS, NOTARY PUBLIC, RICHMOND CO.)*

Notary Seal

Revised 12.05.2014



**WESTCARE**

October 1, 2015

Melanie Wilson, Director
Planning and Development
City of Augusta

Dear Director Wilson,

Please accept this Letter as WestCare's formal request to discontinue our application
for a Special Exception permit for the St. Helena property located at 3042 Eagle Drive.

Please express our sincere appreciation to Kevin Boyd, and your entire Staff for the
professional courtesy shown to our Team.

Sincerely,

Michael Langford
Vice President
WestCare Georgia



# HULL BARRETT

ATTORNEYS

AUGUSTA   AIKEN   EVANS

PATRICK J. RICE
- LICENSED IN GEORGIA

PRICE@HULLBARRETT.COM

September 10, 2015

Melanie Wilson, Director
AUGUSTA PLANNING AND DEVELOPMENT DEPARTMENT
525 Telfair Street
Augusta, Georgia 30901

**VIA HAND-DELIVERY**

Re:   WestCare of Georgia

Dear Director Wilson:

I wanted to thank you and your staff for all the help and kindness over the last few days (and before) in regard to WestCare's application for a Special Exception. I have to say that your office is always most helpful and courteous whenever I need any information or assistance. Everyone greets you warmly with a smile and an immediate "how can I help you?"

My client, WestCare, and all of its representatives expressed their amazement at the friendly assistance they received from your staff. I am sure you are aware of this, but I hope you will express our appreciation to each one of them. One of the WestCare representatives stated your office treated us like family. That is quite a compliment. The courtesy of the Commission in allowing us the opportunity to make a full presentation also was very much appreciated.

I am not sure where this application is headed. WestCare has serious time issues in addition to neighborhood opposition which makes moving ahead quite problematic. I will get back with you on that. Regardless, on behalf of WestCare and myself, please accept our thanks and respectful appreciation for the professionalism of your entire operation. Please share this note with the Chairman, all the Commissioners and staff.

I look forward to working with you in the future.

Very truly yours,

Patrick J. Rice

PJR/m

WWW.HULLBARRETT.COM

HULL BARRETT, PC, 801 BROAD STREET, 7TH FLOOR, AUGUSTA, GEORGIA 30901
TELEPHONE: (706) 722-4481   FAX: (706) 722-9779
MAILING ADDRESS: POST OFFICE BOX 1564, AUGUSTA, GEORGIA 30903-1564

Exhibit G

000003

*Augusta*
GEORGIA

**Planning and Development Department**

**Melanie Wilson,**
**Director**

**Augusta Planning Commission**
**Melvin Ivey,**
**Chairman**

September 30, 2015

Dear Property Owner:

To Whom It May Concern:

We are notifying those concerned members of the public that WestCare Georgia Inc. has withdrawn from further zoning action regarding the following:

> A request by WestCare Georgia Inc., on behalf of the Order of Saint Helen, regarding the establishment of a residential vocational and educational facility that will provide therapy for behavioral and substance abuse per Section 35-10 of the Comprehensive Zoning Ordinance for Augusta, Georgia and O.C.G.A. at 36-66-4(f) of the Georgia State Code on property located at 3042 Eagle Drive containing 20.65 Acres; Tax Map 109-0-001-00-0; Zone R-1A - One–family Residential.

If you have questions please feel free to contact my office.

Sincerely,

Melanie Wilson,
Director

Exhibit G                                        000004



**WEST CARE**

October 1, 2015

Melanie Wilson, Director
Planning and Development
City of Augusta

Dear Director Wilson,

Please accept this Letter as WestCare's formal request to discontinue our application
for a Special Exception permit for the St. Helena property located at 3042 Eagle Drive.

Please express our sincere appreciation to Kevin Boyd, and your entire Staff for the
professional courtesy shown to our Team.

Sincerely.

Michael Langford
Vice President
WestCare Georgia

Exhibit G                                                                     000005

*Augusta*
G E O R G I A

**Planning and Development Department**

**Melanie Wilson,
Director**

**Augusta Planning Commission
Melvin Ivey,
Chairman**

August 17, 2015

Property Owner:

To Whom It May Concern:

A public hearing will be held on Wednesday, September 9, 2015 at 3:30 P.M. or thereafter at the close of the regular meeting of the Augusta Georgia Planning Commission, in Room 281 on the 2nd floor of the Augusta Municipal Building, 535 Telfair Street, Augusta, Georgia for the solicitation of comments regarding the following:

> A request by WestCare Georgia Inc., on behalf of the Order of Saint Helen, regarding the establishment of a residential vocational and educational facility that will provide therapy for behavioral and substance abuse per Section 35-10 of the Comprehensive Zoning Ordinance for Augusta, Georgia and O.C.G.A. at 36-66-4(f) of the Georgia State Code on property located at 3042 Eagle Drive containing 2065 Acres (Tax Map 109-0-001-00-0;  Zone R-1A - One–family Residential).

This public hearing may be followed by a zoning hearing that shall be conducted not less than six (6) months and not more than nine (9) months from the date of application.

The file may be viewed in the office of the Augusta Georgia Planning and Development Department at 535 Telfair Street, Suite 300, Augusta, Georgia during regular business hours.

Sincerely,

Melanie Wilson,
Director

Exhibit G

000006

# HB

# HULL BARRETT

### ATTORNEYS

AUGUSTA   AIKEN   EVANS

PATRICK J. RICE                                                                  PRICE@HULLBARRETT.COM
- LICENSED IN GEORGIA

September 10, 2015

Melanie Wilson, Director                                          **VIA HAND-DELIVERY**
AUGUSTA PLANNING AND DEVELOPMENT DEPARTMENT
525 Telfair Street
Augusta, Georgia 30901

Re:   WestCare of Georgia

Dear Director Wilson:

I wanted to thank you and your staff for all the help and kindness over the last few days (and before) in regard to WestCare's application for a Special Exception. I have to say that your office is always most helpful and courteous whenever I need any information or assistance. Everyone greets you warmly with a smile and an immediate "how can I help you?"

My client, WestCare, and all of its representatives expressed their amazement at the friendly assistance they received from your staff. I am sure you are aware of this, but I hope you will express our appreciation to each one of them. One of the WestCare representatives stated your office treated us like family. That is quite a compliment. The courtesy of the Commission in allowing us the opportunity to make a full presentation also was very much appreciated.

I am not sure where this application is headed. WestCare has serious time issues in addition to neighborhood opposition which makes moving ahead quite problematic. I will get back with you on that. Regardless, on behalf of WestCare and myself, please accept our thanks and respectful appreciation for the professionalism of your entire operation. Please share this note with the Chairman, all the Commissioners and staff.

I look forward to working with you in the future.

Very truly yours,

Patrick J. Rice

PJR/m

WWW.HULLBARRETT.COM

HULL BARRETT, PC, 801 BROAD STREET, 7TH FLOOR, AUGUSTA, GEORGIA 30901
TELEPHONE: (706) 722-4481   FAX: (706) 722-9779
MAILING ADDRESS: POST OFFICE BOX 1564, AUGUSTA, GEORGIA 30903-1564

*Augusta*
G E O R G I A

**Planning and Development Department**

**Melanie Wilson,**
**Director**

**Augusta Planning Commission**
**Melvin Ivey,**
**Chairman**

August 17, 2015

Property Owner:

To Whom It May Concern:

A public hearing will be held on Wednesday, September 9, 2015 at 3:30 P.M. or thereafter at the close of the regular meeting of the Augusta Georgia Planning Commission, in Room 281 on the 2nd floor of the Augusta Municipal Building, 535 Telfair Street, Augusta, Georgia for the solicitation of comments regarding the following:

> A request by WestCare Georgia Inc., on behalf of the Order of Saint Helen, regarding the establishment of a residential vocational and educational facility that will provide therapy for behavioral and substance abuse per Section 35-10 of the Comprehensive Zoning Ordinance for Augusta, Georgia and O.C.G.A. at 36-66-4(f) of the Georgia State Code on property located at 3042 Eagle Drive containing 2065 Acres (Tax Map 109-0-001-00-0;  Zone R-1A - One–family Residential).

This public hearing may be followed by a zoning hearing that shall be conducted not less than six (6) months and not more than nine (9) months from the date of application.

The file may be viewed in the office of the Augusta Georgia Planning and Development Department at 535 Telfair Street, Suite 300, Augusta, Georgia during regular business hours.

Sincerely,

Melanie Wilson,
Director

## Owner Statement of Consent

As the property Owner or representative of the Owner, I do hereby grant permission to WestCare Georgia, Inc. and their authorized signatory Mr. Maurice Lee  to apply for a Special Exception for property located at 3042 Eagle Drive, Augusta, GA 30906-3326 to the Augusta, Georgia Department of Planning and Development.

I also give my permission for the release of information to support this application i.e. recorded deeds, plat information or other supportive documentation which may require my consent.

THE ORDER OF ST. HELENA

Signed by _Lois M. Miller_    Date: _7-29-15_ 2015

AS ITS PRESIDENT

Printed Name: _Lois M. MILLER_

Owner ✓         Owner Representative



**WESTCARE**
G E O R G I A

July 23, 2015

**City of Augusta Georgia**
**Department of Planning and Development**
**Planning Division**
**525 Telfair Street**
**Augusta, Georgia 30901**

Re:    Letter of Intent for Special Exemption for 3042 Eagle Drive, Augusta, GA

Dear Planning & Development:

This submittal is for a Special Exception for 3042 Eagle Drive, Augusta, GA. This property is located between Hummingbird Lane and the Bobby Jones Express with close access to the I-20 freeway. This parcel is zoned R-1A which allows for Transitional Housing as a Special Exemption. We will be providing transitional housing for a maximum of thirty-two (32) youth ages 14-17 in a structured and supportive environment.

*Existing Conditions*
The current use of this property (since it was built) is as a convent for nuns of the Order of St. Helena. Photographs of the building, floor plans, and an aerial view of the property are attached to this application. We do not anticipate any negative impact to the contiguous properties or to immediate neighborhood with this Special Exception.

*Use*
This property will be used as a Transitional Housing (TH) for up to thirty-two (32) male youth ages 14-17. These youth will be supervised by paid professional staff on a twenty four hour (24/7) a day basis. They will receive accredited educational, vocational, and professional services licensed by the state of Georgia. They will also receive professional licensed therapy services for behavioral and substance abuse diagnosis's.

WestCare Georgia, Inc. will have in place and this facility exceptionally trained and fully licensed staff and will comply with all federal, state, and local laws and ordinances. We will abide by all fire, health, and other local codes. The length of stay for youth in this facility will not exceed 120 days per the transitional housing guidelines as set by the City of Augusta Planning and Development.

Respectfully Submitted,

Maurice Lee, Chief Operating Officer, WestCare Foundation

*Augusta*
GEORGIA

**Rezoning Applicant's Response**

Standards Governing the Exercise of the Zoning Power

**Please respond to the following standards in the space provided or use an attachment as necessary:**

a) Whether a proposed rezoning will permit a use that is suitable in view of the use and development of adjacent and nearby property:

Transitional housing is allowed for zone R-1A as an special

exemption. This is a 20.65 acre parcel which is buffered on all

sides by wooded property.

b) Whether a proposed rezoning will adversely affect the existing use or usability of adjacent or nearby property:

No adverse affect is expected with this special exception.

c) Whether the property to be affected by a proposed rezoning has reasonable economic use as currently zoned:

The current use is a convent.

d) Whether the proposed rezoning will result in a use which will or could cause an excessive or burdensome use of existing streets, transportation facilities, utilities, or schools:

None is expected.

e) Whether the proposed rezoning is in conformity with the policy and intent of the land Comprehensive Land Use Plan:

It conforms under the current zoning and special exception.

f) Whether there are other existing or changing conditions affecting the use and development of the property which give supporting grounds for either approval or disapproval of the proposed rezoning:

None known.

Revised 12.05.2014

*Augusta*
GEORGIA

**In order to make an application to the Planning Commission you must submit the following:
Completed application including all supporting documentation listed in this packet.**

1.  The following fees made payable to Augusta Planning and Development Department as of
    March 24, 2014

| | | |
|---|---|---|
| a) | Rezoning A (Agriculture) and R-1 (One-family Residential) Zones | $800.00 |
| b) | All other Zones for applications under 10 acres | $1000.00 |
| c) | All other Zones for applications over 10 acres | $1,250.00 |
| d) | Special Exceptions | $800.00 |
| e) | Subdivision Variance | $500.00 |
| f) | Parking Variance | $300.00 |

2.

If you are not the property owner you must attach a signed statement of consent from the property owner.

3.  The Planning Commission meets on the first Monday of each month at 3:00 p.m. unless otherwise advertised due
    to a holiday. The calendar dates for said meetings are included in this application packet.

4.  The Planning Commission is a recommending body and their decision is forwarded to the Augusta Commission
    for a final decision. The Augusta Commission meets on the third Tuesday of each month at 2:00 p.m. unless
    otherwise advertised.

**The undersigned below is authorized to make this application. Section 35-8 states if the zoning
decision of a local government is for the rezoning of property and the amendment to the Zoning
Ordinance to accomplish the rezoning is defeated by the local government, then the same property
may not again be considered for rezoning until the expiration of at least six (6) months immediately
following the defeat of the rezoning by the local government pursuant to O.C.G.A. 36-66-4-(c) (2012).**

_____                    7/28/15
**Signature of Applicant**                          **Date**

Maurice Lee, Chief Operating Officer, WestCare Foundation
**Print Name and Title**

**Disclosure of Campaign Contributions**

Have you, within the two years immediately preceding the filing of this application, made campaign contributions
aggregating **$250.00** or more to a local government official who will consider this application.

☐ Yes     ☒ No

Applicant's Name: Maurice Lee _____

| | | |
|---|---|---|
| | | |
| N/A | | |
| N/A | | |

*Augusta*
GEORGIA
Revised 12.05.2014

**If necessary attach additional sheets to disclose or describe all contributions.**

## Rezoning and Special Exception Checklist

**The following is a checklist of information required for submission of a Rezoning application. The Planning and Development Department on behalf of the Planning Commission reserves the right to reject any incomplete applications.**

- ☒ Application Form
- ☒ Deed (Legal Description)
- ☒ Recorded Plat or Recorded Boundary Survey
- ☒ (4) Four Site Plans or concept plans and (1) one 8 ½ x 11" reduction (when necessary)
- ☒ Standards governing exercise of the Zoning Power
- ☒ Letter of Intent
- ☒ Conflict of Interest Certification/ Campaign Contributions
- ☒ Application Fee–payable to Augusta Planning and Development Department

<u>**Additional Exhibits that may be required (as necessary):**</u>

- ☐ Additional site plan requirements (where necessary)
- ☐ Traffic Study
- ☐ Review Form for Development of Regional Impact
- ☐ Building Compliance Inspection

### Please bring this checklist when filing for a Rezoning

**If an applicant is submitting a request as (petitioner) and not owner to WITHDRAW an application – it is necessary to have agreement/signature of the property owner to WITHDRAW the application.**

_____ **Withdraw Application**          _____ **Postpone Application**

**Reason:** _____

_____

_____

**Signature of Applicant:** _~~M~~_  **Date:** 7/28/15

**Signature of Property Owner:** by _Reola M. Miller_   **Date:** 7/29/15
*TITLE OWNER OF ST HELENA*  *as pts President*

## 2015 Augusta Georgia Board of Zoning Appeals Meeting Dates

Revised 12.05.2014



**WESTCARE**
G E O R G I A

July 23, 2015

City of Augusta Georgia
Department of Planning and Development
Planning Division
525 Telfair Street
Augusta, Georgia 30901

Re:      Letter of Intent for Special Exemption for 3042 Eagle Drive, Augusta, GA

Dear Planning & Development:

This submittal is for a Special Exception for 3042 Eagle Drive, Augusta, GA. This property is located between Hummingbird Lane and the Bobby Jones Express with close access to the I-20 freeway. This parcel is zoned R-1A which allows for Transitional Housing as a Special Exemption. We will be providing transitional housing for a maximum of thirty-two (32) youth ages 14-17 in a structured and supportive environment.

*Existing Conditions*
The current use of this property (since it was built) is as a convent for nuns of the Order of St. Helena. Photographs of the building, floor plans, and an aerial view of the property are attached to this application. We do not anticipate any negative impact to the contiguous properties or to immediate neighborhood with this Special Exception.

*Use*
This property will be used as a residential, transitional housing for youth ages 14-17. We will provide housing, food, and wraparound supportive services to these youth in our care. WestCare Georgia, Inc. shall have in place 24/7 trained and licensed/certified staff and we will comply with all federal, state, and local laws and ordinances. We will abide by all fire, health, and other local codes. The length of stay for youth in this facility will not exceed 120 days per the transitional housing guidelines as set by the City of Augusta Planning and Development.

Respectfully Submitted,

Maurice Lee, Chief Operating Officer, WestCare Foundation

PUBLIC HEARING – WESTCARE GEORGIA
WEDNESDAY, SEPTEMBER 9, 2015

Those Attending : Name & Address & E-mail

1. BECKY PAVLOS GUIDRY — 3026 Hummingbird Ln Augusta GA 30906
2. GERDA HAAS — 3090 EAGLE DR. AUGUSTA, GA. 30906
3. Joyce Kendricks — 3012 Eagle Dr. Augusta, Ga. 30906
4. Clarence Kendrick — 3022 Eagle Dr. Augusta Ga. 30906
5. William Collins — 3090 Eagle Dr Augusta, GA. 30906
6. Nadine Collins — 3040 Eagle Dr Augusta Ga. 30906 -
7. Ameeka Loggins — 437 Willow Dr. Augusta, GA 30901
8. Suzanne Terrell — 2509 SandRidge Ct. Hephz 30815
9. JAMES HENDERSON — 3012 EAGLE DRIVE AUGUSTA GA. 30906
10. SANDRA HENDERSON — 3012 EAGLE DRIVE AUGUSTA, GA. 30906
11. Starlett Cancer — 3011 Eagle Drive Augusta GA 30906
12. JEFF KELLER — 2448 LUMPKIN RD AUGUSTA, GA 30906
13. Wanda Brunch — 3033 Hummingbird Rd Augusta GA 30906
14. James B. Norris — 2425 Eagle Drive Augusta GA 30906
15. Melody Valentine-Holliman — 3011 Eagle Drive Augusta Ga. 30906
16. Barbara Pikle — 3045 Hummingbird Ln Augusta Gt 3 0906
17. CHANCE GUNN — 2415 EAGLE DR. AUGUSTA GA 30906
18. Leola Evans Fagan — 3006 Earth Dr Augusta, Ga. 30906
19. GWEN DAVIS — 2401 Eagle Dr. Augusta, Ga. 30906
20. Geri Norman — 2401 Eagle Dr. Augusta, Ga. 30906
21. JOAN LANE — 2403 EAGLE Dr AUGUSTA GA. 30906

000015

Exhibit G

000016

22. Lena Yarbrough                    2405 Eagle Dr.  Augusta, GA 30906
23. Donald Yarbrough                  2405 Eagle Dr  Augusta GA 30906
24. Dorothy A. Morris                 3032 Eagle Dr  Augusta, GA 30906
25. Clifford Morris                   3032 Eagle Dr  Augusta, GA 30906
26. George Hatcher                    3036 Eagle Dr. Augusta Ga 30906
27. Viola Carter                      2404 Birdie Dr. Augusta, Ga. 30906
28. Elliott Hannah Jr.                3015 Eagle Dr.  Augusta, GA 30906
29. Crystal Hannah                    3015 Eagle Dr.  Augusta, GA 30906
30. Robert E. Walking                 3109 Richmond Hill Dr  Augusta, GA 30906
31. Rhonda H. Sistare                 3017 Hummingbird Ln. Augusta, GA 30906
32. Andrew Belbr                      2953 Hummingbird ln Augusta, Ga. 30906
33. Lawanda Moody                     8411 Par Drive  Augusta, Ga. 30906
34. Jannie Kyte                       3002 Eagle Dr  Augusta, GA 30906
35. Frankie Kyte                      3002 Eagle Dr.  Augusta, GA 30906
36. Leroy Williard Jr                 2905 Birdie Dr  Augusta GA 30906-3322
37. Jacqueline Williams               2405 Birdie Dr.  Augusta GA 30906
38. Cathy Ashley                      2413 Birdie Dr.  Augusta, Ga. 30906
39. Albert Bruce                      2414 Birdie Dr  Augusta GA 30906
40. Isabel Bruce                      3031 Hummingbird Lane 30906
41.
42.
43.
44.
45.

Witness (are) Hearing    9/9/15

46. Sir Bennie Holmes        3016 Eagle DR    Augusta, Ga
47. Ethel T. Jones           3031 Hummingbird    Aug. Ga
48. Henrietta Jones          3031 Hummingbird    " " Ga
49. Floyd Crockett           2409 Por Dr Augusta Ga
50. Edith Crockett           2409 Por Dr August 9    706 -
51. William H. Wilson        3024 Hummingbird LN Aug 30906
52. Janniel Sykes            2405 Par Drive, Augusta Ga 30906
53. Katie L. Squires         2406 Par Dr.  Augusta GA 30906
54. Daniel Bussey            2407 Eagle Drive  Augusta 30906
55. Maria Bussey             2407 Eagle Drive  Augusta GA
56. Millie Dixon             3006 Hummingbird Ln, Augusta, Ga
57. Bill Dixon               3006 Hummingbird LN  Augusta, GA
58. Eagles' Washington       3013 Eagle DR., Augusta GA
59. Florence Bradley         3013 Eagle Dr Augusta GA
60. Catherine White          3013 Eagle DR  Augusta GeaRG 30906 No
61. Wilfred Gibbons          2437 Eagle Dr Augusta Ga.
62. Gilas Gibbons            2437 Eagle Dr Augusta Ga.
63. Wanda Watson             2440 Par Drive Augusta GA
64. Elisha Watson            2440 Par Drive August GA
65. D M Crews                3011 Hummingbird Ln Augusta Ga
66. Shirnya Maddon           2413 Par Drive Augusta Ga.
67. Harriet & Irean Gauldin  3023 Hummingbird Augusta Ga
68. Mattew & Robin Hamilton  3013 Hummingbird Lane Augusta Ga

000017

Exhibit G

2008   case

## AUGUSTA-RICHMOND COUNTY PLANNING COMMISSION
### STAFF REPORT

**CASE NUMBER:** Z-08-74

**APPLICANT:** L. Phillip Christman II

**PROPERTY OWNER:** The Order of St. Helena

**REQUEST:** Special Exception

**PROPOSED USE:** Modular office addition to convent

**SIZE OF TRACT:** Approximately 20 acres

**LOCATION:** 3042 Eagle Drive

**COMMISSION:** 6

### AREA DESCRIPTION

Mr. Christman is representing the Order of St. Helena which has a religious convent on approximately 20 acres located at the south end of Eagle Drive which extends off the south side of Lumpkin Road just west of Richmond Hill Road within the South Augusta Neighborhood Planning Area. The convent also adjoins the Augusta Tech Campus and the Bobby Jones Expressway. Most surrounding property is zoned R-1A (One-family Residential) although some of that land is used for institutional purposes. The convent adjoins approximately ten single family residences located in Green Meadows Estate Subdivision that are also zoned R-1A.

### SIGNIFICANT FACTORS

The convent wants to add a small modular office unit on the grounds that will adjoin other adjacent single family residences that are owned by the convent. One of the homes owned by the convent was approved for a Special Exception in 1988 for a personal care home. Approval of this Special Exception would allow the modular office addition as well as bring the entire convent into zoning conformance. Public water and sewer lines presently serve the site.

### SUMMARY

The Staff recommends approval of this petition.



## PUBLIC HEARING MINUTES

Wednesday, September 9, 2015 at 3:30 P.M.
Or thereafter at the close of the regular meeting of the Augusta Georgia Planning Commission
Room 281, 2nd floor of the Augusta Municipal Building,
535 Telfair Street, Augusta, Georgia

A request by WestCare Georgia Inc., on behalf of the Order of Saint Helen, regarding the establishment of a residential vocational and educational facility that will provide therapy for behavioral and substance abuse per Section 35-10 of the Comprehensive Zoning Ordinance for Augusta, Georgia and O.C.G.A. at 36-66-4(f) of the Georgia State Code on property located at 3042 Eagle Drive containing 20.65 acres. Tax Map 109-0-001-00-0 - Zone R-1A (One–family Residential)

Those Attending for WestCare Georgia Inc.:

Pat Rice, Attorney, Hull Barrett Firm
Michael Lavin, WestCare Foundation
Michael Langford, WestCare Foundation
John Bascom, West Care Foundation
Augusta Georgia Planning Commission
Augusta Planning & Development Director Melanie Wilson
Augusta Planning & Development Staff

Those Attending on behalf of the Public:

Harold Jones
Clarence Kendrick
Nadine Collins
63 Members of the Public

Meeting was called to order by Chairman Ivey of the Augusta Planning Commission at 4:25 p.m.

Chairman Ivey explained that no decision will be made today regarding this item. The petitioner may return in six (6) months to request zoning action if they choose.

Mr. Pat Rice, Hull Barrett Firm, 1564 Broad Street, Augusta stated that GA Code 36-64-4-F placed no restriction on the amount of time for presentation of facts and while they do not intend to take more time than necessary they are requesting not to be held to 10 minutes. They are agreeable to those in attendance that also wish to speak being afforded equal time. WestCare is considering a large monetary investment which will include 26 local jobs if/when approval is granted not to mention the human investment involved.

Chairman Ivey explained the objective is to gather information and the purpose is to give everyone equal and ample time. The statement read before the Planning Commission states each side is given "a minimum of ten minutes". Ample time will be provided to all parties.

Mr. Rice et al began their presentation at 4:31 p.m.

Mr. Rice stated the WestCare Foundation begin in 1973 and has grown to a national corporation that treats people with abuse issues. Any and all types of citizens who need care are eligible. The program began by treating soldiers and grew from there. WestCare is one of the largest non-profit organizations in the Country. It is well respected organization and Mr. Rice hopes Augusta will welcome them. WestCare is located in 17 states and U.S. territories. Treatment is research and clinically based for substance abuse issues in adolescent males' ages 14 to 17.

Mr. Rice stated the subject property will house 20 young men but will request to be licensed for up to 32. The current grant limits the proposed use to 20. These are not children involved with the criminal justice system. They are brought here by their parents, family members, pastors, even teachers and coaches will refer young men. Their stay is paid for by insurance or private funds and grants.

Mr. Rice stated these young men are not a threat to anyone other than themselves due to their addiction. These young men are "the people's children" and are asking for help. They have adopted bad habits and are reaching out for care and treatment. The young men are not thugs or criminals.

Mr. Rice stated in the next few minutes they will be presenting testimony and letters of support that are the honest truth about this program.

(Mr. Rice asked for the polite silence from those in the audience and promised the same when they present their opinions.)

Mr. Rice stated the young men will be fully supervised by staff 24/7 and the facility will be equipped with security cameras. The boys will attend school six (6) hours a day in order to keep up with their studies so they may graduate high school on-time. They will also receive daily treatment for their addiction problems. The young men will also join community activities under supervised conditions as their treatment permits. They will also attend the church of their faith.

Mr. Rice stated the young men will be transferring from WestCare's Keysville facility that no longer accommodates their needs or meets current codes.

Mr. Rice asked why Augusta for this facility. He answered the property in question is a secluded former convent that has 20+ heavily wooded acres that is bordered by the Interstate, Augusta Tech, RCBOE magnet school, a golf course, and a residential area. The existing buildings can accommodate the boys and staff and be readily renovated for their needs. The seclusion of the property allows the professionals to have the boys' undivided focus but will allow them to access Augusta's activities as permitted.

Mr. Rice reported that WestCare received children from people who love and support them. The boys are carefully screened by trained professionals for addiction, criminal behavior and violent or anti-social behaviors. The philosophy of WestCare is that if they can intercede with these boys at an early age they have a change to make a difference in their futures. No boys are accepted that have a past history of public or family violence or disruption.

Mr. Rice stated that the boys are monitored 24/7 and the facility will be staffed by professional therapists, teachers, recreation professionals and others. The young men will earn high school credits through an on-line program that is overseen by an on-site teacher.

Mr. Rice stated that for 40 years WestCare has provided a tested system that cares for these children. The program also reaches out to the community for input and advice and to mentor these boys.

Mr. Rice concluded his remarks with the statement that all of us know a child and family in need of this kind of help.

Sister Carol Andrew, O.S.H St. Helena Convent, 414 Savannah Farney Drive, North Augusta, South Carolina spoke on behalf of the current owners of the property.

Sister Andrew stated the Sisters have loved the convent and have placed love and prayers and peace into the property for many years. They are sorry to leave it but are happy to be able to leave it in capable hands that will continue the Sisters' history of service and ministry.

Mr. Rice stated his wife had asked him if he thought it was a coincidence that he was helping WestCare to use a property that these nuns had called home and had used for such good works.

Mr. Rice stated the zoning power of the City is considered a police power under law. Meaning the City can zone property but cannot zone to such an extent that is destroys the value to the user or takes away a significant portion of the properties use. The property was on the open market for over one year and no one offered to purchase. The property contains several buildings including a chapel and being bordered by Bobby Jones Expressway limits it's development potential.

Mr. Rice introduced Mr. Langford, Mr. Caldwell, Mr. Lavin and Mr. Bascomb from WestCare.

Mr. Michael Langford, V. P. of WestCare Georgia, 827 Prior St. Atlanta spoke representing WestCare. He stated that WestCare operates within the spirit of cooperation with the community and its citizens.

Ms. Audrey Mack, Program Director for Keysville facility, gave her assurances that the program is structured as a safe and supportive environment for these children. The program hopes to catch these boys early in their addiction and work to save them. The boys are not violent or dangerous and are carefully screened for background problems and issues. The boys receive 5.5 hours of daily education classes via a virtual classroom program that is certified by the State of Georgia Board of Education. A Local Advisory Board is assembled to create strong community ties. The

program strives to be as transparent as possible within the community. Stone Mt., Georgia has a facility and the community is very happy with them.

Ms. Mack explained the boys' typical day starts at 7:30 am and they are in class by 9:00. The boys spend 5.5 hours in classroom activities and then have therapy/treatment sessions individually and in groups.

Mr. Thomas Gordon, 1389 Aylesbury Dr., Augusta introduced himself as a parent of former resident of the WestCare facility in Keysville. Mr. Gordon stated he is retired from the NYPD and moved to Georgia with his family 17 years ago. He never believed any of his 5 children would go through this experience but one son developed addiction issues. He stated that as a society we do anything we can for a child with cancer or any other life threatening illness but drug addiction doesn't get the same reaction and insurance companies do not pay for treatment. Long term care for 30 days can run $16,000. Drugs affect the child and the family until the child asks for help. His son went to WestCare when the family thought there was no hope. At 20 he is clean and has his high school diploma and his working. His son rediscovered church and family at WestCare.

Mr. Gordon stated that the neighbors can put their fears aside; drugs affect a child when they are using but once they are clean they aren't a problem. He said his son would fight with family members and sneak out of the house but at WestCare he was supervised and accepted the help he needed.

Mr. Gordon explained the current location was built in 1907 and cannot continue to be used as it doesn't meet the needs of the program any longer. The facility is well-staffed, well-secured and can make all the difference in a child's life and future.

WestCare presented a video of comments by supporters.

Mr. Langford stated that the success of the program as stated in the video is due to the partnerships established in the community.

_____ Jarrett, Masonic Past Master, Rutherford Ct., Augusta stated that his group has been affiliated with WestCare for 10 years. WestCare establishes a stable environment for the boys. As part of that, groups such as his join the mentor program to provide positive reinforcement to the boys. He stated he never witnessed any security incident during a visit. The program is multi-ethnic which provides a second chance for these boys. He begged the City of Augusta to give the program a chance.

(WestCare portion of presentation lasted 43 minutes; including video)

(Meeting breaks 5 minutes)

(Meeting resumed 5:20 p.m.)

Mr. Clarence Kendrick, 3022 Eagle Drive, Augusta asked how many in the audience we for WestCare and against.

In favor of West Care = 17 people
Not in favor = 63 people

Mr. Harold Jones, 3014 Breeze Hill Dr. Augusta stated that he was a 25 year resident of Green Meadows Subdivision the residential neighborhood bordering the convent property. He now lives in Breeze Hill Subdivision but has fond memories of the convent and the sisters but he agrees with those that are against this proposed use.

Mr. Jones stated that in Section 26-1 of the Comp. Zoning Ordinance under Section 26-1 the Commission is charged with looking at which "...uses are deemed essential or desirable to the public convenience or welfare and are in harmony with the various elements or objectives of the Master Plan/Planning Document in effect..." No one's consideration is more important than those people who live in the immediate area. The usual format of a developer is that if the neighbors only knew they would understand and support a use. But the residents of Green Meadows have self-policed their neighborhood for years and have been tax paying responsible citizens of Richmond County. And these people do understand what is being proposed for their neighborhood and don't want it.

Mr. Jones quoted Section 26-2(g) of the Zoning Ordinance.

Mr. Jones stated property values are at risk, a good stable neighborhood is at risk and whose interests are greater a new owner or those of many 40 year residents of the neighborhood.

Ms. Debra Bunch, 3033 Hummingbird Lane, Augusta presented the documentary the residents had filmed of their neighborhood.

(Presentation played)

Ms. Nadine Collins, 3040 Eagle Drive, Augusta presented a petition signed by area residents opposed to the request. Of the 121 parcels in Green Meadows Subdivision there are 5 vacant house and 2 vacant lots, 2 lots and 5 homes are owned by The Order of St. Helena. Of the 108 residential parcels 89 households were reached, 2 declined to sign the petition but all 87 of the rest signed. To keep things simple the petition asked for one signature per household.

Mr. Kendrick said Green Meadows is the best kept secret in Augusta. This neighborhood is a sanctuary that began over 50 years ago. Many original or long time owners still live there and as elderly people this request worries them.

Mr. Kendrick asked of the 17 present in support of WestCare how many work for them and how many live in Augusta etc.

The audience responded: 5 work for WestCare, 6 live in Augusta and 2 live near the site.

Exhibit G                                                                 000024

Mr. Kendrick repeated this is a close knit community and WestCare is the outsider offering to fix an area that doesn't need fixing.

Mr. Kendrick stated the City has the power to help us maintain our way of life or to destroy a neighborhood.

(Opposition comments lasted 35 minutes, including video presentations)

Chairman Ivey explained no zoning action may take place for six (6) months.  WestCare may facilitate other public hearings at their own discretion.  According to staff the earliest a zoning hearing can take place is February 2016.

A MOTION was made by Commissioner Wright that the public hearing be adjourned; seconded by Commissioner Trammell. MOTION carried unanimously.

MEETING ADJOURNED

Melanie Wilson
Director

MW/ls

Lois Schmidt – Recording Secretary

2·17·21

## Application for a Special Exception to the Zoning Ordinance of Augusta, GA.

_Augusta_
GEORGIA

**Application Date:**

| Applicant Information | | Owner Information | |
|---|---|---|---|
| Name: | Monks of Mt. Tabor | Name: | Order of St. Helena |
| Address: | 17001 Tomki Rd. | Address: | 414 Savannah Barony Dr. |
| City: | Redwood Valley | City: | N. Augusta |
| State: | CA   Zip: 95470 | State: | SC   Zip: 29841 |
| Phone: | | Phone: | 803-426-1616 |
| Contact Person: | Father Damian Higgins | Phone: | |
| Contact's e-mail: | | | |

I hereby request a Special Exception for the explicit purpose of: **monastery**
with full acknowledgement that this exception is for the specified use only and cannot be changed with additional hearings before the Plan Commission and Augusta Commission.

Applicant is the: ☐ Owner   ☐ Petitioner   ☐ Contractor   ☒ Purchaser   ☐ Other

| | |
|---|---|
| Property Address: | 3042 Eagle Dr., Augusta, GA 30906 |
| Present zoning | R 1 A |
| Map/ Parcel #: | 109-0-001-00-0 |
| Proposed Development: | Monastery |

I certify that I am the legal owner of the property for which this application is being made and that I have identified all individuals and business entities having an ownership interest in the real property in question on the space below.

THE ORDER OF ST. HELENA

Owner's Signature by _Lois M. Miller_ As it President   Date: MAY 31, 2017

Petitioner's Signature _Daniel Vincent Higgins fr. Damian_ (RO)   Date: May 23, 2017
DANIEL VINCENT HIGGINS (Fr. DAMIAN)

Subscribed and affirmed before me in the county of _____, State of Georgia.

this 31st day of May 2017

_Ciera Rivers_
(Notary's official signature)

10·21·19
(Commission Expiration)

(see attached for) notary

CIERA RIVERS
NOTARY
EXPIRES
GEORGIA
OCT. 21, 2019
PUBLIC
RICHMOND COUNTY

## Standards Governing the Exercise of the Zoning Power

**The following standards are used by staff to determine whether a proposed Special Exception will:**

a)  Permit a use that is suitable in view of the use and development of adjacent and nearby property;

b)  Adversely affect the existing use or usability of adjacent or nearby Property;

c)  Result in a use which will or could cause an excessive or burdensome use of existing streets, transportation facilities, utilities, or schools;

d)  Be in conformity with the policy and intent of the Comprehensive Land Use Plan.

**Section 26-1 describes additional requirements specific to the proposed use considered for the Special Exception. Other considerations include but are not limited to:**

Whether the property to be affected by a proposed exception has reasonable economic use as currently Zoned;

Whether there are other existing or changing conditions affecting the use and development of the property which give supporting grounds for either approval or disapproval of the proposed exception.

**In order to make an application to the Planning Commission you must submit the following: Completed application including all supporting documentation listed in this packet;**

1   The following fee made payable to Augusta Planning and Development Department: **$800.00**
2.  If you are not the property owner, you must attach a signed statement of consent from the property owner.
3.  The Planning Commission meets on the first Monday of each month at 3:00 p.m. unless otherwise advertised due to a holiday.  The calendar dates for 2016 are included in this application packet.
4.  The Planning Commission is a recommending body and their decision is forwarded to the Augusta Commission for a final decision. The Augusta Commission meets on the third Tuesday of each month at 2:00 p.m. unless otherwise advertised.

**Any use other than churches or church related activities approved under 26-1(a) established as a result of a Special Exception granted per Subsection 26-1 must be initiated within six months of the granting or the Special Exception is no longer valid.  Special Exceptions for churches or church related activities granted per 26-1 shall initiate a use within five years of the granting or the Special Exception shall no longer be valid. The initiation of a use is established by the issuance of a valid business license by the Augusta Planning and Development Department or by other reasonable proof of the establishment of vested rights.  If a Special Exception is granted and the use is initiated but later ceases to operate for a period of one year, then the Special Exception shall no longer be valid.**

*Daniel V. Higgins AKA Fr Damien*          *May 23. 2017*
Signature of Applicant                                    Date

DANIEL V. HIGGINS (AKA) FR. DAMIAN HIGGINS
**Print Name and Title**

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _Mendocino_ )

On _May 23rd, 2017_ before me, _Jesus Zazueta, Notary Public_
                                            (insert name and title of the officer)

personally appeared _Daniel Vincent Higgins AKA Damian Higgins_
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

JESUS ZAZUETA
COMM. #2131501
Notary Public - California
Mendocino County
My Comm. Expires Oct. 26, 2019

Signature _____        (Seal)

*Augusta*
GEORGIA

**Applicant's Response**

Standards Governing the Exercise of the Zoning Power

**Please respond to the following standards in the space provided or use an attachment as necessary:**

a) Whether a proposed rezoning will permit a use that is suitable in view of the use and development of adjacent and nearby property:

The property has been used as a convent for over 40 years. The proposed use will be that of a monastery. Therefore, the use will be unchanged.

b) Whether a proposed rezoning will adversely affect the existing use or usability of adjacent or nearby property:

The proposed special exception will be in line with the special exception that has been in place on the property while the sisters lived there.

c) Whether the property to be affected by a proposed rezoning has reasonable economic use as currently zoned:

The proposed use will have no adverse economic impact on the property or surrounding properties.

d) Whether the proposed rezoning will result in a use which will or could cause an excessive or burdensome use of existing streets, transportation facilities, utilities, or schools:

The use of existing streets, transportation facilities, utilities, and schools will be similar to that during the last 40 years, as the intended use will be the same.

e) Whether the proposed rezoning is in conformity with the policy and intent of the land Comprehensive Land Use Plan:

The proposed use will be the same use that has been on-going at the property for over 40 years while the Sisters of the Order of St. Helena lived at the property.

f) Whether there are other existing or changing conditions affecting the use and development of the property which give supporting grounds for either approval or disapproval of the proposed rezoning:

The conditions of the property and structures will be unchanged.

Revised 12.05.2014

Exhibit H

000004

**Disclosure of Campaign Contributions**

Have you, within the two years immediately preceding the filing of this application, made campaign contributions aggregating **$250.00** or more to a local government official who will consider this application.

☐ Yes    ☒ No

Applicant's Name: *Daniel V. Higgins (AKA Fr. Damian Higgins)*
DANIEL V. HIGGINS (AKA) FR. DAMIAN HIGGINS

| Name and Official position of Government official | Contributions made: (List all which aggregate to $250 or more) | Date Contribution was Made: (in the last two years) |
|---|---|---|
|  |  |  |
|  |  |  |

**If necessary, attach additional sheets to disclose or describe all contributions.**

## Special Exception Checklist

**The following is a checklist of information required for submission of a Rezoning application. The Planning and Development Department on behalf of the Planning Commission reserves the right to reject any incomplete applications.**

☐ Application Form

☐ Legal Description

☐ Boundary Survey

☐ (4) Four Site Plans or concept plans and (1) one 8 ½ x 11" reduction (when necessary)

☐ Standards governing exercise of the Zoning Power

☐ Letter of Intent

☐ Conflict of Interest Certification/ Campaign Contributions

☐ Application Fee–payable to Augusta Planning and Development Department

**Additional Exhibits that may be required (as necessary):**

☐ Additional site plan requirements (where necessary)

☐ Traffic Study

☐ Building Compliance Inspection

**Please bring this checklist when filing for a Special Exception**

# Holy Transfiguration Monastery
## The Monks of Mt. Tabor, Inc.
### 17001 Tomki Rd. – P.O. Box 217
### Redwood Valley, CA  95470-0217
### monksmttabor@gmail.com  https://www.monksofmttabor.com/

May 5, 2017

The Monks of Mt. Tabor are currently under contract to purchase the Order of St. Helena Convent property located at 3042 Eagle Drive, Augusta, GA.  The intended use of the entire facility and surrounding property would be to provide a contemplative environment for those in the monastic community and their guests coming for retreats.  The chapel would continue to operate as a place for private prayer and communal worship where both monastics and guests would come together for daily services.
Please visit our website at https://www.monksofmttabor.com/home to learn more.

In the joy of our Risen Lord,
Fr. Abbot Damian

Exhibit H

000006

*Augusta*

GEORGIA

**Planning and Development Department**

**Melanie Wilson,
Director**

July 24, 2017

Monks of Mt. Tabor
17001 Tomki Rd.
Redwood Valley CA 95470

**Augusta Planning Commission
Robert Cooks,
Chairman**

To Whom It May Concern:

RE:    Special Exception – Monastery

To Whom It May Concern:

At its meeting on Tuesday, July 18, 2017, the Augusta Commission considered the following:

> Z-17-21 – A petition by Monks of Mt. Tabor, on behalf of the Order of St. Helena requesting a Special Exception to utilize the existing former convent as a monastery per Section 26-1 (a) of the Comprehensive Zoning Ordinance for Augusta-Richmond County affecting property containing approximately 20 acres and known as 3042 Eagle Drive. Tax Map 109-0-001-00-0

It was the decision of the Commission to approve your petition with the follow conditions:

1.  The use of the property shall be limited to a monastery with no community outreach programs conducted on site.
2.  The property shall be inspected for a *Certificate of Occupancy* as to a transfer of use and to ensure compliance with all necessary building and fire codes.
3.  Emergency access shall be provided for public safety agencies.

Any use, other than churches or church related activities approved under 26-1 (A), established as a result of a Special Exception granted per Subsection 26-1 must be initiated within six (6) months of the granting, or the Special Exception shall no longer be valid.  Special Exceptions for churches or church related activities granted per 26-1 shall initiate a use within five (5) years of the granting, or the Special Exception shall no longer be valid.  The initiation of a use is established by the issuance of a valid business license by the Planning and Development Department or by other reasonable proof of the establishment of vested rights.  If a Special Exception is granted and the use is initiated but later ceases to operate for a period of one (1) year, then the Special Exception shall no longer be valid.

Please remove the public hearing notice sign.

Sincerely,

For Melanie Wilson

Melanie Wilson
Director

*Augusta*

GEORGIA

**Planning and Development Department**

**Melanie Wilson,**
**Director**

July 11, 2017

**Augusta Planning Commission**
**Robert Cooks,**
**Chairman**

Monks of Mt. Tabor
17001 Tomki Rd.
Redwood Valley CA 95470

To Whom It May Concern:

At its meeting on Monday, July 10, 2017, the Augusta Georgia Planning Commission considered the following:

> Z-17-21 – A petition by Monks of Mt. Tabor, on behalf of the Order of St. Helena requesting a Special Exception to utilize the existing former convent as a monastery per Section 26-1 (a) of the Comprehensive Zoning Ordinance for Augusta-Richmond County affecting property containing approximately 20 acres and known as 3042 Eagle Drive. Tax Map 109-0-001-00-0

It was the decision of the Planning Commission to approve your petition with the following conditions:

1. The use of the property shall be limited to a monastery with no community outreach programs conducted on site.
2. The property shall be inspected for a *Certificate of Occupancy* as to a transfer of use and to ensure compliance with all necessary building and fire codes.
3. Emergency access shall be provided for public safety agencies.

This decision will be forwarded to the Augusta Commission for a final decision. The Commission will meet on Tuesday, July 18, 2017 at 2:00 P.M. in the Commission Chambers (Room 260) on the 2nd floor of the Augusta Municipal building, 535 Telfair Street, Augusta, Georgia.

It is in your best interest to attend this meeting.

Sincerely,

Melanie Wilson
Director

MW/ls

000008

*Augusta*
GEORGIA

**Planning and Development Department**

**Melanie Wilson,**
**Director**

**Augusta Planning Commission**
**Robert Cooks,**
**Chairman**

June 30, 2017

Monks of Mt. Tabor
17001 Tomki Rd.
Redwood Valley CA 95470

To Whom It May Concern:

CERTIFIED LETTER

The Augusta, Georgia Planning Commission will hold a public hearing on **Monday, July 10, 2017 at 3:00 P.M. in the Commission Chambers (Room 260) on the 2nd floor of the Augusta Municipal building, 535 Telfair Street, Augusta, Georgia** to consider the following petition:

> Z-17-21 – A petition by Monks of Mt. Tabor, on behalf of the Order of St. Helena requesting a Special Exception to utilize the existing former convent as a monastery per Section 26-1 (a) of the Comprehensive Zoning Ordinance for Augusta-Richmond County affecting property containing approximately 20 acres and known as 3042 Eagle Drive. Tax Map 109-0-001-00-0

In order for the Planning Commission to consider your petition, it is necessary that you or your representative be present at the hearing.

Sincerely,

*Lois Schmidt for Melanie Wilson*

Melanie Wilson
Director

MW/ls

**PLEASE NOTE:** All visitors to the Municipal Building are required to use the **535 Telfair Street** entrance and to pass through security before entering the building. Parking is also at a premium so please allow extra time to park and pass through security.

/ 32

<table>
<tr><td>Hal R. Powell, et al<br>H. Gould Barrett, et al<br>$5.00, Etc.</td><td>D E E D<br>T O<br>Lot 123rd Dist. G. M.<br>Rich. Co., Ga.</td><td>H. Gould Barrett<br>November 7th, 1936</td></tr>
</table>

STATE OF GEORGIA,            :

Richmond County             :

THIS INDENTURE, made this 7th day of November in the year of our Lord One Thousand Nine Hundred and thirty six between Hal R. Powell and H. Gould Barrett of the State of Georgia and County of Richmond of the first part, and H. Gould Barrett of the State of Georgia and County of Richmond of the second part,

WITNESSETH, That the said parties of the first part, for and in consideration of the sum of Five Dollars and other consideration in hand paid at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, has granted, bargained, sold and conveyed, and by these presents does grant, bargain, sell and convey unto the said party of the second part, his heirs and assigns, all of that tract of parcel of land lying and being in the 123rd District, G. M., Richmond County, Georgia, near the Cohen Crest or Richmond Hill Road, known as lot #9 on a plat made by J. R. Hause, C. E. in August, 1934 and H. R. Powell and H. G. Barrett.* Said tract fronts 200 ft., more or less, on an unnamed road, said road extending Northwesterly from the Cohen Crest or Richmond Hill Road, said tract extending Northeasterly a distance of Nine Hundred and forty (940) feet, more or less, between slightly diverging lines to a width in the rear of two hundred and one (201) feet, more or less.  Said property is bounded Northeast by property of Walker, Southeast by lots Nos. 1, 2, 3 & 4 on said plat, Southwest by said unnamed road, Northwest by lot #10 on said plat.

A strip of ten (10) feet wide and two hundred (200) feet long off of the Southwestern line of the above property is reserved as an easement for a twenty (20) foot road serving this and other property in the subdivision.

TO HAVE AND TO HOLD the said bargained premises, together with all and singular the rights, members and appurtenances thereof, to the same being, belonging or in anywise appertaining, to the only proper use, benefit and behoof of the said party of the second part his heirs and assigns forever, IN FEE SIMPLE.

And the said parties of the first part, for their heirs, executors and administrators will warrant and forever defend the right and title to the above described property unto the said part of the second part, his heirs and assigns, against the lawful claims of all persons whomsoever.

IN WITNESS WHEREOF, the said parties of the first part have hereunto set this hand and affixed this seals, the day and year above written.

Signed, sealed and delivered in presence of

A. L. Maddon<br>Estelle R. Owens<br>Notary Public, Richmond Co. Ga.<br>(Notarial Seal - Estelle R. Owens)

Hal R. Powell        (L.S.)

H. Gould Barrett     (L.S.)

(" NO STAMPS REQUIRED " - H. G. BARRETT)

Filed for record Nov. 12th, 1936 at 9:00 A. M., recorded Nov. 18th, 1936

am

<table>
<tr><td>Realty Savings Bank<br>$165.00</td><td>D E E D<br>T O<br>Lot 22 Block L, Plat Reca. Bk. 10-Z,<br>P. 2</td><td>Fannie Lyons<br>October 27th, 1936</td></tr>
</table>

Exhibit H



P L A T

Showing Property Belonging To

HAL R. POWELL and H. GOULD BARRETT

Located 123 D.G.M. - Richmond Co. - Georgia
Scale: 1" - 800'                    August 16, 1934

J. N. Hawes, C.E.

Filed for record November 12, 1936 at 9:00a.m., and recorded Nov. 18, 1936

Exhibit H                    000011



N/F
RICHARD M. CONNER
TAX MAP #109-3-015-00-0
(REALTY REEL-1163, PAGE-1046)
(DEED BOOK-305, PAGE-525)

N/F
GREEN MEADOWS
GOLF CLUB
TAX MAP #109-3-029-01-0

6°50"W
35.40'

S28°39'47"E
26.11'

S37°56'48"W   207.95'

N/F
BRENDAN D. HIGGS
TAX MAP #109-3-006-00-0
(REALTY REEL-1996, PAGE-1630)

N/F
WILLIAM G. COLLINS
TAX MAP #109-3-002-00-0
(REALTY REEL-1996, PAGE-1830)

... reference ... to the ... of said tract, more
particular description of the interest ... property herein
conveyed.

Also, full rights, together with the owners of other
property, as shown on the ... described plat of J. M. Haxes,
C.E. ... from the tract hereinabove
described to and from the Richmond Hill Road over a twenty
foot road shown on said plat, said road extends in a straight
line in a westerly direction along the boundary line between
lots four (4) and five (5) of said plat and the southern
boundary line of ... lots nine (9), ten (10), eleven (11)
and twelve (12) of said plat with the northern boundary
line of the unplatted southwestern portion of said tract

to the western limit of said tract, whence it turns
at right angles and extends along the westernmost
boundary of lot twelve (12) of said plat in a northerly
direction to its northernmost boundary.

TOGETHER with all and singular the rights, easements, ways,
members and appurtenances to said land being, belonging or in any wise
appertaining and the ... reversions, rents, issues and
profits thereof, and every part thereof.

TO HAVE AND TO HOLD said land and all and singular the members
and appurtenances thereto belonging or ... and every part
thereof, unto the said party of the second part, and to its
successors and assigns, forever, in fee simple.

And the said party of the first part, his heirs and legal rep-
resentatives, the said land unto the party of the second part, its
successors and assigns, against the party of the first part, his
heirs and legal representatives, and against the lawful claim or
claims of any person or persons ... and will WARRANT

age of her, then, at the option of the Grantee, the entire remaining indebtedness shall become due and payable at the option of the Grantee without notice to the Grantor.

In the event of damage to or destruction of any improvements thereon which are covered by insurance, Grantee is authorized and empowered, at its discretion, in fact for the Grantee to collect all insurance monies due upon any policies of insurance covering the premises above described, and to apply the same to the payment of the debt secured hereby, whether the same or any part thereof is then due or not.

Time is of the essence of this contract and the Grantee agrees that in case default is made in the payment of any interest due hereunder, or in the payment of any of the principal as the same matures, or in the payment of any installment including both, or in the payment of any tax assessment, insurance premium or other charge upon the property, promptly when due, or in the payment of any judgment or execution or lien against said property, or against the Grantor, which by remaining unpaid might lessen the security for the loan or disturb it; or in case of actual or threatened demolition or removal of any of the buildings erected upon the premises; or in case said building or buildings shall not be maintained in good order and repair; or should the Grantor fail to abide by, keep and observe in every particular any of the covenants herein contained; then and upon the happening of any such event the entire remaining indebtedness secured hereby shall, at the option of the Grantee, become due and payable at once without notice to the Grantor, anything in this deed or in the note representing said indebtedness to the contrary notwithstanding; and the Grantee may proceed to collect the same, together with all costs and expenses, including any taxes, assessments or insurance premiums paid by the Grantee with interest thereon at the rate of eight per cent per annum, including also an attorney's fee of fifteen per cent of the principal, interest, charges, taxes, assessments and insurance premiums to be collected.

In addition to the remedies provided now or hereafter by law, and not in lieu thereof, all of which may be pursued concurrently, it is further agreed by the Grantor that, if the debt secured hereby is not paid at maturity, or when the same becomes due and payable under the terms and options of this contract, said Grantee is hereby authorized to sell any or all of the property described herein at public outcry, at the Courthouse of the County in which the land is situate, between the legal hours of sale, on any public sale day, to the highest bidder for cash, after advertising the time, place and terms of the sale in the newspaper in which Sheriff's sales for said County are published, once a week for four weeks, (that is one insertion each week for each of the four weeks) immediately preceding the day on which the sale is to take place, regardless of the number of days or calendar weeks between the date of the first publication and the date of the sale.)

The Grantee is hereby constituted and appointed the attorney-in-fact for the Grantor to publish said advertisement and to make such sale or sales, and to execute and deliver to the purchaser or purchasers good and sufficient conveyances, including therein a warranty of title, in fee simple, to said property, which conveyance shall divest the Grantor of all right, title and equity therein, and vest the same in the purchaser or purchasers, and the Grantee may become the purchaser at such sale if the Grantee submits the highest and best bid. The Grantor agrees that all recitals of fact contained in any deed made by the Grantee under this power, showing default, advertisement, sale, and payment of recording taxes shall be conclusive of the truth thereof against the Grantor.

From the proceeds of such sale, the Grantee shall pay the indebtedness hereby with all interest and all taxes, assessments and insurance premiums, and all attorney's fees; and the balance if any shall be paid to the Grantor.

The possession of the premises, whether it be the Grantor or anyone else, after foreclosure of this security deed either by the exercise of the power of sale contained herein or otherwise shall be as a tenant holding over, and such tenant shall be subject to all summary remedies provided by law.

IN WITNESS WHEREOF, said Grantor has   hereunto set her hand and seal

the day and year first above written.

SIGNED, SEALED and DELIVERED

in _____ Richmond _____ County,

State of __ Georgia __

in the presence of:

_____   D. Willis Cook (L.S.)

NOTARY PUBLIC, RICHMOND                                    (L.S.)
COUNTY, GEORGIA                                            (L.S.)



DEED OF CORRECTION

WHEREAS, Max J. Katroff by deed dated December 14, 1948 and recorded in the Office of the Clerk of the Superior Court of Richmond County, Georgia in Realty Book 14-Z, page 134, conveyed a parcel or gore of land to the Board of Trustees of the Yeshuron Synagogue in trust under the same terms and provisions set forth in a Deed of Gift recorded in said Clerk's Office in Realty Book 14-Z, page 134, which parcel or gore of land lies South of Broad Street along the Southern portion of the Western boundary line of property then known and now known under the present system of house numbering in the City of Augusta, Georgia as 1214 Broad Street and,

WHEREAS, it was the intention of the said Max J. Katroff to convey to said Trustees that gore of land lying between the Western boundary line of said 1214 Broad Street and the Eastern boundary line of property known under said system of house numbering as 1216 Broad Street which boundary line is marked by the Eastern face of the brick wall, said gore of land being delineated on a plat attached to and recorded with said deed in Realty Book 14-Z, page 134; and,

WHEREAS, doubt could arise as to the sufficiency of the description in said deed and the parties hereto desire to eliminate any doubt from hereafter arising; and

WHEREAS, since the date of said deed, to-wit: December 14, 1948, The Adas Yeshuron Synagogue, which was originally incorporated under the name of Society Adash Yeshurien, amended its corporate charter so that its correct corporate name is now Adas Yeshuron Synagogue, Inc. and,

WHEREAS, it is the intention of the parties hereto to correct said deed so that the Grantee therein will be designated by its proper corporate name.

Exhibit H

000015

67

ALL that parcel or gore of land situate and
being in the State of Georgia, County of Richmond, City
of Augusta within the Block bounded North by Broad Street,
East by Marbury Street, South by Ellis Street and West
by Watkins Street; said gore of land commencing at the
point along the common boundary line between property
of the party of the second part, as Trustee, known as
1212-1214 Broad Street and property formerly of the party
of the first part, now of Philip Daitch, where said com-
mon boundaries meet; which point is approximately sixty
(60) feet South of Broad Street and said gore of land
extends from said point in a Southerly direction in-
creasing gradually in width until it reaches a width
of fifty-five one-hundredths (.55) feet at a point one
hundred thirty-six and thirty-six one-hundredths (136.36)
feet South of Broad Street. Said gore of land is marked
in red on a plat attached to said deed from the party of the
first part to the party of the second part recorded in
said Clerk's Office in Realty Book 16-Z, pages 242-243 and
is Bounded: Northeast and South by property of the party
of the second part and West by the Eastern face of the
existing brick wall on property formerly of the party
of the first part, now of Philip Daitch, et al.

ALSO conveyed hereby is the right and privilege
in perpetuity to use the Eastern wall of the brick
building on the property adjoining the above described
gore of land on its Western boundary for support of
a party wall or building constructed on or to be con-
structed on the property of the party of the second part
including the gore of land herein described.

TOGETHER WITH ALL AND SINGULAR the rights, easements, ways,

members and appurtenances to said land, being, belonging or in

any wise appertaining and the remainders, reversions, rents

issues and profits thereof, and every part thereof.

TO HAVE AND TO HOLD said property unto the party of the second

part in its representative capacity as Trustee for the Silver

Foundation under the same terms and provisions set out in said

deed from P. Silver, Inc. to Congregation Adas Yeshuron recorded

in said Clerk's Office in Realty Book 14-Z, page 134.

IN WITNESS WHEREOF the party of the first part has hereunto

set his hand and seal the day and year first above written as the

date of these presents.

Signed, sealed and delivered in)
the presence of:                )
                                )
_Marian H. Armour_              )       _Max J. Estroff_        (L.S.)
                                )       MAX J. ESTROFF
_M. Maurice Steinberg_          )
Notary Public, Richmond County,)
Georgia

AFFIDAVIT OF DAVID SILVER MADE IN CONNECTION WITH PROPERTY KNOWN AS
1212-1214 BROAD STREET AND 1209 ELLIS STREET, AUGUSTA, RICHMOND COUNTY,
GEORGIA DESCRIBED IN DEED RECORDED IN THE OFFICE OF THE CLERK OF SUPER-
IOR COURT OF RICHMOND COUNTY, GEORGIA IN REALTY BOOK 14-Z, PAGE 134.

STATE OF GEORGIA
COUNTY OF RICHMOND

Personally appeared before me the undersigned attesting officer,
David Silver who, first being duly sworn deposes and says that he is

Signed, sealed and delivered
ence of:

66

Georgia

&/F7'S

Rlc/nonddaifu, CW Sapmo, ot. S
FIW for        $/f.k/... /tJ 'o-cioc,
R_.w        ?' if4I        ---

## DEED OF CORRECTION

WHEREAS, Max J. Estroff by deed dated December 14, 1948 and recorded in the Office of the Clerk of the Superior Court of Richmond County, G,;;orgia in Realty Book 16-Z, page 242, conveyed a parcel or gore of land to the Board of Trustees of The Yeshuron SynaErQgue in trust under the same terms and provisions set forth in a I)eed of Gift recorded in said Clerk's Office in Realty Book 14-Z, age 134, which parcel or gore of land lies South of Broad Stre\t along the Southern portion of the Western boundary line of property then known and now known under the present system of house numbering in the City of Augusta, Georgia as 1214 Broad Street and,

WHEREAS, it was the intention of the said Max J. Estroff to convey to said Trustees that gore of land lying between the Western boundary line of said 1214 Broad Street and the Eastern boundary line of property known under said system of house numbering as 1216 Broad Street, which boundary line is marked by the Eastern face of the brick wall, said gore of land being delineated on a plat attached to and recorded with said deed in Realty Book 16-Z, page 242.and,

WHEREAS, doubt could arise as to the sufficiency of the description in said deed and the parties hereto desire to eliminate any doubt from hereafter arising and

WHEREAS, since the date of  id deed,       December 14, 1948, The Adas Yeshuron Synagogue, whi h was origin lly incorporated under the name of Society Adash Yesh rien, amended   corporate charter so that its correct corporate ame is now Adas eshuron Synagogue, Inc. and,

WHEREAS, it is the intention of the parties hereto to correct said deed so that the Grantee therein will be desig)p.ated by its proper corporate name.

NOW, THEREFORE, this Deed of Correction made and entered into this   day of  L<  . 1960, by and between Max J. Estroff, a resident of Richmond County, Georgia, hereinafter referred to as the party of the first part and Adas Yeshuron Synagogue, Inc., a corporation incorporated under the laws of the State of Georgia,

Exhibit H

000017

**STATE OF GEORGIA**
**RICHMOND COUNTY**

**CLERK'S OFFICE**
**SUPERIOR COURT**

I,   <u>PRISCILLA DE JESUS</u>   , Deputy Clerk of Superior Court of Richmond

County, Georgia, hereby certify that the foregoing is a true copy

OF:        Deed Of <u>Gift</u>

. GRANTOR:   <u>Gwinn H Nixon</u>

GRANTEE:    ORDER OF ST. HELENA

of title of record in this office in Realty Book/Reel      <u>27-H</u>      Page(s)     <u>65-66</u>

Witness my signature and the seal of said court hereto affixed at Augusta, Georgia this

<u>27</u>   day of           July 27, 2015



<u>P L A T</u>

Showing Property Belonging To.

HAL R. POWELL and H. GOULD BARRETT

Located 123 D.G.M. - Richmond Co. - Georgia
Scale: 1" _ 300'                    .August 1o, 1934

J. N. Hawer, C.E.



led for record November 12, 1936 at 9:00a.m., and recorded Nov. 18, 1936

**STATE OF GEORGIA**
**RICHMOND COUNTY**

**CLERK'S OFFICE**
**SUPERIOR COURT**

I,        Priscilla De jesus        , Deputy Clerk of Superior Court of  Richmond

County, Georgia, hereby  certify that the foregoing is a true  copy

OF:        PLAT
CAPTION:    **Hal R Powell**
           **H Gould Barrett**

of title of record in this office in Realty Book/Reel ──18-G── — Page(s) _____31_____

Witness my signature and the seal of said court hereto affixed at Augusta,  Georgia   this

_27_  day of        July 27, 2015

_____
              Deputy Clerk

Exhibit H                                                    000021



**STATE OF GEORGIA**
**RICHMOND COUNTY**

**CLERK'S OFFICE**
**SUPERIOR COURT**

I,  <u>PRISCILLA DE JESUS</u>  , Deputy Clerk of Superior Court of Richmond

County, Georgia, hereby certify that the foregoing is a true copy

OF:  <u>Deed Of Gift</u>

GRANTOR:  <u>Gwinn H Nixon</u>

GRANTEE:  <u>ORDER OF ST. HELENA</u>

of title of record in this office in Realty Book/Reel  <u>27-H</u>  Page(s)  <u>83-84</u>

Witness my signature and the seal of said court hereto affixed at Augusta, Georgia this

<u>27</u>  day of  July 27, 2015



_____
Deputy Clerk

1h(+   f - ż,

oq

DEED OF GIFT

STATE OF GEORGIA

RICHMOND COUNTY

THIS INDENTURE made and entered into this 23rd day of December, 1960, between GWINN H. NIXON, party of the first part, and THE ORDER OF ST. HELENA, a corporation existing under the laws of the Commonwealth of Kentucky, having its principal office at the Convent of St. Helena, Versailles, Kentucky, hereinafter with its successors and assigns referred to as the party of the second part.

WITNESSETH, that the said party of the first part, for and in consideration of the spiritual benefits he has received as a member of the Protestant Episcopal Church and because of his interest in and desire to promote the extension of the Church and her religious orders in the Diocese of Georgia, has given, granted, released, conveyed and confirmed, and b, these presents does give, grant, release, convey and confirm, unto the said party of the second part, and to its successors and assigns:

A one-half ( )undivided interest in and to all that lot or parcel of land, situate, lying and being in the State of Georgia, County of Richmond, in the 123rd D.G.M., a short distance West of the Richmond Hill Road, about seven miles from the Court House, containing eleven and one-half (11 ) acres, more or less, and being an irregularly shaped parcel of land identified by the legend "11.5 Acres" on a plat made by J. N. Hawes, C.E., dated 16 August, 1934, and recorded in the Office of the Clerk of the superior Court of Richmond County, Georgia, in Realty Book 13 G, page 31; and being the same property the entire title to which was conveyed by Hal R. Powell and H. Gould Barrett to the party of the fics.t part by deed dated October 4,1946 and recorded in said Clerk's Office in Realty Book 15 Y, page 164; reference being made to said deed and plat for a more particular description of the interest in property herein conveyed.

Also, full rights, together with the owners of other property as shown on the above described plat of J. N. Hawes, C.E., of ingress and egress from the tract hereinabove described to and from the Richmond Hill Road over a twenty foot road shown on said plat. Said road extends in a straight line in a westerly direction along the boundary line between lots four (4) and five (5) of said plat and the southern boundary line between lots nine (9), ten (10), eleven (11) and twelve (12) of said plat with the northern boundary line of the unplatted southwestern portion of said tract

to the western limit of said tract, whence it turns at right angles and extends along the westernmost boundary of lot twelve (12) of said plat in a northerly direction to its northernmost boundary.

TOGETHER with all and singular the rights, easements, ways, members and appurtenances to said land being, belonging or in any wise appertaining and the remainders, reversions, rents, issues and profits thereof, and every part thereof.

TO HAVE AND TO HOLD said land and all and singular the members and appurtenances thereto belonging as aforesaid, and every part thereof, unto the said party of the second part, and to its successors and assigns, forever, in fee simple.

And the said party of the first part, his heirs, and legal rep-

Exhibit H

000023

The Grantor does agree that if this security deed is subject or subordinate to any prior security deed, mortgage or lien for repairs or contruction work begun ,or coll:pleted prior to the execution of this deed: and if any default is made in the terms of said prior security deed or mortg.::ge.,,or if p'ly,men't of said lien is not made. and if proceedings are commenced to foreclose said prior secu.rity' deed, m.dri-y;age or lien, then the entire debt ecured hereby may be declare:l immediately, due and, paya], le at',the nptfrin of the Grantee without notice to the Grantor.

rn the ennt of <lamge to the property herein conveyed, or to any improvemt;r1ts: tqereo.n.: whith see l:hered by in::nrance. Granter is authorized an<l constituted the Attorney in l:act,fOr th.e Gr.antC tn rollcn :ill insuranne m1lnies due upon any policie5 of in:ur.in:ce toYering the prem;,if'el". allo:l:e llt'-

"r'irihed. and Le ..l.pply the ame to the payment of the debt secured hereby. whether the ·same ·or any part thereof is then due or not.

Tin!< i- ..f the c··ell.'t of th{: contract auel the Granter agree:; that in c::t: default i:: made in the payment ..ll:llty interest due· hereu.nder, or in the pn;ym        .' fff thi: principal a:; the ·.ame nmture:;, <k in the pa ym r'nt uf :iny in'l'liflinf tl: including    l. ur in the ;J· p:prl:h of any tax: ;l:;a:;:;ment. in:-ur-J.fl:h· l1rertl:ium r ut:lH·r charg-<' upCln the pro  ty, promptly when IC..:Ir in the payment ur any judg-ment : .r :'Xeoution ur lien against :&iel pr perty, or against the Grator. which hy remaining unpaid mtg-ht lt.;;:-en the ·ectrity for the loan   di:5turb it:; ur in case of a/tual ur threatend <.lemulition or remliviblt nf ny rn the buildings erect << upon the premises; or in c sc ..:aid lmllling- .r huilcling$ shall nut l.:e main t:iilf:d in gnod order a: repair ; or $houlcl the Grant  fált tn :thicle hy. ki:ep mcl observe in ever.) l'irtkuln.r my Qf th{' cov n.:ist;t herein l.;:eot.ine<; then .:md upon the happening of any such el.cnt the t:-etirl' r>-ma:in(ng irirlebt dncss .:-.ecured hereby shall,.  the option ur the Gran tee, hetome due ;wd ra..fk:l> ::e l.la.e without nut:ce to the Grant0r, anythin  in thi;; :tiecel ur in the note representing .,tid indf:llted111% to the ton trar  notwith:.tanding; and tl   Grantee may prnenl t> cultt:rt the same, tnJ;dlwr witfl alt l'l;;t; and expe es. indu<ling- any tax , :i:5<:t-t-ml.ll<: ur in:-urunl-t  pn·minm paid by thr 'g:r:liitoe Witlt intcr:i.;:i on the :i.me at eight per cet  per :il11lm:. indudirrg; al:;o .1ll :ttttrney':;; fee nl lllit: n p:r·r trtn of tlie plllL·tp. l, in<:r:-.i.:t charge:; taxe:;-. za:<··:-:ment: an<l :in:-uranc:c- pn:mitl11 :;1 l:-l·d ki::tirl.

In a.l<llit; m tu th:' r<.:me<lit:'·'rnar:i:kl'Cd now or grel'ftr Il} law, nntl not in lieu th:-rl.rrf all :d whkli r:iay he pur;,ned cnnnrrently, l:iis :ii:ther ag-el by the ;;;rn.,.r th:tt is the d<:l;l sectu:-d ll'l'eby. is not f.l:itil :,r m.i:tunt;y. vr when the same    nnne::: lue and payable under the term and options of tlus con-trar:t, saicl Grantee i:s hereby :iuthflrzLd   <to act of all (ii the prop1'rty <.le;;crilic:.l herein at public ":u'l'r:y. :rr th:-·r:;,urtlwnsc- of the Camll:;·-:-l which tile land I:- itunt<'. betwee::n the: legal t:l.ltlrr of sale. ":t :;nn publ6(' :::.alf clay. to the h:ih·e:  :idder for ca::-h. after advert:ing the time. pix<.' antl terms nf the- ·ale in the licw:apller in wbi ·1 $!' rifl's :i.h:<· for :.aid County are 1mhfo,hed. 0:iwe a week fur tour W<'.:k,; ·'that :; one :inertinn :ich www·enfor each of the four week:- immi:diately preceding the d:iv nn witkh tile sn.le fs to t:ike lit;f'e. reg-n.r Jess A the number of <lay:-. or calenelar weeks lictwcen the dar,·nf th:· fir:t public:t:ion a: the d:ite of :l :;ale.)

Thr t:-rnl11<-, i:-. lwrehy :m.;,titnted and :i.pptntorl the attorney-in-fact for the Granter to publbh sa:id :td\'ertisement and to lnke sud1 sale or :m:le . and to execute ancl delh·er to the purchaP.er tir:pur-:fta'{cr l1'tll:d :lml 'ttf:fi <'::r C'Uln'cyant.es. inclueli ]g therein n warranty of title, in fee simpl.e. to said prl1r:ty. wh.kh co:n:y  a.net: ;hn.11 (lin::t the Grant r nf all right, title ancl equity therein, antl .est the ;'une in l.he, purcha:: r nr purchi:-.o-r:s; and the Grantee may hccome the purcha:-er at such sale if the: (-;r:t.n tee :-·:.il1mf:ts e high-<-:-.<·M and h:::t hid. The Gra11tor :tgeec.,: that all recital:;: of fact C'onta.ined :in anr clee-d 11ta<l'  y the Grantf-e under this power, showing default. ad;;_·erti:-em t:nt, ::r:nk. nncl :µ:iyment ;,f req,;irriln;;: - xc,- sha.lt lt cl1111·lu:-.h·e oi the truth thereof ag-a:nt the Granter.

Prnnl t :r p;ir]'<ne> nf :-:nch ale, the Grantee shall pay the inclehtoine.;:;: :-:ccured hereby with all' m:tCrt>-.:. t ur 1 :l11 c:l.xe.:-. a;;:-.:.:t:-:-me:nts and insurance premium::: and all :attorney's fees; and the: ba.lanc.e af any .h· l h:-:e- pn:id to the Gra:tor.

The·· :&e:.:::,.esinn ni the- premi e:>-. whether it he th<' Gra11tOr or anyone eli:e. a.fte-r [areclom.e of di;._ .-:ecurity dfT':l t:ith:>r hy :it:· exerd:.c of the power of sale contained herein or otherwise :hall he as .:: tc-na1u flolfdin:;;; OYer· .ind ..uch ttnant shall be subject to :t11 summary remec-.lies prodded by law.

IX W[TXESS WHER E<1f. said Granter has  h..r  lt:llt_9_se:t_:::ir. b:in;i o.nd..seaL

tht:* d:iy and yt::'a:r first a.hove written.

SIGNe.D, SE,\LED and DELIVERED
m       Ric_hmond      County,    ]
t,ne Or .Georl L9-                 r  j::. LuJl.f.Li c ( t µt:il. s.)
    in the i::jsen}"of:* //                     -<:<(,l_ s.)
                                   ---------------- (L. S.)
:NOTARY PUBL [?..B CHMOND]
GEORG Exhibit H
COUNTY.

GEORGIA: Richmond County, Clerk Superior Court
Filed for Record fctew 7 1961  a 1Ec:o :m
*000024

84

OF ST. HELENA, a corporation, existing under the laws of the Common-
wealth of Kentucky, had its principal office at the City of
St. Helena, Versailles, Kentucky, hereinafter with its successors
and assigns referred to as the party of the second part.

WITNESSETH that the said party of the first part, for and in
consideration of the spiritual benefits he has received as a member
of the Protestant Episcopal Church and because of his interest in
and desire to promote the extension of the Church and her religious
orders in the Diocese of Georgia, has given, granted, released,
conveyed and confirmed, and by these presents does give, grant, release,
convey and confirm, unto the said party of the second part, and to
its successors and assigns:

A one-half () undivided interest in and to all that lot
or parcel of land situate, lying and being in the State
of Georgia, County of Richmond, in the 123rd D.G.M., a
short distance West of the Richmond Hill Road, about seven
miles from the Court House, containing eleven and one-half
(11) acres, more or less, and being an irregularly shaped
parcel of land identified by the legend "11.5 Acres" on a
plat made by J. N. Hawes, C.E., dated 16 August, 1934, and
recorded in the Office of the Clerk of the Superior Court
of Richmond County, Georgia, in Realty Book 13 G, page 31;
and being the same property a one-half () undivided interest
in which was conveyed by the party of the first part to the
party of the second part by deed dated December 23,1960;
reference being made to said deed and plat for a more
particular description of the interest in property herein
conveyed.

Also, full rights, together with the owners of other
property, as shown on the above described plat of J. N. Hawes,
C.E., of ingress and egress from the tract hereinabove
described to and from the Richmond Hill Road over a twenty
foot road shown on said plat. Said road extends in a straight
line in a westerly direction along the boundary line between
lots four (4) and five (6) of said plat and the southern
boundary line between lots nine (9), ten (10), eleven (11)
and twelve (12) of said plat with the northern boundary
line of the unplatted southwestern portion of said tract

to the western limit of said tract, whence it turns
at right angles and extends along the westernmost
boundary of lot twelve (12) of said plat in a northerly
direction to its northernmost boundary.

TOGETHER with all and singular the rights, easements, ways,
members and appurtenances to said land being, belonging or in any wise
appertaining and the remainders, reversions, rents, issues and
profits thereof, and every part thereof.

TO HAVE AND TO HOLD said land and all and singular the members
and appurtenances thereto belonging as aforesaid, and every part
thereof, unto the said party of the second part, and to its
successors and assigns, forever, in fee simple.

And the said party of the first part, his heirs, and legal rep-
resentatives, the said land unto the party of the second part, its
successors and assigns, against the party of the first part, his
heirs and legal representatives, and against the lawful claim or
claims of any person or persons whomscever, shall and will WARRANT
and forever defend by these presents.

IN WITNESS WHEREOF, the said party of the first part has hereunto
set his hand and seal, the day and year first above written.

Exhibit H

000025

## AUGUSTA-RICHMOND COUNTY PLANNING COMMISSION
## STAFF REPORT

**Case Number: Z-17- 21-SP**

**Hearing Date:  July 10, 2017**

**Prepared by: Colleen Russell**

---

**Applicant:  Monks of Mount Tabor**

**Property Owner: Order of St. Helena**

**Address of Property:   3042 Eagle Drive**

**Tax Parcels #: 109-0-001-00-0**

**Current Zoning:  R-1C (One-family Residential)**

**Subdivision: Green Meadows Estates**

**Proposed:   Special Exception**

**Commission District: 6 (B. Hasan)        Super District: 10 (Grady Smith)**

**Fort Gordon Notification Required: NA**

| Request | Proposed Use / Activity | Applicable Ordinance Section(s) |
|---|---|---|
| Special Exception in R-1A Zone | Monastery | Section 26-1 (a) |

**Background:**

The request involves a 20.65-acre parcel located where Richmond Hill Road crosses over the Bobby Jones Expressway.  The site was previously used as an abbey (convent) for over 40 years. The existing buildings and parking lot on the property are about 515 feet from the front gate. What appears to be a maintenance shed, sits about 385 feet from Eagle Drive.

1

000026

Residences on Humming Bird Lane, which are part of Green Meadows Estates, are adjacent to the northeast side of the property, while Bobby Jones Expressway borders the southwest property line. The Richmond County Board of Education Technical Magnet High School is located north of the property but is accessed by Augusta Tech Drive.

The current petition is requesting it be used for a monastery. There was one previous zoning case; it was Z-08-74. The case was for a Special Exception, to bring the existing convent into zoning conformance.

- **Land Use and Zoning** – The current zoning classification is R-1A with a Special Exception for the convent. The property appears vacant, but is still in limited use by nuns of the Order of Saint Helena. The nuns relocated to a new convent in North Augusta. However, they commute to the subject property to do some daily activities and continue maintenance of the site. The front gate stays locked for security reasons. Fourteen nuns lived on the property prior to their move to North Augusta.

- **Utilities** – public water and sewer serve the property. The sewer is a 4-inch diameter line is approximately 10 years old. The 3.5-inch line water line was replaced about one year ago. The closest fire station is at Deans Bridge Road, which is one mile away; another is located at Richmond Hill Road, which is 1.26 miles away. There is a fire hydrant on the property.

- **Environmental** – Apart from the space occupied by the parking lot and buildings, the property is covered by trees. There are no floodplains or wetlands on the property.

- **Traffic and Circulation -** The sole entrance to the property is off Eagle Drive, which is accessible via Green Meadows Drive. The property is not open to the public without an appointment. There are about two dozen parking spaces on the lot, including a handicapped space. Since access property is controlled, vehicle traffic will be limited.

- **Buffer and Landscaping** – The property is covered with mature trees. The trees serve as a natural buffer between the property and adjoining parcels. A 4-foot tall, chain link fence encloses the property. The property exceeds the amount of canopy coverage required under the Tree Ordinance.

- **Comprehensive Plan** – The property is adjacent to the Green Meadows Estates subdivision. The Comprehensive Plan encourages suburban development with appropriate zoning. The current R-1A zoning is in accordance with the plan. While new housing is encouraged, there is also a request for more public services and facilities along with commercial activity. Institutional uses, mostly churches, are presently scattered throughout the area. The Monks of Mount Tabor is a similar use and as such would be consistent with the Comprehensive Plan.

**Project Analysis:**

The applicant is requesting a Special Exception in the R-1A zone for a monastery. The existing buildings will be utilized and no expansion of the facility is planned at this time. Should the footprint be expanded, compliance will be required with the applicable ordinances and codes. If this petition is approved, the property should be inspected for occupancy and the owners/occupants must correct any deficiencies prior to occupancy.

**Findings:**

- The property has water and sewer services, and the expected four monks will not exceed the usage capacity.
- The monastery does not propose to provide any community outreach programs or to be open to the public.
- Should expansion of the property be proposed a site plan shall be submitted to ensure compliance of all the codes and ordinances.
- The existing tree canopy complies with the current Tree Ordinance.
- Public safety agencies should have access to the property in the event of an emergency.

**Preliminary Staff Recommendation**: The Planning Commission recommends approval with the following conditions:

- The use of the property shall be limited to a monastery with no community outreach programs conducted on site.
- The property shall be inspected for a *Certificate of Occupancy* as to a transfer of use and to ensure compliance with all necessary building and fire codes.
- Emergency access shall be provided for public safety agencies.

**Note:** The information included in the staff report represents the best available information at the time it is written, which is generally two weeks prior to the Planning Commission hearing at which the zoning petition is to be heard. It represents an evaluation of the facts presented by the applicant, research done by the staff, and consideration of the relevant factors in the Comprehensive Zoning Ordinance of Augusta, Georgia. New facts may emerge and staff reserves the right to make an oral recommendation at the hearing based on all the information available at that time.

3

Exhibit H

000028



Planning Commission
Z-17-21

July 10, 2017
3042 Eagle Drive
Utilize existing
convent as monastery

Aerial

Legend

☐ 3042 Eagle Drive

Produced By: City of Augusta
Planning & Development Department
535 Telfair Street Suite 300
Augusta, GA 30901
6/22/2017   MH118072

Augusta, GA Disclaimer

The data represented on this map has been compiled by the best methods available. Accuracy is contingent upon the source information as compiled by various agencies and departments both internal and external to the consolidated government of Augusta, GA. Augusta, GA and the companies contracted to develop these data assume no legal responsibilities for the information or accuracy contained on this map. It is strictly forbidden to act or reproduce these maps or data for any reason without the written consent of the Augusta-Richmond County Commission.

**Request:**
Utilize the existing former convent as a monastery per Section 26-1 (a) of the Comprehensive Zoning Ordinance for Augusta-Richmond County affecting property containing approximately 20 acres and known as 3042 Eagle Drive.
**Name:**
Monks of Mt. Tabor, on behalf of the Order of St. Helena
**Parcel:** 109-0-001-00-0

0          400 Feet

Exhibit H

000029



Planning Commission
Z-17-21

July 10, 2017
3042 Eagle Drive
Utilize existing
convent as monastery

Aerial

Legend

☐ 3042 Eagle Drive

Zoning Classification
■ B-2:  General Business
■ HI:  Heavy Industry
■ LI:  Light Industry
☐ R-1A:  One Family Residential

Produced By: City of Augusta
Planning & Development Department
535 Telfair Street Suite 300
Augusta, GA 30901
6/22/2017   MH18072

Augusta, GA Disclaimer

400 Feet

Request:
Utilize the existing former convent as a monastery per
Section 26-1 (a) of the Comprehensive Zoning Ordinance
for Augusta-Richmond County affecting property
containing approximately 20 acres and known as 3042
Eagle Drive.

Name:
Monks of Mt. Tabor, on behalf of the Order of St. Helena
Parcel: 109-0-001-00-0

Exhibit H

000030



HOLY TRANSFIGURATION MONASTERY
MONKS OF MT. TABOR, INC.
17001 Tomki Road
P.O. Box 217
Redwood Valley, CA  95470-0217

July 6, 2017

Augusta Planning and Development Department
535 Telfair St.
Suite 300
Augusta, GA 30901

Dear Commissioners:

Due to circumstances beyond my control I am unable to attend the planning commission meeting on July 10, 2017 concerning our interest in purchasing the property On Eagle Drive formerly known as the Convent of St. Helena.  I beg your pardon for any inconvenience that my absence  may cause and have authorized Rev. Deacon Kent Plowman, M.D. and  Ms. Rachel Willoughby as members of the Board of Directors for The  Monks of Mt. Tabor, Inc. to represent me at this meeting. Both of these individuals are fully competent  to represent my interests and that of our community.  I am most grateful for all the efforts of the Augusta Planning Commission to seek to guide and direct the development of our city in such a way that the rights of its citizens and the integrity of our laws regarding land use are properly assured.

The Monks of Mt. Tabor will be honored to continue the work of contemplative prayer and retreat ministry of the Sisters of St. Helena on Eagle Drive in accord with our own religious tradition.

Humbly  presuming  your  forgiveness for my absence ,  I am gratefully yours,

+Fr. Abbot Damian Higgins
Holy Transfiguration  Monastery
Monks of Mt. Tabor,  Inc.

6/8/2017                                                                Property Report

### Augusta, GA - Property Report    Convert to PDF    6/8/2017

| Parcel ID | Property Address | City, State Zip |
|---|---|---|
| 109-0-001-00-0 | 3042 Eagle Dr | AUGUSTA, GA 30906 |



**Owner Information**

| Owner Name | ORDER OF ST HELEN THE |
|---|---|
| Mailing Address | 3042 EAGLE DR |
| City, State Zip | AUGUSTA, GA 30906-3326 |

 Mobile Maps and Information 

*Disclaimer:* By using this website the User shall constitute an agreement to release Augusta, GA, and all the aforementioned parties in original disclaimer agreed to at entry to the website, of any such liability. For Zoning verification including special exceptions contact the Planning & Development Department at 706-821-1796.

### Parcel Information

| Tax District | Tax Year | Millage Rate | Tax Prop Type (Not Zoning) | Homestead Exemption | Acres | Vacant |
|---|---|---|---|---|---|---|
| 02 County | 2016 | | C4-COMMERCIAL | No | 20.65 | No |

| Tax Neighborhood | Subdivision | Phase | Section | Block | Lot |
|---|---|---|---|---|---|
| 48C090 REGENCY MALL | | | | | |

| Water | Sewer | Electric | Gas | Topography | Drainage | Road Class | Parcel Road Access |
|---|---|---|---|---|---|---|---|
| No Water | No Sewer | Electricity | Tank Gas | Rolling | Good | County | Paved |

### 2017 Tax Year Value Information

| Land Value | Improvement Value | Accessory Value | Total Value | Previous Value |
|---|---|---|---|---|
| $165,200 | $459,738 | $10,889 | $635,827 | $421,262 |

### Land Information

| Type | Value | Description | Calculation Method | Size |
|---|---|---|---|---|
| RES | $165,200 | C090 -R02 -AC | Acre | 20.65 Acres |

### Commercial Improvements 1 of 5

| Description | Value | Actual Year Built | Effective Year Built | Square Feet |
|---|---|---|---|---|
| Church | $211,956 | 1971 | 1975 | 4,322 |

| Wall Height | Wall Frames | Heating | Exterior Wall | Roof Cover |
|---|---|---|---|---|
| 10 | Wood | Forced Hot Air | Brick Veneer | |

| Interior Walls | Ceiling Finish | Floor Construct. | Floor Finish | Lighting |
|---|---|---|---|---|
| Sheetrock | | Reinforced Concrete | Asphalt | Standard F.F. |

### Commercial Improvements 2 of 5

| Description | Value | Actual Year Built | Effective Year Built | Square Feet |
|---|---|---|---|---|
| Church | $86,251 | 1971 | 1975 | 4,322 |

Exhibit H                                                          000033

6/8/2017                                     Property Report





| Wall Height | Wall Frames | Heating | Exterior Wall | Roof Cover |
|---|---|---|---|---|
| 10 | Wood | Forced Hot Air | Brick Veneer | |
| **Interior Walls** | **Ceiling Finish** | **Floor Construct.** | **Floor Finish** | **Lighting** |
| Sheetrock | | Reinforced Concrete | Asphalt | Standard F.F. |





### Commercial Improvements 3 of 5

| Description | Value | Actual Year Built | Effective Year Built | Square Feet |
|---|---|---|---|---|
| Church | $28,372 | 1971 | 1975 | 4,322 |

Exhibit H                                                      000034

6/8/2017                                                                 Property Report

| Wall Height | Wall Frames | Heating | Exterior Wall | Roof Cover |
|---|---|---|---|---|
| 10 | Wood | Forced Hot Air | Brick Veneer | |

| Interior Walls | Ceiling Finish | Floor Construct. | Floor Finish | Lighting |
|---|---|---|---|---|
| Sheetrock | | Reinforced Concrete | Asphalt | Standard F.F. |

NO
IMAGE
AVAILABLE



### Commercial Improvements 4 of 5

| Description | Value | Actual Year Built | Effective Year Built | Square Feet |
|---|---|---|---|---|
| Dormitory | $77,448 | 1971 | 1975 | 2,706 |

| Wall Height | Wall Frames | Heating | Exterior Wall | Roof Cover |
|---|---|---|---|---|
| 10 | Wood | Forced Hot Air | Brick Veneer | |

| Interior Walls | Ceiling Finish | Floor Construct. | Floor Finish | Lighting |
|---|---|---|---|---|
| Sheetrock | | Reinforced Concrete | Asphalt | Standard F.F. |



### Commercial Improvements 5 of 5

| Description | Value | Actual Year Built | Effective Year Built | Square Feet |
|---|---|---|---|---|
| Church | $55,711 | 1996 | 1996 | 1,040 |

Exhibit 11                                                              000035

6/8/2017                                          Property Report



| **Wall Height** | **Wall Frames** | **Heating** | **Exterior Wall** | **Roof Cover** |
|---|---|---|---|---|
| 10 | Reinforced Concrete | Steam Radiators | Glass Block | Open Steel System |
| **Interior Walls** | **Ceiling Finish** | **Floor Construct.** | **Floor Finish** | **Lighting** |
| Plaster | | | Vinyl Tile | Sodium Halide |





Exhibit H                                         000036

6/8/2017                                                                 Property Report

## Accessory Information

| Description | Year Built | Dimensions/Units | Value | Photo | Sketch |
|---|---|---|---|---|---|
| SOLID WASTE | 2017 | | $0 | | |
| GAZEBO | 2016 | 0 X 0 64 | $1,121 | Photo | |
| ASPHALT 10001-20000 | 1971 | 0 X 0 14800 | $9,768 | Photo | |

## Sales Information

| Sale Date | Deed Book | Plat Page | Price | Reason | Grantor | Grantee |
|---|---|---|---|---|---|---|
| | 27H 83 | | $0 | Non-Market | | |

## Permit Information

| Permit Date | Permit Number | Type | Description |
|---|---|---|---|
| | ITOS | | ADD BACK SEGMENTS TO CONVENT. CORRECT ASPHALT. |
| | | | 2014 CORRECTION....SKETCH AND CALULATED SF OF BLDG # 2 DID NOT MATCH....RESKETCHED BLDG # 2 (10,000/2,706 sf)...12/19/13 C GILCHRIST |
| | | FIELDCHECK | 2017 F/C...EXEMPT STATUS RMV`D...3/30/17 C GILCHRIST |
| | | FIELDCHECK | 2017 F/C...PROPERTY DOES APPEARS TO BE USED AS A CHURCH...NO CHURCH FURNITURE NOTED...PROPERTY IS FOR SALE...ADDED MODULAR BLDG...CHANGED BLDG TYPE FRM C TO B...ADDED GAZEBO...3/30/17 C GILCHRIST...REMV`D EXEMPT STATUS |

## Community Information - Dial 311 for Augusta Information and Services

| Commissioner District | Super Commissioner District | School District | Super School District |
|---|---|---|---|
| 6 Ben Hasan | 10 Grady Smith | 6 Jack Padgett | 10 Helen Minchew |

| Solid Waste Hauler | Solid Waste Service Day | Storm Water | #SW Accts |
|---|---|---|---|
| Inland Services | Wed | Fee: $134.40 Contact: (706) 821-2300 | 2 |

### Solid Waste & Street Light Information

### Property Tax Bill

## Comments

17: EXEMPTION REMOVED PER BOA 4.17.17. SROUNTREE 4.7.17 2017 F/C...SEE PERMITS 14:EXEMPT REVIEW NO CHANGE PER BOA 04.14.14 NGREER 04.11.14 12/19/13..SEE PERMITS 13ITOS: SEE PERMITS. MAILING ADDRESS CHANGE PER NCOA - 04/28/09 EASEMENT DEED 1205/1785. SC 3/4/09. 09: LAND OVERRIDE REMOVED, NO LAND VAL. ADJ. DUE TO ZONING CHANGE (Z-08-74) SPEX FOR CONVENT. B SHINGLER 1/12/09 Z-08-74 APPROVED SPEX FOR CONVENT, 11-18-08, LS 11-25-08 MAILING ADDRESS CHANGE PER NCOA - 08/18/08 AS PER OWNER REQUEST POSTED MAILING ADDRESS CHANGE KLESTER 6/5/08. MAILING ADDRESS CHANGE PER NCOA - 08/14/07 ADDRESS CHANGED FROM 0 RICHMOND HILL RD TO 3042 EAGLE DRIVE, TLT 9-19-05 QUARTERS TB/KC 3/21/00; 00#111620$122800: REPAIRS TO CEILING, HVAC, RENOVS TO GUEST; V/C F'85 109-6 C/W THIS PARCEL PER OWNER; V/C (A PORTION NOW C/W 109-2 FOR 1979; 27-H-65, 27-H-83 DM 2/24/94

Exhibit H                                                    000037

## APPLICATION FOR REZONING

DATE: SEPTEMBER        2008           RECEIVED BY: _____

LOCATION: 3042 EAGLE DRIVE, Augusta, GA 30906

PLAT: _____ TAX MAP: 109-0-001-00-0 PARCELS: _____

_____ I hereby request that the property described in this application be rezoned from

_____ zoning classification to _____ zoning classification.

__✓__ I hereby request a SPECIAL EXCEPTION for the purpose of RELigious –

CONVENT

OWNER: THE ORDER OF ST. HELENA

OWNER'S DESIGNATED REPRESENTATIVE: L. PHILLIP CHRISTMAN II

FEE PAID:     CHECK #250⁰⁰ ADDRESS: 909 LITTLETON ST.
              CASH                    Augusta, GA 30904

PHONE: ██████████████

I certify that I am the legal owner of the property for which this application is being made and that I have identified all individuals and business entities having an ownership interest in the real property in question on the space below.

THE ORDER OF ST. HELENA
by Ellen francis louisa, OSH
OWNER'S SIGNATURE AS iTS Treasurer        Damian father

Office = 706-748-5201 x 213
Cell = ██████████

I have made, within two years, campaign contributions aggregating $250.00 or more or made gifts having an aggregate of $250.00 or more to a local government official who will consider this application. The name of that official is _____ and the amount of the contribution was $ _____ . The date of the contribution(s) was _____ .

_____     _____
APPLICANT'S ATTORNEY'S SIGNATURE   OWNER'S OR APPLICANT'S SIGNATURE



AUGUSTA-RICHMOND COUNTY
**PLANNING COMMISSION**
**GEORGE A. PATTY**
EXECUTIVE DIRECTOR
**GENE HUNT**
CHAIRMAN
525 TELFAIR STREET
AUGUSTA, GEORGIA 30901
PHONE: (706) 821-1796
FAX: (706) 821-1806
www.AugustaGA.gov

November 26, 2008

L. Phillip Christman II
909 Littleton St.
Augusta GA  30904

Dear Mr. Christman:

At its meeting on Tuesday, November 18, 2008 the Augusta Commission approved your petition, on behalf of The Order of St. Helena, requesting a Special Exception to allow for a minor addition and to bring an existing convent in to zoning conformance per Section 26-1 (a) of the Comprehensive Zoning Ordinance for Augusta-Richmond County affecting property containing approximately 20 acres

Any use, other than churches or church related activities approved under 26-1 (A), established as a result of a Special Exception granted per Subsection 26-1 must be initiated within six (6) months of the granting, or the Special Exception shall no longer be valid.  Special Exceptions for churches or church related activities granted per 26-1 shall initiate a use within five (5) years of the granting, or the Special Exception shall no longer be valid.   The initiation of a use is established by the issuance of a valid business license by the Augusta License and Inspections Department or by other reasonable proof of the establishment of vested rights.  If a Special Exception is granted and the use is initiated but later ceases to operate for a period of one (1) year, then the Special Exception shall no longer be valid.

Sincerely,

George A. Patty
Executive Director

Exhibit H

000039

AUGUSTA-RICHMOND COUNTY PLANNING COMMISSION
STAFF REPORT

CASE NUMBER: Z-08-74

APPLICANT: L. Phillip Christman II

PROPERTY OWNER: The Order of St. Helena

REQUEST: Special Exception

PROPOSED USE: Modular office addition to convent

SIZE OF TRACT: Approximately 20 acres

LOCATION: 3042 Eagle Drive

COMMISSION: 6

### AREA DESCRIPTION

Mr. Christman is representing the Order of St. Helena which has a religious convent on approximately 20 acres located at the south end of Eagle Drive which extends off the south side of Lumpkin Road just west of Richmond Hill Road within the South Augusta Neighborhood Planning Area. The convent also adjoins the Augusta Tech Campus and the Bobby Jones Expressway. Most surrounding property is zoned R-1A (One-family Residential) although some of that land is used for institutional purposes. The convent adjoins approximately ten single family residences located in Green Meadows Estate Subdivision that are also zoned R-1A.

### SIGNIFICANT FACTORS

The convent wants to add a small modular office unit on the grounds that will adjoin other adjacent single family residences that are owned by the convent. One of the homes owned by the convent was approved for a Special Exception in 1988 for a personal care home. Approval of this Special Exception would allow the modular office addition as well as bring the entire convent into zoning conformance. Public water and sewer lines presently serve the site.

### SUMMARY

The Staff recommends approval of this petition.

Exhibit H

000040

NOTE- The information included in this staff report represents the best available information at the time that it is written, which is generally two weeks before the Planning Commission meeting at which the rezoning petition is to be heard. It represents an evaluation of the facts presented by the petitioner, research done by the staff, and consideration of the factors described in subsection 35-4 of the Comprehensive Zoning Ordinance. New facts may emerge after the staff report is written and staff reserves the right to make the oral staff recommendation at the hearing based on all information available at that time.

The Augusta-Richmond County Planning Commission will hold a public hearing on Monday, November 3, 2006 at 3:00 P.M. in Room 803 of the County Municipal Building, to consider a petition by L. Phillip Christman II, on behalf of The Order of St. Helena, requesting a Special Exception to bring an existing convent in to zoning conformance per Section 26-1 (a) of the Comprehensive Zoning Ordinance for Augusta-Richmond County affecting property situate, lying and being in the State of Georgia, and in the County of Richmond described as follows:

Beginning at a point located on the southwest right-of-way line of Eagle Drive (dead end), 250 feet, more or less, south of Hummingbird Lane; thence, in a southeast direction along the southwest right-of-way line of Eagle Drive (dead end) a distance of 50 feet to a point; thence, in a southwesterly direction a distance of 35 feet, more or less, to a point; thence, in a southeasterly direction a distance of 20 feet, more or less, to a point; thence, in a southwesterly direction a distance of 211.45 feet to a point; thence, in a southeasterly direction a distance of 206 feet, more or less, to a point; thence, in a southwesterly direction a distance of 200 feet, more or less, to a point located on the northeast right-of-way line of Bobby Jones Expressway; thence, in a northwesterly direction along the northeast right-of-way line of Bobby Jones Expressway a distance of 1,645.4 feet to a point; thence, in an easterly direction a distance of 668.39 feet to a point; thence, in a northerly direction a distance of 992.00 feet to a point; thence, in a southeasterly direction a distance of 1,470 feet, more or less, to the point of beginning. This property contains approximately 20 acres and is known as 3042 Eagle Drive. (Tax Map 109-0-001-00-0)

Plat is on file in the office of the Augusta-Richmond County Planning Commission for public inspection.

All persons interested in this petition are requested to be present at the hearing. Please take notice that any opponent to an application for a rezoning action who has made campaign contributions aggregating $250.00 or more to a local government official within two years of the rezoning application must file a disclosure report with the governing authority within five (5) calendar days before the hearing date listed above.

George A. Patty
Executive Director



CONVENT FOR THE ORDER OF ST. HELENA

AUGUSTA GEORGIA

CONVENT OF ST. HELENA
AUGUSTA, GA.



TO BE PUBLISHED IN THE AUGUSTA CHRONICLE, THURSDAY, JUNE 22, 2017
NOTICE OF PUBLIC HEARING

The Augusta Richmond County Planning Commission will hold a public hearing on **Monday, July 10, 2017** at 3:00 P.M. in the Augusta Commission Chambers, Room 260 on the 2nd floor of the Augusta, Georgia Municipal Building, 535 Telfair Street, Augusta, Georgia to consider rezoning requests, review subdivision development plans, final plats and zoning amendments. The rezoning requests to be considered will affect the following properties situate, lying and being in the State of Georgia, and in the County of Richmond:

1. Z-17-20 – A petition by COEL Development Co. Inc. requesting to amend a previously approved Special Exception to allow detached dwellings developed in accordance with Section 13 provided that the density does not exceed three (3) units per acre per Section 8-2 (a) of the Comprehensive Zoning Ordinance for Augusta-Richmond County affecting property containing .24 acres and known as 4101 Pullman Circle. Tax Map 065-3-150-00-0

2. Z-17-21 – A petition by Monks of Mt. Tabor, on behalf of the Order of St. Helena requesting a Special Exception to utilize the existing former convent as a monastery per Section 26-1 (a) of the Comprehensive Zoning Ordinance for Augusta-Richmond County affecting property containing approximately 20 acres and known as 3042 Eagle Drive. Tax Map 109-0-001-00-0

3. Z-17-22 – A petition by Gordon Hardy, on behalf of Pilcher-Hardy Rentals, LLC, requesting a Special Exception to re-establish a church in an existing structure per Section 26-1 (a) of the Comprehensive Zoning Ordinance for Augusta-Richmond County affecting property containing 3.41 acres and known as 2801 Ingleside Drive. Tax Map 025-2-124-02-0

4. Z-17-23 – A petition by Wayne Millar, on behalf of the Terranova Development Corp., requesting to amend a previously approved concept plan in the R-1E (One-family Residential) Zone affecting property containing 16.18 acres and known as 1013 Amli Way. Tax Map 040-0-044-00-0

5. Z-17-24 – A petition by Wayne Millar, on behalf of David W. Law, requesting a change of zoning from Zone A (Agriculture) to Zone R-1D (One-family Residential) affecting property containing 18.33 acres and known as 1235 Augusta West Parkway. Tax Map 030-0-062-00-0

6. Z-17-25 – A petition by Michael Thurman requesting a change of zoning from Zone R-1C (One-family Residential) to Zone P-1 (Professional) for the purpose of establishing paid surface parking areas consisting of five tax parcels totally .97 acres and known as 1223, 1227 and 1239 Augusta Avenue, 1204 Holley Street and 1236 R A Dent Boulevard. Tax Map 046-3-253-00-0, 046-3-252-00-0, 046-3-248-00-0, 046-3-185-00-0 and 046-3-184-00-0 Postone to August be petitioner

7. Z-17-26 – A petition by Guru Darshaw, LLC requesting a change of zoning from Zone A (Agriculture) to Zone B-2 (General Business) affecting property containing .98 acres and known as 2657 Tobacco Road. Tax Map 140-2-002-00-0

An explanation of any Zoning Ordinance amendments is available on our web site at http://www.augustaga.gov/290/Planning-and-Development. Text copies along with the zoning files and plats are on file in the office of the Augusta Georgia Planning and Development Department at 535 Telfair Street, Suite 300, Augusta, Georgia for public inspection.

All persons interested in these petitions are requested to be present at the hearing. Please take notice that any opponent to an application for a rezoning action who has made campaign contributions aggregating $250.00 or more to a local government official within two years of the rezoning application must file a disclosure report with the governing authority at least five (5) calendar days before the hearing date listed above.

Melanie Wilson, Director

MEETING MINUTES

AGENDA

AUGUSTA GEORGIA PLANNING COMMISSION
ROOM #260, AUGUSTA, GEORGIA MUNICIPAL BUILDING
535 TELFAIR ST., AUGUSTA, GEORGIA
MONDAY, JULY 10, 2017 AT 3:00 P.M.
(Pre-Meeting will be in Room #291 at 2:00 P.M.)

**Please note due to the Fourth of July Holiday the meeting date was changed**

**THOSE PRESENT:**

Robert Cooks, Chairman                    David Hogg, Vice-Chairman
Bill Wright                               Gary Trammell
Sonny Pittman                             Moses McCauley
Michael Owens                             Brandon Garrett
Pat Jefferson                             Melvin Ivey

**ABSENT:**

James O'Neal

**ALSO, PRESENT:**

Melanie Wilson, Director                  Lois Schmidt, Recording Secretary
Brendon Cunningham, Dev. Services Mgr.    Wayne Brown, City Attorney
Marion Williams, Ex-officia Member

Lois Schmidt read the following: The Augusta, Georgia Planning Commission is a recommending Body. The final decision on all zoning matters coming before it will be made by the Augusta Commission on **Tuesday, July 18, 2017 2:00 P.M.**, in Room 281, of the Municipal Building. The Planning Commission makes the final decision on all variances including subdivision regulations. A handout describing the Zoning procedures from which these cases are decided is available upon request. These procedures also require that any opponent to an application for a rezoning action who has made contributions aggregating $250.00 or more to a local government official within two years of the rezoning application is required to file a disclosure report with the governing authority within five (5) calendar days prior to today's hearing.

A minimum of ten minutes shall be afforded for the presentation of data, evidence, and opinions on each side of a rezoning petition or a special exception. If more than ten minutes is afforded to a proponent or opponent, then an equal amount of time shall be afforded to the other side.

There was no addendum to today's meeting.

Chairman Cook recommended amending today's agenda to move Items 5, 6, and 7 to the start of the agenda.

A MOTION was made by Commissioner Trammel those Items 5, 6, & 7 be moved to the start of today's agenda; seconded by Commissioner Owens. MOTION carried unanimously. (For the purpose of this record the transcript remains in order)

1. Z-17-17 – A petition by Larry G. Check, on behalf of Michael Woodcock, requesting a change of zoning from Zone B-2 (General Business) with conditions to Zone B-2 affecting property containing .88 acres and known as 3161 Gordon Highway. Tax Map 092-0-015-00-0 CONTINUED from June 5, 2017

Director Wilson presented Z-17-17 and requested the staff report be entered into the record.

Mr. Cunningham presented the following findings.

- The subject property is in an area that allows for the placement of billboard signs;
- There are no residential units or residentially zoned properties within 100 feet of the proposed location of the signs;
- The structure will be located at the proper front and side-yard setback lines;
- The next nearest billboard is located at the intersection of Gordon Highway and East Robinson Avenue approximately 1 ½ miles to the northeast;
- The support pole and sign will not exceed the allowed 60 feet of height;
- The sign faces will not exceed the allowed 300 square feet per face;
- GDOT has granted approval of the sign to be located adjacent to a state road;
- To date, Fort Gordon officials have made no comment regarding this petition.

Mr. Alex Vzuda and Mr. Larry Check, Knight Outdoor Signs, 328 Village Square Drive, Evans, Georgia was present on behalf of the petition.

Mr. Check stated they wish to erect a modern digital display single pole sign. The sign will meet all state and local requirements for square footage and height.

There were no concerned citizens present.

Chairman Cooks asked for the staff recommendation.

Director Wilson stated staff recommends approval with the following conditions:

1. The only additional structure permitted shall be the billboard as described in this application.
2. Any other new structures would need to return to the Planning Commission for additional approval.

A MOTION was made by Commissioner Wright that Z-17-17 be APPROVED with the above stated conditions; seconded by Commissioner Garrett. MOTION carried unanimously.

2. <u>Z-17-20</u> – A petition by COEL Development Co. Inc. requesting to amend a previously approved Special Exception to allow detached dwellings developed in accordance with Section 13 provided that the density does not exceed three (3) units per acre per Section 8-2 (a) of the Comprehensive Zoning Ordinance for Augusta-Richmond County affecting property containing .24 acres and known as 4101 Pullman Circle. Tax Map 065-3-150-00-0

Director Wilson presented Z-17-20 and requested the staff report be entered into the record.

Mr. Cunningham presented the following findings.

- The streets in the Haynes Station subdivision are to be dedicated to Augusta-Richmond County.
- The stub-out was part of the original approval and by association is part of the street dedication;
- The grading issue is self-created and can be corrected with the removal of existing fill and regrading to provide the slope allowed in the Street and Road Design Technical Manual.

Commissioner Hogg recused himself from this item citing a conflict of interest.

Mr. Joseph Guilino, COEL Development Co. Inc., 7009 Evans Town Center Blvd., Evans, Georgia was present on behalf of the petition.

Mr. Guilino stated that the subject property was originally slated to be a stub-out access point to the adjoining subdivision but the final grade is such that you would need about twelve feet of fill on the adjoining property to match the grade. He is requesting to eliminate this stub-out in favor of another one in Section 10 that is currently under development plan review. The new site is more favorable. No land has been disturbed for Sims Landing, the adjoining subdivision, so they do not know what their plans show for either location.

Commissioner Spencer asked the subject property is a comparable size to the other building lots.

Mr Guilino said yes and it will be possible to meet all required setbacks on the subject property.

Commissioner Spencer confirmed there is another spot to make the interconnectivity.

Mr. Guilino said yes in Section 10.

Commissioner Spencer asked staff if construction of a house would require any variances.

Director Wilson said there is no way to know until a house plan is proposed.

Director Wilson stated the final plat for this section was approved in March 2013 and this stub-out was defined as part of the public road system for this subdivision. As such, this would now be part of the City road network.

Mr. Guilino stated he is not sure if it was deeded over to the City with the other roads.

Director Wilson explained the recorded plat is a legal document, which shows this parcel to be a future road.

Mr. Guilino agreed.

Director Wilson said addition legal advice might be needed to determine how to proceed with this request.

Mr. Guilino said he has no problem with the required interconnectivity but a concept may be drawn one-way and when actual engineering and field review is done things change.

Mr. Guilino stated in his professional opinion how the subject property can be used for a connection.

Commissioner Ivey asked if when presenting a concept plan you confer with the adjacent developers so connections meet up.

Mr. Guilino said that never happens, anywhere he does business. Whoever goes in first creates the stub-outs and the next developer has to meet them.

Commissioner Ivey asked if the regulations address this.

Director Wilson large developments are required to provide interconnectivity and the concept plans must show that during the review process. The developer may choose the location but eventually the location is included in the final plat.

Commissioner Trammell asked if we get connectivity somewhere and the developer is agreeable to this can we postpone this item and see if everyone can agree on the new location.

Director Wilson said anything is possible.

Director Wilson stated the current plat is recorded if the developer chooses to offer up another connection point it should be part of any approval so that they are tied to that location.

Mr. Guilino indicated they have shown the new connection in Section 10.

Director Wilson stated a concept under review does not affect this request to eliminate the connection in the current phase. She agreed that a postponement would allow the petitioner to present the new location and its workability within the other section. She reminded the petitioner they chose the first location not staff.

Commissioner Ivey asked how the new location would affect traffic flow and emergency vehicles.

Mr. Guilino stated the new location is farther back in the subdivision.

Chairman Cooks suggested that was not the basis of the Planning Commission discussion.

A MOTION was made by Commissioner Pittman that Z-17-20 be CONTINUED to the August 7, 2017 meeting; seconded by Commissioner Garrett. MOTION carried with Commissioner Hogg recused.

Mr. Guilino agreed to the continuance but questioned the length of time it has taken staff to review this petition.

3. Z-17-21 – A petition by Monks of Mt. Tabor, on behalf of the Order of St. Helena requesting a Special Exception to utilize the existing former convent as a monastery per Section 26-1 (a) of the Comprehensive Zoning Ordinance for Augusta-Richmond County affecting property containing approximately 20 acres and known as 3042 Eagle Drive. Tax Map 109-0-001-00-0

Director Wilson presented Z-17-21 and requested the staff report be entered into the record.

Mr. Cunningham presented the following findings.

- The property has water and sewer services, and the expected four monks will not exceed the usage capacity.
- The monastery does not propose to provide any community outreach programs or to be open to the public.
- Should expansion of the property be proposed a site plan should be submitted to ensure compliance of all the codes and ordinances.
- The existing tree canopy complies with the current Tree Ordinance.
- Public safety agencies should have access to the property in the event of an emergency.

Mr. Philip Christman, Augusta Georgia was present on behalf of the petition.

Mr. Christman stated that the Convent of St. Helena has relocated to a smaller facility and the Monks of Mt. Tabor wish to purchase the subject property for their use.

There were no concerned citizens present.

Chairman Cooks asked for the staff recommendation.

Director Wilson stated staff recommends approval with the following conditions:

1. The use of the property shall be limited to a monastery with no community outreach programs conducted on site.
2. The property shall be inspected for a *Certificate of Occupancy* as to a transfer of use and to ensure compliance with all necessary building and fire codes.
3. Emergency access shall be provided for public safety agencies.

A MOTION was made by Commissioner Trammell that Z-17-21 be APPROVED with the above stated conditions; seconded by Commissioner Hogg. MOTION carried unanimously.

4. <u>Z-17-22</u> – A petition by Gordon Hardy, on behalf of Pilcher-Hardy Rentals, LLC, requesting a Special Exception to re-establish a church in an existing structure per Section 26-1 (a) of the Comprehensive Zoning Ordinance for Augusta-Richmond County affecting property containing 3.41 acres and known as 2801 Ingleside Drive. Tax Map 025-2-124-02-0

Director Wilson presented Z-17-22 and requested the staff report be entered into the record.

Mr. Cunningham presented the following findings.

- The existing building will be used for religious services and related activities.
- The property has been used for religious services and activities in the past without any apparent adverse effect on the neighborhood.
- The property is served by the necessary public utilities.
- Adequate paved parking exists on the site. Church members should not have to park on the adjoining streets.
- There are to two driveways on the site, which appear to be sufficient for vehicle access to and from the site.
- Should the use of the property expand or change, a site plan shall be required to ensure compliance with existing codes and ordinances.

Mr. Clyde Pilcher, Augusta, Georgia was present on behalf of the petition.

Mr. Pilcher stated that the building has been vacant for 3 years due to water damage. His partners had originally planned to use the building as an event center but that was denied by the Commission. They now have a minister interested in reestablishing a church in the building.

Rev. Brandon Bay, 1221 Lynch Street, Augusta stated he was born here and is a graduate of Trinity Baptist College. He has been a youth minister in Florida and is returning to Augusta to establish a church. When visiting Augusta he has found many people his age who are in need of a church. Currently they use Westside High School.

There were no concerned citizens present.

Chairman Cooks asked for the staff recommendation.

Director Wilson stated staff recommends approval with the following conditions:

1. The water and sewer shall be inspected to ensure they meet the capacity for the occupants' use.
2. The property shall be inspected for a *Certificate of Occupancy* as to a transfer of use and to ensure that all codes are being met.
3. Any additions or expansion of the property shall require a site plan to ensure compliance with existing codes and ordinances.

4. Any additional parking lot or security lighting shall be directed away from adjoining residential properties.

Mr. Pilcher and Rev. Bay agreed.

A MOTION was made by Commissioner Pittman that Z-17-22 be APPROVED with the about stated conditions; seconded by Commissioner Trammell. MOTION carried unanimously.

5. Z-17-23 – A petition by Wayne Millar, on behalf of the Terranova Development Corp., requesting to amend a previously approved concept plan in the R-1E (One-family Residential) Zone affecting property containing 16.18 acres and known as 1013 Amli Way. Tax Map 040-0-044-00-0 Requested postponement to August meeting.

Director Wilson stated the petitioner has requested to continue this item to the August meeting.

There were no concerned citizens present.

A MOTION was made by Commissioner Trammell that Z-17-23 be CONTINUED to the August 7, 2017 meeting; seconded by Commissioner Owens. MOTION carried unanimously.

6. Z-17-24 – A petition by Wayne Millar, on behalf of David W. Law, requesting a change of zoning from Zone A (Agriculture) to Zone R-1D (One-family Residential) affecting property containing 18.33 acres and known as 1235 Augusta West Parkway. Tax Map 030-0-062-00-0 Requested postponement to August meeting.

Director Wilson stated the petitioner has requested to continue this item to the August meeting.

There were no concerned citizens present.

A MOTION was made by Commissioner Trammell that Z-17-24 be CONTINUED to the August 7, 2017 meeting; seconded by Commissioner Owens. MOTION carried unanimously.

7. Z-17-25 – A petition by Michael Thurman requesting a change of zoning from Zone R-1C (One-family Residential) to Zone P-1 (Professional) for the purpose of establishing paid surface parking areas consisting of five tax parcels totally .97 acres and known as 1223, 1227 and 1239 Augusta Avenue, 1204 Holley Street and 1236 R A Dent Boulevard. Tax Map 046-3-253-00-0, 046-3-252-00-0, 046-3-248-00-0, 046-3-185-00-0 and 046-3-184-00-0 Requested postponement to August meeting.

Director Wilson stated the petitioner has requested to continue this item to the August meeting.

There were concerned citizens present.

Commissioner Williams asked if an item should be delayed if there are people present to discuss the item.

Director Wilson explained that every effort is made to contact those people who express concerns about an item but no one can guarantee everyone is notified.

Chairman Cooks stated he appreciates the comment but if the applicant is not present for an equal opportunity to address the item and the continuance was requested in a timely manner, there is no reason not to entertain the request.

Chairman Cooks called for the vote.

A MOTION was made by Commissioner Trammell that Z-17-25 be CONTINUED to the August 7, 2017 meeting; seconded by Commissioner Owens. MOTION carried unanimously.

8. Z-17-26 – A petition by Guru Darshaw, LLC requesting a change of zoning from Zone A (Agriculture) to Zone B-2 (General Business) affecting property containing .98 acres and known as 2657 Tobacco Road. Tax Map 140-2-002-00-0

Director Wilson presented Z-17-26 and requested the staff report be entered into the record.

Mr. Cunningham presented the following findings.

- The subject property is located north of the Tobacco Road and Fairington Drive intersection.
- The area represents one of the few remaining undeveloped properties in the general vicinity.
- The property has no access to public sewer. Extending sanitary sewer service to the site may be costly, given that the nearest line is located south of Tobacco Road and would likely require a jack and bore of existing lines to access the site.
- According to the Richmond County Health Department, the septic drain field is inadequate as designed. Based on the use, the applicant would need to increase the size of the lot or reduce the size of the proposed building and identify the use for the additional tenant space.
- The concept plan proposes an area for stormwater detention in the rear of the property.
- The proposal does not meet the minimum off-street parking requirement based on the proposed parking and the nature of the use. Based on the number of parking spaces required to support the use, the applicant would need to reduce the size of the proposed building.
- The Tobacco and Fairington Drive intersection has a traffic light.
- No traffic impact study was conducted to fully assess the possible movement or queuing of vehicles resulting from the layout of the proposed convenience store.

There was no petitioner present.

Mr. L. C. Myles, 2006 Walton Farms Drive, Hephzibah spoke on behalf of the Neighborhood Alliance. Mr. Myles stated they have 2 main objections to this request:

Exhibit H

000054

1. No business should be approved without sewer access.  The City is attempting to get everyone off septic tanks so a business should not be approved on one.
2. The traffic at Fairington Drive and Tobacco Road.  This is a busy intersection now and if this use is permitted it will only get worse, especially during school hours.

Mr. Myles stated there are 6 convenience stores between Ft. Gordon and Windsor Spring Road. That is an overload of use in a small area.

Mr. Earl Reese, 4206 Creekview Ct. in the Fairington Subdivision stated they live at the top of the water table and worry that a large commercial sized septic system would possibly leave room for contamination of the ground water should it fail.  One of the City water tanks is right there and he worries about "gray water" leeching into the ground water.  He would guess that installing sewer lines is too costly to the developer to be financially feasible but that is no reason to approve a commercial septic system.

Chairman Cooks asked for the staff recommendation.

Director Wilson stated staff recommends Denial but if approved recommends the following conditions:

1. Sanitary sewer must be extended to the site at the owner/petitioner's expense.  The water and sewer shall meet capacity for the proposed use.
   Or:
   The Richmond County Health Department must approve all aspects of the septic system, including but not limited to: size of system, any additional lands needed and location.
2. The only B-2 use of the property may be a convenience store.
3. Parking lot and security lighting must be directed away from the residential properties located to the west of the subject property.
4. Any new curb-cuts for the site on Tobacco Road are subject to approval from Augusta Engineering Department.
5. Site plan/Development Plan must comply with all other ordinances and regulations in effect at the time of construction.

A MOTION was made by Commissioner Wright that Z-17-26 be DENIED; seconded by Commissioner Garrett. MOTION carried unanimously.

9. ZA-R-247 – A request to amend the Comprehensive Zoning Ordinance for Augusta Georgia by adding Micro/Craft Breweries and Distilleries to Section 2 – Definitions and Section 22 – B-2 (General Business).

Director Wilson presented ZA-R-247 and requested the staff report be entered into the record.

Mr. Cunningham presented the slide presentation.

Mr. Dave Ellison, Savannah River Brewing Co., stated they have concerns regarding the amendment as presented. Their operation could be defined as a Nano Brewery and when they came

to town, they were required to locate in the LI or HI zones. Now any new one could set up in the B-2 zone with a Special Exception. A Brewpub as defined by the new Georgia law can be even bigger than a Nano Brewery and sell more volume along with other alcohol products and food. This give an unfair advantage to other operations.

Mr. Ellison stated that standard restricting the odors would limit the use of many locations. Brewing smells like oats.

Mr. Ellison stated that in his opinion there should be no Special Exception a use should be zoned or not.

He explained they chose their facility to have the potential to expand but they are just getting started. He felt there should be a significant delay in approving any new breweries to allow the two existing breweries to get established.

Mr. Tony Loop stated he is interested in possibly establishing a PICO brewery as part of the Southbound BBQ restaurant on Central Avenue. It could add a unique component to what the restaurant can offer its clientele. But they would not want to be in competition to the larger breweries.

Mr. Loop stated he feels acting on the new Georgia law is an opportunity for Augusta to become like other urban areas. PICOs are very common and will bring Augusta into the 21st Century.

Mr. George Claussen, Southbound Restaurant, 1857 Central Avenue, Augusta stated they would not attempt a large operation they are just looking to utilize an adjoining building into a partnership with the restaurant. The idea has great potential.

Mr. Loop stated Augusta needs this industry to attract and keep younger professionals in this area. PICOs will fit in with the ambience of downtown and Riverwalk.

Commissioner Pittman asked if the 2 existing breweries could go downtown or open satellites in the downtown.

Director Wilson stated the owner of the Riverwatch Brewery told her the State law allows that as an option. In addition, she explained that while all Nanos are capped at 3,000 barrels per year of on-site sale and/or consumption their bottling and distribution levels are higher. Those operations located in the LI and HI zones have more potential for expansion.

Director Wilson also stated that no one has expressed any interest in anything other than PICOs

Director Wilson explained there have been several public information meetings to allow for discussion on this topic staring in December 2016. The amendment may not be perfect but it is what we are recommending after our study of other municipalities.

Commissioner Williams stated he agreed with some of the concerns expressed here.

- Odor – things can be used to control odor issues and should be required. Any odors should be dealt with where the public is concerned.

Commissioner Williams understands people are scared of change and understands the objections but we need to invest in the area.  He is concerned that the Augusta Commission many not have a full understanding of the amendment. He suggested they meet on the subject to better understand it. The outcome is to draw business to Augusta.  He hopes to hear more at the Augusta Commission level about how to promote business and growth while helping the existing businesses to expand and profit.

A MOTION was made by Commissioner Pittman that ZA-R-247 be APPROVED.

MOTION died for lack of a second.

A MOTION was made by Commissioner Trammell that ZA-R-247 be CONTINUED to August meeting; seconded by Commissioner Spencer.

Commissioner Williams asked if a postponement would allow for more dialogue.

Chairman Cooks explained Georgia House Bill 85 goes into effect on September 1 and we were hoping to be ready for that.

Chairman Cooks called for the vote.

Commissioners Wright, Spencer, McCauley, Ivey, Hogg and Trammell voted in favor of the continuance.  MOTION carried.

10 Minutes from June 5, 2017

Commissioner Spencer asked that the minutes be corrected to note she was not present at the June meeting.

Director Wilson recommended approval of the June 5, 2017 minutes as corrected.

A MOTION was made by Commissioner Ivey that the June 5, 2017corrected minutes be APPROVED; seconded by Commissioner Garrett. MOTION carried unanimously.

11. List of Development Plans for June 2017

Director Wilson recommended approval of the list of Development Plans for June 2017.

A MOTION was made by Commissioner Wright that the Development Plans for June 2017 be APPROVED; seconded by Commissioner Garrett. MOTION carried unanimously.

12. List of Site Plans for June 2017

Exhibit H

000057

Director Wilson recommended approval of the list of Site Plans for June 2017.

A MOTION was made by Commissioner Ivey that the Site Plans for June 2017 be APPROVED; seconded by Commissioner Garrett. MOTION carried unanimously.

MEETING ADJOURNED

Recording Secretary:  Lois Schmidt

# EXHIBIT "I"

A true and accurate copy of the video referenced in Exhibit I is stored on a portable drive that will be filed and stored at Richmond County Clerk of Court's office.